# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAIʻI; STATE OF MAINE;
STATE OF MARYLAND; ATTORNEY
GENERAL DANA NESSEL FOR THE
PEOPLE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF
NEW YORK; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF
WISCONSIN; and CITY & COUNTY OF
SAN FRANCISCO,

                    *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; U.S. DEPARTMENT OF
HOMELAND SECURITY; BENJAMINE
HUFFMAN, in his official capacity as
Acting Secretary of Homeland Security; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK, in
her official capacity as Acting Secretary of
Health and Human Services; U.S. SOCIAL
SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity
as Acting Commissioner of U.S. Social
Security Administration, and UNITED
STATES OF AMERICA,

                    *Defendants*.

No. 1:25-cv-10139

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Plaintiffs bring this action to protect their states, localities, and residents from the President's flagrantly unlawful attempt to strip hundreds of thousands American-born children of their citizenship based on their parentage.

2.    The principle of birthright citizenship has been enshrined in the Constitution for more than 150 years. The Citizenship Clause of the Fourteenth Amendment unambiguously and expressly confers citizenship on "[a]ll persons born" in and "subject to the jurisdiction" of the United States.  More than 125 years ago, the Supreme Court confirmed that this entitles a child born in the United States to noncitizen parents to automatic citizenship. *See United States v. Wong Kim Ark*, 169 U.S. 649 (1898). Congress subsequently codified that understanding in the Immigration and Nationality Act (8 U.S.C. § 1401). And the Executive Branch has long recognized that any attempt to deny citizenship to children based on their parents' citizenship or immigration status would be "unquestionably unconstitutional."

3.    President Trump now seeks to abrogate this well-established and longstanding Constitutional principle by executive fiat.  Just hours after taking office, he signed an executive order titled "Protecting the Meaning and Value of American Citizenship," (attached hereto as Exhibit A), which declares that birthright citizenship does not extend to any child born in the United States to a mother who is unlawfully present or lawfully present on a temporary basis and a father who is neither a U.S. citizen nor a lawful permanent resident. On the basis of this unlawful declaration, the President prescribes that the federal government shall not issue or recognize any document recognizing citizenship for any such child born after February 19, 2025. The President has no authority to rewrite or nullify a constitutional amendment or duly enacted statute. Nor is he empowered by any other source of law to limit who receives United States citizenship at birth.

4.      If this unprecedented executive action is allowed to stand, both Plaintiffs and their residents will suffer immediate and irreparable harm. Every year, thousands of children are born in Plaintiffs' jurisdictions to parents who lack legal status or have a lawful status on a temporary basis. Under the Order, such children born after February 19, 2025—who would have been unquestionably deemed citizens had they been born two days ago—will lack any legal status in the eyes of the federal government. They will all be deportable, and many will be stateless. They will lose the ability to access myriad federal services that are available to their fellow Americans. And despite the Constitution's guarantee of their citizenship, they will lose their rights to participate in the economic and civic life of their own country—to work, vote, serve on juries, and run for certain offices.

5.      The Order will also cut federal funding on which Plaintiff States rely to provide essential services to the most vulnerable children living within their borders:  basic healthcare access for low-income children, foster care services for neglected and abused kids, and early interventions for infants, toddlers, and students with disabilities.  Plaintiffs will also be required—on no notice and at considerable expense—to immediately begin modifying their administration of benefits programs to account for this change.

6.      The Court should declare that the policy announced by the Order is unlawful and enjoin any actions taken to implement it.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The

Commonwealth of Massachusetts is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Massachusetts.

**PARTIES**

**A.    Plaintiffs**

9.    The Commonwealth of Massachusetts is a sovereign state of the United States of America.

10.    The Attorney General of Massachusetts is the Commonwealth's chief lawyer and law enforcement officer and is authorized to act in federal court on behalf of the Commonwealth on matters of public concern.

11.    Massachusetts is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Massachusetts, receiving benefits in Massachusetts, and receiving government services in Massachusetts, harms Massachusetts' sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

12.    The State of New Jersey is a sovereign state of the United States of America.

13.    The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

14.    New Jersey is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in New Jersey, receiving benefits in New Jersey, and receiving government services in New Jersey, harms New Jersey's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

15.    The State of California is a sovereign state of the United States of America.

16.     The Attorney General of California is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

17.     California is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in California, receiving benefits in California, and receiving government services in California, harms California's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

18.     The State of Colorado is a sovereign state of the United States of America.

19.     The Attorney General of Colorado is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

20.     Colorado is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Colorado, receiving benefits in Colorado, and receiving government services in Colorado, harms Colorado's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

21.     The State of Connecticut is a sovereign state of the United States of America.

22.     The Attorney General of Connecticut is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

23.     Connecticut is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Connecticut, receiving benefits in Connecticut, and receiving government services in Connecticut, harms Connecticut's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

24.     The State of Delaware is a sovereign state of the United States of America.

25.     The Attorney General of Delaware is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

26.     Delaware is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Delaware, receiving benefits in Delaware, and receiving government services in Delaware, harms Delaware's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

27.     The District of Columbia (the "District") is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.

28.     The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

29.     The District of Columbia is aggrieved and has standing to bring this action because Defendants' efforts to strip citizenship from United States citizens born and residing in the District, receiving benefits in the District, and receiving government services in the District, harms the District's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

30.     The State of Hawai'i is a sovereign state of the United States of America.

31.     The Attorney General of Hawai'i is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

32.     Hawaiʻi is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Hawaiʻi, receiving benefits in Hawaiʻi, and receiving government services in Hawaiʻi, harms Hawaiʻi's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

33.     The State of Maine is a sovereign state of the United States of America.

34.     The Attorney General of Maine is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

35.     Maine is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Maine, receiving benefits in Maine, and receiving government services in Maine, harms Maine's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

36.     The State of Maryland is a sovereign state of the United States of America.

37.     The Attorney General of Maryland is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

38.     Maryland is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Maryland, receiving benefits in Maryland, and receiving government services in Maryland, harms Maryland's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

39.     The State of Michigan is a sovereign state of the United States of America.

40.     The Attorney General of Michigan is the State's chief law enforcement officer and is authorized to act in federal court on behalf of the People of the State on matters of public concern.  M.C.L. 14.28.

41.     The People of Michigan are aggrieved and have standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in Michigan, receiving benefits in Michigan, and receiving government services in Michigan, harms the People of Michigan's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

42.     The State of Minnesota is a sovereign state of the United States of America.

43.     The Attorney General of Minnesota is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

44.     Minnesota is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Minnesota, receiving benefits in Minnesota, and receiving government services in Minnesota, harms Minnesota's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

45.     The State of Nevada is a sovereign state of the United States of America.

46.     The Attorney General of Nevada is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

47.     Nevada is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Nevada, receiving benefits in Nevada, and receiving government services in Nevada, harms Nevada's sovereign,

proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

48.     The State of New Mexico is a sovereign state of the United States of America.

49.     The Attorney General of New Mexico is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

50.     New Mexico is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in New Mexico, receiving benefits in New Mexico, and receiving government services in New Mexico, harms New Mexico's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

51.     The State of New York is a sovereign state of the United States of America.

52.     The Attorney General of New York is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

53.     New York is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in New York, receiving benefits in New York, and receiving government services in New York, harms New York's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

