**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAI'I; STATE OF
MAINE; STATE OF MARYLAND;
ATTORNEY GENERAL DANA NESSEL FOR
THE PEOPLE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE
OF NEW MEXICO; STATE OF NEW YORK;
STATE OF NORTH CAROLINA; STATE OF
RHODE ISLAND; STATE OF VERMONT;
STATE OF WISCONSIN; and CITY &
COUNTY OF SAN FRANCISCO,

     *Plaintiffs*,

 v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO RUBIO,
in his official capacity as Secretary of State; U.S.
DEPARTMENT OF HOMELAND SECURITY;
BENJAMINE HUFFMAN, in his official
capacity as Acting Secretary of Homeland
Security; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; DOROTHY FINK,
in her official capacity as Acting Secretary of
Health and Human Services; U.S. SOCIAL
SECURITY ADMINISTRATION; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration, and UNITED STATES OF
AMERICA,

     *Defendants.*

No. 1:25-cv-10139

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2

    A.    Terms of the Executive Order ...............................................................2

    B.    The Impacts of the Order ......................................................................3

ARGUMENT

    I.    Plaintiffs Have Standing to Bring Suit...................................................8

    II.    Plaintiffs Are Highly Likely to Succeed on The Merits ........................9

        A.    The Order Violates the Fourteenth Amendment.........................9

        B.    The Order Independently Violates Federal Law ........................14

    III.    The Equities Compel Preliminary Relief ...............................................15

CONCLUSION.............................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
   969 F.3d 12 (1st Cir. 2020)................................................................8

*City & Cnty. of S.F. v. USCIS*,
   408 F. Supp. 3d 1057 (N.D. Cal. 2019) ..............................................16

*CMM Cable Rep., Inc. v. Ocean Coast Props.*,
   48 F.3d 618 (1st Cir. 1995) ...............................................................15

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
   ___ F. Supp. 3d ___, 2024 WL 3650089 (D.N.H. Aug. 5, 2024)...........................15

*Crowe & Dunlevy, P.C. v. Stidham*,
   640 F.3d 1140 (10th Cir. 2011) .........................................................15

*Does 1-6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021)................................................................17

*DraftKings Inc. v. Hermalyn*,
   118 F.4th 416 (1st Cir. 2024)......................................................18, 19

*Dred Scott v. Sandford*,
   60 U.S. 393 (1857)....................................................................1, 13

*E. Bay Sanctuary v. Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ............................................................15

*Elk v. Wilkins*,
   112 U.S. 94 (1884).......................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   110 F.4th 295 (1st Cir. 2024)............................................................8

*Gonzalez-Alarcon v. Macias*,
   884 F.3d 1266 (10th Cir. 2018) ..........................................................3

*Gustavsen v. Alcon Labs, Inc.*,
   903 F.3d 1 (1st Cir. 2018) ................................................................8

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)......................................................................12

*HIAS v. Trump,*
    985 F.3d 309 (4th Cir. 2021) ...........................................................................19

*Inglis v. Trustees of Sailor's Snug Harbour,*
    28 U.S. 99 (1830) ...........................................................................................11

*INS v. Rios-Pineda,*
    471 U.S. 444 (1985) .......................................................................................12

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ..........................................................................15

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
    923 F.3d 209 (1st Cir. 2019) ............................................................................8

*McBreairty v. Miller,*
    93 F.4th 513 (1st Cir. 2024) .............................................................................8

*Miles v. Apex Marine Corp.,*
    498 U.S. 19 (1990) .........................................................................................14

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................................17

*Plyler v. Doe,*
    457 U.S. 202 (1982) .........................................................................1, 11, 12, 19

*Pub. Int. Rsch. Grp. v. FCC,*
    522 F.2d 1060 (1st Cir. 1975) ...........................................................................9

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005) .............................................................................15

*Savino v. Souza,*
    459 F. Supp. 3d 317 (D. Mass. 2020) ............................................................17

*Schooner Exchange v. McFaddon,*
    11 U.S. 116 (1812) .........................................................................................10

*Sindi v. El-Moslimany,*
    896 F.3d 1 (1st Cir. 2018) ..............................................................................20

*Tennessee v. Dep't of Education,*
    104 F.4th 577 (6th Cir. 2024) ........................................................................16

*Texas v. Yellen,*
    105 F.4th 755 (5th Cir. 2024) ........................................................................15

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ................................................................................18

*United States v. Abreu*,
    106 F.4th 1 (1st Cir. 2024) ......................................................................14

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ....................................................1, 10, 11, 12, 14, 18, 19

*Whitman-Walker Clinic, Inc., v. HHS*,
    485 F.Supp.3d 1 (D.D.C. 2020) ...............................................................16

**Statutes and Regulations**

5 U.S.C. § 706 ...............................................................................................9, 15

8 U.S.C. § 1356 ..................................................................................................7

8 U.S.C. § 1401 .........................................................................................1, 14, 15

8 U.S.C. § 1611 ...............................................................................................4, 6

8 U.S.C. § 1612 ..................................................................................................4

8 U.S.C. § 1641 ..................................................................................................6

20 U.S.C. § 1400 ................................................................................................5

20 U.S.C. § 1412 ................................................................................................5

22 U.S.C. § 254 ................................................................................................11

42 U.S.C. § 405 ................................................................................................14

42 U.S.C. § 1396b ...............................................................................................4

42 U.S.C. § 1396d ...............................................................................................4

20 C.F.R. § 422.103(c)(2) ...................................................................................13

20 C.F.R. § 422.107(d) ......................................................................................13

42 C.F.R. § 435.406 .............................................................................................4

88 Fed. Reg. 81090 .............................................................................................4

## Other Authorities

Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*
72 N.Y.U. L. Rev. 54 (1997) .................................................................................11

