# EXHIBIT Q

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, et al., | : |
| Plaintiffs, | : |
| v. | : |
| DONALD J. TRUMP, et al., | : Civil Action No.: 25-cv-10139 |
| Defendants. | : |

## DECLARATION OF Jennifer Avenia

I, Jennifer Avenia, hereby declare:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by our staff.

2. I am Director of Immigration Practice for the Connecticut Department of Children and Families (DCF), a position I have held since 2019. As Director of Immigration Practice I provide the following services: ongoing legal and clinical consultation and training for DCF staff and DCF affiliated community agencies concerning migrant children, youth and their families; guidance in developing and implementing DCF policy and operational strategies with regard to immigrants and refugees; certification of U and T Visas; collaboration with immigrant legal aid agencies and attorneys throughout the United States; communication with the federal Office of Refugee Resettlement / Unaccompanied Alien Children Program, the Connecticut Office of Refugee Resettlement and the United States Customs and Immigration Service (USCIS) and its constituent agencies, including Immigration and Customs Enforcement (ICE) as well as the United States State Department and numerous embassies and consulates.

3. Prior to holding this position, I worked in various clinical and administrative capacities at DCF since 1999. I am a licensed clinical social worker and an attorney with a Bachelor of Arts degree in history from Wesleyan University as well as a Master of Social Work degree and a Juris Doctorate from the University of Connecticut. I have a Practitioner's Certificate in Immigration Law from the Connecticut Institute for Refugees and Immigrants and am fluent in Spanish.

4. As Director of Immigration Practice at DCF, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my colleagues at the Connecticut Department of Children and Families.

5. The Connecticut Department of Children and Families is devoted to serving and supporting children at risk for child abuse and neglect as well as their families. DCF is responsible for investigating allegations of child abuse and neglect and, if necessary, arranging for a child's protection.

6. DCF provides extensive clinical and legal consultation to its staff from licensed clinicians and attorneys working in its Regional Resource Groups and Office of Legal Affairs.

7. DCF contracts with community-based agencies throughout the state to provide services for children and families. Services include psychotherapy, mentoring, parent education, substance abuse treatment, intensive in-home case management and clinical services, standard and therapeutic foster care as well as residential and inpatient psychiatric treatment.

8. If a child has been harmed or is at risk of harm, DCF will petition the Superior Court for Juvenile Matters (SCJM) and request court orders requiring parents to comply with services, orders of temporary custody and/or neglect adjudications. Children who are removed from their parents' care are usually placed in homes of licensed relative or fictive kin caregivers or other foster parents who have completed extensive training and are licensed by DCF or a private not-for-profit therapeutic foster care agency to provide foster care.

9. DCF provides foster care services to children regardless of their immigration status.

10. The average daily population of children in foster care in Connecticut in State Fiscal Year 2024 was 2,666. The average daily population of children in foster care in Connecticut in Calendar Year 2024 was 2,704.

11. Children often enter DCF's care within the first year of their lives. The total number of children in foster care for all 12 months of Calendar Year 2023 was 4,165.

<u>Federal Funding Tied to a Child's Citizenship</u>

12. DCF receives several sources of federal funding for providing services to U.S. citizen and "qualified alien" children that DCF does not receive for providing services to undocumented children.

<u>Title IV-E Funding</u>

13. Under Title IV-E of the federal Social Security Act, the federal government provides grants to state foster care agencies with approved Title IV-E plans, including DCF, to assist those agencies with the costs of foster care maintenance for eligible children, as well as for adoption, guardianship, prevention, and other support services.

14. Pursuant to Title IV-E, the federal government partially reimburses DCF for foster care expenditures for children who are removed from home and placed in foster care <u>and</u> who meet the eligibility criteria for the former Aid to Families with Dependent Children (AFDC) program, as it was in effect on July 16, 1996.

15. Under the 1996 AFDC program, federal public benefits are limited to United States citizens and "qualified aliens." As DCF understands the Title IV-E limitations, undocumented children are not "qualified aliens," *cf.* 8 U.S.C. § 1641, and thus DCF does not receive any federal reimbursement for foster care expenditures by DCF for undocumented children.

16. Federal funding under Title IV-E covers foster care maintenance payments for eligible children and a portion of the State's administrative expenses. Foster care maintenance payments cover the cost of basic necessities, including food, clothing, shelter, daily supervision, and school supplies for eligible children in DCF's care. Federal funding is

4

provided on a quarterly basis after the State submits claims for eligible expenditures associated with eligible children.

17. In Federal Fiscal year 2024, DCF received $33,837,223 million in Title IV-E federal funding for administrative expenses and foster care maintenance payments for eligible children.

18. If children in the Connecticut foster care system were not granted citizenship, DCF would, consistent with state law, continue to provide these children with foster care services as needed. However, because those children would be ineligible for Title IV-E funding, DCF would not receive any reimbursement under Title IV-E for providing those services.

