# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, et al., :<br><br>    Plaintiffs, :<br><br>v. :<br><br>DONALD J. TRUMP, et al., :<br><br>    Defendants. : | Civil Action No.: 25-cv-10139 |

# DECLARATION OF PETER HADLER

I, Peter Hadler, hereby declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff.

2. I am the Deputy Commissioner for the Connecticut Department of Social Services (DSS). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program, the Temporary Assistance for Needy Families block grant, the Low Income Home Energy Assistance block grant and numerous other public assistance programs.

3. I am an attorney with a juris doctor degree from Boston University and am admitted to the bar in both Connecticut and New York.

## Connecticut HUSKY and Eligibility Rules

4. Medicaid is the federally matched medical assistance program under Title XIX of the Social Security Act. CHIP is the federally matched medical assistance program under Title XXI of the Social Security Act. The programs operate as a state and federal partnership with states funding a portion of the programs (usually starting at 50%). In Connecticut, Medicaid, CHIP and other medical assistance programs are collectively called "HUSKY Health" or simply "HUSKY." HUSKY provides comprehensive health care coverage to

State residents, including preventative care, inpatient and outpatient services, behavioral health services and many other health care services.

5. DSS is the designated single state agency responsible for administering Connecticut's Medicaid program and Children's Health Insurance Program (CHIP), federal programs regulated by the U.S. Department of Health and Human Services. Medicaid and CHIP are jointly funded by both state and federal dollars, though at different rates, as explained herein. DSS also administers some state funded health care programs, including the State HUSKY program (which provides coverage for children up to 15 years of age who do not qualify for Medicaid or CHIP due to immigration status).

6. "HUSKY" is an umbrella term or "brand name" for all Connecticut State medical assistance programs, including Medicaid, CHIP and state-funded coverage. DSS is Connecticut's Medicaid authority and functions as one of the largest providers of health coverage in Connecticut. It is a leader in ensuring Connecticut residents have access to high-quality, affordable health care, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut. DSS provides health care for over 1 million state residents annually through HUSKY.

7. The table below illustrates the State Fiscal Year (SFY) 2024 expenditure dollars in the thousands for DSS's programs. Funds are broken out by federal funded (FF) and state funded (SF) expenditures. The Medicaid line in the table includes funds associated with all eligibility groups authorized pursuant to Title XIX of the Social Security Act as well as CHIP funds that cover certain pregnant women and children. The CHIP line in the table includes children covered under Title XXI of the Social Security Act. State-only programs

2

in Connecticut include State HUSKY for Children and post-partum coverage for noncitizens, among others. States, including Connecticut, use federal funds to support services for noncitizens through Emergency Medicaid. Emergency Medicaid is authorized under Title XIX and expenditures are reflected within the Medicaid line in the below table.

| SFY 2024 Expenditures ($$ in Thousands) | | | |
|---|---|---|---|
| | FF | SF | Total |
| *Medicaid* | $4,883,249 | $3,357,225 | $8,240,475 |
| *CHIP* | $26,608 | $14,145 | $40,753 |
| *State-only (State HUSKY)* | $ - | $23,502 | $23,502 |
| *Total* | $4,883,249 | $3,394,873 | $8,304,730 |

8. Within DSS, roughly 1,000 State employees and hundreds of contracted staff are responsible for determining eligibility, providing customer service, and managing policy for the majority of state and federal medical assistance programs serving over 1 million Connecticut residents. In addition to providing direct access to the Medicaid and CHIP programs through HUSKY, DSS administers the Supplemental Nutrition Assistance Program, the Temporary Assistance for Needy Families block grant, and a number of other public assistance programs.

9. Medicaid eligibility is comprised of three income methodologies: Modified Adjusted Gross Income (MAGI) methodology, non-MAGI methodology, and categorical eligibility (for example, SSI recipients or Foster Care/Adoption support coverage). Programs with eligibility determined under MAGI rules include coverage for adults aged 19-64, pregnant women, families, and children. Programs with eligibility determined under non-MAGI rules include coverage for aged, blind, or disabled populations, including long-term services and supports programs. Categorical eligibility means that a person is granted

3

coverage based on their categorical relationship to the program. For example, a person receiving Supplemental Security Income (SSI) automatically receives Medicaid coverage.

