# EXHIBIT Z

# THE CONGRESSIONAL GLOBE:

CONTAINING

# THE DEBATES AND PROCEEDINGS

OF

## THE FIRST SESSION

OF

## THE THIRTY-NINTH CONGRESS.

BY F. & J. RIVES.

CITY OF WASHINGTON:
PRINTED AT THE CONGRESSIONAL GLOBE OFFICE.
1866.

Mr. CHANDLER. I will then renew my motion, that the unfinished business be postponed until to-morrow at two o'clock.

The PRESIDENT *pro tempore*. The motion of the Senator from Illinois is that the present and all prior orders be postponed, and that the Senate proceed to the consideration of the resolution from the House of Representatives proposing an amendment to the Constitution of the United States. That is now the motion before the Senate.

The motion was agreed to.

### RECONSTRUCTION.

The Senate, as in Committee of the Whole, resumed the consideration of the joint resolution (H. R. No. 127) proposing an amendment to the Constitution of the United States, the pending question being on the amendment offered by Mr. JOHNSON to strike out the third section, in the following words:

SEC. 3. Until the 4th day of July, in the year 1870, all persons who voluntarily adhered to the late insurrection, giving it aid and comfort, shall be excluded from the right to vote for Representatives in Congress and for electors for President and Vice President of the United States.

Mr. HOWARD. I hope the vote will be taken on that motion.

Mr. JOHNSON. Is there anything proposed as a substitute for that section?

Mr. CLARK. Your motion precludes that now. You move to strike out, simply.

Mr. JOHNSON. I ask for the yeas and nays upon the amendment.

The yeas and nays were ordered; and being taken, resulted—yeas 43, nays 0; as follows:

YEAS—Messrs. Anthony, Buckalew, Chandler, Clark, Conness, Cowan, Cragin, Creswell, Davis, Doolittle, Edmunds, Fessenden, Foster, Grimes, Guthrie, Harris, Henderson, Hendricks, Howard, Howe, Johnson, Kirkwood, Lane of Indiana, Lane of Kansas, Morgan, Morrill, Nesmith, Norton, Nye, Poland, Pomeroy, Ramsey, Riddle, Saulsbury, Sherman, Stewart, Sumner, Trumbull, Van Winkle, Wade, Willey, Williams, and Wilson—43.

NAYS—0.

ABSENT—Messrs. Brown, Dixon, McDougall, Sprague, Wright, and Yates—6.

So the amendment was agreed to.

Mr. HOWARD. I now offer a series of amendments to the joint resolution under consideration, which I will send to the Chair.

Mr. FESSENDEN. Take them one section at a time.

Mr. HOWARD. I will state very briefly what they are. I propose to amend section one of the article by adding after the words "section one" the following words, which will of course constitute a part of section one:

All persons born in the United States and subject to the jurisdiction thereof are citizens of the United States and of the States wherein they reside.

The second amendment——

Mr. FESSENDEN. Let us take a vote on the first one.

Mr. TRUMBULL. The Senator had better state all the amendments.

Mr. JOHNSON. I hope we shall hear them all.

Mr. HOWARD. The second amendment is to amend the second section by striking out the word "citizens," in the twentieth line, where it occurs, and inserting after the word "male" the words "inhabitants, being citizens of the United States;" and by inserting at the end of that section the words "any such State."

The third section has already been stricken out. Instead of that section, or rather in its place, I offer the following:

SEC. 3. No person shall be a Senator or Representative in Congress, or an elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath as a member of Congress, or as an officer of the United States, or as a member of any State Legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof; but Congress may, by a vote of two thirds of each House, remove such disability.

The following is to come in as section four:

The obligations of the United States incurred in suppressing insurrection, or in defense of the Union, or for payment of bounties or pensions incident thereto, shall remain inviolate.

Section four, as it now stands, will be changed to section five, and I propose to amend that section as follows: strike out the word "already," in line thirty-four, and also the words "or which may hereafter be incurred," in line thirty-five, and also the words "or of war" in lines thirty-five and thirty-six, and insert the word "rebellion" in lieu thereof; and also strike out the words "loss of involuntary service or labor" in line thirty-seven, and insert "the loss or emancipation of any slave; but all such debts, obligations, and claims shall be forever held illegal and void."

After consultation with some of the friends of this measure it has been thought that these amendments will be acceptable to both Houses of Congress and to the country, and I now submit them to the consideration of the Senate.

The PRESIDENT *pro tempore*. The first question in order is the amendment proposed to the joint resolution by the Senator from Ohio, [Mr. WADE.]

Mr. WADE. I ask leave to withdraw that amendment.

The PRESIDENT *pro tempore*. It is still in the power of the mover, and he can withdraw it if he pleases. The amendment is withdrawn. The question now is on the amendments proposed by the Senator from Michigan.

Mr. SAULSBURY. It is very well known that the majority of the members of this body who favor a proposition of this character have been in very serious deliberation for several days in reference to these amendments, and have held some four or five caucuses on the subject. Perhaps they have come to the conclusion among themselves that the amendments offered are proper to be made, but this is the first intimation that the minority of the body has had of the character of the proposed change in the constitutional amendment. Now, sir, it is nothing but fair, just, and proper that the minority of the Senate should have an opportunity to consider these amendments; and I rise for the purpose of moving that these amendments, together with the original proposition, be printed, so that we may see them before we are called upon to vote on them. Certainly there can be no graver question, no more serious business that can engage the attention of this Senate than a proposed change in the fundamental law.

Mr. FESSENDEN. I will say to the Senator that if any gentleman on that side of the Chamber desires that these amendments be laid upon the table and printed, there is no objection to that.

Mr. SAULSBURY. Then I will defer any further remarks, and make that motion.

The PRESIDENT *pro tempore*. It is moved that the amendments be printed and that the further consideration of the joint resolution be postponed until to-morrow.

The motion was agreed to.

Mr. SUMNER. I wish to give notice of an amendment which at the proper time I intend to offer to Senate bill No. 292, entitled "A bill to provide for restoring to the States lately in insurrection their full political rights." It is to strike out all after the enacting clause of the first section and to insert a section as a substitute which I ask to have printed.

Mr. JOHNSON and Mr. STEWART. Let it be read.

The PRESIDENT *pro tempore*. The proposed amendment will be read, if there be no objection.

The Secretary read it, as follows:

Strike out all after the enacting clause of the first section of the bill and insert in lieu thereof the following:

That when any State lately in rebellion shall have ratified the foregoing amendment and shall have modified its constitution and laws in conformity therewith, and shall have further provided that there shall be no denial of the elective franchise to citizens of the United States because of race or color, and that all persons shall be equal before the law, the Senators and Representatives from such State, if found duly elected and qualified, may, after having taken the required oaths of office, be admitted into Congress as such: *Provided*, That nothing in this section shall be so construed as to require the disfranchisement of any loyal person who is now allowed to vote.

Mr. SUMNER. I simply wish to have that amendment printed.

The PRESIDENT *pro tempore*. The order to print will be entered.

Mr. SUMNER. I also ask the unanimous consent of the Senate to introduce a bill of which no notice has been given, which I desire to have considered in connection with the other measure, as it belongs to this group of reconstruction measures.

There being no objection, leave was granted to introduce a bill (S. No. 345) to enforce the amendment to the Constitution abolishing slavery by securing the elective franchise to colored citizens; which was read twice by its title.

Mr. SUMNER. I move that the bill be printed and laid upon the table.

The motion was agreed to.

### MESSAGE FROM THE HOUSE.

A message from the House of Representatives, by Mr. McPHERSON, its Clerk, announced that the House of Representatives had agreed to the amendment of the Senate to the bill (H. R. No. 459) granting a pension to Anna E. Ward.

The message further announced that the House of Representatives had passed the following bills of the Senate with amendments to each, in which it requested the concurrence of the Senate:

A bill (S. No. 184) to define more clearly the jurisdiction and powers of the supreme court of the District of Columbia, and for other purposes; and

A bill (S. No. 237) granting a pension to Mrs. Martha Stevens.

### PRIVATE CLAIMS.

Mr. CLARK. I ask that the Senate give me a little time on Friday next for the purpose of disposing of certain private claims, if there be no objection.

Mr. FESSENDEN. I shall object to that unless the constitutional amendment is disposed of by that time.

Mr. CLARK. I will state that I will not antagonize them with the constitutional amendment, or a public necessity of that kind, but I should like to have an understanding that I may have an hour or so on Friday next for the consideration of private claims, if there is no other public business of pressing importance in the way.

### APPROVAL OF BILLS.

A message from the President of the United States, by Mr. COOPER, his Secretary, announced that the President of the United States had approved and signed, on the 26th instant, the following act and joint resolutions:

An act (S. No. 318) to authorize the appointment of an additional Assistant Secretary of the Navy;

A joint resolution (S. R. No. 74) providing for the acceptance of a collection of plants tendered to the United States by Frederick Pech; and

A joint resolution (S. R. No. 97) to authorize certain medals to be distributed to veteran soldiers free of postage.

### MARTHA STEVENS.

Mr. LANE, of Indiana. I move to take up Senate bill No. 237, granting a pension to Mrs. Martha Stevens, which has been returned from the House of Representatives with an amendment. The bill as it passed the Senate gave a pension of twenty dollars a month; the amendment of the House reduces it to seventeen dollars a month, the amount allowed in the case of a first lieutenant.

The amendment was concurred in.

### DISTRICT SUPREME COURT.

On motion of Mr. WADE, the amendments of the House of Representatives to the bill (S. No. 184) to define more clearly the jurisdiction and powers of the supreme court of the District of Columbia, and for other purposes, were

The motion was agreed to; and Messrs. WILSON, ANTHONY, and HENDRICKS were appointed conferees on the part of the Senate.

### FORTIFICATION APPROPRIATION BILL.

The Senate proceeded to consider its amendment to the bill (H. R. No. 255) making appropriations for the construction, preservation, and repair of certain fortifications and other works of defense for the year ending June 30, 1867, which was disagreed to by the House of Representatives.

Mr. FESSENDEN. I move that the Senate insist on its amendment, and agree to the conference asked by the House.

The motion was agreed to; and Messrs. MORGAN, MORRILL, and SAULSBURY were appointed conferees on the part of the Senate.

### WOMEN'S HOSPITAL.

Mr. MORRILL. There is a bill on the table which comes from the House of Representatives amended. I desire to call it up and concur in the amendments. It is Senate bill No. 167, to incorporate the Women's Hospital Association of the District of Columbia.

Mr. HOWARD. It is very nearly one o'clock, and I hope the joint resolution to amend the Constitution will be taken up.

Mr. MORRILL. This is pending simply on a question of concurring in the amendments made by the House to a bill of the Senate, and will not occupy two minutes.

Mr. HOWARD. If it does not go beyond one o'clock I shall not object.

Mr. MORRILL. Let it come up. I move to take it up.

The motion was agreed to; and the Senate proceeded to consider the amendments of the House of Representatives to the bill (S. No. 167) to incorporate the Women's Hospital Association of the District of Columbia.

The PRESIDENT pro tempore. The first amendment of the House has already been concurred in.

The Secretary read the second amendment of the House of Representatives, which was in the first section, line three, after the name "Adelaide J. Brown," to strike out all the names to and including that of "Mary K. Lewis," in line seven, except that of "Mary W. Kelly," and to insert "Elmira W. Knap, Mary C. Havermer, Mary Ellen Norment, Jane Thompson, Maria L. Harkness, Isabella Margaret Washington, and Mary F. Smith."

Mr. MORRILL. I move that the Senate concur in that amendment.

The motion was agreed to.

The next amendment was after the word "Columbia," at the end of section one, to add "by the name of the Columbia Hospital for Women and Lying-in Asylum."

Mr. MORRILL. I move that the Senate concur in that amendment.

The motion was agreed to.

The next amendment was in section two, line two to strike out the word "twelve" and insert "twenty-four" as the number of directors.

The amendment was concurred in.

The next amendment was in section three, after the word "directors" at the end of line three to insert "to consist of the first twelve of the above-named incorporators."

The amendment was concurred in.

The next amendment was in section four, line one, after the word "the" to insert "first twelve."

The amendment was concurred in.

The next amendment was in section five, after the word "Women" in line three, to insert "and Lying-in Asylum."

The amendment was concurred in.

The next amendment was in section five, line four, after the word "with" to insert "board, lodging."

The amendment was concurred in.

The PRESIDENT pro tempore. The amendments are completed.

### DEATH OF GENERAL SCOTT.

The PRESIDENT pro tempore laid before the Senate the following message from the President of the United States:

*To the Senate and House of Representatives:*

With sincere regret I announce to Congress that Winfield Scott, late lieutenant general in the Army of the United States, departed this life at West Point, in the State of New York, on the 29th day of May instant, at eleven o'clock in the forenoon. I feel well assured that Congress will share in the grief of the nation which must result from its bereavement of a citizen whose high fame is identified with the military history of the Republic.

ANDREW JOHNSON.

WASHINGTON, *May* 30, 1866.