54.     The State of North Carolina is a sovereign state of the United States of America.

55.     The Attorney General of North Carolina is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

56.     North Carolina is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing

in North Carolina, receiving benefits in North Carolina, and receiving government services in North Carolina, harms North Carolina's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

57.    The State of Rhode Island is a sovereign state of the United States of America.

58.    The Attorney General of Rhode Island is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

59.    Rhode Island is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Rhode Island, receiving benefits in Rhode Island, and receiving government services in Rhode Island, harms Rhode Island's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

60.    The State of Vermont is a sovereign state of the United States of America.

61.    The Attorney General of Vermont is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

62.    Vermont is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Vermont, receiving benefits in Vermont, and receiving government services in Vermont, harms Vermont's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

63.    The State of Wisconsin is a sovereign state of the United States of America.

64.    The Attorney General of Wisconsin is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

65.     Wisconsin is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Wisconsin, receiving benefits in Wisconsin, and receiving government services in Wisconsin, harms Wisconsin's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

66.     Plaintiff the City and County of San Francisco, represented by and through its City Attorney, is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

67.     San Francisco is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in San Francisco, receiving benefits in San Francisco, and receiving government services in San Francisco, harms San Francisco's interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

**B.    Defendants**

68.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

69.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing the Order. DHS is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1)

70.     Defendant Benjamine Huffman is the Acting Secretary of Homeland Security. He is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. He is sued in his official capacity.

71.     Defendant U.S. Social Security Administration (SSA) is a federal agency responsible for administering federal retirement, survivors, and disability income programs, as

well as the program of supplemental security income (SSI) for the aged, blind, and disabled. SSA is responsible for implementing the Order.  SSA processes applications for and issues Social Security Numbers (SSNs) to eligible applicants. SSA is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552.

72.     Defendant Michelle King is the Acting Commissioner of the SSA. The Office of the Commissioner is directly responsible for all programs administered by the SSA, including the development of policy, administrative and program direction, and program interpretation and evaluation. She is sued in her official capacity.

73.     Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the Order. The State Department is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1). It is authorized by law to grant and issue passports. 22 U.S.C. § 211a.

74.     Defendant Marco Rubio is the Secretary of State. He is responsible for carrying out the President's foreign policies through the State Department and Foreign Service of the United States. Among other duties, the Secretary of State administers the State Department and grants and issues passports to American citizens. 22 U.S.C. § 211a. He is sued in his official capacity.

75.     Defendant U.S. Department of Human & Health Services (HHS) is a federal cabinet agency responsible for implementing the Order. HHS is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1). HHS is the federal cabinet agency responsible for the Medicaid and CHIP health insurance programs.

76.     Defendant Dorothy Fink is the Acting Secretary of HHS. She is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's Operating Divisions. She is sued in her official capacity.

77.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Order.

## ALLEGATIONS

### A.    The Constitution Guarantees Citizenship to All Individuals Born in the United States and Subject to its Jurisdiction

78.     Section 1 of the Fourteenth Amendment to the United States Constitution states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This provision is known as the Citizenship Clause. The Citizenship Clause's text and history—as well as judicial precedent and longstanding Executive Branch interpretation—confirm that the clause automatically confers citizenship on all individuals born in the United States and subject to its jurisdiction, regardless of the citizenship or immigration status of their parent(s).

79.     Prior to the Fourteenth Amendment's adoption, the Constitution referenced U.S. citizenship, *see, e.g.*, U.S. Const. art. I, §§ 2-3; *id.* art. IV, § 2, including the concept of citizenship by birth, *see id.* art. II, § 1, without defining who was entitled to it, leaving that instead to common law. In the early nineteenth century, most U.S. judges had adopted the British common law tradition of *jus soli*, that is, that anyone born within the territorial limits of a nation, was thereby a subject of that nation.

80.     By the mid-nineteenth century, however, disagreement percolated regarding the citizenship status of freed slaves, culminating in the Supreme Court's notorious pronouncement in *Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857), that descendants of slaves could not be U.S. citizens.

81.     In the wake of the Civil War, the Fourteenth Amendment's Citizenship Clause was proposed to overrule *Dred Scott* and to comprehensively define who was entitled to United States

citizenship. In adopting the language of the Citizenship Clause, the 39th Congress chose to return to the pre-*Dred Scott* common law rule that birth within the United States conveys United States citizenship. Indeed, when proposing the language of the Citizenship Clause to the Senate, Senator Jacob M. Howard of Michigan explained that, "[t]his amendment … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is … a citizen of the United States."

82.    While the intent to overrule *Dred Scott* was apparent, the Congressional debate over whether to adopt the Citizenship Clause focused on individuals *other* than descendants of slaves who would be entitled to citizenship were the proposal adopted.

83.    Though some senators disagreed, the majority view was that Native American tribal members living on tribal territory or unincorporated lands would not become citizens by virtue of the Citizenship Clause because they belonged to their own sovereign nations. By contrast, no one contested that the Clause would confer citizenship on American-born children of foreigners, such as Chinese immigrants living in California or so-called "Gypsy" settlers living in Pennsylvania— though some senators opposed the Clause for this very reason.

84.    Undergirding the debate was the universal understanding that the Citizenship Clause, if adopted, would confer citizenship upon anyone born in the United States and "subject to its jurisdiction," excluding only persons not fully subject to the sovereign authority of the United States, such as tribal members and the children of foreign ministers, who enjoyed common law immunity from local law.

85.    Ultimately the Citizenship Clause was passed and ratified as part of the Fourteenth Amendment. The Citizenship Clause reaffirmed the longstanding common law principle of *jus soli* as the default rule of citizenship in the United States: All individuals born in the United States and

subject to its jurisdiction are citizens. Its operation is automatic. No further action is required for individuals born in the United States to "become" citizens and no additional limitations are imposed.

86.    Unlike the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, which empowers Congress to set rules for naturalization, the Constitution nowhere else speaks to citizenship by birth in the United States and nowhere empowers the President or Congress to set additional requirements that override or conflict with the Citizenship Clause's plain and broad grant of automatic citizenship to individuals born in the United States.

87.    The Citizenship Clause contains no exceptions based on the citizenship or immigration status of one's parent(s). Rather, the Citizenship Clause's only requirements are that an individual be born "in the United States" and "subject to the jurisdiction thereof."

88.    There is no exception to the Citizenship Clause's plain and unconditional grant of U.S. citizenship to all born on American soil and subject to the United States' sovereign authority. Only those not fully subject to United States law fail to acquire U.S. citizenship by virtue of being born on U.S. soil. This includes members of Native American tribes, who are subject to tribal law; the children of agents of foreign sovereigns and those born on foreign public ships, to the extent that they enjoy immunity from United States law; and the children of foreign enemies within and during a hostile occupation, who are subject to martial law on account of the occupation.

89.    The Supreme Court cemented this longstanding and established understanding of the Citizenship Clause more than 125 years ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). There, the Court forcefully rejected a challenge to the citizenship of a man who had been born in San Francisco, California to parents who were Chinese nationals. Residing primarily in the United States, Ark briefly left the United States for China in 1894, and upon his return in August

1895, was detained at the Port of San Francisco by the Collector of Customs, denying him entry by contending he was not a U.S. citizen despite having been born in the United States. The Court explained that the "clear words and ... manifest intent" of the Citizenship Clause confers citizenship upon "all children here born of resident aliens," "whatever [the] race or color" of their parents.