James C. Ho, *Defining "American:" Birthright Citizenship & the Original
Understanding of the 14th Amendment*
9 Green Bag 2d 367 (2006)..................................................................................13

Jocelyn Kane, et al., *Health Care Experiences of Stateless People in Canada*
1 J. Migration & Hum. Security (2023)....................................................................3

Margaret Stock, *Is Birthright Citizenship Good for America*
32 CATO J. 139 (Winter 2012) ...............................................................................3

Michael Ramsey, *Originalism and Birthright Citizenship*
109 Geo. L.J. 405 (2020)........................................................................................11

Noah Webster, An American Dictionary of the English Language 635 (George &
Charles Merriam 1860) ...........................................................................................9

Omar Martinez, et al, *Evaluating Impact of Immigration Policies on Health Status
Among Undocumented Immigrants: A Systematic Review*
J. Immigrant Minority Health 947 (2015)................................................................3

Polly J. Price, *Stateless in the United States: Current Reality and a Future
Prediction*, 46 Vand. J. Transnat'l L. 443 (March 2013) .......................................3

U.S. Department of Justice, *Legislation Denying Citizenship at Birth to Certain
Children Born in the United States*, 19 Op. O.L.C. 340 (1995) ................13, 18, 20

1 William Blackstone, *Commentaries on the Laws of England* 366 (6th ed., Co. of
Booksellers, Dublin 1775) ....................................................................................12

## INTRODUCTION

Few principles are stitched deeper into the American fabric than birthright citizenship—and few principles have clearer grounding in law. From the earliest days of this Nation's history, America followed the common law tradition of *jus soli*, that those born within the United States's sovereign territory are subject to its laws and citizens by birth. That tradition continued unimpeded until the Supreme Court's notorious pronouncement in *Dred Scott* that descendants of slaves were not citizens despite their birth in this country. But that aberration was short-lived: in the wake of the Civil War, our Nation adopted the Fourteenth Amendment to ensure citizenship for all who are born here. The Citizenship Clause thus promises "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Since its adoption, Congress has codified that guarantee, and the Supreme Court has twice confirmed that it means what it says. *See* 8 U.S.C. § 1401(b); *United States v. Wong Kim Ark*, 169 U.S. 649 (1898); *Plyler v. Doe*, 457 U.S. 202 (1982). For more than 150 years, the promise of the Citizenship Clause has never been undermined—until now.

This Court should step in to protect the centuries-old status quo from unprecedented attack. The President's decision last night to direct federal agencies to refuse to recognize children newly born in this country as citizens based on the immigration status of their parents is inconsistent with the Constitution and federal statutes alike. Indeed, because the Supreme Court has repeatedly held that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, this lawsuit is not just likely to succeed before this Court—is it all but certain. And this unlawful order works tremendous and irreparable harms, not only on more than 150,000 American babies born each year who will be deprived of the privileges of citizenship, but also on the Plaintiffs themselves: the order, which takes effect in 29 days, will

cause Plaintiffs to suffer direct losses of federal funds that turn on residents' citizenship and incur significant expenses to account for this radical change, none of which is remediable at the end of this case. Preliminary relief before February 19, 2025, including nationwide relief, is thus essential to protect the status quo from these profound and irretrievable injuries.

The President has no power to deny citizenship that the Fourteenth Amendment and federal statutes guarantee. This Court should grant a preliminary injunction.

## **BACKGROUND**

### A.    **Terms of the Executive Order.**

Within hours of taking office, President Trump issued an Executive Order, "Protecting the Meaning and Value of American Citizenship," (Ex. W) ("Order") to strip American-born children of citizenship. The Order declares that birthright citizenship does not extend to anyone born to (i) a mother who is unlawfully present or who is lawfully present on a temporary basis, and (ii) a father who is neither a citizen nor lawful permanent resident. Based on this declaration, the Order announces a new policy: no federal agency "shall issue documents recognizing United States citizenship, or accept documents ... purporting to recognize United States citizenship" for such children born after February 19, 2025 ("Affected Children"). Order, § 2. The Order instructs all executive departments and agencies to implement this policy and specifically directs the Social Security Administration and the Departments of State, Justice, and Homeland Security to "ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id*., § 3(a).

Not only does the Order strip the Affected Children of their citizenship, but the Order does not confer on them any lawful status and renders their presence in the United States unauthorized. Because the Order instructs all federal agencies to refuse to issue or accept any written recognition

of an Affected Child's citizenship, it leaves the Affected Children ineligible for a range of federal services and programs that are unavailable to unauthorized individuals. As a result, in less than 30 days, Plaintiffs will begin to lose significant federal funding for various critical health and welfare services that they provide to newborns who will now be considered unauthorized.

### B.      The Impacts Of The Order.

"Citizenship is unique"; "it is nothing less than the right to have rights." *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1277 (10th Cir. 2018). The Order will deny this fundamental right to millions across the Nation, creating a class of American-born children who are excluded from most federal public benefits, who live under a constant, destabilizing threat of deportation, and who, as they age, will be unable to work lawfully or to participate in American political life as voters or officeholders. Margaret Stock, *Is Birthright Citizenship Good for America*, 32 CATO J. 139, 150 (Winter 2012). The impacts on their health and well-being will be profound. Not only will they be ineligible for many public services to which U.S. citizens and even "qualified aliens" are entitled, but they may be dissuaded from accessing services for which they are eligible based on a "fear of deportation and harassment from authorities." Omar Martinez, et al, *Evaluating Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, J. Immigrant Minority Health 947, 964 (2015) (describing resultant impacts on public health); *see also* Jocelyn Kane, et al., *Health Care Experiences of Stateless People in Canada* 1 J. Migration & Hum. Security 272-73 (2023). Further, as compared to U.S. citizens, undocumented immigrants are more likely to live in poverty and less likely to have a high school diploma. *See* Wong Decl. (Ex. T). And this newly subordinated class of American babies may be rendered stateless—unable to naturalize and potentially denied citizenship by any other nation. Stock, *supra*, at 148-49; *see* Polly J. Price, *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vand. J. Transnat'l L. 443, 492-99 (March 2013). Our Nation will also suffer, losing the "the constructive

economic energies" of these American children: "engagement in [authorized] work, establishment of businesses, provision of services, [and] innovation." Price, *supra*, at 503.