19. DCF has limited data with regard to the citizenship and immigration status of parents. However, we do know that DCF serves hundreds of U.S. citizen children with undocumented or noncitizen parents. DCF reasonably expects that some number of children born within the next 12 months will enter DCF's care. If those children are purportedly denied birthright citizenship, DCF will lose material amounts of federal funding that it would use for foster care maintenance payments for those children, as well as reimbursement for administrative expenses associated with their care.

Other Federal Benefits Programs

20. DCF provides targeted support, resource assistance and referrals to families with at risk children. Many families with at risk children also receive assistance for their children through federal programs, including SNAP, TANF, and HUD vouchers, for which their children are eligible because of their citizenship status. If these children were not eligible for these federal programs, it could give rise to a significant increase in the number of children

entering the foster care system along with a related increase in costs to DCF in order to meet its statutory mandates.

## Costs of Ascertaining Citizenship Status

21. In order to determine whether children in its care are eligible for federally funded programs like SNAP, Medicaid, TANF, or HUD vouchers, and in order to accurately obtain quarterly Title IV-E reimbursements for foster care services provided to eligible children, DCF needs to determine the citizenship status of the children it serves.

22. Presently, DCF relies on a birth certificate as evidence of U.S. citizenship. This is administratively simple, especially with respect to newborns that DCF social workers may interact with shortly after birth.

23. If birthright citizenship were purportedly terminated, it would complicate DCF's determination of whether a child in foster care is eligible for Medicaid, SNAP, TANF, or HUD vouchers, or whether certain foster care services are reimbursable under Title IV-E.

24. To ascertain such eligibility, DCF social workers would have to develop a new system for determining the citizenship and immigration status of children in its care. That system would likely require DCF to take steps to determine, verify, and document the citizenship and immigration status of the parents of children who come into foster care. This could be especially difficult in certain circumstances where parents are unwilling to engage with DCF. It would cost considerable time and resources to implement such a system.

25. In addition, DCF must determine the citizenship of the children in foster care in order to assist them with matters related to their immigration status. The system developed to ascertain citizenship of children born to undocumented or noncitizen parents would have to

involve the cooperation of the embassies and consulates of the parents' countries of origin in order to obtain the parents' documentation of citizenship.

26. It is also not uncommon for parents to have problems with ascertaining their own citizenship status in their countries of origin as vital statistics may not be collected. Birth certificates in other countries are sometimes not at all available because people's births were not documented in the first place.

27. Undocumented children in DCF care are primarily from Guatemala, Honduras, El Salvador and Mexico, in that order. The embassies and consulates of Guatemala, Honduras and El Salvador are completely overwhelmed and unable to timely respond to routine requests for birth certificates at this time. We would anticipate further significant delays were birthright citizenship in the United States terminated.

28. The embassies and consulates usually require that both parents request and cooperate with the process of getting birth certificates for their children. If a parent is unavailable or unwilling to do this, it may not be at all possible to get a birth certificate for a child via the embassy or consulate.

29. If it is not possible for children to obtain birth certificates from their parents' countries of origin, then there is a strong likelihood that these children will become stateless if birthright citizenship is not available to them.

30. Stateless people are at vastly increased risk for becoming victims of homelessness, extreme poverty as well as sex and/or labor trafficking. They cannot work legally. Government benefits of any kind are unavailable to them. It is impossible to order their removal to another country because there is no other country that will accept them.

31. DCF would have to expend considerable resources to develop and implement a system to determine, verify, and document the citizenship and immigration status of children whose citizenship could not be presumed on the basis of a birth certificate showing their birth in the United States. It would also incur significant costs to train and provide support services to DCF social workers to implement that system, which would be dependent upon already overburdened embassies and consulates. While the precise costs are difficult to estimate without further guidance from the federal government on how states must determine citizenship status, it would be extensive. This would be an additional burden to a system already struggling with ongoing workforce challenges. Because submissions to the federal government for IV-E reimbursements are due quarterly, DCF would have to develop and begin implementing such a system within a matter of months.

32. Additionally, DCF occasionally takes temporary custody of newborn children who have been abandoned, such as pursuant to Connecticut's Safe Haven Act, CGS § 17a-59 and 17a-60.

33. The parents of such abandoned children may be unknown, and DCF would thus be unable to ascertain their eligibility for the above-mentioned federal programs.

34. Indeed, if a newborn is abandoned pursuant to the Safe Haven Act, Connecticut's Safe Haven law forbids DCF from requiring the person abandoning the child to disclose the biological parent's name or other identifying information. DCF thus would be legally unable to seek the immigration status of the abandoned newborn's parents unless that information were volunteered.

35. Thus, DCF would be unable to establish that abandoned newborns are U.S. citizens eligible for Title IV-E reimbursement for DCF regardless of the actual immigration status of the newborn's parents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of January, 2025, in Canton, Connecticut.

*Jennifer Avenia*

Jennifer Avenia

Director of Immigration Practice

Department of Children and Families

250 Hamilton Street

Hartford, Connecticut 06106