10. Federal Medicaid rules direct states to look at income and residency rules first and then determine whether someone is a citizen or has a qualifying immigration status in order to determine eligibility. Individuals who are undocumented or do not have a lawful, qualifying immigration status are not eligible for Medicaid or most other federally funded DSS administered benefits. The limited exception involves the federal Medicaid program for undocumented or non-qualified non-citizens to receive emergency medical care coverage if they are otherwise eligible for Medicaid. This is also known as Emergency Medicaid. Emergency Medicaid covers emergency health care for a limited set of qualifying emergent medical conditions. Individuals must meet all the income and other requirements of Medicaid. In other words, they must be eligible "but for" their citizenship and immigration status. Individuals who are undocumented or non-qualified can receive Emergency Medicaid services, and the federal matching rate is 50%, meaning that federal funds cover 50% of the cost and state funds cover 50% of the cost.

11. Coverage programs for children are also provided under HUSKY. HUSKY covers all kids through age 15, regardless of immigration status, up to 323% of the Federal Poverty Level (FPL), and covers all citizen children and non-citizens with qualifying immigration statuses up to 323% FPL through age 18. Funding for the coverage depends on a child's eligibility for different programs that fall under the HUSKY Health branding, i.e. Medicaid, CHIP or State coverage.

12. Below 201% of the FPL, for children who are citizens or qualified immigrants, the funding for this coverage is through Medicaid.

4

13. Between 201% and 323% of the FPL, for children who are citizens or qualified immigrants, the funding for this coverage comes through CHIP, and some households pay a small premium or copays for coverage. CHIP is a federally matched health coverage program that expands coverage to children above the Medicaid income limit. Connecticut's CHIP offers comprehensive healthcare coverage to children through age 18, who reside in households with incomes between 201% and 323% of the FPL, whereas Medicaid covers eligible children at or below 201% of the FPL.

14. While provided in Connecticut under the name HUSKY, coverage provided under the CHIP program operates separately from Medicaid on the funding side. Historically, CHIP federal match has been 65%. It was increased as high as 88% for a period of time in recent years, but now is at 65%. This means that coverage provided to eligible children under the CHIP funding structure results in federal funds covering a higher portion of the expenses compared to Medicaid, where federal funding normally covers 50% of the expenses.

15. Children who would have been eligible for Connecticut's Medicaid or CHIP-funded coverage programs had they met immigration status requirements receive coverage through the 100% state-funded State HUSKY program. Connecticut law requires such coverage to be provided to all children who apply and are eligible.

<u>Healthcare Coverage for Pregnant Women and Newborns</u>

16. HUSKY also covers all pregnant women regardless of immigration status with income at or below 263% of the FPL. This is possible because their unborn children are deemed covered at conception, so even though the mother may not have a qualifying immigration status, the child will be born a U.S. citizen and is therefore eligible for services under CHIP from conception through birth. After the child is born, the child (as a U.S. citizen) can

5

remain covered under HUSKY, while the mother is no longer covered under any federal healthcare program, but in Connecticut is provided 12 months of state-funded postpartum coverage.

17. As of 2024, DSS administers Medicaid funded coverage for more than 380,000 children annually in Connecticut, and CHIP funded coverage for approximately 39,000 children in Connecticut. DSS estimates that coverage on a per-child basis costs approximately $3,850 per year on average. For this coverage, Connecticut expended approximately $1,450,000,000 and received $744,000,000 in reimbursement from the federal government under Medicaid and CHIP. With respect to State HUSKY, there were over 20,000 children covered and the State expended approximately $23,000,000 in 2024.

18. Under federal law, DSS must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. Applications for coverage are processed either through Access Health Connecticut (the state's health insurance marketplace), where eligibility is based on a MAGI determination, or through DSS directly for individuals qualifying under a non-MAGI basis. Citizenship eligibility status is one eligibility factor that DSS must verify for HUSKY coverage. There are multiple ways that DSS verifies citizenship or immigration status to determine eligibility.

19. Generally speaking, for MAGI-based coverage, DSS first uses an individuals' Social Security Number (SSN) along with the individual's name and date of birth to automatically check the SSN with the Social Security Administration (SSA) in order to confirm identity and citizenship or qualifying immigration status through what is called the "federal data services hub." For newborns who do not yet have an SSN, citizenship eligibility is verified

6

by birth records provided (usually by the hospital or other medical provider) at the time of birth because children born in the United States are citizens. For individuals who declare to be lawfully present and have an SSN, DSS uses the SSN, name, and date of birth to confirm an individual's status with the Department of Homeland Security. For individuals who have an SSN and declare to be a citizen, but for whom citizenship cannot be automatically verified, DSS will request verification from the individual of their citizenship. When an individual is applying for non-MAGI coverage through DSS, SSN and citizenship are automatically verified through an interface with the SSA.