Mr. WILSON. I offer the following resolution:

*Resolved by the Senate,* (the House of Representatives concurring,) That the Committee on Military Affairs and the Militia of the Senate and the Committee on Military Affairs of the House of Representatives, be, and they are hereby, appointed a joint committee of the two Houses of Congress to take into consideration the message of the President of the United States announcing to Congress the death of Lieutenant General Winfield Scott, and to report what method should be adopted by Congress to manifest their appreciation of the high character, tried patriotism, and distinguished public services of Lieutenant General Winfield Scott, and their deep sensibility upon the announcement of his death.

There being no objection, the Senate proceeded to consider the resolution; and it was adopted unanimously.

Mr. WILSON. As this committee is to be a joint one, and the resolution will have to be acted on by the House of Representatives, I move, for the present, that the message of the President be laid upon the table, and printed.

The motion was agreed to.

### RECONSTRUCTION.

Mr. HOWARD. I now move to take up House joint resolution No. 127.

The motion was agreed to; and the Senate, as in Committee of the Whole, resumed the consideration of the joint resolution (H. R. No. 127) proposing an amendment to the Constitution of the United States.

The PRESIDENT pro tempore. The question is on the amendments proposed by the Senator from Michigan, [Mr. HOWARD.]

Mr. HOWARD. The first amendment is to section one, declaring that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside." I do not propose to say anything on that subject except that the question of citizenship has been so fully discussed in this body as not to need any further elucidation, in my opinion. This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States. This has long been a great desideratum in the jurisprudence and legislation of this country.

The PRESIDENT pro tempore. The first amendment proposed by the Senator from Michigan will be read.

The Secretary read the amendment, which was in line nine, after the words "section one," to insert:

All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside.

So that the section will read:

SEC. 1. All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside.

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Mr. DOOLITTLE. I presume the honorable Senator from Michigan does not intend by this amendment to include the Indians. I move, therefore, to amend the amendment—I presume he will have no objection to it—by inserting after the word "thereof" the words "excluding Indians not taxed." The amendment would then read:

All persons born in the United States, and subject to the jurisdiction thereof, excluding Indians not taxed, are citizens of the United States and of the States wherein they reside.

Mr. HOWARD. I hope that amendment to the amendment will not be adopted. Indians born within the limits of the United States, and who maintain their tribal relations, are not, in the sense of this amendment, born subject to the jurisdiction of the United States. They are regarded, and always have been in our legislation and jurisprudence, as being *quasi* foreign nations.

Mr. COWAN. The honorable Senator from Michigan has given this subject, I have no doubt, a good deal of his attention, and I am really desirous to have a legal definition of "citizenship of the United States." What does it mean? What is its length and breadth? I would be glad if the honorable Senator in good earnest would favor us with some such definition. Is the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen? If so, what rights have they? Have they any more rights than a sojourner in the United States? If a traveler comes here from Ethiopia, from Australia, or from Great Britain, he is entitled, to a certain extent, to the protection of the laws. You cannot murder him with impunity. It is murder to kill him, the same as it is to kill another man. You cannot commit an assault and battery on him, I apprehend. He has a right to the protection of the laws; but he is not a citizen in the ordinary acceptation of the word.

It is perfectly clear that the mere fact that a man is born in the country has not heretofore entitled him to the right to exercise political power. He is not entitled, by virtue of that, to be an elector. An elector is one who is chosen by the people to perform that function, just the same as an officer is one chosen by the people to exercise the franchises of an office. Now, I should like to know, because really I have been puzzled for a long while and have been unable to determine exactly, either from conversation with those who ought to know, who have given this subject their attention, or from the decisions of the Supreme Court, the lines and boundaries which circumscribe that phrase, "citizen of the United States." What is it?

So far as the courts and the administration of the laws are concerned, I have supposed that every human being within their jurisdiction was in one sense of the word a citizen, that is, a person entitled to protection; but in so far as the right to hold property, particularly the right to acquire title to real estate, was concerned, that was a subject entirely within the control of the States. It has been so considered in the State of Pennsylvania; and aliens and others who acknowledge no allegiance, either to the State or to the General Government, may be limited and circumscribed in that particular. I have supposed, further, that it was essential to the existence of society itself, and particularly essential to the existence of a free State, that it should have the power, not only of declaring who should exercise political power within its boundaries, but that if it were overrun by another and a different race, it would have the right to absolutely expel them. I do not know that there is any danger to many of the States in this Union; but is it proposed that the people of Cal-



Case 1:25-cv-10139-LTS   Document 5-27   Filed 01/21/25   Page 5 of 14

ifornia are to remain quiescent while they are overrun by a flood of immigration of the Mongol race? Are they to be immigrated out of house and home by Chinese? I should think not. It is not supposed that the people of California, in a broad and general sense, have any higher rights than the people of China; but they are in possession of the country of California, and if another people of a different race, of different religion, of different manners, of different traditions, different tastes and sympathies are to come there and have the free right to locate there and settle among them, and if they have an opportunity of pouring in such an immigration as in a short time will double or treble the population of California, I ask, are the people of California powerless to protect themselves? I do not know that the contingency will ever happen, but it may be well to consider it while we are on this point.

As I understand the rights of the States under the Constitution at present, California has the right, if she deems it proper, to forbid the entrance into her territory of any person she chooses who is not a citizen of some one of the United States. She cannot forbid his entrance; but unquestionably, if she was likely to be invaded by a flood of Australians or people from Borneo, man-eaters or cannibals if you please, she would have the right to say that those people should not come there. It depends upon the inherent character of the men. Why, sir, there are nations of people with whom theft is a virtue and falsehood a merit. There are people to whom polygamy is as natural as monogamy is with us. It is utterly impossible that these people can meet together and enjoy their several rights and privileges which they suppose to be natural in the same society; and it is necessary, a part of the nature of things, that society shall be more or less exclusive. It is utterly and totally impossible to mingle all the various families of men, from the lowest form of the Hottentot up to the highest Caucasian, in the same society.

It must be evident to every man intrusted with the power and duty of legislation, and qualified to exercise it in a wise and temperate manner, that these things cannot be; and in my judgment there should be some limitation, some definition to this term "citizen of the United States." What is it? Is it simply to put a man in a condition that he may be an elector in one of the States? Is it to put him in a condition to have the right to enter the United States courts and sue? Or is it only that he is entitled as a sojourner to the protection of the laws while he is within and under the jurisdiction of the courts? Or is it to set him upon some pedestal, some position, to put him out of the reach of State legislation and State power?

Sir, I trust I am as liberal as anybody toward the rights of all people, but I am unwilling, on the part of my State, to give up the right that she claims, and that she may exercise, and exercise before very long, of expelling a certain number of people who invade her borders; who owe to her no allegiance; who pretend to owe none; who recognize no authority in her government; who have a distinct, independent government of their own—an *imperium in imperio*; who pay no taxes; who never perform military service; who do nothing, in fact, which becomes the citizen, and perform none of the duties which devolve upon him, but, on the other hand, have no homes, pretend to own no land, live nowhere, settle as trespassers where ever they go, and whose sole merit is a universal swindle; who delight in it, who boast of it, and whose adroitness and cunning is of such a transcendent character that no skill can serve to correct it or punish it; I mean the Gypsies. They wander in gangs in my State. They follow no ostensible pursuit for a livelihood. They trade horses, tell fortunes, and things disappear mysteriously. Where they came from nobody knows. Their very origin is lost in mystery. No man to-day can tell from whence the Zingara come or whither they go, but it is understood that they are a distinct people. They never intermingle with any other. They never intermarry with any other. I believe there is no instance on record where a Zingara woman has mated with a man of any other race, although it is true that sometimes the males of that race may mate with the females of others; but I think there is no case in history where it can be found that a woman of that race, so exclusive are they, and so strong are their sectional antipathies, has been known to mate with a man of another race. These people live in the country and are born in the country. They infest society. They impose upon the simple and the weak everywhere. Are those people, by a constitutional amendment, to be put out of the reach of the State in which they live? I mean as a class. If the mere fact of being born in the country confers that right, then they will have it; and I think it will be mischievous.

I think the honorable Senator from Michigan would not admit the right that the Indians of his neighborhood would have to come in upon Michigan and settle in the midst of that society and obtain the political power of the State, and wield it, perhaps, to his exclusion. I do not know that anybody would agree to that. It is true that our race are not subjected to dangers from that quarter, because we are the strongest, perhaps; but there is a race in contact with this country which, in all characteristics except that of simply making fierce war, is not only our equal, but perhaps our superior. I mean the yellow race; the Mongol race. They outnumber us largely. Of their industry, their skill, and their pertinacity in all worldly affairs, nobody can doubt. They are our neighbors. Recent improvement, the age of fire, has brought their coasts almost in immediate contact with our own. Distance is almost annihilated. They may pour in their millions upon our Pacific coast in a very short time. Are the States to lose control over this immigration? Is the United States to determine that they are to be citizens? I wish to be understood that I consider those people to have rights just the same as we have, but not rights in connection with our Government. If I desire the exercise of my rights I ought to go to my own people, the people of my own blood and lineage, people of the same religion, people of the same beliefs and traditions, and not thrust myself in upon a society of other men entirely different in all those respects from myself. I would not claim that right. Therefore I think, before we assert broadly that everybody who shall be born in the United States shall be taken to be a citizen of the United States, we ought to exclude others besides Indians not taxed, because I look upon Indians not taxed as being much less dangerous and much less pestiferous to society than I look upon Gypsies. I do not know how my honorable friend from California looks upon Chinese, but I do know how some of his fellow-citizens regard them. I have no doubt that now they are useful, and I have no doubt that within proper restraints, allowing that State and the other Pacific States to manage them as they may see fit, they may be useful; but I would not tie their hands by the Constitution of the United States so as to prevent them hereafter from dealing with them as in their wisdom they see fit.

Mr. CONNESS. Mr. President, I have failed to learn, from what the Senator has said, what relation what he has said has to the first section of the constitutional amendment before us; but that part of the question I propose leaving to the honorable gentleman who has charge of this resolution. As, however, the State of California has been so carefully guarded from time to time by the Senator from Pennsylvania and others, and the passage, not only of this amendment, but of the so-called civil rights bill, has been deprecated because of its pernicious influence upon society in California, owing to the contiguity of the Chinese and Mongolians to that favored land, I may be excused for saying a few words on the subject.

If my friend from Pennsylvania, who professes to know all about Gypsies and little about Chinese, knew as much of the Chinese and their habits as he professes to do of the Gypsies, (and which I concede to him, for I know nothing to the contrary,) he would not be alarmed in our behalf because of the operation of the proposition before the Senate, or even the proposition contained in the civil rights bill, so far as it involves the Chinese and us.

The proposition before us, I will say, Mr. President, relates simply in that respect to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation. I am in favor of doing so. I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States.

Now, I will say, for the benefit of my friend, that he may know something about the Chinese in future, that this portion of our population, namely, the children of Mongolian parentage, born in California, is very small indeed, and never promises to be large, notwithstanding our near neighborhood to the Celestial land. The habits of those people, and their religion, appear to demand that they all return to their own country at some time or other, either alive or dead. There are, perhaps, in California to-day about forty thousand Chinese—from forty to forty-five thousand. Those persons return invariably, while others take their places, and, as I before observed, if they do not return alive their bones are carefully gathered up and sent back to the Flowery Land. It is not an unusual circumstance that the clipper ships trading between San Francisco and China carry at a time three or four hundred human remains of these Chinese. When interred in our State they are not interred deep in the earth, but laid very near the surface, and then mounds of earth are laid over them, so that the process of disinterment is very easy. That is their habit and custom; and as soon as they are fit for transmission to their own country they are taken up with great regularity and sent there. None of their bones are allowed to remain. They will return, then, either living or dead.

Another feature connected with them is, that they do not bring their females to our country but in very limited numbers, and rarely ever in connection with families; so that their progeny in California is very small indeed. From the description we have had from the honorable Senator from Pennsylvania of the Gypsies, the progeny of all Mongolians in California is not so formidable in numbers as that of the Gypsies in Pennsylvania. We are not troubled with them at all. Indeed, it is only in exceptional cases that they have children in our State; and therefore the alarming aspect of the application of this provision to California, or any other land to which the Chinese may come as immigrants, is simply a fiction in the brain of persons who deprecate it, and that alone.

I wish now to address a few words to what the Senator from Pennsylvania has said as to the rights that California may claim as against the incursion of objectionable population from other States and countries. The State of California at various times has passed laws restrictive of Chinese immigration. It will be remembered that the Chinese came to our State, as others did from all parts of the world, to gather gold in large quantities, it being found there. The interference with our own people in the mines by them was deprecated by and generally objectionable to the miners in California. The Chinese are re-

garded, also, not with favor as an addition to the population in a social point of view; not that there is any intercourse between the two classes of persons there, but they are not regarded as pleasant neighbors; their habits are not of a character that make them at all an inviting class to have near you, and the people so generally regard them. But in their habits otherwise, they are a docile, industrious people, and they are now passing from mining into other branches of industry and labor. They are found employed as servants in a great many families and in the kitchens of hotels; they are found as farm hands in the fields; and latterly they are employed by thousands—indeed, I suppose there are from six to seven thousand of them now employed in building the Pacific railroad. They are there found to be very valuable laborers, patient and effective; and, I suppose, before the present year closes, ten or fifteen thousand of them, at least, will be employed on that great work.