90.    The Executive Branch has embraced this understanding of the Citizenship Clause for more than a century. Indeed, in 1995, the Office of Legal Counsel (OLC) provided a statement to Congress opining that proposed legislation that would deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be "unquestionably unconstitutional." *See* 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *1-2 (1995). The OLC's statement recognizes that "[t]hroughout this country's history, the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship." *Id.* at *1. As OLC explained: "Congress and the States adopted the Fourteenth Amendment in order to place the right of citizenship based on birth within the jurisdiction of the United States *beyond question*. Any restriction on that right contradicts both the Fourteenth Amendment and the underlying principle that the amendment safeguards." *Id.* (emphasis added). Indeed, the OLC statement and opinion explain that "children born in the United States of aliens are subject to the full jurisdiction of the United States," and that "as consistently recognized by courts and the Attorneys General for over a century, most notably by the Supreme Court in *United States v. Wong Kim Ark*, there is no question that they possess constitutional citizenship under the Fourteenth Amendment." *Id.*

91.    In 1952, Congress enacted the Immigration and Nationality Act, codifying the Citizenship Clause's language into statute. *See* Pub. L. No. 82-414, § 301, 66 Stat. 163, 235.

Mirroring the language of the Citizenship Clause, Section 301(a) of the Act, codified at 8 U.S.C. § 1401(a), provides that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth."

92.     Federal, state, and local agencies rely on this fundamental and longstanding constitutional grant of birthright citizenship in implementing various federal programs. For example, federal law gives the United States Department of State the authority to issue U.S. passports. 22 U.S.C. § 211(a). As explained in the State Department's Foreign Affairs Manual, "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth." 8 F.A.M. 301.1(d) (Acquisition by Birth in the United States). Indeed, the U.S. State Department's Application for a U.S. Passport confirms that for "Applicants Born in the United States," a U.S. birth certificate alone is sufficient to prove one's citizenship. USCIS likewise confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship."[1]

93.     The SSA also has long accepted that all children born in the United States are citizens. Under current public guidance, SSA states that "[t]he easiest way to get a Social Security Number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital."[2] With respect to citizenship, SSA explains that for children born in the United States, the child's U.S. birth certificate is proof of U.S. citizenship.[3]

---

[1] Available at: https://perma.cc/RY93-S2DR .
[2] Available at: https://perma.cc/MN8K-Y3V6.
[3] *Id.* at 2-3.

94.    SSA's guidance is consistent with federal regulations, which establish that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence ... that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). Indeed, for newborn babies, SSA utilizes what is called "Enumeration at Birth." Under that program, SSA enters into agreements with States to streamline the process for obtaining SSNs. Where a parent requests an SSN as part of an official birth registration process, the States' vital statistics offices electronically transmit the request to SSA along with the child's name, date and place of birth, sex, mother's maiden name, father's name, address of the mother, and birth certificate number. That information alone is used to establish the age, identity, and U.S. citizenship of the newborn child. 20 C.F.R. § 422.103.

## B.    The President Acted Without Legal Authority in Purporting to Strip Individuals of Their U.S. Citizenship

95.    President Trump's public statements make clear that he wishes to end birthright citizenship purely as a policy tactic to purportedly deter immigration to the United States. Despite a President's broad powers to set immigration policy, however, the Citizenship Stripping Order falls far outside the legal bounds of the President's authority.

96.    During his most recent campaign for President, for example, then-candidate Trump made clear that an Executive Order would issue "[o]n Day One" to "stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens."[4] As he explained, the goal is for this Executive Order to "eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal

---

[4] Available at: https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism

aliens in the U.S. to return home."[5] It is also designed to stop what President Trump calls "Birth Tourism."

97.     After the 2024 election, President-Elect Trump continued to state that birthright citizenship should be ended. In December 2024, for example, President-Elect Trump again promised an executive order "directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen."[6]

98.     The Order declares that birthright citizenship does not extend to any individual born to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.  On the basis of this unconstitutional declaration, the Order announces a new federal policy:  no federal agency "shall issue documents recognizing United States citizenship, or accept documents ... purporting to recognize United States citizenship" for such individuals who are born after February 19, 2025 ("Affected Children").

99.     The Order instructs all executive departments and agencies to implement this policy and specifically directs the Departments of State, Justice, and Homeland Security, and Social Security Administration, to act in accordance with this policy.

100.     Not only does the Order strip the Affected Children of their citizenship, it does not confer on them any lawful status and therefore renders their presence in the United States unauthorized.  Because the Order instructs all federal agencies to refuse to issue or accept any written recognition of an Affected Child's citizenship, it leaves the Affected Children ineligible for a range of federal services and programs that are unavailable to undocumented individuals.

---

[5] *Id.*
[6] Available at: https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291

101.    The Constitution does not empower the President to set rules regarding citizenship at birth.

102.    The Constitution does not empower the President to condition citizenship at birth on the citizenship or immigration status of one's parents.

103.    The Constitution does not empower the President to unilaterally amend the Fourteenth Amendment.

104.    The Constitution does not empower the President to deny citizenship to individuals born in the United States.

105.    The Constitution and federal law confer automatic citizenship to individuals born in the United States and subject to its jurisdiction. The Constitution removes control over the grant of citizenship from the category of legitimate policy options the President and Congress may exercise to address immigration policy issues. As the Office of Legal Counsel explained when discussing the unconstitutionality of such proposals, "the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *5.

## C.    United States Citizens Are Entitled to All Rights and Benefits of Citizenship as Defined by Law

106.    United States citizens are entitled to a broad array of rights and benefits as a result of their citizenship. Stripping individuals of their citizenship will result in an immediate and irreparable harm to those individuals and to Plaintiffs.

107.    Natural born United States citizens are not subject to deportation from the United States. They may obtain a U.S. passport, travel abroad, and re-enter the United States as they wish.

108.    Individuals over 18 years of age who are United States citizens are eligible to vote in federal, state, and local elections. U.S. Const. amend. XXVI; *see, e.g.*, N.J. Const. Art. II § 1, ¶3, as amended; Cal. Const. art. II, § 2; Mass. Const. amend. III, as amended; N.Y. Const. Art. II, § 1; N.Y. Elec. Law § 5-102(1). The right to vote is a fundamental political right.

109.    Individuals over 18 years of age who are United States citizens are eligible to serve on federal and state juries. 28 U.S.C. § 1865(b)(1); *see, e.g.*, N.J. Stat. Ann. § 2B:20-1; Cal. Code Civ. Proc., § 203; Mass. G.L. c. 234A, §§ 2-4.

110.    Individuals who are United States citizens may petition for immigration status for family members including spouses, children, parents, and siblings. *See* 8 U.S.C. §§ 1151(b)(2)(A), 1153(a).

111.    Individuals who are natural born United States citizens are eligible for election to the offices of President and Vice President of the United States. U.S. Const. art. 2, § 1; U.S. Const. amend. XII.

112.    Individuals who are United States citizens are eligible for election to the United States House of Representatives and the United States Senate. U.S. Const. art. 1, §§ 2-3.

113.    Individuals who are United States citizens or nationals are eligible for appointment to competitive service Federal jobs. Executive Order 11935 (Sept. 2, 1976); 5 C.F.R. § 7.3(b).

114.    Depending on immigration or citizenship status, Plaintiffs' residents may also be eligible to participate in a number of federal and state programs that ensure the health and welfare of individuals, families, and communities. Those include programs administered by the States and jointly funded by federal and state dollars. These programs provide healthcare coverage, foster care and custodial services, and economic assistance to vulnerable children and those in need.