In addition to the profound long-term impacts on these children, the Order will impose financial injury on Plaintiffs, principally by causing them to assume a greater fiscal responsibility for providing critical services and assistance to tens of thousands of their residents. The federal government has long provided funding to States to support provision of low-cost health insurance, certain educational services, and child welfare services. But eligibility for federal funding depends on the citizenship and immigration status of the children who are served. *See*, *e.g.*, 8 U.S.C. §§ 1611(a), (c)(1)(B), 1612(b)(3)(C); 42 U.S.C. § 1396b; 42 C.F.R. § 435.406. To comply with federal and state laws, as well as to maintain the health and safety of their overall communities, Plaintiffs must continue to provide services to the Affected Children, but will now solely bear the costs of doing so. Plaintiffs will also lose funding for their agencies as a direct effect of the Order's instruction to SSA to adopt the new citizenship policy. Consider the following examples:[1]

Healthcare. Medicaid and CHIP, created by federal law, provide low-cost health insurance to U.S. citizens or "qualified aliens" whose family incomes fall below certain thresholds. 42 C.F.R. § 435.406; 8 U.S.C. § 1611(a), (c)(1)(B). States administer the programs, but the federal government covers a substantial portion of the costs—between 50 and 75 percent for children across the States. *See* Adelman Decl. (Ex. A) at ¶15; 42 U.S.C. § 1396d(b); 88 Fed. Reg. 81090. But U.S. law prohibits federal reimbursement for non-emergency costs incurred on behalf of "an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. § 1396b(v). To ensure that all children within

---

[1] While this brief focuses on the fiscal impacts the Order will have on States, the City and County of San Francisco's declaration spells out the impacts on localities as well. *See* Ex. V.

their jurisdictions have access to comprehensive health insurance, several Plaintiff States offer fully state-funded health insurance to unauthorized children who meet the income eligibility requirements for Medicaid or CHIP. *See* Ex. A at ¶¶5-11 (describing state program); Harrington Decl. (Ex. K) at ¶17. These programs expand access to preventative healthcare, limit the spread of communicable illnesses, and minimize the financial burdens on healthcare providers. *See* Ex. A at ¶¶12-14; Ex. K at ¶16-17. As a direct result of the Order, however, the federal government will refuse to recognize Affected Children as eligible for Medicaid or CHIP, so they will have to be enrolled in state-funded health insurance instead, a shift in coverage that will cost the Plaintiff States tens of millions of dollars. *See* Ex. A at ¶29; Boyle Decl. (Ex. E) at ¶¶9-11; Ex. K at ¶36; Armenia Decl. (Ex. O) at ¶¶23-25; Hadler Decl. (Ex. R) ¶¶26-27. Meanwhile, in Plaintiff States that do not provide such coverage to undocumented children, the loss of Medicaid and CHIP eligibility will place a financial strain on their public healthcare facilities, which will experience greater levels of uncompensated care. *See* Groen Decl. (Ex. J) at ¶¶19.

Special Needs Education. The same loss of Medicaid eligibility also has direct impacts on public health agencies and local schools, which must provide certain early intervention and special education services to infants, toddlers, and students with disabilities under the Individuals with Disabilities in Education Act (IDEA). *See* 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1). States and local school districts receive partial Medicaid reimbursement from the federal government for providing such services to Medicaid-enrolled children. Ehling Decl. (Ex. B) at ¶10; Baston Decl. (Ex. C) at ¶¶17-18; Heenan Decl. (Ex. L) at ¶12. Because the Order will eliminate this funding for Affected Children with special needs, the Plaintiffs will suffer direct financial harms.

Child Welfare. The Order will cause state child welfare agencies to lose significant federal Title IV-E funding, which covers a sizeable portion of States' expenses for foster care, adoption,

and guardianship assistance. *See*, *e.g.*, Jamet Decl. (Ex. D) at ¶¶14-15; Sesti Decl. (Ex. H) at ¶¶4-6. Plaintiff States incur costs to provide Affected Children with child welfare services as required by state law, and federal funds are used for both direct payments to families caring for children in foster care and to help cover States' administrative expenses. *See*, *e.g.*, Ex. D at ¶12; Ex. H at ¶5. But because this funding, too, is limited to citizens or "qualified aliens," *see* 8 U.S.C. §§ 1611(a), (c)(1)(B), 1641, States would lose access to Title IV-E funding for Affected Children and have to cover the costs themselves. *See*, *e.g.*, Ex. D at ¶15; Ex. H at ¶¶8-9; Avenia Decl. (Ex. Q) at ¶¶17-20. And the impacts do not stop there: to help keep children with their parents, some child welfare agencies provide targeted assistance for basic necessities to the families they serve. *See*, *e.g.*, Ex. D at ¶18; Ex. Q at ¶20. Here, too, the Order has a direct impact: because the quantum of assistance the State must provide to keep a child with their parents turns on the child's eligibility for federal programs like SNAP, TANF, and SSI, and the federal programs are again available to U.S. citizens and qualified aliens, the States would have to increase their assistance to families whose Affected Children are otherwise at risk of requiring foster care. *See*, *e.g.*, Ex. D at ¶18; Ex. Q at ¶20.