20. In the relatively infrequent instances where citizenship is not or cannot be verified by those automatic means, an individual can be approved for coverage based on their attestation and given a reasonable opportunity to provide verification. On that issue, a declaration of citizenship or qualifying immigration status may be provided in writing, and under penalty of perjury by an adult member of the household, an authorized representative, or someone acting for the applicant. States must provide otherwise eligible individuals with a "reasonable opportunity period" to verify their qualifying immigration status. Individuals making a declaration of a qualifying citizenship or immigration status are furnished at least 90 days of Medicaid coverage while additional verification is collected. If an individual's status is found to be unsatisfactory before the 90 days, their eligibility is determined and their coverage closed.

<u>Impact of Purported Revocation of Birthright Citizenship</u>

21. I am aware of an executive order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother

7

who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident. This Executive Order will have a variety of widespread harmful impacts on Connecticut's HUSKY programs, including a decrease in receipt of proper medical care for children born in Connecticut and increased operational and administrative costs for the State.

22. In addition to impacts on those subject to such a policy—children who would have been citizens had they been born weeks earlier—it will have a direct impact on DSS's administration of its healthcare programs and the amount of federal funding Connecticut receives to reimburse medical expenses for children residing in Connecticut.

23. Connecticut has made tremendous strides in reducing the number of uninsured individuals. Many immigrants are direct beneficiaries of HUSKY coverage. Connecticut has continued to improve and broaden coverage options for children residing in the State and worked to streamline the application process and make that process as simple as possible for parents seeking coverage for themselves and their children. This is possible using both state and federal Medicaid and CHIP dollars as appropriate. Uninsured individuals suffer significant negative health impacts and the economic impacts of an increase in the uninsured rate could be severe. Individuals with health insurance that provides preventative care are less likely to need more intensive health care treatments, including emergency care. Health insurance reduces the financial burden on Connecticut health care providers who provide care to uninsured individuals, reduces uncompensated care, and ensures families are not left with medical bills that they are unable to pay. Sick children with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

24. Connecticut's current Medicaid, CHIP, and other health coverage programs are structured around the significant reimbursements from the federal government, and any loss of funding would have serious consequences for Connecticut and the individuals served by DSS. The federal government action of taking away birthright citizenship from children born in Connecticut would result in babies being born as non-citizens with no legal status. That will result in direct loss of federal reimbursements to the State for coverage provided to those children because eligibility for federally matched programs such as Medicaid and CHIP depend on the individual's eligibility under federal law, which necessarily depends on their citizenship or immigration status. In particular, federally matched coverage to many children that would have been provided under Medicaid or CHIP will very likely be lost without the clear line of eligibility tied to birth in the United States, because those programs are not available to individuals who have not been verified to be eligible. This will necessarily result in a shift to the State of funding responsibility for this group of children, which poses a direct threat to the ability of the State to provide meaningful healthcare to all in need without interruption. It will also likely result in a significant number of children going uninsured and receiving only emergency care when absolutely necessary, leading to worse health outcomes as they grow up and require more expensive care through emergency procedures due to a lack of access to affordable preventative care.

25. Additionally, there will be substantial uncertainty and administrative burdens for DSS in providing coverage to pregnant women and their unborn children. As noted above, Connecticut is able to provide coverage to all pregnant women, regardless of citizenship status, for prenatal care under the CHIP program because the unborn children are covered under CHIP. If the children are no longer to be citizens at birth, DSS will be left in limbo

9

to determine whether coverage to those vulnerable pregnant women will be able to be covered, and if so, under what program. This is likely to pose a significant barrier to DSS providing streamlined coverage to State residents in need of medical care for themselves and their future children.

26. The purported removal of birthright citizenship is also likely to cause coverage lapses or, at a minimum, result in direct shifts to the State with respect to the cost of funding healthcare coverage for children who would have otherwise been immediately eligible for Medicaid and/or CHIP at birth. These are not impacts that can be avoided. For example, with respect to emergency care, the State and its providers will be required to absorb costs that would normally be recoverable through federal reimbursements under Medicaid and CHIP. Hospitals must provide emergency medical care under federal law, including the Emergency Medical Treatment and Labor Act and the relevant Emergency Medicaid provisions. They cannot turn patients away as a general rule. Such emergency services, if provided to a child otherwise eligible for Medicaid but for their immigration status, will still be covered in part by the federal government at the 50% match rate for Medicaid. However, if a child is a citizen and covered under CHIP, such services would be covered and reimbursed at the 65% match rate. If that same child is deemed a non-citizen at birth (and thus is ineligible for CHIP), the State will be left to pay for that care. Indeed, Connecticut's state-funded State HUSKY program would provide coverage, as is required under state law. As a result, for each child that would be eligible for CHIP but for their new non-citizen status, the State will lose the 65% federal reimbursement for any care provided—solely because the child, now as a non-citizen, would not be eligible for CHIP.