The State of California has undertaken, at different times, to pass restrictive statutes as to the Chinese. The State has imposed a tax on their right to work the mines, and collected it ever since the State has been organized—a tax of four dollars a month on each Chinaman; but the Chinese could afford to pay that and still work in the mines, and they have done so. Various acts have been passed imposing a poll tax or head tax, a capitation tax, upon their arrival at the port of San Francisco; but all such laws, when tested before the supreme court of the State of California, the supreme tribunal of that people, have been decided to be unconstitutional and void.

Mr. HOWARD. A very just and constitutional decision, undoubtedly.

Mr. CONNESS. Those laws have been tested in our own courts, and when passed under the influence of public feeling there they have been declared again and again by the supreme court of the State of California to be void, violative of our treaty obligations, an interference with the commerce of the nation. Now, then, I beg the honorable Senator from Pennsylvania, though it may be very good capital in an electioneering campaign to declaim against the Chinese, not to give himself any trouble about the Chinese, but to confine himself entirely to the injurious effects of this provision upon the encouragement of a Gypsy invasion of Pennsylvania. I had never heard myself of the invasion of Pennsylvania by Gypsies. I do not know, and I do not know that the honorable Senator can tell us, how many Gypsies the census shows to be within the State of Pennsylvania. The only invasion of Pennsylvania within my recollection was an invasion very much worse and more disastrous to the State, and more to be feared and more feared, than that of Gypsies. It was an invasion of rebels, which this amendment, if I understand it aright, is intended to guard against and to prevent the recurrence of. On that occasion I am not aware, I do not remember that the State of Pennsylvania claimed the exclusive right of expelling the invaders, but on the contrary my recollection is that Pennsylvania called loudly for the assistance of her sister States to aid in the expulsion of those invaders—did not claim it as a State right to exclude them, did not think it was a violation of the sovereign rights of the State when the citizens of New York and New Jersey went to the field in Pennsylvania and expelled those invaders.

But why all this talk about Gypsies and Chinese? I have lived in the United States for now many a year, and really I have heard more about Gypsies within the last two or three months than I have heard before in my life. It cannot be because they have increased so much of late. It cannot be because they have been felt to be particularly oppressive in this or that locality. It must be that the Gypsy element is to be added to our political agitation, so that hereafter the negro alone shall not claim our entire attention. Here is a simple declaration that a score or a few score of human beings born in the United States shall be regarded as citizens of the United States, entitled to civil rights, to the right of equal defense, to the right of equal punishment for crime with other citizens; and that such a provision should be deprecated by any person having or claiming to have a high humanity passes all my understanding and comprehension.

Mr. President, let me give an instance here, in this connection. to illustrate the necessity of the civil rights bill in the State of California; and I am quite aware that what I shall say will go to California, and I wish it to do so. By the influence of our "southern brethren," who I will not say invaded California, but who went there in large numbers some years since, and who seized political power in that State and used it, who made our statutes and who expounded our statutes from the bench, negroes were forbidden to testify in the courts of law of that State, and Mongolians were forbidden to testify in the courts; and therefore for many years, indeed, until 1862, the State of California held officially that a man with a black skin could not tell the truth, could not be trusted to give a relation in a court of law of what he saw and what he knew. In 1862 the State Legislature repealed the law as to negroes, but not as to Chinese. Where white men were parties the statute yet remained, depriving the Mongolian of the right to testify in a court of law. What was the consequence of preserving that statute? I will tell you. During the four years of rebellion a good many of our "southern brethren" in California took upon themselves the occupation of what is there technically called "road agents." It is a term well known and well understood there. They turned out upon the public highways, and became robbers, highway robbers; they seized the treasure transmitted and conveyed by the express companies, by our stage lines, and in one instance made a very heavy seizure, and claimed that it was done in accordance with the authority of the so-called confederacy. But the authorities of California hunted them down, caught a few of them, and caused them to be hanged, not recognizing the commission of Jeff. Davis for those kinds of transactions within our bounds. The spirit of insubordination and violation of law, promoted and encouraged by rebellion here, affected us so largely that large numbers of— I will not say respectable southern people, and I will not say that it was confined to them alone—but large numbers of persons turned out upon the public highways, so that robbery was so common upon the highways, particularly in the interior and in the mountains of that State, that it was not wondered at, but the wonder was for anybody that traveled on the highways to escape robbery. The Chinese were robbed with impunity, for if a white man was not present no one could testify against the offender. They were robbed and plundered and murdered, and no matter how many of them were present and saw the perpetration of those acts, punishment could not follow, for they were not allowed to testify. Now, sir, I am very glad indeed that we have determined at length that every human being may relate what he heard and saw in a court of law when it is required of him, and that our jurors are regarded as of sufficient intelligence to put the right value and construction upon what is stated.

So much for what has been said in connection with the application of this provision to the State that I in part represent here. I beg my honorable friend from Pennsylvania to give himself no further trouble on account of the Chinese in California or on the Pacific coast. We are fully aware of the nature of that class of people and their influence among us, and feel entirely able to take care of them and to provide against any evils that may flow from their presence among us. We are entirely ready to accept the provision proposed in this constitutional amendment, that the children born here of Mongolian parents shall be declared by the Constitution of the United States to be entitled to civil rights and to equal protection before the law with others.

Mr. HOWARD. There is a typographical error in the amendment now under consideration. The word "State" in the eleventh line is printed "States." It should be in the singular instead of the plural number, so as to read "all persons born in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State" (not States) "wherein they reside." I move that that correction be made.

Mr. JOHNSON. I suggest to the Senator from Michigan that it stands just as well as it is.

Mr. HOWARD. I wish to correct the error of the printer; it is printed "States" instead of "State."

The PRESIDENT pro tempore. The correction will be made.

Mr. JOHNSON. I doubt whether it is an error of the printer.

The PRESIDENT pro tempore. The question is on the amendment proposed by the Senator from Wisconsin to the amendment of the Senator from Michigan to the resolution before the Senate.

Mr. DOOLITTLE. I moved this amendment because it seems to me very clear that there is a large mass of the Indian population who are clearly subject to the jurisdiction of the United States who ought not to be included as citizens of the United States. All the Indians upon reservations within the several States are most clearly subject to our jurisdiction, both civil and military. We appoint civil agents who have a control over them in behalf of the Government. We have our military commanders in the neighborhood of the reservations, who have complete control. For instance, there are seven or eight thousand Navajoes at this moment under the control of General Carlton, in New Mexico, upon the Indian reservations, managed, controlled, fed at the expense of the United States, and fed by the War Department, managed by the War Department, and at a cost to this Government of almost a million and a half of dollars every year. Because it is managed by the War Department, paid out of the commissary fund and out of the appropriations for quartermasters' stores, the people do not realize the enormous expense which is upon their hands. Are these six or seven thousand Navajoes to be made citizens of the United States? Go into the State of Kansas, and you find there any number of reservations, Indians in all stages, from the wild Indian of the plains, who lives on nothing but the meat of the buffalo, to those Indians who are partially civilized and have partially adopted the habits of civilized life. So it is in other States. In my own State there are the Chippewas, the remnants of the Winnebagoes, and the Pottawatomies. There are tribes in the State of Minnesota and other States of the Union. Are these persons to be regarded as citizens of the United States, and by a constitutional amendment declared to be such, because they are born within the United States and subject to our jurisdiction?

Mr. President, the word "citizen," if applied to them, would bring in all the Digger Indians of California. Perhaps they have mostly disappeared; the people of California, perhaps, have put them out of the way; but there are the Indians of Oregon and the Indians of the Territories. Take Colorado; there are more Indian citizens of Colorado than there are white citizens this moment if you admit it as a State. And yet by a constitutional amendment you propose to declare the Utes, the Tabahuaches, and all those wild Indians to be citizens of the United States, the great Republic of the world, whose citizenship should be a



title as proud as that of king, and whose danger is that you may degrade that citizenship.

Mr. President, citizenship, if conferred, carries with it, as a matter of course, the rights, the responsibilities, the duties, the immunities, the privileges of citizens, for that is the very object of this constitutional amendment to extend. I do not intend to address the Senate at length on this question now. I have simply raised the question. I think that it would be exceedingly unwise not to adopt this amendment and to put in the Constitution of the United States the broad language proposed. Our fathers certainly did not act in this way, for in the Constitution as they adopted it they excluded the Indians who are not taxed; did not enumerate them, indeed, as a part of the population upon which they based representation and taxation; much less did they make them citizens of the United States.

Mr. President, before the subject of the constitutional amendment passes entirely from the Senate, I may desire to avail myself of the opportunity to address the body more at length; but now I simply direct what I have to say to the precise point contained in the amendment which I have submitted.

Mr. FESSENDEN. I rise not to make any remarks on this question, but to say that if there is any reason to doubt that this provision does not cover all the wild Indians, it is a serious doubt; and I should like to hear the opinion of the chairman of the Committee on the Judiciary, who has investigated the civil rights bill so thoroughly, on the subject, or any other gentleman who has looked at it. I had the impression that it would not cover them.

Mr. TRUMBULL. Of course my opinion is not any better than that of any other member of the Senate; but it is very clear to me that there is nothing whatever in the suggestions of the Senator from Wisconsin. The provision is, that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens." That means "subject to the complete jurisdiction thereof." Now, does the Senator from Wisconsin pretend to say that the Navajoe Indians are subject to the complete jurisdiction of the United States? What do we mean by "subject to the jurisdiction of the United States?" Not owing allegiance to anybody else. That is what it means. Can you sue a Navajoe Indian in court? Are they in any sense subject to the complete jurisdiction of the United States? By no means. We make treaties with them, and therefore they are not subject to our jurisdiction. If they were, we would not make treaties with them. If we want to control the Navajoes, or any other Indians of which the Senator from Wisconsin has spoken, how do we do it? Do we pass a law to control them? Are they subject to our jurisdiction in that sense? Is it not understood that if we want to make arrangements with the Indians to whom he refers we do it by means of a treaty? The Senator himself has brought before us a great many treaties this session in order to get control of those people.

If you introduce the words "not taxed," that is a very indefinite expression. What does "excluding Indians not taxed" mean? You will have just as much difficulty in regard to those Indians that you say are in Colorado, where there are more Indians than there are whites. Suppose they have property there, and it is taxed; then they are citizens.

Mr. WADE. And ought to be.

Mr. TRUMBULL. The Senator from Ohio says they ought to be. If they are there and within the jurisdiction of Colorado, and subject to the laws of Colorado, they ought to be citizens; and that is all that is proposed. It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is "subject to the jurisdiction of the United States." Would the Senator from Wisconsin think for a moment of bringing a bill into Congress to subject these wild Indians with whom we have no treaty to the laws and regulations of civilized life? Would he think of punishing them for instituting among themselves their own tribal regulations? Does the Government of the United States pretend to take jurisdiction of murders and robberies and other crimes committed by one Indian upon another? Are they subject to our jurisdiction in any just sense? They are not subject to our jurisdiction. We do not exercise jurisdiction over them. It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens; and there can be no objection to the proposition that such persons should be citizens.

It seems to me, sir, that to introduce the words suggested by the Senator from Wisconsin would not make the proposition any clearer than it is, and that it by no means embraces, or by any fair construction—by any construction, I may say—could embrace the wild Indians of the plains or any with whom we have treaty relations, for the very fact that we have treaty relations with them shows that they are not subject to our jurisdiction. We cannot make a treaty with ourselves; it would be absurd. I think that the proposition is clear and safe as it is.

Mr. JOHNSON. Mr. President, the particular question before the Senate is whether the amendment proposed by the Senator from Wisconsin shall be adopted. But while I am up, and before I proceed to consider the necessity for that amendment, I will say a word or two upon the proposition itself; I mean that part of section one which is recommended as an amendment to the old proposition as it originally stood.

The Senate are not to be informed that very serious questions have arisen, and some of them have given rise to embarrassments, as to who are citizens of the United States, and what are the rights which belong to them as such; and the object of this amendment is to settle that question. I think, therefore, with the committee to whom the matter was referred, and by whom the report has been made, that it is very advisable in some form or other to define what citizenship is; and I know no better way of accomplishing that than the way adopted by the committee. The Constitution as it now stands recognizes a citizenship of the United States. It provides that no person shall be eligible to the Presidency of the United States except a natural-born citizen of the United States or one who was in the United States at the time of the adoption of the Constitution; it provides that no person shall be eligible to the office of Senator who has not been a citizen of the United States for nine years; but there is no definition in the Constitution as it now stands as to citizenship. Who is a citizen of the United States is an open question. The decision of the courts and the doctrine of the commentators is, that every man who is a citizen of a State becomes *ipso facto* a citizen of the United States; but there is no definition as to how citizenship can exist in the United States except through the medium of a citizenship in a State.

Now, all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power—for that, no doubt, is the meaning of the committee who have brought the matter before us—shall be considered as citizens of the United States. That would seem to be not only a wise but a necessary provision. If there are to be citizens of the United States entitled everywhere to the character of citizens of the United States there should be some certain definition of what citizenship is, what has created the character of citizen as between himself and the United States, and the amendment says that citizenship may depend upon birth, and I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States, born of parents who at the time were subject to the authority of the United States. I am, however, by no means prepared to say, as I think I have intimated before, that being born within the United States, independent of any new constitutional provision on the subject, creates the relation of citizen to the United States.