**D.      Those Stripped of Citizenship Will be Grievously Harmed.**

115.    The Order will deny over one hundred and fifty thousand children nationwide their birthright to citizenship over the course of a year. According to a 2025 analysis by the National Demographics Corporation, in 2022, an estimated 153,000 children nationwide were born to two parents who were noncitizens and lacked legal status.  Many of these births were in the Plaintiffs' jurisdictions—for example, an estimated 4,200 such births in Massachusetts, 6,200 in New Jersey, and 24,500 in California in 2022.

116.    Further, a report by the Center for Immigration Studies estimated that, in 2014, more than 125,000 children were born to undocumented mothers in the Plaintiff States alone. *See* https://cis.org/Report/Births-Legal-and-Illegal-Immigrants-US#2.

117.    These many thousands of children may never be able to naturalize, nor to obtain citizenship from any other nation. They will be ineligible for most federal public benefits, including federal student financial aid, and they will live under a constant threat of deportation. And as they age, they will be unable to work lawfully, or to participate in American political life as voters or elected officials.

118.    Their ability to travel will be limited. They will be ineligible for a REAL ID Act compliant driver's license or identification card, which will be required for all air travel, including domestic flights, as of May 7, 2025. *See* 49 U.S.C. § 30301. They will be ineligible for a United States passport. And if they depart the country, they will be unable lawfully to reenter.

119.    Further, as compared to citizens and lawfully present immigrants, children without lawful status within a country suffer myriad negative impacts on their health and wellbeing. Such children may fail to access health services for which they may be eligible on account of fear of deportation and harassment from authorities. As a result, they may not receive critical preventive care, such as screenings and vaccinations, which has negative impacts on the broader public health.

Further, undocumented children face anxiety over arrest, and detention, and removal of family members due to immigration status, leading to increased child trauma and harm.

120.    If these American-born children without lawful status remain in the country and themselves have children, those children will inherit their parents' lack of lawful status. The result will be a multigenerational class of marginalized families, who with each generation grow increasingly disconnected from any country but the United States, yet will remain forever outsiders.

**E.    Plaintiffs Will be Irreparably Injured by the Order.**

121.    Plaintiffs will be irreparably injured by the Order separate and apart from the grievous harms their residents will suffer as a result of the Order, principally by forcing Plaintiffs to assume a greater fiscal burden for providing essential services and assistance to tens of thousands of residents.

122.    Plaintiffs administer numerous programs for the benefit of their residents, including for newborns and young children. Some of these programs are funded in part by federal dollars, with federal funding frequently tied to the citizenship and immigration status of the individuals served. As detailed below, stripping individuals of their citizenship and rendering them without a qualifying immigration status will render them ineligible to receive partially federally funded benefits. In many Plaintiffs' jurisdictions, these individuals will be left to rely on state-only funded benefits, causing direct and measurable financial harm to Plaintiffs. In other cases, the individuals may be left without adequate assistance, imposing other harms on Plaintiffs.

**Healthcare Expenditures**

123.    The Medicaid and CHIP health insurance programs were created by federal law and are jointly funded by the federal government. Medicaid provides health insurance for individuals, including children, whose household incomes fall below certain eligibility thresholds that vary

slightly by state. CHIP provides health insurance coverage for children whose household incomes exceed the eligibility thresholds for Medicaid but fall below a separate threshold. Medicaid and CHIP are administered by States, but the Federal Government covers a substantial portion of the costs, reimbursing States for between 50 and 75 percent of expenditures on eligible children.

124.    Individuals who are not U.S. citizens and lack a qualifying immigration status are ineligible for Medicaid and CHIP (except for certain emergency medical services). 8 U.S.C. § 1611(a), (c)(1)(B); 8 U.S.C. § 1612(b)(3)(C); 42 U.S.C. § 1396b(v); 42 C.F.R. § 435.406. Consequently, States do not receive federal reimbursement for healthcare expenditures for such individuals.

125.    Nonetheless, many Plaintiff States, including New Jersey, Massachusetts, California, New York, and Connecticut provide State-funded healthcare coverage for children who would be eligible for Medicaid or CHIP but for the fact that they are not United States citizens or qualifying noncitizens.  These States do so because ensuring healthcare access for all their residents improves public health. Access to health insurance increases utilization of preventative healthcare, limits the spread of communicable illnesses, and minimizes financial burdens on healthcare providers.

126.    In States that ensure affordable healthcare for children regardless of immigration or citizenship status, the Order will not change the fact that all income-eligible children residing in these States can access public healthcare. But it will increase the fiscal burden on these States of ensuring this critical access. As a result of the Order, newborns who would otherwise be eligible for federally-funded Medicaid or CHIP will lack that eligibility, causing States like New Jersey, Massachusetts, California, New York, and Connecticut to bear the full cost of ensuring that these newborns receive healthcare.

127.    For example, New Jersey fully funds public health insurance for children who meet the income eligibility guidelines for federal Medicaid or CHIP, but who do not qualify for those programs because they are not United States citizens or qualifying noncitizens. New Jersey receives no federal funding for providing such coverage, with the exception of certain limited emergency medical services that may be covered by federal Medicaid.

128.    By contrast, when New Jersey funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, then New Jersey receives a federal reimbursement of 50 to 65 percent of its expenditures.

129.    New Jersey will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing millions of dollars per year in federal reimbursement it would have received if the citizenship of these children were still recognized by the federal government.

130.    Similarly, the Order will force California to bear direct and substantial financial costs and administrative burdens to its Medicaid and related programs.

131.    Since 2015, California has also provided full-scope, state-funded health insurance coverage to all children who meet the income eligibility guidelines for federal Medicaid or CHIP but do not qualify for those programs because they are not United States citizens or qualifying noncitizens. California receives no federal funding for providing such coverage, with the exception of certain limited emergency medical services that may be covered by federal Medicaid.

132.    By contrast, when California funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, California receives a federal reimbursement of 50 to 65 percent of its expenditures.

133.    California will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing tens of millions of dollars per year in federal reimbursement it would have received if the citizenship of these children were still recognized by the federal government.

134.    The same circumstances exist in Massachusetts: the Order will cause financial harm to the Commonwealth in connection with public healthcare programs.

135.    Massachusetts funds public health insurance for children who meet the income eligibility guidelines for federal Medicaid or CHIP, but who do not qualify for those programs because they are not United States citizens or qualifying noncitizens. Massachusetts receives no federal matching funds for providing such coverage, with the exception of certain limited emergency medical services that may be covered by Federal-State Medicaid.

136.    By contrast, when Massachusetts funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, then Massachusetts receives a federal reimbursement of 50 to 65 percent of its expenditures.

137.    Massachusetts currently spends an average of approximately $4,800 per year per child enrolled in Massachusetts' partially federally-funded public health insurance program.

138.    Massachusetts will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing federal reimbursements it would have received if the citizenship of these children were still recognized by the federal government.