SSN Funding. The Order will also strip States of federal funding from the Social Security Administration (SSA). Pursuant to SSA's Enumeration At Birth ("EAB") program—under which 99% of newborns obtain their SSNs—participating States transmit SSN applications for newborns to SSA and receive $4.82 per SSN issued. *See*, *e.g.*, Ex. C at ¶¶10-11; Duncan Decl. (Ex. I) at ¶19; Nguyen Decl. (Ex. M) at ¶¶22-23. Consistent with the Order, however, SSA will issue fewer SSNs to newborns, because it can no longer recognize the citizenship of Affected Children—and thereby cost the States tens of thousands of dollars they use to support the work of their vital statistics and records agencies. *See*, *e.g.*, Ex. C at ¶¶12-16; Ex. E at ¶19; Ex. I at ¶¶20-21; Ex. M at ¶30; Villamil-Cummings Decl. (Ex. N) at ¶18; Gauthier Decl. (Ex. S) ¶19.

Administrative/Operational Expenses. Finally, the Order will impose direct administrative and operational burdens on Plaintiffs. Plaintiffs maintain systems to verify residents' eligibility for federally-funded programs such as Medicaid, CHIP, Title IV-E, TANF, and SNAP. *See, e.g.*, Ex. A at ¶17; Ex. D at ¶¶19-20; Ex. H at ¶¶7-8; Ex. K at ¶23. Before the Order, there was an easily administrable way to verify the citizenship of American-born children: confirming that they were born in America. *See, e.g.*, Ex. D at ¶21; Ex. J at ¶15. But because a child's birth in this country will no longer suffice as proof, Plaintiffs will have to develop new systems that incorporate information about the child's parents to determine eligibility for federally funded programs; identify and determine the kinds of evidence sufficient to prove citizenship; design and implement new systems for processing applications and tracking citizenship status; train staff, partner organizations, and healthcare providers on the new system and procedures; and revise existing guidance and manuals regarding eligibility. *See* Ex. A at ¶¶32-35 (detailing costs); Ex. D at ¶¶22-25 (same); Ex. H at ¶¶12-15 (same); Ex. K at ¶¶44-45 (same); Ex. O at ¶¶31-33 (same); Ex. R at ¶¶25-28 (same). Moreover, Plaintiffs—as well as public healthcare facilities—will face increased administrative burdens trying to secure SSNs for newborn children through the EAB program. *See* Ex. C at ¶14-16; Ex. M at ¶¶31-32. Here, again, state facilities will no longer be able to count on the fact of the child's birth at their facility—and will incur new costs to verify their parents' immigration statuses. Ex. C at ¶16.

The federal government's own practices confirm the substantial cost Plaintiffs will incur to determine a child's citizenship based on their parents' own immigration status. USCIS charges *$1,335 per application* to determine whether a child (who was not born in the United States) is entitled to U.S. citizenship because one of their parents is a U.S. citizen—an amount that was set "at a level that will ensure recovery of the full costs of providing … services." 8 U.S.C. § 1356(m);

*see* USCIS, Form G-1055, Fee Schedule, at 34-35 (ed. Jan. 17, 2025).

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.'" *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). All four factors overwhelmingly support granting a preliminary injunction.

## I.    PLAINTIFFS HAVE STANDING TO BRING SUIT.

Plaintiffs have standing to challenge this unprecedented Order because they will suffer an "injury in fact" that is "fairly traceable" to the Order and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). Plaintiffs can show standing based on a "substantial risk" that they will suffer proprietary harms, including fiscal injuries. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019) (State "established standing under a traditional Article III analysis" via its "demonstration of fiscal injury"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (agreeing financial losses are "a quintessential injury in fact"); *Gustavsen v. Alcon Labs, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) ("out-of-pocket loss of $500 to $1000 per year" is Article III injury). Even "small economic loss … is enough to confer standing." *Massachusetts*, 923 F.3d at 222.

Plaintiffs have more than cleared that bar here. As detailed both above and in the attached declarations, Plaintiffs have demonstrated that the Order will impose financial injuries directly on them: the loss of federal health funds and concomitant state healthcare expenses, *supra* at 4-5; loss of federal funding and concomitant expenses for special needs youth, *supra* at 5; loss of federal funding and concomitant governmental expenses for foster care, adoption, guardianship, and child

welfare assistance, *supra* at 5-6; loss of SSA reimbursements under the EAB, *supra* at 6; and major operational disruptions and administrative burdens across agencies and facilities, *supra* at 6-7. Each financial injury flows from the Order, which requires all federal agencies to comply with its unprecedented approach to citizenship, and would thus be redressed by a swift injunction.

## II.    PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are exceptionally likely to succeed on their claims that the Order contravenes the Constitution and a series of federal statutes, including the Immigration and Nationality Act (INA), and that any actions an executive agency takes to implement it would violate the APA. *See*, *e.g.*, *Pub. Int. Rsch. Grp. v. FCC*, 522 F.2d 1060, 1064 (1st Cir. 1975) (Executive is bound by "the twin external standards of statutory law and constitutional right"); 5 U.S.C. § 706(2) (requiring court invalidate agency action that is contrary to law). The President's decision to eliminate birthright citizenship contravenes the plain text of the Fourteenth Amendment, directly on-point Supreme Court decisions, centuries of history and practice, and a decades-old federal statute.

### A.    The Order Violates the Fourteenth Amendment.

Begin with the Fourteenth Amendment. The Citizenship Clause is clear: "All persons born … in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. The Constitution does not qualify this guarantee of citizenship, nor does it empower the President, or even Congress, to do so. The sole textual question is thus whether a child born in the United States to non-citizen parents is "subject to the jurisdiction" of the United States. That question admits of an easy answer: prior to the adoption of the Citizenship Clause in 1868, it was established that persons physically present in the United States, including non-citizens and their children, were subject to its sovereign power and control. *See*, *e.g.*, Noah Webster, An American Dictionary of the English Language 635 (George & Charles Merriam 1860) (Ex. X) (explaining legal term of art "subject to the jurisdiction" refers to the sovereign's "[p]ower of

governing or legislating" or "power or right of exercising authority" over the person); *Schooner Exchange v. McFaddon*, 11 U.S. 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself."); *Wong Kim Ark*, 169 U.S. at 693 (emphasizing "[i]t can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides").