27. This poses a risk to DSS's federal funding stream used to provide healthcare coverage to vulnerable Connecticut newborns and children. Based on DSS's most recent data for 2024, there were over 5,500 children born who were eligible for HUSKY and born to mothers who qualified for state-funded postpartum coverage because the mother could not qualify for Medicaid due to their immigration status. If the children covered under Medicaid and CHIP became ineligible due to a loss of citizenship and moved to the State-funded coverage, that would result in a loss of over $10,000,000 in federal reimbursements to Connecticut and a corresponding increase to State expenditures of the same amount.

28. In order to respond and update its practices in light of the federal government's new policy, DSS will also need to develop updated comprehensive training for staff, partners, and healthcare providers. For example, DSS will need to update its training and guidance around which children are citizens and therefore eligible for Medicaid and CHIP programs, and which must be funneled into state-only programs. DSS will also need to change its verification processes, acquire more information from parents, pursue absent parents, change its computer systems, and in so doing significantly increase both the number of staff required to conduct this eligibility work and delay the enrollment process for families. This is a significant burden for the State, children, parents, and healthcare providers. This will require additional eligibility units comprised of eligibility workers and supervisory staff. For every additional eligibility unit that would need to be brought on to support the additional work, it will cost the state approximately $1,700,000. Because of the burden of revamping a program of this size and complexity, adjusting to the federal government's new policy and ensuring coverage for all needy newborns in Connecticut would likely take one year at a minimum. It may also require additional legislative

solutions at the state level, including the allocation of additional state funds to operationalize this dramatically changed interpretation of citizenship.

### Impact on School-Based Health Services

29. In addition, and upon information and belief, local education agencies (LEAs) within the State serve all school-age children, regardless of their immigration status. Within DSS, the Division of Health Services administers federal Medicaid funds to LEAs to support crucial education initiatives and provide essential services to students. Upon information and belief, school-based health services (SBHS) refer broadly to medical services provided to all students in a school setting, such as on-site school nurses, behavioral health counselors, and preventative health screenings for visual and auditory acuity. All Connecticut LEAs are required to provide certain SBHS free of charge to all students, regardless of their immigration or insurance status.

30. Upon information and belief, Section 1903(c) of the Social Security Act has authorized the federal Medicaid program to reimburse LEAs for medically necessary SBHS provided to Medicaid-eligible students with disabilities pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., provided the services were delineated in the student's individualized education program (IEP) (or similar plan) and covered in the State plan for Medicaid. IDEA requires LEAs to develop an IEP for children found eligible for special education and related services. An IEP identifies certain special education and related services, and program modifications and supports, that the LEA will provide a child with a disability.

31. Upon information and belief, in SFY 2023 there were over 25,000 unique Medicaid recipients identified as obtaining services claimed under Medicaid related to SBHS. For

SFY 2023, and upon information and belief, quarterly statistics submitted by the LEAs to DSS indicate a total of approximately 22,800 Medicaid-eligible special educated students with medical services in their IEP/504 plans. Upon information and belief, in SFY 2022, total LEA gross costs were approximately $61 million, of which federal Medicaid reimbursed 50%, or approximately $30.5 million. The State retained 50% of the federal reimbursement, or approximately $15.25 million, with the remainder passed on to the LEAs.

32. If birthright citizenship was revoked, impacted students with disabilities—who would have otherwise qualified for federally-funded Medicaid—would lose that eligibility and thus there would be no federal matching support. LEAs would thus not receive any reimbursement funds for provision of SBHS to those students, increasing the State's net costs. A change to birthright citizenship would also increase the population of undocumented children, some percentage of whom would very likely have disabilities that require SBHS and would have been eligible for partially federally-funded Medicaid but for their immigration status. The costs of providing those services would be borne by the State of Connecticut and LEAs without any federal Medicaid reimbursement.

I declare under penalty of perjury under the laws of the State of Connecticut and the United States of America that the foregoing is true and correct.

Executed this 21st day of January 2025, in New Haven, Connecticut.

Peter Hadler
Digitally signed by Peter Hadler
DN: cn=Peter Hadler, o=DSS, ou=Deputy Commissioner, email=peter.hadler@ct.gov, c=US
Date: 2025.01.21 07:32:04 -05'00'

Peter Hadler, Deputy Commissioner
Connecticut Department of Social Services