The amendment proposed by my friend from Wisconsin I think, and I submit it to the Senate, should be adopted. The honorable member from Illinois seems to think it unnecessary, because, according to his interpretation of the amendment as it stands, it excludes those who are proposed to be excluded by the amendment of the Senator from Wisconsin, and he thinks that that is done by saying that those only who are born in the United States are to become citizens thereof, who at the time of birth are "subject to the jurisdiction thereof," and he supposes and states very positively that the Indians are not subject to the jurisdiction of the United States. With due deference to my friend from Illinois, I think he is in error. They are within the territorial limits of the United States. If they were not, the provision would be altogether inapplicable to them. In one sense, therefore, they are a part of the people of the United States, and independent of the manner in which we have been dealing with them it would seem to follow necessarily that they are subject to the jurisdiction of the United States, as is anybody else who may be born within the limits of the United States. But when the United States took possession—England for us in the beginning, and our limits have been extended since—of the territory which was originally peopled exclusively by the Indians, we found it necessary to recognize some kind of a national existence on the part of the aboriginal settlers of the United States; but we were under no obligation to do so, and we are under no constitutional obligation to do so now, for although we have been in the habit of making treaties with these several tribes, we have also, from time to time, legislated in relation to the Indian tribes. We punish murder committed within the territorial limits in which the tribes are to be found. I think we punish the crime of murder committed by one Indian upon another Indian. I think my friend from Illinois is wrong in supposing that that is not done.

Mr. TRUMBULL. Not except where it is done under special provision—not with the wild Indians of the plains.

Mr. JOHNSON. By special provision of legislation. That I understand. I am referring to that.

Mr. TRUMBULL. We propose to make citizens of those brought under our jurisdiction in that way. Nobody objects to that, I reckon.

Mr. JOHNSON. Yes, I do. I am not objecting at all to their being citizens now; what I mean to say, is that over all the Indian tribes within the limits of the United States, the United States may—that is the test—exercise jurisdiction. Whether they exercise it in point of fact is another question; whether they propose to govern them under the treaty-making power is quite another question; but the question as to the authority to legislate is one, I think, about which, if we were to exercise it, the courts would have no doubt; and when, therefore, the courts come to consider the meaning of this provision, that all persons born within the limits of the United States and subject to the jurisdiction thereof are citizens, and are called upon to decide whether Indians born within the United States, with whom we are now making treaties are citizens, I think they will decide that they have become citizens by virtue of this amendment. But at any rate, without expressing any decided opinion to that effect, as I would not do when the honorable member from Illinois is so decided in the opposite opinion, when the honorable member from Wisconsin, to say nothing of myself, entertains a reasonable doubt that Indians would be embraced within the provision, what possible harm can there be in guarding against it? It does not affect the constitutional amendment in any way. That is not my purpose, and I presume is not the purpose of my friend from Wisconsin.

The honorable member from Illinois says that the terms which the member from Wis-

Generated on 2025-01-04 00:00:29 GMT / https://hdl.handle.net/2027/osu.32437011560386
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

consin proposes to insert would leave it very uncertain. I suppose that my friend from Illinois agreed to the second section of this constitutional amendment, and these terms are used in that section. In apportioning the representation, as you propose to do by virtue of the second section, you exclude from the basis "Indians not taxed." What does that mean? The honorable member from Illinois says that that is very uncertain. What does it mean? It means, or would mean if inserted in the first section, nothing, according to the honorable member from Illinois. Well, if it means nothing inserted in the first section it means nothing where it is proposed to insert it in the second section. But I think my friend from Illinois will find that these words are clearly understood and have always been understood; they are now almost technical terms. They are found, I think, in nearly all the statutes upon the subject; and if I am not mistaken, the particular statute upon which my friend from Illinois so much relied as one necessary to the peace of the country, the civil rights bill, has the same provision in it, and that bill I believe was prepared altogether, or certainly principally, by my friend from Illinois. I read now from the civil rights bill as it passed:

"That all persons born in the United States and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens."

What did these words mean? They meant something; and their meaning as they are inserted in that act is the same meaning which will be given to them if they are inserted in the first section of this constitutional amendment. But I conclude by saying that when we are trying to settle this, among other questions, for all time, it is advisable—and if my friend will permit me to say so, our clear duty—to put every provision which we adopt in such plain language as not to be capable of two interpretations, if we can. When Senators upon the floor maintain the opinion that as it now stands it is capable of an interpretation different from that which the committee mean, and the amendment proposed gets clear of that interpretation which the committee do not mean, why should we not adopt it?

I hope, therefore, that the friends—and I am the friend of this provision as far as we have gone in it—that the friends of this constitutional amendment will accept the suggestion of the honorable member from Wisconsin.

Mr. TRUMBULL. The Senator from Maryland certainly perceives a distinction between the use of the words "excluding Indians not taxed" in the second section and in the first. The second section is confined to the States; it does not embrace the Indians of the plains at all. That is a provision in regard to the apportionment of representation among the several States.

Mr. JOHNSON. The honorable member did not understand me. I did not say it meant the same thing.

Mr. TRUMBULL. I understood the Senator, I think. I know he did not say that the clause in the second section was extended all over the country, but he did say that the words "excluding Indians not taxed" were in the second section, and inasmuch as I had said that those words were of uncertain meaning, therefore, having gone for the words in the second section I was guilty of a great inconsistency. Now, I merely wish to show the Senator from Maryland that the words in the second section may have a very clear and definite meaning, when in the first section they would have a very uncertain meaning, because they are applied under very different circumstances. The second section refers to no persons except those in the States of the Union; but the first section refers to persons everywhere, whether in the States or in the Territories or in the District of Columbia. Therefore the criticism upon the language that I had used, it seems to me, is not a just one.

But the Senator wants to insert the words, "excluding Indians not taxed." I am not willing to make citizenship in this country depend on taxation. I am not willing, if the Senator from Wisconsin is, that the rich Indian residing in the State of New York shall be a citizen and the poor Indian residing in the State of New York shall not be a citizen. If you put in those words in regard to citizenship, what do you do? You make a distinction in that respect, if you put it on the ground of taxation. We had a discussion on the civil rights bill as to the meaning of these words, "excluding Indians not taxed." The Senator from Maryland, [Mr. JOHNSON,] I think, on that occasion gave this definition to the phrase "excluding Indians not taxed," that it did not allude to the fact of taxation simply but it meant to describe a class of persons; that is, civilized Indians. I was inclined to fall into that view. I was inclined to adopt the suggestion of the Senator from Maryland, that the words "excluding Indians not taxed" did not mean literally excluding those upon whom a tax was not assessed and collected, but rather meant to define a class of persons, meaning civilized Indians; and I think I gave that answer to the Senator from Indiana, [Mr. HENDRICKS,] who was disposed to give it the technical meaning that "Indians not taxed" meant simply those upon whom no tax was laid. If it does mean that, then it would be very objectionable to insert those words here, because it would make of a wealthy Indian a citizen and would not make a citizen of one not possessed of wealth under the same circumstances. This is the uncertainty in regard to the meaning of those words. The Senator from Maryland and myself, perhaps, would understand them alike as embracing all Indians who were not civilized; and yet, if you insert that language, "Indians not taxed," other persons may not understand them that way; and I remember that the Senator from Indiana was disposed to understand them differently when we had the discussion upon the civil rights bill. Therefore I think it better to avoid these words and that the language proposed in this constitutional amendment is better than the language in the civil rights bill. The object to be arrived at is the same.

I have already replied to the suggestion as to the Indians being subject to our jurisdiction. They are not subject to our jurisdiction in the sense of owing allegiance solely to the United States; and the Senator from Maryland, if he will look into our statutes, will search in vain for any means of trying these wild Indians. A person can only be tried for a criminal offense in pursuance of laws, and he must be tried in a district which must have been fixed by law before the crime was committed. We have had in this country, and have to-day, a large region of country within the territorial limits of the United States, unorganized, over which we do not pretend to exercise any civil or criminal jurisdiction, where wild tribes of Indians roam at pleasure, subject to their own laws and regulations, and we do not pretend to interfere with them. They would not be embraced by this provision.

For these reasons I think this language is better than the language employed by the civil rights bill.

Mr. HENDRICKS. Will the Senator from Illinois allow me to ask him a question before he sits down?

Mr. TRUMBULL. Certainly.

Mr. HENDRICKS. I wish to know if, in his opinion, it is not a matter of pleasure on the part of the Government of the United States, and especially of Congress, whether the laws of the United States be extended over the Indians or not; if it is not a matter to be decided by Congress alone whether we treat with the Indians by treaty or govern them by direct law; in other words, whether Congress has not the power at its pleasure to extend the laws of the United States over the Indians and to govern them.

Mr. TRUMBULL. I suppose it would have the same power that it has to extend the laws of the United States over Mexico and govern her if in our discretion we thought proper to extend the laws of the United States over the republic of Mexico, or the empire of Mexico, if you please so to call it, and had sufficient physical power to enforce it. I suppose you may say in this case we have the power to do it, but it would be a violation of our treaty obligations, a violation of the faith of this nation, to extend our laws over these Indian tribes with whom we have made treaties saying we would not do it.

Mr. FESSENDEN. We could extend it over Mexico in the same way.

Mr. TRUMBULL. I say we could extend it over Mexico just as well; that is, if we have the power to do it. Congress might declare war, or, without declaring war, might extend its laws, or profess to extend them, over Mexico, and if we had the power we could enforce that declaration; but I think it would be a breach of good faith on our part to extend the laws of the United States over the Indian tribes with whom we have these treaty stipulations, and in which treaties we have agreed that we would not make them subject to the laws of the United States. There are numerous treaties of that kind.

Mr. VAN WINKLE. If the Senator will permit me, I wish to remind him of a citation from a decision of the Supreme Court that he himself made here, I think, when the veto of the civil rights bill was under discussion; and if I correctly understood it, as he read it, the Supreme Court decided that these untaxed Indians were subjects, and distinguished between subjects and citizens.

Mr. TRUMBULL. I think there are decisions that treat them as subjects in some respects. In some sense they are regarded as within the territorial boundaries of the United States, but I do not think they are subject to the jurisdiction of the United States in any legitimate sense; certainly not in the sense that the language is used here. The language seems to me to be better chosen than it was in the other bill. There is a difficulty about the words, "Indians not taxed." Perhaps one of the reasons why I think so is because of the persistency with which the Senator from Indiana himself insisted that the phrase "excluding Indians not taxed," the very words which the Senator from Wisconsin wishes to insert here, would exclude everybody that did not pay a tax; that that was the meaning of it; we must take it literally. The Senator from Maryland did not agree to that, nor did I; but if the Senator from Indiana was right, it would receive a construction which I am sure the Senator from Wisconsin would not be for: for if these Indians come within our limits and within our jurisdiction and are civilized, he would just as soon make a citizen of a poor Indian as of the rich Indian.

Mr. HENDRICKS. I expected the Senator from Illinois, being a very able lawyer, at the head of the Judiciary Committee, to meet the question that I asked him and to answer it as a question of law, and not as a question of military power. I did not ask him the question whether the Government of the United States had the military power to go into the Indian territory and subjugate the Indians to the political power of the country; nor had he a right to understand the question in that sense. I asked him the question whether, under the Constitution, under the powers of this Government, we may extend our laws over the Indians and compel obedience, as a matter of legal right, from the Indians. If the Indian is bound to obey the law he is subject to the jurisdiction of the country; and that is the question I desired the Senator to meet as a legal question, whether the Indian would be bound to obey the law which Congress in express terms extended over him in regard to questions within the jurisdiction of Congress.

Now, sir, this question has once or twice been decided by the Attorney General, so far as he could decide it. In 1855 he was inquired of whether the laws of the United States regulating the intercourse with the Indian tribes, by the general legislation in regard to Oregon,



had been extended to Oregon; and he gave it as his opinion that the laws had been extended to Oregon, and regulated the intercourse between the white people and the Indians there. Subsequently, the Attorney General was asked whether Indians were citizens of the United States in such sense as that they could become the owners of the public lands where the right to acquire them was limited to citizens; and in the course of that opinion he says that the Indian is not a citizen of the United States by virtue of his birth, but that he is a subject. He says:

"The simple truth is plain that the Indians are the subjects of the United States, and therefore are not, in mere right of home-birth, citizens of the United States. The two conditions are incompatible. The moment it comes to be seen that the Indians are domestic subjects of this Government, that moment it is clear to the perception that they are not the sovereign constituent ingredients of the Government. This distinction between citizens proper, that is, the constituent members of the political sovereignty, and subjects of that sovereignty, who are not therefore citizens, is recognized in the best authorities of public law."

He then cites some authorities. Again, he says:

"Not being citizens of the United States by mere birth, can they become so by naturalization? Undoubtedly.

"But they cannot become citizens by naturalization under existing general acts of Congress. (2 Kent's Commentaries, page 72.)

"Those acts apply only to foreigners, subjects of another allegiance. The Indians are not foreigners, and they are in our allegiance without being citizens of the United States."

Mr. JOHNSON. Whose opinion is that?