139.    Similarly, New York has a program for ensuring healthcare coverage for its most vulnerable residents known as Child Health Plus. Child Health Plus predates the federal CHIP

program, and was one of three state health insurance plans for low-income children whose benefit package was grandfathered in after the creation of CHIP. Child Health Plus is available to children who (i) are under the age of 19, (ii) reside in New York, (iii) are not eligible for Medicaid, and (iv) do not have any other health insurance coverage or access to or enrollment in state health benefits, the New York State Health Insurance Program (NYSHIP). Depending on household income, children's coverage may be fully or partially subsidized. Children in households above the income threshold for subsidized coverage, 400% of the federal poverty level, may purchase the program at full cost if otherwise eligible. New York's Child Health Plus program offers coverage through twelve health plans throughout the state with an extensive network of participating providers and covers a host of services including well-child care, immunizations, emergency care, prescription and non-prescription drugs if ordered by a licensed provider, outpatient surgery, and more. Child Health Plus is available regardless of immigration status.

140.    New York children that are United States citizens or have a qualifying immigration status under federal law are eligible for federal financial participation (FFP) in the Medicaid or CHIP programs. Children eligible for FFP in Medicaid generally receive a 50% federal match, while children enrolled in Child Health Plus receive a 65% federal match. Children enrolled in the Medicaid expansion group (ages 6-18, and whose families are living at 100-154% of the federal poverty level) receive the enhanced CHIP match of 65%, which is funded under Title XXI of the Social Security Act. For undocumented children, the State pays the entirety of the cost of coverage through the Child Health Plus program. As of October of 2024, a combined 2.4 million children under age 19 in New York State had been enrolled in either Medicaid or Child Health Plus, of whom 571,386 were enrolled Child Health Plus.

141.    Under the Order, thousands of babies born in New York each year will only qualify for the state-funded program, resulting in a loss of millions of dollars in federal funding. New York instead will be forced to bear the direct and substantial costs and administrative burdens to its Medicaid and Child Health Plus programs as a result of the Order. Children who previously would be eligible for the Medicaid and/or CHIP healthcare programs that are currently eligible for FFP will no longer be eligible for federally subsidized coverage. Instead, their health care coverage will be entirely state-funded, or they may forego healthcare coverage altogether and may instead seek only emergency healthcare.

142.    Similarly, the Order will force Connecticut to bear direct and substantial financial costs and administrative burdens to its Medicaid and related programs.

143.    Connecticut's HUSKY Health is the State's program that provides comprehensive health insurance coverage to all qualifying Connecticut residents, and it includes Connecticut's partially federally-funded Medicaid and CHIP programs. Connecticut's DSS is Connecticut's Medicaid authority and functions as one of the largest providers of health coverage in Connecticut. It is a leader in ensuring Connecticut residents have access to high-quality, affordable healthcare, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut. DSS provides healthcare for over 1 million state residents annually through HUSKY.

144.    Any child through age 15, regardless of immigration status, residing in Connecticut whose family income is at or below 323 percent of the Federal Poverty Level is eligible for free or low-cost healthcare coverage under HUSKY. HUSKY also covers all citizen children and non-citizens with qualifying immigration statuses up to 323% FPL through age 18.

145.    Connecticut children that are United States citizens or have a qualifying immigration status under federal law are eligible through HUSKY for the partially federally-funded Medicaid or CHIP programs. Federal funding for children enrolled in Medicaid or CHIP in Connecticut provided at different rates. Historically, CHIP federal match has been 65 percent. It was increased as high as 88 percent for a period of time in recent years, but now is at 65 percent. This means that coverage provided to eligible children under the CHIP funding structure results in federal funds covering a higher portion of the expenses compared to Medicaid, where federal funding normally covers 50 percent of the expenses.

146.    Children who would have been eligible for Connecticut's Medicaid or CHIP-funded coverage programs had they met immigration status requirements receive coverage through the 100 percent state-funded State HUSKY program. Connecticut law requires such coverage to be provided to all children who apply and are eligible.

147.    Based on DSS's most recent data for 2024, there were over 5,500 children born who were eligible for HUSKY and born to mothers who qualified for state-funded postpartum coverage because the mother could not qualify for Medicaid due to their immigration status.  If the children covered under Medicaid and CHIP became ineligible due to a loss of citizenship and moved to State-funded coverage, that would result in a loss of over $10,000,000 in federal reimbursements to Connecticut and a corresponding increase to State expenditures of the same amount.

148.    Some Plaintiff States, including Michigan, do not have a fully state-funded health insurance program for children who do not meet the citizenship or immigration status eligibility requirements for Medicaid or CHIP.  In those states, healthcare facilities and medical providers

who provide treatment to these children, including public providers, will incur greater costs in the form of uncompensated care.

### Special Education Expenditures

149.    That thousands of children born in Plaintiffs' jurisdictions over the next year will lose Medicaid eligibility as a consequence of the Order also increases education expenditures.

150.    Plaintiffs are required by the U.S. Individuals with Disabilities in Education Act (IDEA) to provide certain early intervention and special education services to infants, toddlers, and students with disabilities. *See* 20 U.S.C. § 1400(d)(1)(A); 20 U.S.C. § 1412(a)(1). Consistent with constitutional and statutory requirements, Plaintiffs provide these services to all children who need them, regardless of the child's immigration status. *See* 20 U.S.C. § 1400 et seq.; *Plyler v. Doe*, 457 U.S. 202 (1982).

151.    The federal government reimburses a percentage of these costs when the services are provided to a child who is enrolled in Medicaid. By contrast, when the services are provided to a noncitizen child who is ineligible for Medicaid because they lack any lawful immigration status, the federal government provides no reimbursement. By stripping children born in Plaintiffs' jurisdictions of citizenship they otherwise would acquire at birth, the Order thus causes Plaintiffs to lose federal reimbursement for providing IDEA-required services to such children.

152.    For example, the IDEA requires States to provide Early Intervention Services (EIS), such as speech or occupational therapy, to children up to three years old with certain disabilities or developmental delays. And, New Jersey, for example, ensures that *all* infants and toddlers within its borders who need EIS receive it, regardless of citizenship or immigration status. The federal government reimburses New Jersey for 50% of its EIS expenditures—but only for EIS provided to Medicaid-enrolled children.

153.    As noted above, of the estimated 6,200 children who will be born in New Jersey over the next year yet denied citizenship pursuant to the Order, New Jersey estimates that at least 4,000 would be eligible for Medicaid, and several more for CHIP, but for their loss of citizenship status.

154.    It is highly likely that some of these children will receive EIS over the next year. In a 2023 report, the United States Government Accountability Office found that about 7 percent of children nationwide received EIS at some point in the most recent 12-month period.[7] Applying that percentage to New Jersey's estimate of the number of children who will be born in the State over the next year, yet denied citizenship pursuant to the Order, and be eligible for Medicaid or CHIP, New Jersey estimates that it will provide EIS to approximately 280 such children born in the State over the next year.

155.    New Jersey, for example, will provide EIS to these infants and toddlers, but it will bear the full cost of doing so, losing the 50% federal reimbursement it would receive if the citizenship of these children were still recognized by the federal government.

156.    Plaintiffs will also lose federal funding related to the provision of certain required medical services provided at school to students with disabilities. 34 C.F.R. § 300.101(c).

157.    The Social Security Act authorizes the federal Medicaid program to reimburse local education agencies, such as school districts, for medically necessary health services that are covered in the State's Medicaid plan and provided at school to Medicaid-enrolled students with disabilities in accordance with the student's individualized education program (IEP). An IEP identifies special education and related services, and program modifications and supports, that a

---

[7] *See* GAO, Special Education, Additional Data Could Help Early Intervention Programs Reach More Eligible Toddlers, GAO-24-106019, at 9 (Oct. 2023).

school must provide for a child with a disability. Children as young as three years old can have IEPs which require that the child be provided school-based health services (SBHS).