The Supreme Court has twice held, in no uncertain terms, that children born in the United States to non-citizen parents fall within the Citizenship Clause's textual guarantee—regardless of their parents' immigration status. In *Wong Kim Ark*, decided 127 years ago, the Court forcefully rejected a challenge to the citizenship of an American born in California to parents of Chinese descent. 169 U.S. at 705. The Court reviewed the text of the Fourteenth Amendment, canvassed the history of birthright citizenship, and found that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory" and expressly "includ[es] all children here born of resident aliens." *Id.* at 693; As the Court explained:

> The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id.* In short, the Court held, to "exclude[] from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons … who have always been considered and treated as citizens of the United States." *Id.* at 694.

The four circumscribed exceptions to birthright citizenship that *Wong Kim Ark* identified only confirm the Citizenship Clause extends broadly to those born in the United States and subject to U.S. authority. The exceptions are for children: (1) of active "members of the Indian tribes," (2) of "foreign sovereigns or their ministers," (3) "born on foreign public ships," and (4) of "enemies

within and during a hostile occupation of part of our territory." *Wong Kim Ark*, 169 U.S. at 693.

Each describes individuals who are not fully subject to U.S. jurisdiction, that is, to U.S. law and

governance, despite physical presence in the country. "[C]hildren of members of the Indian tribes"

who maintain their tribal affiliations, *id.*, are subject to tribal law. *See Elk v. Wilkins*, 112 U.S. 94,

102 (1884). (Congress ultimately granted children of tribal members citizenship by statute in 1924.

*See* 8 U.S.C. § 1401(b).) Children of foreign sovereigns and their ministers, and children born on

foreign government ships, enjoy immunity from U.S. law, conferred by common law, *see Wong*

*Kim Ark*, 169 U.S. at 658, 684-85; conferred by statute, *see* 22 U.S.C. §§ 254a–254e; or both. And

children of foreign enemies "during and within [a] hostile occupation" are governed by martial

law. *Wong Kim Ark*, 169 U.S. at 655; *see Inglis v. Trustees of Sailor's Snug Harbour*, 28 U.S. 99,

156 (1830) (Story, J., dissenting) (explaining common-law rule that "children of enemies, born in

a place ... then occupied by them by conquest, are still aliens"); Michael Ramsey, *Originalism and*

*Birthright Citizenship*, 109 Geo. L.J. 405, 444 (2020) ("It was common ground that hostile armies

were not subject to U.S. jurisdiction when within U.S. territory as a result of their practical

condition as beyond U.S. civil authority"). The children born to foreign visitors or resident aliens

fit none of these; they are bound by U.S. law, enjoying no immunity from its reach. *See* Christopher

L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 65 (1997) ("[T]he

children of illegal aliens are certainly 'subject to the jurisdiction of the United States' in the sense

that they have no immunity from American law.").

The Supreme Court unanimously reached the same conclusion eight decades later in *Plyler*

*v. Doe*, 457 U.S. 202 (1982). Although that case involved the threshold question of which persons

fall "within [the United States's] jurisdiction" for purposes of the Fourteenth Amendment's Equal

Protection Clause, U.S. Const. Amend XIV, § 1, the Supreme Court acknowledged that the phrase

bore the same meaning across the Amendment. *See Wong Kim Ark*, 169 U.S. at 687 (finding it "is impossible to construe the words 'subject to the jurisdiction thereof,' in the [Citizenship Clause], as less comprehensive than the words 'within its jurisdiction,' in the [Equal Protection Clause]"); *Plyler*, 457 U.S. at 211 n.10 (same). And in construing the term, the Court agreed that immigrants who are physically present in this country, regardless of their immigration status, fall within the Nation's "jurisdiction." *Compare Plyler*, 457 U.S. at 211 & n.10 (majority) (finding "no plausible" basis to distinguish "resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful," for purposes of who falls "within" U.S. "jurisdiction"), *with id.* at 243 (Burger, C.J., dissenting) (agreeing equal protection "applies to aliens who, after their illegal entry into this country, are indeed physically 'within the jurisdiction' of a state").[2]

Not only is this Court bound by *Wong Kim Ark* and *Plyler*, but these longstanding decisions follow inexorably from the history and original understanding of the Citizenship Clause. Prior to the Fourteenth Amendment, the Constitution referenced U.S. citizenship, *see, e.g.*, U.S. Const. art. I, §§ 2-3; *id.* art. IV, § 2, including the concept of citizenship by birth, *see id.* art. II, § 1, but left its precise scope to the common law. *See Slaughter-House Cases*, 83 U.S. 36, 72 (1872); Ramsey, *supra*, at 410-15. With respect to the acquisition of citizenship at birth, the prevailing view in the early nineteenth century was that the United States adopted "the English idea of subjectship by birth within the nation's territory (*jus soli*)," *id.* at 413, that "[n]atural-born subjects are such as are born within the dominions of the crown of England," 1 William Blackstone, *Commentaries on the Laws of England* 366 (6th ed., Co. of Booksellers, Dublin 1775) (Ex. Y); *accord Wong Kim*

---

[2] Nor was *Plyler* the last word: the Supreme Court has repeatedly acknowledged that children born in this country to noncitizens are citizens themselves. *See INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (unanimously noting undocumented resident "had given birth to a child, who, born in the United States, was a citizen of this country"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004).