Mr. HENDRICKS. That is the opinion of Mr. Cushing, given on the 5th of July, 1856. I did not intend to discuss this question, but I will make one further reply to the Senator from Illinois. When the civil rights bill was under consideration I was of the opinion that the term "not taxed" meant not taxed; and when words are plain in the law I take them in their natural sense. When there is no ambiguity the law says there shall be no construction; and when you say a man is not taxed I presume it means that he is not taxed. I do not know any words that express the meaning more clearly than the words themselves, and therefore I cannot express the meaning in any more apt words than the words used by the Senator from Wisconsin, "Indians not taxed." When I said that that was making citizenship to rest upon property I recollect, or I think I do, the indignant terms in which the Senator from Illinois then replied, conveying the idea that it was a demagogical argument in this body to speak of a subject like that; and yet to-day he says to the Senator from Wisconsin that it is not a statesmanlike proposition. He makes the same point upon the Senator from Wisconsin which he undertook to make upon me on the civil rights bill.

If it is the pleasure of Congress to make the wild Indians of the desert citizens, and then if three fourths of the States agree to it, I presume we will get along the best way we can; and what shall then be the relations between these people and the United States will be for us and for our descendants to work out. They are not now citizens; they are subjects. For safety, as a matter of policy we regulate our intercourse with them to a large extent by treaties, so that they shall assent to the regulations that govern them. That is a matter of policy, but we need not treat with an Indian. We can make him obey our laws, and being liable to such obedience he is subject to the jurisdiction of the United States. I did not intend to discuss this question, but I got into it by the inquiry I made of the Senator from Illinois.

Mr. HOWARD. I hope, sir, that this amendment will not be adopted. I regard the language of the section as sufficiently certain and definite. If amended according to the suggestion of the honorable Senator from Wisconsin it will read as follows:

All persons born in the United States, and subject to the jurisdiction thereof, excluding Indians not taxed, are citizens of the United States, and of the State wherein they reside.

Suppose we adopt the amendment as suggested by the honorable Senator from Wisconsin, in what condition will it leave us as to the Indian tribes wherever they are found? According to the ideas of the honorable Senator, as I understand them, this consequence would follow: all that would remain to be done on the part of any State would be to impose a tax upon the Indians, whether in their tribal condition or otherwise, in order to make them citizens of the United States. Does the honorable Senator from Wisconsin contemplate that? Does he propose to leave this amendment in such a condition that the State of Wisconsin, which he so ably represents here, will have the right to impose taxes upon the Indian tribes within her limits, and thus make of these Indians constituting the tribes, no matter how numerous, citizens of the United States and of the State of Wisconsin? That would be the direct effect of his amendment if it should be adopted. It would, in short, be a naturalization, whenever the States saw fit to impose a tax upon the Indians, of the whole Indian race within the limits of the States.

Mr. CLARK. The Senator will permit me to suggest a case. Suppose the State of Kansas, for instance, should tax her Indians for five years, they would be citizens.

Mr. HOWARD. Undoubtedly.

Mr. CLARK. But if she refuse to tax them for the next ten years how would they be then? Would they be citizens or not?

Mr. HOWARD. I take it for granted that when a man becomes a citizen of the United States under the Constitution he cannot cease to be a citizen, except by expatriation or the commission of some crime by which his citizenship shall be forfeited.

Mr. CLARK. If it depends upon taxation.

Mr. HOWARD. The continuance of the quality of citizenship would not, I think, depend upon the continuance of taxation.

Mr. CLARK. But still he would be an "Indian not taxed."

Mr. HOWARD. He has been taxed once.

Mr. CLARK. The point I wish to bring the Senator to is this: would not the admission of a provision of that kind make a sort of shifting use of the Indians?

Mr. HOWARD. It might, depending upon the construction which would happen to be given by the courts to the language of the Constitution. The great objection, therefore, to the amendment is, that it is an actual naturalization, whenever the State sees fit to enact a naturalization law in reference to the Indians in the shape of the imposition of a tax, of the whole Indian population within their limits. There is no evading this consequence, but still I cannot impute to the honorable Senator from Wisconsin a purpose like that. I think he has misapprehended the effect of the language which he suggests. I think the language as it stands is sufficiently certain and exact. It is that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

I concur entirely with the honorable Senator from Illinois, in holding that the word "jurisdiction," as here employed, ought to be construed so as to imply a full and complete jurisdiction on the part of the United States, coextensive in all respects with the constitutional power of the United States, whether exercised by Congress, by the executive, or by the judicial department; that is to say, the same jurisdiction in extent and quality as applies to every citizen of the United States now. Certainly, gentlemen cannot contend that an Indian belonging to a tribe, although born within the limits of a State, is subject to this full and complete jurisdiction. That question has long since been adjudicated, so far as the usage of the Government is concerned. The Government of the United States have always regarded and treated the Indian tribes within our limits as foreign Powers, so far as the treaty-making power is concerned, and so far especially as the commercial power is concerned, for in the very Constitution itself there is a provision that Congress shall have power to regulate commerce, not only with foreign nations and among the States, but also with the Indian tribes. That clause, in my judgment, presents a full and complete recognition of the national character of the Indian tribes, the same character in which they have been recognized ever since the discovery of the continent and its occupation by civilized men; the same light in which the Indians were viewed and treated by Great Britain from the earliest commencement of the settlement of the continent. They have always been regarded, even in our ante-revolutionary history, as being independent nations, with whom the other nations of the earth have held treaties, and in no case, I believe, has either the Government of Great Britain or of the United States recognized the right of an individual Indian to transfer or convey lands. Why? If he was a citizen, in other words, if he was not a subject of a foreign Power, if he did not belong to a tribe whose common law is that land as well as almost every other description of property shall be held in common among the members of the tribe, subject to a chief, why is it that the reservation has been imposed and always observed upon the act of conveyance on the part of the Indian?

A passage has been read from an opinion given by Mr. Attorney General Cushing on this subject, in which, it seems to me, he takes great liberties with the Constitution in speaking of the Indian as being a subject of the United States. Certainly I do not so hold; I cannot so hold, because it has been the habit of the Government from the beginning to treat with the Indian tribes as sovereign Powers. The Indians are our wards. Such is the language of the courts. They have a national independence. They have an absolute right to the occupancy of the soil upon which they reside; and the only ground of claim which the United States has ever put forth to the proprietorship of the soil of an Indian territory is simply the right of preëmption; that is, the right of the United States to be the first purchaser from the Indian tribes. We have always recognized in an Indian tribe the same sovereignty over the soil which it occupied as we recognize in a foreign nation of a power in itself over its national domains. They sell the lands to us by treaty, and they sell the lands as the sovereign Power owning, holding, and occupying the lands.

But it is useless, it seems to me, Mr. President, to enlarge further upon the question of the real political power of Indians or of Indian tribes. Our legislation has always recognized them as sovereign Powers. The Indian who is still connected by his tribal relation with the government of his tribe is subject for crimes committed against the laws or usages of the tribe to the tribe itself, and not to any foreign or other tribunal. I believe that has been the uniform course of decision on that subject. The United States courts have no power to punish an Indian who is connected with a tribe for a crime committed by him upon another member of the same tribe.

Mr. FESSENDEN. Within the territory.

Mr. HOWARD. Yes, sir. Why? Because the jurisdiction of the nation intervenes and ousts what would otherwise be perhaps a right of jurisdiction of the United States. But the great objection to the amendment to the amendment is that it is an unconscious attempt on the part of my friend from Wisconsin to naturalize all the Indians within the limits of the United States. I do not agree to that. I am not quite so liberal in my views. I am not yet prepared to pass a sweeping act of naturalization by which all the Indian savages, wild or tame, belonging to a tribal relation, are to become my fellow-citizens and go to the polls and vote with me and hold lands and deal in every other way that a citizen of the United States has a right to do.

Mr. DOOLITTLE. Mr. President, the Senator from Michigan declares his purpose to be

Digitized by Google

not to include these Indians within this constitutional amendment. In purpose I agree with him. I do not intend to include them. My purpose is to exclude them; and the question between us is whether his language includes them and mine excludes them, or whether his language excludes them and mine includes them. The Senator says, in the first place, if the words which are suggested by me, "Indians not taxed," are to govern, any State has it in its power to naturalize the Indian tribes within its limits and bring them in as citizens. Can a State tax them unless they are subject to the State? Certainly not. My friend from Michigan will not contend that an Indian can be taxed if he is not subject to the State or to the United States; and yet, if they are subject to the jurisdiction of the United States they are declared by the very language of his amendment to be citizens.

Now, sir, the words which I have used are borrowed from the Constitution as it stands—the Constitution adopted by our fathers. We have lived under it for seventy years; and these words, "Indians not taxed," are the very words which were used by our fathers in forming the Constitution as descriptive of a certain class of Indians which should not be enumerated as a part of our population, as distinguished from another class which should be enumerated as a part of our population; and these are words of description used by them under which we have acted for seventy years and more. They have come to have a meaning that is understood as descriptive of a certain class of Indians that may be enumerated within our population as a part of the citizens of the United States, to constitute a part of the basis of the political power of the United States, and others not included within it are to be excluded from that basis. The courts of the United States have had occasion to speak on this subject, and from time to time they have declared that the Indians are subjects of the United States, not citizens; and that is the very word in your amendment where they are "subject to the jurisdiction" of the United States. Why, sir, what does it mean when you say that a people are subject to the jurisdiction of the United States? Subject, first, to its military power; second, subject to its political power; third, subject to its legislative power; and who doubts our legislative power over the reservations upon which these Indians are settled? Speaking upon that subject, I have to say that one of the most distinguished men who ever sat in this body, certainly that have sat in this body since I have been a member of it, the late Senator from Vermont, Judge Collamer, time and again urged upon me, as a member of the Committee on Indian Affairs, to bring forward a scheme of legislation by which we should pass laws and subject all the Indians in all the Territories of the United States to the legislation of Congress direct. The Senator from Ohio not now in his seat [Mr. SHERMAN] has contended for the same thing, and other members of Congress contend that the very best policy of dealing with the Indian tribes is to subject them at once to our legislative power and jurisdiction. "Subjects of the United States!" Why, sir, they are completely our subjects, completely in our power. We hold them as our wards. They are living upon our bounty.

Mr. President, there is one thing that I doubt not Senators must have forgotten. In all those vast territories which we acquired from Mexico, we took the sovereignty and the jurisdiction of the soil and the country from Mexico, just as Mexico herself had held it, just as Spain had held it before the Mexican republic was established; and what was the power that was held by Spain and by Mexico over the Indian tribes? They did not recognize even the possessory title of an Indian in one foot of the jurisdiction of those territories. In reference to the Indians of California, we have never admitted that they had sufficient jurisdiction over any part of its soil to make a treaty with them. The Senate of the United States expressly refused to make treaties with the Indians of California, on the ground that they had no title and no jurisdiction whatever in the soil; they were absolutely subject to the authority of the United States, which we derived from our treaty with Mexico.

The opinion of Attorney General Cushing, one of the ablest men who has ever occupied the position of Attorney General, has been read here, in which he states clearly that the Indians, though born upon our soil, owing us allegiance, are not citizens; they are our subjects; and that is the very word which is used in this amendment proposed to the Constitution of the United States, declaring that if they be "subject" to our jurisdiction, born on our soil, they are, *ipso facto*, citizens of the United States.

Mr. President, the celebrated civil rights bill which has been passed during the present Congress, which was the forerunner of this constitutional amendment, and to give validity to which this constitutional amendment is brought forward, and which without this constitutional amendment to enforce it has no validity so far as this question is concerned, uses the following language:

"That all persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States."

Why should this language be criticised any more now, when it is brought forward here in this constitutional amendment, than when it was in the civil rights bill? Why should the language be more criticised here than it is in the second section of this constitutional amendment, where the same words are used? The second section, in apportioning representation, proposes to count the whole number of persons in each State, "excluding Indians not taxed." Why not insert those words in the first section as well as in the second? Why not insert them in this constitutional amendment as well as in the civil rights bill? The civil rights bill undertook to do this same thing. It undertook to declare that "all persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States." But, sir, the committee of fifteen, fearing that this declaration by Congress was without validity unless a constitutional amendment should be brought forward to enforce it, have thought proper to report this amendment.

Mr. FESSENDEN. I want to say to the honorable Senator, who has a great regard for truth, that he is drawing entirely upon his imagination. There is not one word of correctness in all that he is saying, not a particle, not a scintilla, not the beginning of truth.

Mr. DOOLITTLE. I take a little issue with my friend from Maine on that point as a question of fact.

Mr. FESSENDEN. In the first place, this was not brought forward by the committee of fifteen at all.

Mr. DOOLITTLE. This proposition was first introduced into the House by a gentleman from Ohio by the name of BINGHAM.

Mr. FESSENDEN. I thought the Senator was speaking of this first part of the section, the amendment, not the whole.

Mr. DOOLITTLE. No, sir; that is proposed by the Senator from Michigan. As I understand, a member from Ohio, Mr. BINGHAM, who in a very able speech in the House maintained that the civil rights bill was without any authority in the Constitution, brought forward a proposition in the House of Representatives to amend the Constitution so as to enable Congress to declare the civil rights of all persons, and that constitutional amendment, Mr. BINGHAM being himself one of the committee of fifteen, was referred by the House to that committee, and from the committee it has been reported. I say I have a right to infer that it was because Mr. BINGHAM and others of the House of Representatives and other persons upon the committee had doubts, at least, as to the constitutionality of the civil rights bill that this proposition to amend the Constitution now appears to give it validity and force. It is not an imputation upon any one.