158.    To receive reimbursement for the provision of special education SBHS provided to Medicaid-enrolled students, a local education agency submits a reimbursement claim to the federal government, and the federal government partially reimburses the State and the local education agency for that expenditure.

159.    New Jersey, for example, retains 65% of the reimbursement provided by the federal government for a local education agency's provision of special education SBHS. Connecticut, as another example, retains 50% of the reimbursement provided by the federal government for a local education agency's provision of special education SBHS.

160.    In New Jersey and Connecticut, local education agencies are required to provide any special education SBHS that are specified in a student's IEP to that student free of charge, regardless of the student's citizenship or immigration status. However, the federal government will not provide any reimbursement for special education SBHS provided to students without lawful status, because such students are not Medicaid-eligible.

161.    The Order will render students who would have been enrolled in Medicaid ineligible for Medicaid. For any such students who have an IEP that requires special education SBHS, local education agencies will not be able to submit reimbursement claims to the federal government to help cover the costs of providing the student's special education SBHS.

162.    New Jersey, in turn, will not receive its 65% share of the federal reimbursement for special education SBHS provided by its local education agencies. And Connecticut likewise will not receive its 50% share of the federal reimbursement for special education SBHS provided by its local education agencies.

163.    Thus, the Order will cause Plaintiffs, including New Jersey and Connecticut, not to receive funding they would have received but for the Order.

**Child Welfare Expenditures**

164.    In addition to causing Plaintiff States to lose federal funding related to children's healthcare and education, the Order will cause Plaintiff States to lose federal funding related to the provision of foster care, adoption, and guardianship services.

165.    Many Plaintiff States' child welfare systems are funded in part by the U.S. Department of Health and Human Services Federal Foster Care Program, known as "Title IV-E." Federal funding under Title IV-E reimburses a portion of a State's administrative expenses and maintenance payments for children in State care. Maintenance payments include foster care assistance, adoption assistance, and guardianship assistance, and cover the cost of providing children in State care with basic necessities, including food, clothing, shelter, daily supervision, and school supplies.

166.    The amount of each type of reimbursement depends on the number of children to whom a State has provided foster care and related services and who meet Title IV-E eligibility criteria. As to administrative expenses, States are reimbursed for a portion of such expenditures based on a formula that is tied to the percentage of children in the State's care who meet Title IV-E eligibility criteria. As to maintenance payments, State are reimbursed only for expenditures on maintenance provided to Title IV-E eligible children.

167.    Children who are neither citizens nor have a lawful immigration status are not Title IV-E eligible. 8 U.S.C. §§ 1611 (a), (c)(1)(A).

168.    Nonetheless, many Plaintiff States, including New Jersey, Connecticut, and Massachusetts, provide child welfare services to any child in their borders who need them

regardless of their citizenship or immigration status. This will include children who would have been U.S. citizens but for the Order.

169.    Plaintiff States will provide any child welfare services needed by such children, but they will not receive any Title IV-E funding to do so. By contrast, if the Order were enjoined and the citizenship of these children recognized, Plaintiff States would receive Title IV-E funding for providing them with care. Thus, the Order results in a loss to the States equivalent to the amount of Title IV-E funding Plaintiff States would receive but for the Order.

170.    For example, New Jersey provides child welfare services to at-risk children in the State regardless of citizenship or immigration status, as required by law. Hundreds of at-risk children enter into the care of New Jersey's child welfare agency within twelve months of birth. For example, in 2023, 268 children entered State care within three months of birth, and 364 children entered State care within twelve months of birth. Given that an estimated 6,200 newborns in New Jersey will be denied citizenship pursuant to the Order in the next year—about 6 percent of all New Jersey newborns—it is highly likely that a significant number of children entering DCF's care within the first three months and 12 months of their birth will be denied citizenship by the Order.

171.    New Jersey will still care for these children, but it will bear the full cost of doing so, losing the Title IV-E federal reimbursement it would receive if the citizenship of these children were still recognized by the federal government.

172.    In addition to this loss of Title IV-E funds, the Order will cause some of Plaintiffs' child welfare agencies to expend additional resources assisting families whose children are at risk of entering the foster care system.

173.    Some of Plaintiffs' child welfare agencies, including those of New Jersey and Connecticut, provide targeted financial and resource assistance to families whose children are at risk of entering the foster care system, including for necessities such as rent, baby supplies, and groceries, to ensure adequate care for these children.

174.    Many families with at-risk children also receive assistance for their children through federal programs, including the Supplemental Nutrition Assistance Program (SNAP) and SSI, for which their children are eligible because they are United States citizens.

175.    If these children are deprived of birthright citizenship and therefore ineligible for these federal programs, the child welfare agencies of Plaintiffs like New Jersey and Connecticut will have to increase their expenditures to ensure that these at-risk children receive adequate care.

**Social Security Number Funding**

176.    The Order will also cause Plaintiff States to lose federal funding that they receive in connection with an SSA program called Enumeration at Birth (EAB). Through EAB, parents may apply for an SSN for their newborn child at the healthcare facility where the child was born, folded into the process for registering the child's birth with the State.

177.    A parent's participation in EAB is optional, but, nationwide, about 99% of infants who obtain SSNs obtain them through this program. Further, it can reasonably be expected that most parents will obtain SSNs for their newborn children, given that an SSN is required to claim a child as a dependent on a federal income tax return, and is often required to get medical coverage for the child and apply for government services for the child. *See* SSA, Social Security Numbers for Children, Pub. No. 05-10023, at 1 (Jan. 2024), ssa.gov/pubs/EN-05-10023.pdf.

178.    To enable the EAB process, SSA enters into contracts with States. Pursuant to those agreements, when a parent wishes to obtain an SSN for a newborn child, the parent completes a

form at the hospital which the hospital then transmits to the State agency that registers births. That agency then transmits to the SSA the child's SSN application along with verification of the child's place of birth and identity. In return for assisting with EAB, States receive a payment from SSA of $4.82 per SSN issued. These funds are then used to support general administrative expenses for state agencies. Plaintiff States—including, for example, New Jersey, Massachusetts, California, New York, Connecticut, and Michigan—participate in EAB.

179.    All U.S. citizen children are eligible to receive SSNs. Noncitizen children without any lawful immigration status are not eligible to receive SSNs. Consequently, the Order precludes newborns who otherwise would have been eligible to obtain SSNs through EAB from doing so.

180.    SSA does not issue SSNs to undocumented individuals. The Order will therefore result in a loss of funding to Plaintiffs. For every child born in one of the Plaintiff States who would have obtained an SSN through EAB but for the Order, that State will lose the $4.82 SSA payment that the State would have received had the child obtained an SSN through EAB.

181.    As noted above, Plaintiffs estimate that the Order will result in the wrongful denial of citizenship to, for example, approximately 6,200 children born in New Jersey, 24,500 children born in California, 4,200 children born in Massachusetts, and 7,400 children in Connecticut each year. Assuming that all these newborns would have obtained SSNs through EAB but for the Order, the Order will cause New Jersey, California, Massachusetts, and Connecticut to lose approximately $30,000, $120,000, $20,000, and $35,000, respectively, per year in EAB payments they would have received but for the Order.