*Ark*, 169 U.S. at 654-64 (detailing common law *jus soli* rule and surveying U.S. decisions holding that birth within United States sovereign territory conveys U.S. citizenship). And when the Supreme Court infamously declared that this citizenship right was unavailable to the descendants of slaves, *Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857), the post-Civil War Nation adopted the Citizenship Clause "to establish a clear and comprehensive definition" of citizenship, *Slaughter-House Cases*, 83 U.S. at 73, by returning the Nation to the citizenship doctrine that had long prevailed. *See* Cong. Globe, 39th Cong., 1st Sess., 2890 (Ex. Z) (Sen. Howard of Michigan, introducing Citizenship Clause proposal and explaining "[t]his amendment … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is … a citizen of the United States"); *id.* at 2890-91 (Sen. Cowan) (opposing provision *because* it would ensure birthright citizenship); James C. Ho, *Defining "American:" Birthright Citizenship & the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 370 (2006) (canvassing Citizenship Clause debates and finding "[t]his understanding was universally adopted by other Senators," including by its opponents).

Beyond text, precedent, and history, centuries of practice are in accord. The Department of Justice's Office of Legal Counsel has found that "the text and legislative history of the citizenship clause as well as consistent judicial interpretation" all "place the right to citizenship based on birth within the jurisdiction of the United States beyond question." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 1995 WL 1767990, at *1-2 (1995) ("OLC Op."). And federal agencies have long accepted a U.S. birth certificate as evidence of citizenship. *See, e.g.*, 20 C.F.R. § 422.107(d) ("[A]n applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate … that shows a U.S. place of birth."); 20 C.F.R. § 422.103(c)(2) (same for issuance of

SSNs to newborns through State's birth registration process); Ex. U (State Department's Foreign Affairs Manual, involving issuance of passports, noting "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth"). Plaintiffs know of no contrary precedent, history, or practice that would undermine this bedrock principle.

### B.    The Order Independently Violates Federal Law.

Not only does the Order thus violate the Fourteenth Amendment, but it is contrary to the INA as well. The INA, enacted in 1952, parrots the Citizenship Clause's language by providing that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth." Pub. L. No. 82-414, §301(a)(1), 66 Stat. 163, 235 (codified at 8 U.S.C. § 1401(a)). "Under controlling precedent, [this Court] interpret[s] a statute's words based on their plain and ordinary meaning at the time of the statute's enactment." *United States v. Abreu*, 106 F.4th 1, 12 (1st Cir. 2024). And by 1952, the meaning of the term of art "subject to the jurisdiction thereof" was clear: it followed the "fundamental rule of citizenship by birth within the territory," and "includ[ed] all children here born of resident aliens." *Wong Kim Ark*, 169 U.S. at 693. So even if the federal government urges the Supreme Court to abandon its interpretation of the Citizenship Clause—notwithstanding its plain text, unanimous precedent, preexisting common law, originalist evidence, and a century of practice—the meaning of the law Congress enacted in 1952 would stay the same. *See, e.g.*, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). In abrogating birthright citizenship for the first time since the Civil War, the Order is unconstitutional and *ultra vires* alike.[3]

---

[3] Actions federal agencies will have to take in order to implement this Order likewise violate their governing laws, and so those actions must thus be enjoined on those bases too. For example, SSA is statutorily required to issue SSNs to persons eligible to apply for federal benefits, 42 U.S.C.

### III.    THE EQUITIES COMPEL PRELIMINARY RELIEF.

This Court should grant preliminary relief to protect the centuries-old status quo before the

Order strips American children of citizenship in 30 days, not only because the Order is unlawful,

but because relief is necessary to avoid irreparable harm and protect the equities and public interest.

*See, e.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) (noting

salutary "purpose of a preliminary injunction is to preserve the status quo" and "freez[e] an existing

situation" to avoid injuries while court engages in "full adjudication"); *Rio Grande Cmty. Health

Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if challengers would suffer "irreparable

harm" because injuries "cannot adequately be compensated for either by a later-issued permanent

injunction, after a full adjudication on the merits, or by a later-issued damages remedy").

Absent relief from this Court before the Order takes effect, Plaintiffs' injuries here will be

immediate and irreparable. *See, e.g.*, *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,

___ F. Supp. 3d ___, 2024 WL 3650089, at *24 (D.N.H. Aug. 5, 2024) (emphasizing financial

costs cannot be recouped where the public defendant is protected from damages claims); *Crowe

& Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011); *Texas v. Yellen*, 105 F.4th 755,

774 (5th Cir. 2024); *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). As the record confirms,

approximately 153,000 babies are born in this country to two undocumented parents every year—

such that, on average, at least 420 Affected Children would be born, stripped of their citizenship,

---

§ 405(c)(2)(B), which necessarily includes Affected Children pursuant to the Citizenship Clause
and 8 U.S.C. § 1401(a). SSA therefore cannot implement this Order and start categorically refusing
to recognize as proof of citizenship documents showing that a child was born in the United States
without running afoul of that statute and, consequently, the APA. *See* 5 U.S.C. §§ 706(2)(B)-(D);
*E. Bay Sanctuary v. Covenant v. Trump*, 932 F.3d 742, 770-71 (9th Cir. 2018) (finding agency
action implementing executive order is reviewable under the APA).

every day after the Order takes effect in a month. *See* Lapkoff Decl. (Ex. F), Ex. 2 at 1.[4]