Mr. GRIMES. It is an imputation upon every member who voted for the bill, the inference being legitimate and logical that they violated their oaths and knew they did so when they voted for the civil rights bill.

Mr. DOOLITTLE. The Senator goes too far. What I say is that they had doubts.

Mr. FESSENDEN. I will say to the Senator one thing: whatever may have been Mr. BINGHAM's motives in bringing it forward, he brought it forward some time before the civil rights bill was considered at all and had it referred to the committee, and it was discussed in the committee long before the civil rights bill was passed. Then I will say to him further, that during all the discussion in the committee that I heard nothing was ever said about the civil rights bill in connection with that. It was placed on entirely different grounds.

Mr. DOOLITTLE. I will ask the Senator from Maine this question: if Congress, under the Constitution now has the power to declare that "all persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States," what is the necessity of amending the Constitution at all on this subject?

Mr. FESSENDEN. I do not choose that the Senator shall get off from the issue he presented. I meet him right there on the first issue. If he wants my opinion upon other questions, he can ask it afterward. He was saying that the committee of fifteen brought this proposition forward for a specific object.

Mr. DOOLITTLE. I said the committee of fifteen brought it forward because they had doubts as to the constitutional power of Congress to pass the civil rights bill.

Mr. FESSENDEN. Exactly; and I say, in reply, that if they had doubts, no such doubts were stated in the committee of fifteen, and the matter was not put on that ground at all. There was no question raised about the civil rights bill.

Mr. DOOLITTLE. Then I put the question to the Senator: if there are no doubts, why amend the Constitution on that subject?

Mr. FESSENDEN. That question the Senator may answer to suit himself. It has no reference to the civil rights bill.

Mr. DOOLITTLE. That does not meet the case at all. If my friend maintains that at this moment the Constitution of the United States, without amendment, gives all the power you ask, why do you put this new amendment into it on that subject?

Mr. HOWARD. If the Senator from Wisconsin wishes an answer, I will give him one such as I am able to give.

Mr. DOOLITTLE. I was asking the Senator from Maine.

Mr. HOWARD. I was a member of the same committee, and the Senator's observations apply to me equally with the Senator from Maine. We desired to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill beyond the legislative power of such gentlemen as the Senator from Wisconsin, who would pull the whole system up by the roots and destroy it, and expose the freedmen again to the oppressions of their old masters.

Mr. DOOLITTLE. The Senator has made his answer, I suppose.

Mr. HOWARD. Yes, sir.

Mr. DOOLITTLE. Mr. President, when the Senator undertakes to say that I have any disposition to subject the freedmen to the despotism of their old masters, he says that which there is not a particle of foundation or excuse for saying. I say to that Senator——

Mr. HOWARD. I beg the Senator to allow me one word. I made no personal imputation against the Senator from Wisconsin.

Mr. DOOLITTLE. I desire to finish my sentence before being interrupted.

Mr. HOWARD. I will not be forced by the Senator into a false position.

Mr. DOOLITTLE. I do not desire to be interrupted until I finish one sentence. I say to that Senator that so far as the rights of the freedmen are concerned, I am willing to compare my course of action in this body or elsewhere with his. I say to that Senator that I labored as hard as he has labored to secure the rights and liberties of the freedmen, to emancipate the slaves of the South, and to put an end forever not only to slavery, but to the aristocracy that was founded upon it; and I have never, by word or deed, said or done anything, as a member of this body or elsewhere, tending to build up any oppression against the freedmen, tending to destroy any of their rights. I say to that honorable Senator, and I am ready at any time to meet him in argument upon it although it is drawing me now from the question in dispute, that I myself prepared and introduced here and urged a bill whose provisions defended every right of the freedmen just as much as the bill to which we have now made reference, and I am prepared to do so and to defend their rights with the whole power of the Government.

But, sir, the Senator has drawn me off from the immediate question before the Senate. The immediate question is, whether the language which he uses, "all persons subject to the jurisdiction of the United States," includes these Indians. I maintain that it does; and, therefore, for the purpose of relieving it from any doubt, for the purpose of excluding this class of persons, as they are, in my judgment, utterly unfit to be citizens of the United States, I have proposed this amendment, which I borrow from the Constitution as it stands, which our fathers adopted more than seventy years ago, which I find also in the civil rights bill which passed this present Congress, and which I find also in the second section of this constitutional amendment when applied to the enumeration of the inhabitants of the States. I insist that it is just, proper in every way, but reasonable, that we exclude the wild Indians from being regarded or held as citizens of the United States.

Mr. WILLIAMS. I would not agree to this proposed constitutional amendment if I supposed it made Indians not taxed citizens of the United States. But I am satisfied that, giving to the amendment a fair and reasonable construction, it does not include Indians not taxed. The first and second sections of this proposed amendment are to be taken together, are to be construed together, and the meaning of the word "citizens," as employed in both sections, is to be determined from the manner in which that word is used in both of those sections. Section one provides that—

All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

If there be any doubt about the meaning of that paragraph, I think that doubt is entirely removed by the second section, for by the second section of this constitutional amendment Indians not taxed are not counted at all in the basis of representation. The words in the second section are as follows:

Representatives shall be apportioned among the several States which may be included within the Union, according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.

They are not to be regarded as persons to be counted under any circumstances. Indians not taxed are not even entitled to be counted as persons in the basis of representation under any circumstances; and then the section provides—

But whenever, in any State, the elective franchise shall be denied to any portion of its male inhabitants, being citizens of the United States, &c.

Now, can any reasonable man conclude that the word "citizens" there applies to Indians not taxed, or includes Indians not taxed, when they are expressly excluded from the basis of representation and cannot even be taken into the enumeration of persons upon

39TH CONG. 1ST SESS.—No. 182.

whom representation is to be based? I think it is perfectly clear, when you put the first and second sections together, that Indians not taxed are excluded from the term "citizens;" because it cannot be supposed for one moment that the term "citizens," as employed in these two sections, is intended to apply to Indians who are not even counted under any circumstances as a part of the basis of representation. I therefore think that the amendment of the Senator from Wisconsin is clearly unnecessary. I do not believe that "Indians not taxed" are included, and I understand that to be a description of Indians who maintain their tribal relations and who are not in all respects subject to the jurisdiction of the United States.

In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, but they are not subject to the jurisdiction of the United States in every sense. Take the child of an embassador. In one sense, that child born in the United States is subject to the jurisdiction of the United States, because if that child commits the crime of murder, or commits any other crime against the laws of the country, to a certain extent he is subject to the jurisdiction of the United States, but not in every respect; and so with these Indians. All persons living within a judicial district may be said, in one sense, to be subject to the jurisdiction of the court in that district, but they are not in every sense subject to the jurisdiction of the court until they are brought, by proper process, within the reach of the power of the court. I understand the words here, "subject to the jurisdiction of the United States," to mean fully and completely subject to the jurisdiction of the United States. If there was any doubt as to the meaning of those words, I think that doubt is entirely removed and explained by the words in the subsequent section; and believing that, in any court or by any intelligent person, these two sections would be construed not to include Indians not taxed, I do not think the amendment is necessary.

Mr. SAULSBURY. I do not presume that any one will pretend to disguise the fact that the object of this first section is simply to declare that negroes shall be citizens of the United States. There can be no other object in it, I presume, than a further extension of the legislative kindness and beneficence of Congress toward that class of people.

"The poor Indian, whose untutored mind,
Sees God in clouds, or hears him in the wind,"

was not thought of. I say this not meaning it to be any reflection upon the honorable committee who reported the amendment, because for all the gentlemen composing it I have a high respect personally; but that is evidently the object. I have no doubt myself of the correctness of the position, as a question of law, taken by the honorable Senator from Wisconsin; but, sir, I feel disposed to vote against his amendment, because if these negroes are to be made citizens of the United States, I can see no reason in justice or in right why the Indians should not be made citizens. If our citizens are to be increased in this wholesale manner, I cannot turn my back upon that persecuted race, among whom are many intelligent, educated men, and embrace as fellow-citizens the negro race. I therefore, as at present advised, for the reasons I have given, shall vote against the proposition of my friend from Wisconsin, although I believe, as a matter of law, that his statements are correct.

The PRESIDENT pro tempore. The question is on the amendment of the Senator from Wisconsin to the amendment proposed by the Senator from Michigan.

Mr. DOOLITTLE. I ask for the yeas and nays on that question.

The yeas and nays were ordered.

Mr. VAN WINKLE. I desire to have the amendment to the amendment read.

The Secretary read the amendment to the amendment, which was to insert after the word "thereof" in the amendment the words "excluding Indians not taxed;" so that the amendment, if amended, would read:

All persons born in the United States, and subject to the jurisdiction thereof, excluding Indians not taxed, are citizens of the United States and of the State wherein they reside.

The question being taken by yeas and nays, resulted—yeas 10, nays 30; as follows:

YEAS—Messrs. Buckalew, Cowan, Davis, Doolittle, Guthrie, Hendricks, Johnson, McDougall, Norton, and Riddle—10.
NAYS—Messrs. Anthony, Clark, Conness, Cragin, Creswell, Edmunds, Fessenden, Foster, Grimes, Harris, Henderson, Howard, Howe, Kirkwood, Lane of Kansas, Morgan, Morrill, Nye, Poland, Pomeroy, Ramsey, Sherman, Stewart, Sumner, Trumbull, Van Winkle, Wade, Willey, Williams, and Wilson—30.
ABSENT—Messrs. Brown, Chandler, Dixon, Lane of Indiana, Nesmith, Saulsbury, Sprague, Wright, and Yates—9.

So the amendment to the amendment was rejected.

The PRESIDENT pro tempore. The question now is on the amendment of the Senator from Michigan.

The amendment was agreed to.

The PRESIDENT pro tempore. The next amendment proposed by the Senator from Michigan [Mr. HOWARD] will be read.

The Secretary read the amendment, which was in section two, line twenty-two, after the word "male," to strike out the word "citizens" and insert "inhabitants, being citizens of the United States;" so as to make the section read:

SEC. 2. Representatives shall be apportioned among the several States which may be included within the Union, according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But whenever, in any State, the elective franchise shall be denied to any portion of its male inhabitants, being citizens of the United States, not less than twenty-one years of age, or in any way abridged, except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens not less than twenty-one years of age.

Mr. JOHNSON. Is it supposed that that amendment changes the section as it was before? It appears to me to be the same as it was before, because, although the word "inhabitants" is used, it is in connection with the other words that they are to be citizens of the United States. As it originally stood it read:

But whenever, in any State, the elective franchise shall be denied to any portion of its male citizens.

Mr. FESSENDEN. The object is the same as in the amendment already made, to prevent a State from saying that although a person is a citizen of the United States he is not a citizen of the State.

Mr. HOWARD. The object is to make section two conform to section one, to make them harmonize.

Mr. JOHNSON. I am satisfied.

The amendment was agreed to.

Mr. SAULSBURY. Is it in order now to offer an amendment to the first section?

The PRESIDENT pro tempore. There are several more amendments before the Senate, offered by the Senator from Michigan, [Mr. HOWARD,] not yet acted upon. The next amendment offered by him will be read.

The Secretary read the amendment, which was to add at the end of section two the words "in such State."

The amendment was agreed to.

The next amendment was to insert as section three the following:

SEC. 3. That no person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State Legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may, by a vote of two thirds of each House, remove such disability.

Mr. HENDRICKS. I move to amend the amendment by inserting after the word "shall" in the thirty-seventh line the words "during the term of his office." I presume I understand

Several SENATORS. Now let us vote on all the other amendments together.

The PRESIDING OFFICER. If such be the pleasure of the Senate, the question will be taken collectively on all the other amendments.

Mr. JOHNSON. I hope not. I want a separate vote on the third section.

The PRESIDING OFFICER. That is the next section.

Mr. HENDRICKS. I do not understand this. Can this resolution be adopted by voting on sections separately?

Mr. FESSENDEN. No.

The PRESIDING OFFICER. The Senate is now concurring in amendments made as in Committee of the Whole.

Mr. SHERMAN. No amendment was made to the third section.

Mr. HENDRICKS. That is what I want to understand. I understand that there is no amendment from the Committee of the Whole to the third section.

Mr. FESSENDEN. Yes, we struck out the third section as reported and inserted a substitute for it.

The PRESIDING OFFICER. The question is on the amendment made as in Committee of the Whole to the third section.

Mr. JOHNSON. I ask for the yeas and nays on that.

The yeas and nays were ordered.

Mr. SHERMAN. The third section was the original section that came from the House disfranchising the southern people from voting. That has been stricken out.

Mr. HOWARD. The question is on concurring in the amendment we made to the third section.

Mr. SHERMAN. That was to strike out the third section which came from the House and insert another.