182.    Last year, New York State, exclusive of New York City, collected approximately $445,000 through the EAB program. New York will suffer a substantial loss of revenue under this

program because of the Order, both because some babies will no longer be eligible for SSNs, but also because some parents will decline to participate in the EAB program out of fear.

**Administrative Burdens**

183.    The Order will impose, and is already imposing, administrative and operational burdens on the Plaintiffs, in particular relating to their systems for verifying residents' eligibility of federally-funded programs including, but not limited to, Medicaid, CHIP, Title IV-E, and EAB.

184.    As explained above, the amount of federal funding that Plaintiffs may receive through programs such as Medicaid, CHIP, and Title IV-E depends on the citizenship or immigration status of individuals to whom the States provide social services through these programs. Because federal law provides that Plaintiffs may only seek federal reimbursement for services provided to individuals who are citizens or qualified noncitizens, Plaintiffs need systems for determining whether individuals they serve are citizens or qualified noncitizens.

185.    Prior to the Order, confirming the citizenship of American-born children for purposes of seeking reimbursement from the federal government was simple: all an agency needed was a U.S. birth certificate. Now, that straightforward path will be unavailable beginning February 20, 2025. Instead, Plaintiffs will have to determining the citizenship or immigration status of each of a child's parents in order to confirm the child's citizenship status.

186.    This has consequences for Plaintiff States' agencies that administer Medicaid and CHIP. These agencies must update their eligibility verification systems to incorporate information about every U.S.-born child's parents, and to determine citizenship based on that information. These agencies must identify the kinds of evidence sufficient to prove citizenship pursuant to the Order, and to modify the IT systems they use to process applications and verify eligibility. Plaintiff States' will have to train staff, partners, and healthcare facilities on the new eligibility system and

procedures, and to revise existing guidance documents and manuals regarding eligibility rules and procedures.

187.    New Jersey estimates that this process will take its health agency approximately 6 months to develop and implement a new eligibility system and undertake the necessary training to ensure that it can be deployed effectively.

188.    These burdens will be compounded if birthright citizenship rules vary by state.  For example, children residing in New Jersey are eligible for public health insurance programs regardless of where they were born. Children residing in New Jersey who moved into the State from other States are frequently enrolled in these health insurance programs. Presently, the State agencies who administer these programs have no reason to track the State of birth of U.S.-born child applicants.

189.    However, if the rules governing birthright citizenship varied by State of birth, New Jersey agencies' eligibility verification systems will have to start tracking State of birth so that they can accurately determine whether a child is a citizen and therefore eligible for Federal-State Medicaid or CHIP, or whether they are not a citizen and thus only eligible for fully state-funded health insurance.  This will further complicate the process of redesigning eligibility verification systems described above, requiring additional expenditure of time and resources.

190.    Similar administrative burdens will fall on Plaintiff States' child welfare agencies in connection with Title IV-E. Prior to the Order, these agencies relied on a child's birth certificate as evidence of U.S. citizenship for the purposes of determining eligibility for Title IV-E funding and applying for certain federal assistance for which a child in its care may be eligible, including Medicaid and SSI benefits. Using a birth certificate to prove U.S. citizenship is administratively simple, especially with respect to newborns that a State's child welfare agency's caseworkers may

interact with shortly after birth. Because of the Order, these agencies must now expend considerable time and resources to develop, implement, and train its workers on a new system to determine the citizenship and immigration status of U.S.-born children in their care.

191.    For example, Connecticut DCF must determine the citizenship of the children to whom they provide services in order to assist them with any matters related to their immigration status. The system developed to ascertain citizenship of children born to undocumented or noncitizen parents would have to involve the cooperation of the embassies and consulates of the parents' countries of origin in order to obtain the parents' documentation of citizenship. A system to verify citizenship would impose significant administrative burdens on DCF. DCF would have to expend considerable resources to develop and implement a system to determine, verify, and document the citizenship and immigration status of children whose citizenship could not be presumed on the basis of a birth certificate showing their birth in the United States.  It would also incur significant costs to train and provide support services to DCF social workers to implement that system, which would be dependent upon already overburdened embassies and consulates.

192.    Plaintiffs will also face new administrative burdens and increased costs in assisting with SSN applications for newborn children through the EAB process.

193.    Before the Order, a newborn child's eligibility for an SSN did not need to be verified by the healthcare facility that assists the parent with the SSN application or the State agency that registers the child's birth; that eligibility flowed from the fact of the child's U.S. birth.

194.    Following the Order, whether SSA will issue a newborn an SSN will depend on the citizenship or immigration status of the newborn's parents. Consequently, to assist with EAB, State-run healthcare facilities now must verify parents' immigration statuses. These facilities will

need to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish citizenship or lawful immigration status.

195.    State agencies that register births will need to redesign the systems through which they receive applications from the healthcare facilities. And they will have to train their staff on the new citizenship rules and how to use the redesigned systems. Vital records jurisdictions may need to create two different birth certificates to differentiate between children whose citizenship will be recognized by the federal government and those whose citizenship will not be recognized by the federal government. This requires enhanced information gathering about parents' citizenship and technology advancements to capture the new workflow, data modifications and verification processes.

196.    Additionally, SSA will need to revise the electronic system it uses for receiving SSN applications from the State agencies participating in EAB, as well as the guidelines for using that system, which are currently detailed in a 59-page SSA manual. And State agency staff will have to study these new guidelines and receive training on using this revised system.

197.    That Plaintiffs' agencies will incur substantial administrative costs verifying newborns' citizenship under the new requirements of the Order is evidenced by the amount that USCIS charges to certify the U.S. citizenship of children born abroad. Because USCIS receives nearly all of its funding from application and petition fees, and is required to set fees "at a level that will ensure recovery of the full costs of providing … services," 8 U.S.C. § 1356(m), the fee that USCIS charges for a service reflects the cost to the agency of providing that service.

198.    Although USCIS has not previously certified citizenship for children born in the United States, given that a U.S. birth certificate has, until now, sufficed as proof of citizenship, USCIS does certify citizenship for children born abroad to at least one U.S. citizen parent, *see*

USCIS, Form N-600, Instructions, OMB No. 1615-0057, at 1-2 (ed. Apr. 1, 2024). And USCIS charges $1,335 per online application to determine whether such a child is indeed a U.S. citizen. *See* USCIS, Form G-1055, Fee Schedule, at 34-35 (ed. Jan. 17, 2025). This hefty fee reflects the administrative complexity of determining and verifying a parent's citizenship status, a burden now falling on Plaintiffs' agencies every time they seek federal funding for services they provide to children newly born within their borders.

199.    Additionally, Plaintiff San Francisco, California—the home of Wong Kim Ark— will be irreparably harmed if the Order stands. As a California county government, San Francisco bears responsibility for administering federal-state public benefits programs like Temporary Assistance to Needy Families (TANF) and Supplemental Nutrition Assistance Program (SNAP), which in California are called CalWORKS and CalFresh, respectively.  These programs are administered by the San Francisco Human Services Agency (SF HSA).  Federal funding to California, in turn distributed to SF HSA, comprises a substantial portion of the aid administered through those assistance programs.  *See* 42 U.S.C. § 603(a)(1)(B); 7 C.F.R. § 277.4(b).  Funding is only provided to administer aid to those eligible under federal criteria, which includes proof of a valid social security number (SSN) for both CalWORKS, *see* 45 C.F.R. § 205.52; Cal. Welf. & Inst. Code §§ 11268(a), (d); Cal. Dep't of Soc. Servs., Eligibility and Assistance Standards, Manual Letter No. EAS-14-02, § 40-105.2, and CalFresh, *see* 7 C.F.R. § 273.6(b)(4); Cal. Dep't of Soc. Servs., Manual of Policies & Procs., Food Stamps, Manual Letter No. FS-00-03, § 63-404.3.