Plaintiffs must thus contend with the operational chaos and financial losses that this Order imposes as soon as it takes effect—indeed they must start planning for its disruption now. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1122 (N.D. Cal. 2019) (recognizing "burdens on … ongoing operations" for public entities constitute irreparable harm); *Tennessee v. Dep't of Education*, 104 F.4th 577, 613 (6th Cir. 2024) (same); *cf. Whitman-Walker Clinic, Inc., v. HHS*, 485 F.Supp.3d 1, 56 (D.D.C. 2020) (finding irreparable harm based upon "financial and operational burdens" imposed by a regulatory action). For Affected Children, Plaintiffs could no longer use their existing and longstanding procedures for verifying eligibility for federal funding for health and welfare programs. *See, e.g.*, Ex. D at ¶16 (noting, as immediate example in which verification is needed, that hundreds of New Jersey children unfortunately enter state care in first year of their lives, some of whom will be Affected Children); Ex. A at ¶30-31 (noting many States enroll low-income children in public health insurance immediately upon birth, likewise requiring verification). Instead of relying on a U.S. hospital's registration to confirm the newborn's eligibility for federal funding, Plaintiffs would need to develop eligibility verification systems that document and track the immigration status of the newborn's parents—an immediate change that demands significant expenditures and diversion of resources. *See* Ex. A at ¶¶31-35; Ex. D at ¶¶22-24; *see also* Stock, *supra*, at 152 ("Proving one's parents' citizenship or immigration status at the moment of one's birth can be difficult … apart from the simple birthright citizenship rule."); USCIS, Form G-1055, at 34-35 ($1,335 per application to certify citizenship based upon parentage). This disruption will be compounded if Plaintiffs prevail, despite having spent weeks

---

[4] This is a conservative estimate of the number of Affected Children, because it does not account for Affected Children whose parents are lawfully present on a temporary basis or whose fathers at birth are conditional permanent residents. *See* Order, § 2(a).

redesigning and reimplementing their system, as they would then have to expend resources to revert to the pre-existing system. A court order preserving the status quo that has been in effect since 1868 would prevent this chaos and harm.

Beyond the chaos for residents and Plaintiffs alike, the many financial harms laid out above are likewise imminent and irreparable. As explained above, many States enroll their low-income children in public health insurance immediately upon birth. *See, e.g.*, Ex. A at ¶30. That matters not only for basic operations, but for funding too: Federal Medicaid and CHIP funding are provided through an upfront quarterly grant. Ex. A at ¶17. States utilize these funds throughout the quarter— for example, New Jersey draws from the funds on a weekly basis—to fund health care expenditures for enrolled children. *Id.* ¶18. Once the Order takes effect, more and more Affected Children will be enrolled in state-funded health care rather than Medicaid or CHIP with each passing day, and States will be unable to use the federal funds to pay for their care—funds they would have received but for the Order. *Id.* ¶¶28-29. And the same is true for EAB funding associated with SSNs, which will also prove irreparable immediately upon the Order taking effect. Once any newborn leaves a hospital without securing an SSN through the EAB program, States will likely lose the opportunity to secure an EAB payment. And Title IV-E funding, for its part, is provided quarterly, meaning States must submit to the federal government their next reimbursement claims for eligible children soon after the end of the first quarter in 2025. *See, e.g.*, Ex. D at ¶12. There is no basis to require States to incur these costs where their legal success is so certain.

The equities and public interest overwhelmingly demand temporary and preliminary relief too. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (noting the balance of equities and the public interest "merge when the [g]overnment is the opposing party" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Savino v. Souza*, 459 F. Supp. 3d 317, 331 (D. Mass. 2020) (adding the

factors merge "in the immigration context"). The public interest could scarcely be clearer: today's Order undermines "the ancient and fundamental rule of citizenship by birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, a doctrine that reflects the post-*Dred Scott* lesson that "our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship," and that ensures there will "be no inquiry into whether or not one came from the right caste, or race, or lineage, or bloodline in establishing American citizenship," *OLC Op.* at *6. Without the fundamental citizenship to which their birth entitles them, Affected Children risk deportation before their right to citizenship may be adjudicated, even in the weeks and months in which this case is pending. Even if they are not removed during the pendency of this litigation, in many States, they will be unable to access non-emergency healthcare during the first few months of their lives on account of ineligibility for federal benefits like CHIP and Medicaid. Add to that the federal funds Plaintiffs will irreparably lose and the time and resources that their agencies must expend as they rush to redesign benefits eligibility systems to accord with the Executive Branch's new definition of citizenship, *supra* at 2-3, and the equities call powerfully for averting all these harms by preserving the status quo prior to February 19, 2025, while this litigation proceeds.

Consistent with the extraordinary nature of this case, the emergency relief this Court orders should apply nationwide. District court judges have discretion "to design 'the scope of injunctive relief'" so that it is tailored to the "specific harm alleged." *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) (affirming nationwide preliminary injunction enjoining ex-employee from competing with former employer anywhere in the country). Because there are times in which any narrower relief "would entirely undercut th[e] injunction's effectiveness," *id.* at 424, courts have found nationwide injunctions of federal policies can be appropriate if a more limited preliminary injunction would fail to remedy the irreparable harm. *See, e.g.*, *Trump v. Int'l Refugee Assistance*

*Project*, 582 U.S. 571, 579, 581 (2017) (declining to stay nationwide injunction insofar as it barred enforcement of travel ban "against foreign nationals who have a … relationship with a person or entity in the United States," given "the hardships identified by the courts below" that would flow to such persons absent nationwide preliminary relief); *HIAS v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) (affirming nationwide injunction when state agencies "place[d] refugees throughout the country" and demonstrated irreparable harm from the order taking effect in other jurisdictions).