The question was taken by yeas and nays, with the following result:

YEAS—Messrs. Anthony, Chandler, Clark, Conness, Cowan, Cragin, Creswell, Davis, Doolittle, Edmunds, Fessenden, Foster, Grimes, Guthrie, Harris, Henderson, Hendricks, Howard, Howe, Kirkwood, Lane of Indiana, Lane of Kansas, McDougall, Morgan, Morrill, Norton, Nye, Poland, Pomeroy, Ramsey, Saulsbury, Sherman, Sprague, Stewart, Sumner, Trumbull, Van Winkle, Wade, Willey, Williams, Wilson, and Yates—42.

NAY—Mr. Johnson—1.

ABSENT—Messrs. Brown, Buckalew, Dixon, Nesmith, Riddle, and Wright—6.

Mr. HENDRICKS, (before the result was announced.) I think the vote just taken is not correctly understood.

The PRESIDING OFFICER. No discussion is in order; the vote has not been announced.

Mr. HENDRICKS. I am not going into any discussion, but I have a right to ask of the Chair the precise question in time to let any gentleman change his vote if he desires to do so. The motion was not originally to strike out the third section as it came from the House and to insert another. They were separate motions. Then ought there not to be two votes upon this section now?

Mr. SHERMAN. I suppose any Senator can call for a division.

Mr. HENDRICKS. There is no need to call for a division because there were two distinct motions. There was first a motion to strike out and afterward a motion to insert something else. Now, the precise question before the Senate is whether the third section as it came from the House shall be stricken out, and then there will be another question not yet voted upon by the Senate, whether we shall insert the third section which was agreed to as in Committee of the Whole. That is the way it stands.

Several SENATORS. Oh, no.

Mr. JOHNSON. Mr. President——

Mr. CONNESS. I object to discussion at this time.

The PRESIDING OFFICER. The discussion is not in order; the vote has not been announced.

Mr. JOHNSON. I am not about to discuss the question. The Senator from California need not suppose that I propose to occupy the time of the Senate unnecessarily. I proposed to strike out the original third section as it came from the House.

Mr. CONNESS. I rise to a question of order. It is not in order to discuss a question after the call of the roll has been commenced.

The PRESIDING OFFICER. The result of the vote has not been announced, but the roll has been called.

Mr. JOHNSON. If I am not in order I will take my seat; but it is barely possible that the Senator from California may not be in order.

Mr. CONNESS. I am quite aware of that; but I believe I have a right to raise the question of order.

Mr. JOHNSON. I do not object to that.

Mr. CONNESS. Very well; then let the Chair decide.

The PRESIDING OFFICER. No discussion is in order until after the vote is announced; but, by common consent, Senators may be allowed to explain their own votes, but no extended remarks can be allowed.

Mr. CONNESS. There is no right to explain a vote.

Mr. JOHNSON. I moved to strike out the third section as it came from the other House. That motion was carried, and afterward what now appears upon the face of the resolution as the third section was proposed and adopted as a separate amendment. I voted just this moment to strike out what was adopted. The effect of that would have been to restore the original third section, perhaps, but I meant when that was done to move to strike out the third section so as to leave no such section.

The PRESIDING OFFICER. On this question——

Mr. HENDRICKS. What question?

The PRESIDING OFFICER. The question was on concurring in the amendment made as in Committee of the Whole, which was to strike out the third section and insert other words in lieu of it. The result of that vote is 42 in the affirmative and 1 in the negative. So the amendment is concurred in. The Secretary will read the next amendment.

The Secretary read the next amendment, which was to strike out the fourth and fifth sections, and to insert the following section in lieu of them:

SEC. —. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations, and claims shall be held illegal and void.

The amendment was concurred in.

The amendments were ordered to be engrossed and the joint resolution to be read a third time. The joint resolution was read the third time.

The PRESIDING OFFICER. This joint resolution having been read three times, the question is on its passage.

Mr. JOHNSON. I ask for the yeas and nays.

Several SENATORS. The yeas and nays must be taken, of course.

The yeas and nays were ordered; and being taken, resulted—yeas 33, nays 11; as follows:

YEAS—Messrs. Anthony, Chandler, Clark, Conness, Cragin, Creswell, Edmunds, Fessenden, Foster, Grimes, Harris, Henderson, Howard, Howe, Kirkwood, Lane of Indiana, Lane of Kansas, Morgan, Morrill, Nye, Poland, Pomeroy, Ramsey, Sherman, Sprague, Stewart, Sumner, Trumbull, Wade, Willey, Williams, Wilson, and Yates—33.

NAYS—Messrs. Cowan, Davis, Doolittle, Guthrie, Hendricks, Johnson, McDougall, Norton, Riddle, Saulsbury, and Van Winkle—11.

ABSENT—Messrs. Brown, Buckalew, Dixon, Nesmith, and Wright—5.

The PRESIDING OFFICER. The joint resolution is passed, having received the votes of two thirds of the Senate.

ADJOURNMENT TO MONDAY.

Mr. HARRIS. I move that when the Senate adjourn to-day, it be to meet on Monday next.

The motion was agreed to.

FORTIFICATION BILL.

Mr. MORGAN. I submit the following report from the committee of conference on the fortification bill, and I move that the Senate concur in the report:

The committee of conference on the disagreeing votes of the two Houses on the amendment to the bill (H. R. No. 255) making appropriations for the construction, preservation, and repairs of certain fortifications and other works of defense for the year ending June 30, 1867, having met, after full and free conference have agreed to recommend, and do recommend, to their respective Houses as follows:

That the House of Representatives recede from their disagreement to the amendment of the Senate to said bill and agree to the same.

E. D. MORGAN,
L. M. MORRILL,
W. SAULSBURY,
*Managers on the part of the Senate.*
H. J. RAYMOND,
W. E. NIBLACK,
S. PERHAM,
*Managers on the part of the House.*

The report was concurred in.

ENROLLED BILLS SIGNED.

A message from the House of Representatives, by Mr. McPHERSON, its Clerk, announced that the Speaker of the House of Representatives had signed the following enrolled bills; which were thereupon signed by the President *pro tempore* of the Senate:

A bill (H. R. No. 15) authorizing documentary evidence of title to be furnished to the owners of certain lands in the city of St. Louis; and

A bill (H. R. No. 281) to amend the postal laws.

REPORT FROM A COMMITTEE.

Mr. HOWE, from the Committee on Claims, to whom was referred the petition of George W. Tarlton, praying for the restoration of his property confiscated under proceedings instituted in the United States district court for the northern district of New York. submitted a written report and asked to be discharged from the further consideration of the subject. The committee was discharged and the report was ordered to be printed.

Mr. HENDERSON. I move that the Senate adjourn.

The motion was agreed to; and the Senate adjourned.

---

HOUSE OF REPRESENTATIVES.

FRIDAY, *June* 8, 1866.

The House met at twelve o'clock m. Prayer by the Chaplain, Rev. C. B. BOYNTON.

The Journal of yesterday was read and approved.

MUTILATED NOTES OF NATIONAL BANKS.

Mr. HUBBARD, of West Virginia, by unanimous consent submitted the following resolution; which was read, considered, and agreed to:

*Resolved,* That the Committee on Banking and Currency be instructed to inquire into the expediency of providing by law, either by the establishment of a Bureau of Redemption in connection with the Treasury Department, or such other mode as may be deemed most advisable, for the redemption of the worn-out, mutilated, altered, or disfigured bank notes issued under the national currency act, so as to obviate the necessity of sending such notes to each particular bank of issue for redemption; and that the committee have leave to report by bill or otherwise.

Mr. HUBBARD, of West Virginia, moved to reconsider the vote by which the resolution was agreed to; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

MONUMENT TO LIEUTENANT GENERAL SCOTT.

Mr. HALE, by unanimous consent, submitted the following resolution; which was read, considered, and agreed to:

*Resolved,* That the Committee on Military Affairs be instructed to inquire into the expediency of providing by law for the erection of a monument at West Point to the memory of Lieutenant General Winfield Scott, and to report by bill or otherwise.



both branches of it, yet as we were compelled to unite on some measure—and we must all yield some of our opinions upon various questions involved—there are five sections in this proposed article—I feel bound to vote against this amendment offered by the Senator from Wisconsin, though in my judgment it would do more than any other to heal the difficulties by which we are surrounded."

There is an open confession that he is about to vote against an amendment which he entertains no doubt would do more to heal our difficulties than anything else!

Now, sir, no man can excuse himself for a thing of that kind; and while I admire the honesty of his confession, that he is doing it for party and political purposes, yet I utterly detest the odious principle that he avows for mere party purposes.

I ask the attention of the House to an extract from another speech, and, mark you, I am not now offering you "copperhead" testimony. The extract is from a speech made by one of your great northern lights, the celebrated Wendell Phillips. I ask the Clerk to read it.

The Clerk read as follows:

"Mr. Phillips hoped the Senate's amendment of the reconstruction plan would meet with an ignominious defeat, and that Massachusetts would reject it. He would welcome every Democrat and copperhead vote to help its defeat. He would go a step further and said, I hope that the Republican party, if it goes to the polls next fall on this basis, will be defeated. If this is the only thing that the party has to offer, it deserves defeat. The Republican party to-day seeks only to save its life. God grant that it may lose it!"

"The Republicans go to the people in deceit and hypocrisy, with their faces masked and their convictions hid; I hope to God they will be defeated! I want another serenade, not only to uncover the hidden sentiments of a Cabinet, but to smoke out the United States Senate, that we may see how many of them range by the side of Sumner, Ben. Wade, Judge Kelley, and Thad. Stevens."

Mr. HARDING, of Kentucky. Ay, sir, some of the men named there have since given way and fallen, and are no longer on Phillips's loyal list. As I said, sir, I am not reading southern testimony, or the testimony of copperheads; but from this great northern light, the man who has done more for the Republican party than any other man in the country. He was raised among them; he has affiliated with them; and he cannot be deceived as to their purposes. He charges that this Republican party is going before the country wearing a mask of hypocrisy, with its visage masked, and that its object is not to amend the Constitution, but, as Senator SHERMAN says, to save the life of the Republican party; and he says, "God grant they may lose it!" Now, sir, I cannot call in question such authority as this. He must know what he is talking about, and I have had read to you what he says.

[Here the hammer fell.]

Mr. STEVENS. I now, sir, move the previous question.

The previous question was seconded and the main question ordered.

ENROLLED BILL AND RESOLUTION SIGNED.

Mr. TROWBRIDGE, from the Committee on Enrolled Bills, reported that the committee had examined and found truly enrolled an act (S. No. 328) for the relief of Mrs. Abigail Ryan, and joint resolution (S. R. No. 51) respecting bounties to colored soldiers, and the pensions, bounties, and allowances to their heirs; when the Speaker signed the same.

RECONSTRUCTION—AGAIN.

Mr. STEVENS. Mr. Speaker, I do not intend to detain the House long. A few words will suffice.

We may, perhaps, congratulate the House and the country on the near approach to completion of a proposition to be submitted to the people for the admission of an outlawed community into the privileges and advantages of a civilized and free Government.

When I say that we should rejoice at such completion, I do not thereby intend so much to express joy at the superior excellence of the scheme, as that there is to be a scheme—a scheme containing much positive good, as well, I am bound to admit, as the omission of many better things.

In my youth, in my manhood, in my old age, I had fondly dreamed that when any fortunate chance should have broken up for awhile the foundation of our institutions, and released us from obligations the most tyrannical that ever man imposed in the name of freedom, that the intelligent, pure and just men of this Republic, true to their professions and their consciences, would have so remodeled all our institutions as to have freed them from every vestige of human oppression, of inequality of rights, of the recognized degradation of the poor, and the superior caste of the rich. In short, that no distinction would be tolerated in this purified Republic but what arose from merit and conduct. This bright dream has vanished "like the baseless fabric of a vision." I find that we shall be obliged to be content with patching up the worst portions of the ancient edifice, and leaving it, in many of its parts, to be swept through by the tempests, the frosts, and the storms of despotism.

Do you inquire why, holding these views and possessing some will of my own, I accept so imperfect a proposition? I answer, because I live among men and not among angels: among men as intelligent, as determined, and as independent as myself, who, not agreeing with me, do not choose to yield their opinions to mine. Mutual concession, therefore, is our only resort, or mutual hostilities.

We might well have been justified in making renewed and more strenuous efforts for a better plan could we have had the coöperation of the Executive. With his cordial assistance the rebel States might have been made model republics, and this nation an empire of universal freedom. But he preferred "restoration" to "reconstruction." He chooses that the slave States should remain as nearly as possible in their ancient condition, with such small modifications as he and his prime minister should suggest, without any impertinent interference from Congress. He anticipated the legitimate action of the national Legislature, and by rank usurpation erected governments in the conquered provinces; imposed upon them institutions in the most arbitrary and unconstitutional manner; and now maintains them as legitimate governments, and insolently demands that they shall be represented in Congress on equal terms with loyal and regular States.

To repress this tyranny and at the same time to do some justice to conquered rebels requires caution. The great danger is that the seceders may soon overwhelm the loyal men in Congress. The haste urged upon us by some loyal but impetuous men; their anxiety to embrace the representatives of rebels; their ambition to display their dexterity in the use of the broad mantle of charity; and especially the danger arising from the unscrupulous use of patronage and from the oily orations of false prophets, famous for sixty-day obligations and for protested political promises, admonish us to make no further delay.