200.    San Francisco faces numerous pocketbook injuries as a result the Executive Order. Deprived of SSNs, fewer individuals will qualify for CalWORKS and CalFresh assistance, and so San Francisco will lose funding from the federal government both to administer those programs

and to distribute aid and assistance to its eligible residents.  Numerous San Franciscans will be deprived of the aid they are presently entitled to, financially impacting San Francisco's economy as a whole.  *See* Rosanna Mentzer Morrison & Patrick Canning, USDA, Quantifying the Impact of SNAP Benefits on the U.S. Economy and Jobs (July 18, 2019), https://www.ers.usda.gov/amber-waves/2019/july/quantifying-the-impact-of-snap-benefits-on-the-u-s-economy-and-jobs.  Such individuals will predictably seek and be eligible for other forms of public assistance, such as in-kind food assistance and free diaper programs, which are provided by San Francisco's general fund, and in accordance with its broader responsibility for the care of its poor and indigent residents who are not otherwise supported by other aid programs.

201.    In sum, the Order, if allowed to stand, will work direct and substantial injuries to the Plaintiffs themselves, in addition to their residents.

### FIRST CAUSE OF ACTION
### (Fourteenth Amendment – Citizenship Clause)
### All Defendants

202.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

203.    The Fourteenth Amendment declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

204.    Contrary to the Fourteenth Amendment, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

205.    The Order expressly violates the Fourteenth Amendment's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

206.    The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution unilaterally, and therefore lacks authority to strip individuals of their right to citizenship.

207.    The Order will cause harm to Plaintiffs and their residents.

## SECOND CAUSE OF ACTION
### (Separation of Powers – U.S. Const., Art. I, § 1; U.S. Const., Art. II, § 3)
### All Defendants

1.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

2.    Article I, Section I of the U.S. Constitution states that "[a]ll legislative Powers herein shall be vested in Congress."

3.    Article II, Section 3 of the United States Constitution requires that the President "shall take Care that the Laws be faithfully executed."

4.    The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Moreover, there is no provision in the United States Constitution that authorizes the President to enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

5.    Section 301 of the Immigration and Nationality Act, 8 U.S.C. § 1401, states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth."

6.    Contrary to the INA, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

7.      The President has no authority to override Section 301's statutory guarantee of citizenship, and his Executive Order directly contradicting Section 301's requirements usurps Congress's legislative authority and violates the Constitution's separation of powers.

8.      The Order will cause harm to Plaintiffs and their residents.

### THIRD CAUSE OF ACTION
**(Immigration and Nationality Act – 8 U.S.C. § 1401)**
**All Defendants**

9.      Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

10.     Section 301 of the Immigration and Nationality Act, 8 U.S.C. § 1401, states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth."

11.     Contrary to the INA, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

12.     The Order expressly violates Section 301's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

13.     The President has no authority to override Section 301's statutory guarantee of citizenship, and therefore lacks any authority to unilaterally strip individuals of their right to citizenship. Such action is ultra vires.

14.     The Order will cause harm to Plaintiffs and their residents.

## FOURTH CAUSE OF ACTION
### (Administrative Procedure Act – 5 U.S.C. § 706(2)(A)-(D))
### Agency Defendants

15.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

16.     The Order directs federal agencies, including SSA, to take actions that are contrary to the constitution and federal statutes.

17.     The Administrative Procedure Act (APA), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary and capricious, unconstitutional, contrary to statute, and without observance of procedure recognize by law. In implementing the Order, federal agencies are taking unconstitutional, unlawful, and arbitrary and capricious action, as alleged herein, in violation of the APA.

18.     Defendants' violations will cause harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.     Declare that the Order is contrary to the Constitution and laws of the United States;

b.     Declare that actions taken by Defendant agencies to implement or enforce the Order violate the Administrative Procedure Act;

c.     Preliminarily and permanently enjoin Defendants from implementing or enforcing the Order;

d.     Vacate any actions taken by Defendant agencies to implement or enforce the Order; and

e.     Award such additional relief as the interests of justice may require.

45

January 21, 2025

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum *
  Solicitor General
Shankar Duraiswamy*
  Deputy Solicitor General
Viviana M. Hanley*
Shefali Saxena*
Elizabeth R. Walsh*
  Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Jeremy.feigenbaum@njoag.gov

Counsel for the State of New Jersey

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

/s/ Denise Levey
Denise Levey*
  Deputy Attorney General
Michael Newman
  Senior Assistant Attorney General
Marissa Malouff*
Irina Trasovan*
  Supervising Deputy Attorneys General
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  Deputy Attorneys General
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
Denise.Levey@doj.ca.gov

Counsel for the State of California

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Gerard J. Cedrone
Gerard J. Cedrone (BBO No. 699674)
  Deputy State Solicitor
Jared B. Cohen (BBO No. 689217)
  Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
jared.b.cohen@mass.gov

Counsel for the Commonwealth of
  Massachusetts

**PHIL WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ Shannon Stevenson
Shannon Stevenson
  Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

Counsel for the State of Colorado

**WILLIAM M. TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ *William M. Tong*
William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860)-808-5020
Janelle.Medeiros@ct.gov

*Counsel for the State of Connecticut*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ *Nicole S. Hill*
Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ *Vanessa L. Kassab*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAI'I

/s/ *Kaliko'onālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawai'i 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

47

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

*/s/ Sean D. Magenis*
Sean D. Magenis
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sean.d.magenis@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

*/s/ Toni L. Harris*
Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov
ServiceS3@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Attorney General Dana Nessel on behalf of the People of Michigan*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

*/s/ Jessica M. Finberg*
Jessica M. Finberg*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Counsel for the State of Maryland*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

*/s/ John C. Keller*
John C. Keller*
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
   ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern*
   Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

Counsel for the State of Nevada

**LETITIA JAMES**
   ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine*
   Special Counsel for Immigrant Justice
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

Counsel for the State of New York

**RAÚL TORREZ**
   ATTORNEY GENERAL OF NEW MEXICO

/s/ James W. Grayson
James W. Grayson*
   Chief Deputy Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

Counsel for the State of New Mexico

**JEFF JACKSON**
   ATTORNEY GENERAL OF NORTH CAROLINA

/s/ Daniel P. Mosteller
Daniel P. Mosteller*
   Associate Deputy Attorney General
Laura Howard
   Chief Deputy Attorney General
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

Counsel for State of North Carolina

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Katherine Connolly Sadeck*
Katherine Connolly Sadeck (MA Bar No. 681501)
  *Solicitor General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI  02903
Tel: (401) 274-4400, Ext. 2480
Fax: (401) 222-2995
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*


**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

*/s/ Gabe Johnson-Karp*
Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

*/s/ Julio A. Thompson*
Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for State of Vermont*


**DAVID CHIU***
  CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO

*/s/ David Chiu*
Yvonne R. Meré*
  *Chief Deputy City Attorney*
Sara J. Eisenberg*
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 6th Fl.
San Francisco, California 94102-5408
(415) 505-0844
David.Louk@sfcityatty.org

*Counsel for City and County of San Francisco*


*\*Application for pro hac vice admission forthcoming*