Such relief is appropriate here. Initially, the issue has already been settled for this Nation: the Supreme Court has twice, in decisions that apply to every State, expressly confirmed that the Constitution ensures birthright citizenship for all American-born children subject to our sovereign laws. *See Wong Kim Ark*, 169 U.S. 649; *Plyler*, 457 U.S. 202. Indeed, other than in the post-*Dred Scott* Civil War, that has been the clear status quo for the entire Nation since before the Fourteenth Amendment and in the 157 years since. And any order that grants narrower relief than established by *Wong Kim Ark* and *Plyler*—in which birthright citizenship would exist in some States but not others—would fail to fully remedy Plaintiffs' harms. After all, if children born in Plaintiff States acquire citizenship regardless of their parents' immigration status, but children born in other States do not, then Plaintiffs' agencies would still have to recalibrate how they determine eligibility for federal programs, and incur related administrative costs, due to the reality that infants born in other States can move to Plaintiff States and ultimately seek services. Ex. A at ¶36; Ex. D at ¶25. That is, given the reality that families move across state lines, Plaintiff States faced with any patchwork judicial order would still have to redesign and implement eligibility verification systems to account for this possibility—one of the irreparable harms laid out above, *see supra* at 7—which would "undercut th[e] injunction's effectiveness." *DraftKings*, 118 F.4th at 424.

There are further reasons that a patchwork court order fails "to provide complete relief" to

Plaintiffs. *Sindi v. El-Moslimany*, 896 F.3d 1, 31 (1st Cir. 2018). In addition to the operational chaos that would persist, if the challenged policies are enjoined within the Plaintiff States but not throughout the rest of the country, then Plaintiff States will still incur increased costs for providing state-funded healthcare and foster care to infants who move into their States after being born in non-Plaintiff States. For example, Plaintiff States provide foster care to infants regardless of the child's state of birth or of the parents' citizenship or immigration status, but they only receive Title IV-E matching funds for providing foster care to U.S. citizens or qualifying noncitizens. *See supra* at 5-6; Ex. D at ¶11. And many Plaintiff States likewise fund health care for children without regard to their immigration status or to the State in which they were born. *See supra* at 4-5. Without nationwide preliminary relief, Plaintiff States would have to spend more of their own funds providing foster care and healthcare to children born to undocumented parents in this country but outside of the Plaintiff States. Given the unprecedented and extraordinary nature of this Order, this court should preserve the centuries-old status quo to protect babies' fundamental citizenship rights and avoid profound irreparable harms while this case proceeds.

As the Department of Justice has acknowledged, "[t]o have citizenship in one's own right, by birth upon this soil, is fundamental to our liberty as we understand it." *OLC Op.* at *7. Although other Nations make other choices, "for us, for our nation, the simple, objective, bright-line fact of birth on American soil is fundamental." *Id.* at *6. Simply put, "All who have the fortune to be born in this land inherit the right, save by their own renunciation of it, to its freedoms and protections." *Id.* at *7. This Court should enjoin this assault on our fundamental American tradition.

## **CONCLUSION**

This Court should grant the motion for a preliminary injunction.

January 21, 2025

Respectfully submitted.

MATTHEW J. PLATKIN
  ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum *
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Viviana M. Hanley*
Shefali Saxena*
Elizabeth R. Walsh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Jeremy.feigenbaum@njoag.gov

*Counsel for the State of New Jersey*

ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

*/s/ Denise Levey*
Denise Levey*
  *Deputy Attorney General*
Michael Newman
  *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
  *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
Denise.Levey@doj.ca.gov

*Counsel for the State of California*

ANDREA JOY CAMPBELL
  ATTORNEY GENERAL OF MASSACHUSETTS

*/s/ Gerard J. Cedrone*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
jared.b.cohen@mass.gov

*Counsel for the Commonwealth of
  Massachusetts*

PHIL WEISER
  ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

**WILLIAM M. TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ *William M. Tong*
William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860)-808-5020
Janelle.Medeiros@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ *Vanessa L. Kassab*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ *Nicole S. Hill*
Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ *Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
 ATTORNEY GENERAL OF MAINE

/s/ Sean D. Magenis
Sean D. Magenis
 *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sean.d.magenis@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
 ATTORNEY GENERAL OF MICHIGAN

/s/ Toni L. Harris
Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
 *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov
ServiceS3@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Attorney General Dana Nessel on behalf of the People of Michigan*

**ANTHONY G. BROWN**
 ATTORNEY GENERAL OF MARYLAND

/s/ Jessica M. Finberg
Jessica M. Finberg*
 *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Counsel for the State of Maryland*

**KEITH ELLISON**
 ATTORNEY GENERAL OF MINNESOTA

/s/ John C. Keller
John C. Keller*
 *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
  Attorney General of Nevada

/s/ Heidi Parry Stern
Heidi Parry Stern*
  Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

Counsel for the State of Nevada

**LETITIA JAMES**
  Attorney General of New York

/s/ Zoe Levine
Zoe Levine*
  Special Counsel for Immigrant Justice
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

Counsel for the State of New York

**RAÚL TORREZ**
  Attorney General of New Mexico

/s/ James W. Grayson
James W. Grayson*
  Chief Deputy Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

Counsel for the State of New Mexico

**JEFF JACKSON**
  Attorney General of North Carolina

/s/ Daniel P. Mosteller
Daniel P. Mosteller*
  Associate Deputy Attorney General
Laura Howard
  Chief Deputy Attorney General
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

Counsel for State of North Carolina

**PETER F. NERONHA**
  Attorney General of Rhode Island

*/s/ Katherine Connolly Sadeck*
Katherine Connolly Sadeck (MA Bar No. 681501)
  *Solicitor General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2480
Fax: (401) 222-2995
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSHUA L. KAUL**
  Attorney General of Wisconsin

*/s/ Gabe Johnson-Karp*
Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

**CHARITY R. CLARK**
  Attorney General of Vermont

*/s/ Julio A. Thompson*
Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for State of Vermont*

**DAVID CHIU***
  City Attorney, City and County of San Francisco

*/s/ David Chiu*
Yvonne R. Meré*
  *Chief Deputy City Attorney*
Sara J. Eisenberg*
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 6th Fl.
San Francisco, California 94102-5408
(415) 505-0844
David.Louk@sfcityatty.org

*Counsel for City and County of San Francisco*

*\*Application for pro hac vice admission forthcoming*