A few words will suffice to explain the changes made by the Senate in the proposition which we sent them.

The first section is altered by defining who are citizens of the United States and of the States. This is an excellent amendment, long needed to settle conflicting decisions between the several States and the United States. It declares this great privilege to belong to every person born or naturalized in the United States.

The second section has received but slight alteration. I wish it had received more. It contains much less power than I could wish; it has not half the vigor of the amendment which was lost in the Senate. It or the proposition offered by Senator WADE would have worked the enfranchisement of the colored man in half the time.

The third section has been wholly changed by substituting the ineligibility of certain high offenders for the disfranchisement of all rebels until 1870.

This I cannot look upon as an improvement. It opens the elective franchise to such as the States choose to admit. In my judgment it endangers the Government of the country, both State and national; and may give the next Congress and President to the reconstructed rebels. With their enlarged basis of representation, and exclusion of the loyal men of color from the ballot-box, I see no hope of safety unless in the prescription of proper enabling acts, which shall do justice to the freedmen and enjoin enfranchisement as a condition-precedent.

The fourth section, which renders inviolable the public debt and repudiates the rebel debt, will secure the approbation of all but traitors.

The fifth section is unaltered.

You perceive that while I see much good in the proposition I do not pretend to be satisfied with it. And yet I am anxious for its speedy adoption, for I dread delay. The danger is that before any constitutional guards shall have been adopted Congress will be flooded by rebels and rebel sympathizers. Whoever has mingled much in deliberative bodies must have observed the mental as well as physical nervousness of many members, impelling them too often to injudicious action. Whoever has watched the feelings of this House during the tedious months of this session, listened to the impatient whispering of some and the open declarations of others; especially when able and sincere men propose to gratify personal predilections by breaking the ranks of the Union forces and presenting to the enemy a ragged front of stragglers, must be anxious to hasten the result and prevent the demoralization of our friends. Hence, I say, let us no longer delay; take what we can get now, and hope for better things in further legislation; in enabling acts or other provisions.

I now, sir, ask for the question.

The SPEAKER. The question before the House is on concurring in the amendments of the Senate; and as it requires by the Constitution a two-thirds vote, the vote will be taken by yeas and nays.

Mr. DEFREES. I ask the consent of the House to print some remarks upon this question, which I have not had an opportunity of delivering.

No objection was made, and leave was granted. [The speech will be found in the Appendix.]

Mr. WRIGHT. I ask the same privilege.

No objection was made, and leave was granted. [The speech will be found in the Appendix.]

The joint resolution as amended by the Senate is as follows:

Joint resolution proposing an amendment to the Constitution of the United States.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* (two thirds of both Houses concurring,) That the following article be proposed to the Legislatures of the several States as an amendment to the Constitution of the United States, which, when ratified by three fourths of said Legislatures, shall be valid as part of the Constitution, namely:

ARTICLE —.

SEC. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

SEC. 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

SEC. 3. No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States or under any State, who, having previously taken an oath as a member of Congress, or as an officer of the United States, or as a member of any State Legislature, or as an executive or judicial officer of any State, to support the Constitution

Generated on 2025-01-04 00:00:39 GMT / https://hdl.handle.net/2027/osu.32437011560386
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may, by a vote of two thirds of each House, remove such disability.

SEC. 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations, and claims shall be held illegal and void.

SEC. 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

The question was put on concurring with the amendments of the Senate; and there were—yeas 120, nays 32, not voting 32; as follows:

YEAS—Messrs. Alley, Allison, Ames, Delos R. Ashley, James M. Ashley, Baker, Baldwin, Banks, Barker, Baxter, Beaman, Bidwell, Bingham, Blaine, Boutwell, Bromwell, Buckland, Bundy, Reader W. Clarke, Sidney Clarke, Cobb, Conkling, Cook, Cullom, Darling, Davis, Dawes, Defrees, Delano, Dodge, Donnelly, Driggs, Dumont, Eckley, Eggleston, Eliot, Farnsworth, Farquhar, Ferry, Garfield, Grinnell, Griswold, Hale, Abner C. Harding, Hart, Hayes, Henderson, Higby, Holmes, Hooper, Hotchkiss, Asahel W. Hubbard, Chester D. Hubbard, John H. Hubbard, James R. Hubbell, Jenckes, Julian, Kelley, Kelso, Ketcham, Kuykendall, Laflin, Latham, George V. Lawrence, Loan, Longyear, Lynch, Marvin, McClurg, McKee, McRuer, Mercur, Miller, Moorhead, Morrill, Morris, Moulton, Myers, Newell, O'Neill, Orth, Paine, Perham, Phelps, Pike, Plants, Pomeroy, Price, William H. Randall, Raymond, Alexander H. Rice, John H. Rice, Sawyer, Schenck, Scofield, Shellabarger, Sloan, Smith, Spalding, Stevens, Stilwell, Thayer, Francis Thomas, John L. Thomas, Trowbridge, Upson, Van Aernam, Robert T. Van Horn, Ward, Warner, Henry D. Washburn, William B. Washburn, Welker, Wentworth, Whaley, Williams, James F. Wilson, Stephen F. Wilson, Windom, and the Speaker—120.

NAYS—Messrs. Ancona, Bergen, Boyer, Chanler, Coffroth, Dawson, Denison, Eldridge, Finck, Glossbrenner, Grider, Aaron Harding, Hogan, Edwin N. Hubbell, James M. Humphrey, Kerr, Le Blond, Marshall, Niblack, Nicholson, Samuel J. Randall, Ritter, Rogers, Ross, Sitgreaves, Strouse, Taber, Taylor, Thornton, Trimble, Winfield, and Wright—32.

NOT VOTING—Messrs. Anderson, Benjamin, Blow, Brandegee, Broomall, Culver, Deming, Dixon, Goodyear, Harris, Hill, Demas Hubbard, Hulburd, James Humphrey, Ingersoll, Johnson, Jones, Kasson, William Lawrence, Marston, McCullough, McIndoe, Noell, Patterson, Radford, Rollins, Rousseau, Shanklin, Starr, Burt Van Horn, Elihu B. Washburne, and Woodbridge—32.

The SPEAKER. Two thirds of both Houses having concurred in the joint resolution (H. R. No. 127) proposing an amendment to the Constitution of the United States, the joint resolution has passed.

During the roll-call on the foregoing vote,

Mr. KELLEY said: I desire to announce that Mr. BROOMALL, and Mr. WASHBURNE of Illinois, are paired with Mr. SHANKLIN upon this question.

Mr. LAFLIN said: I wish to announce that my colleague, Mr. VAN HORN, is paired upon this question with Mr. GOODYEAR.

Mr. ANCONA said: My colleague, Mr. JOHNSON, is absent on account of sickness, and is paired upon this question with Mr. ROLLINS and Mr. MARSTON, of New Hampshire.

Mr. DARLING said: I desire to state that my colleague, Mr. JAMES HUMPHREY, is detained at home by sickness. If present he would have voted in the affirmative.

Mr. WINFIELD said: My colleague, Mr. RADFORD, is unavoidably detained from his seat. If here he would have voted against the Senate amendment.

Mr. ASHLEY, of Ohio, said: My colleague, Mr. LAWRENCE, has been called home in consequence of the death of his father. If present he would have voted "ay."

Mr. COBB said: Mr. McINDOE is detained from his seat by illness. If here he would vote in the affirmative.

Mr. MOULTON said: My colleague, Mr. INGERSOLL, has gone home under leave of absence from the House.

Mr. HART said: Mr. HUBBARD, of New York, is absent on account of death in his family. If he had been here he would have voted "ay."

Mr. WASHBURN, of Indiana, said: My colleague Mr. HILL, is absent by leave of the House. If here he would have voted in the affirmative.

Mr. ELDRIDGE. I desire to state that if Messrs. Brooks and Voorhees had not been expelled, they would have voted against this proposition. [Great laughter.]

Mr. SCHENCK. And I desire to say that if Jeff. Davis were here, he would probably also have voted the same way. [Renewed laughter.]

Mr. WENTWORTH. And so would Jake Thompson.

The result of the vote having been announced as above recorded,

Mr. STEVENS moved to reconsider the vote by which the amendments of the Senate were concurred in; and also moved to lay the motion to reconsider on the table.

The latter motion was agreed to.

The SPEAKER. The House is now engaged in executing the order of the House to proceed to business upon the Speaker's table.

RIVER AND HARBOR BILL.

The next business upon the Speaker's table was the amendments of the Senate to House bill No. 492, making appropriations for the repair, preservation, and completion of certain public works heretofore commenced under authority of law, and for other purposes.

Mr. ELIOT. I move that the House nonconcur in the amendments of the Senate, and ask for a committee of conference on the disagreeing votes of the two Houses.

The motion was agreed to.

Mr. ELIOT moved to reconsider the vote just taken; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

STEAMBOAT INSPECTION LAW.

The next business upon the Speaker's table was the amendments of the Senate to House bill No. 477, further to provide for the safety of the lives of passengers on board of vessels propelled in whole or in part by steam, to regulate the salaries of steamboat inspectors, and for other purposes.

Mr. ELIOT. I move that the bill and amendments be referred to the Committee on Commerce.

The motion was agreed to.

EXAMINERS OF PATENTS.

The next business upon the Speaker's table was Senate bill No. 350, to authorize the Commissioner of Patents to pay those employed as examiners and assistant examiners the salary fixed by law for the duties performed by them; which was read a first and second time.

Mr. JENCKES. I ask that this bill be put upon its passage now.

Mr. RANDALL, of Pennsylvania. Let the bill be read. I want to know what it is.

The bill was read at length. It authorizes the Commissioner of Patents to pay those employed in the Patent Office from April 1, 1861, until August 1, 1865, as examiners and assistant examiners of patents, at the rate fixed by law for those respective grades, provided that the same be paid out of the Patent Office fund, the compensation thus to be paid not to exceed that paid to those duly enrolled as examiners and assistant examiners for the same period.

Mr. JENCKES. This matter has been considered by the House Committee on Patents, who have recommended it once during the last Congress and once during the present Congress. I call the previous question upon the passage of the bill.

Mr. HARDING, of Illinois. I move that the bill be laid upon the table.

Mr. RANDALL, of Pennsylvania. I suggest that this bill better be referred to the Committee on Patents.

Mr. FARNSWORTH. I understand that the Committee on Patents of this House have examined this bill and decided to report unanimously in its favor.

Mr. ROSS. Is a motion to refer the bill now in order?

The SPEAKER. That motion is not now in order, pending the motion to lay upon the table and the demand for the previous question.

Mr. STEVENS. I move that the House adjourn.

The SPEAKER. Will the gentleman from Pennsylvania [Mr. STEVENS] withdraw the motion to allow the Chair to lay before the House several executive communications?

Mr. STEVENS. I will withdraw the motion for that purpose.

DIRECT TAXES IN GEORGIA.

The SPEAKER laid before the House the following message from the President of the United States:

*To the Senate and House of Representatives:*

I communicate, and invite the attention of Congress to, a copy of joint resolutions of the Senate and House of Representatives of the State of Georgia, requesting the suspension of the collection of the internal revenue tax due from that State pursuant to an act of Congress of 5th of August, 1861.
ANDREW JOHNSON.
WASHINGTON, D. C., *June* 11, 1866.

The message, with accompanying documents, was referred to the Committee of Ways and Means and ordered to be printed.

AGRICULTURAL COLLEGE—GEORGIA.

The SPEAKER also laid before the House the following message from the President of the United States:

*To the Senate and House of Representatives:*

It is proper that I should inform Congress that a copy of an act of the Legislature of Georgia of the 10th of March last has been officially communicated to me, by which that State accepts the donation of land for the benefit of colleges for agriculture and the mechanic arts, which donation was provided for by the acts of Congress of 2d July and 14th April, 1864. ANDREW JOHNSON.
WASHINGTON, D. C., *June* 11, 1866.

The message was laid upon the table and ordered to be printed.

DRAFT IN PENNSYLVANIA.

The SPEAKER also laid before the House a communication from the Secretary of War, in answer to a resolution of the House of Representatives of the 11th instant, in regard to the draft in the eighth congressional district of Pennsylvania.

Mr. ANCONA. I move that this communication be printed and referred to the Committee on Military Affairs.

The motion was agreed to.

BRITISH AMERICAN TRADE.

The SPEAKER also laid before the House a communication from the Secretary of the Treasury in answer to a resolution of the House of Representatives of March 28, 1866, calling for information in regard to commercial relations with British America.

The question was upon ordering the communication to be printed.

Mr. DAVIS. Can an objection be made at this time to the printing of this communication?

The SPEAKER. It is customary to order the printing of all executive communications without putting the question to the House, unless objections be made to the printing.

Mr. DAVIS. I object to the printing of this communication.

The SPEAKER. Objection being made, the question of printing will be submitted to the House.

Mr. DAVIS. Before the question is taken I desire to say a single word upon it. If I understand this communication——

Mr. WENTWORTH. What is the question before the House?

The SPEAKER. It is whether the communication from the Secretary of the Treasury in regard to commercial relations with British America shall be printed.

Mr. WENTWORTH. Before that question is voted upon, or even debated, I insist that the communication shall be read. I object to one