## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE, *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Case No. 1:25-cv-10135-LTS |
| STATE OF NEW JERSEY, *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Case No. 1:25-cv-10139-LTS |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

Pursuant to the Court's January 24, 2025 Order (ECF No. 71, *New Jersey, et al v. Donald J. Trump, et al,*, No. 1:25-cv-10139-LTS), Defendants submit this consolidated memorandum in opposition to the motions for preliminary injunction filed in the two above-referenced cases.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

I.    The Executive Order .............................................................................................. 3

II.   This Litigation ....................................................................................................... 5

STANDARD OF REVIEW ............................................................................................. 6

ARGUMENT ................................................................................................................... 7

I.    The State Plaintiffs Lack Standing. ...................................................................... 7

II.   Plaintiffs Lack A Valid Cause of Action. ........................................................... 11

      A.    Plaintiffs' APA Claims Fail. ....................................................................... 11

      B.    Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA
            Claims. ......................................................................................................... 13

III.  Plaintiffs Are Not Likely To Succeed On the Merits. ........................................ 14

      A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to
            Regulatory Power .......................................................................................... 15

      B.    Children Born of Unlawfully Present Aliens or Lawful But Temporary
            Visitors Fall Outside the Citizenship Clause. ............................................. 19

      C.    Applicable Interpretive Principles Support the Government's Reading of
            the Citizenship Clause .................................................................................. 27

      D.    Plaintiffs' Contrary Arguments Are Unpersuasive. ..................................... 30

IV.   Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This Lawsuit. ....... 35

V.    The Public Interest Does Not Favor an Injunction. ............................................. 38

VI.   Any Relief Should Be Limited. ............................................................................ 38

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*Abuhajeb v. Pompeo*,
   531 F. Supp. 3d 447 (D. Mass. 2021) .................................................................. 13

*Afroyim v. Rusk*,
   387 U.S. 253 (1967) ............................................................................................. 35

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ............................................................................................. 14

*Alsaidi v. U.S. Dep't of State*,
   292 F. Supp. 3d 320 (D.D.C. 2018) .................................................................... 13

*Arcam Pharm. Corp. v. Faria*,
   513 F.3d 1 (1st Cir. 2007) .................................................................................... 33

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ....................................................................... 8, 9, 39

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................................. 38

*Benny v. O'Brien*,
   32 A. 696 (N.J. 1895) .................................................................................... 25, 26

*Berenyi v. Dist. Dir., INS*,
   385 U.S. 630 (1967) ............................................................................................. 30

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
   996 F.3d 37 (1st Cir. 2021) .................................................................................. 37

*Cambranis v. Blinken*,
   994 F.3d 457 (5th Cir. 2021) ............................................................................... 12

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020) ...................................................................... 37

*Carlisle v. United States*,
   83 U.S. (16 Wall.) 147 (1872) ............................................................................. 20

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ............................................................................... 37

*Cherokee Nation v. Georgia*,
   30 U.S. (5 Pet.) 1 (1831) ..................................................................................... 21

*Chin Bak Kan v. United States*,
   186 U.S. 193 (1902) .................................................................................. 32

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................... 9

*DeVillier v. Texas*,
   601 U.S. 285 (2024) .................................................................................. 13

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .................................................................................. 35

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) .................................................................. 38

*E. Bay Sanctuary Covenant v. Biden*,
   102 F.4th 996 (9th Cir. 2024) ..................................................................... 8

*Elk Run Coal Co. v. U.S. Dep't of Labor*,
   804 F. Supp. 2d 8 (D.D.C. 2011) .............................................................. 11

*Elk v. Wilkins*,
   112 U.S. 94 (1884) ............................................................................. *passim*

*Elkins v. Moreno*,
   435 U.S. 647 (1978) .................................................................................. 20

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .................................................................................... 9

*Franchise Tax Bd. of Cal. v. Hyatt*,
   587 U.S. 230 (2019) .................................................................................. 22

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................................. 11, 39

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) .................................................................. 12

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
   458 U.S. 375 (1982) .................................................................................. 17

*Gill v. Whitford*,
   585 U.S. 48 (2018) .................................................................................... 39

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) .............................................................. 10, 11, 16, 21

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................... 27

*Inglis v. Trs. of Sailor's Snug Harbor*,
   28 U.S. (3 Pet.) 99 (1830) ................................................... 22, 31

*INS v. Chadha*,
   462 U.S. 919 (1983) ................................................................... 35

*INS v. Legalization Assistance Project*,
   510 U.S. 1301 (1993) ................................................................. 38

*Kaiser v. Blue Cross of Cal.*,
   347 F.3d 1107 (9th Cir. 2003) ................................................. 36

*Kawakita v. United States*,
   343 U.S. 717 (1952) ................................................................... 29

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ................................................................... 10

*Kwock Jan Fat v. White*,
   253 U.S. 454 (1920) ................................................................... 32

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
   599 U.S. 382 (2023) ................................................................... 21

*Lamar v. Micou*,
   112 U.S. 452 (1884) ................................................................... 20

*Liu v. SEC*,
   591 U.S. 71 (2020) ..................................................................... 28

*Lone Wolf v. Hitchcock*,
   187 U.S. 553 (1903) ................................................................... 16

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................... 38

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .................................................. 16

*Martinez v. Bynum*,
   461 U.S. 321 (1983) ................................................................... 20

*Maryland v. King*,
   567 U.S. 1301 (2012) ................................................................. 38

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ................................................................................................ 10

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .................................................................................................. 6

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................................................ 17

*Metro. Stevedore Co. v. Rambo*,
515 U.S. 291 (1995) .................................................................................................. 3

*Miller v. Albright*,
523 U.S. 420 (1998) ................................................................................................ 30

*Minor v. Happersett*,
88 U.S. 162 (1874) .................................................................................................. 19

*Mississippi Band of Choctaw Indians v. Holyfield*,
490 U.S. 30 (1989) .................................................................................................. 20

*Mississippi v. Johnson*,
71 U.S. 475 (1866) .................................................................................................. 39

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................................................................................................. 10

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,
927 F.3d 1 (1st Cir. 2019) ........................................................................................ 36

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ................................................................................ 39

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) ................................................................................................ 28

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................ 38

*NYSRPA v. Bruen*,
597 U.S. 1 (2022) .............................................................................................. 34, 35

*Oceanic Navigation Co. v. Stranahan*,
214 U.S. 320 (1909) ................................................................................................ 28

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ................................................................................................ 35

*Ortega-Morales v. Lynch*,
    168 F. Supp. 3d 1228 (D. Ariz. 2016) ........................................................ 13

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ..................................................................................... 9

*Pizarro*,
    15 U.S. (2 Wheat.) 227 (1817) .................................................................. 20

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................................... 33

*Richards v. Sec'y of State*,
    752 F.2d 1413 (9th Cir. 1985) ................................................................. 12

*Robertson v. Cease*,
    97 U.S. 646 (1878) ................................................................................... 18

*Rogers v. Bellei*,
    401 U.S. 815 (1971) ................................................................................. 29

*Savorgnan v. United States*,
    338 U.S. 491 (1950) ................................................................................. 29

*Schooner Exchange v. McFaddon*,
    11 U.S. (7 Cranch) 116 (1812) ........................................................... 16, 17

*Sierra Club v. Larson*,
    769 F. Supp. 420 (D. Mass. 1991) .......................................................... 36

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ................................................................................. 10

*The Slaughterhouse Cases*,
    83 U.S. 36 (1873) ..................................................................................... 24

*Town of Milton v. FAA*,
    87 F.4th 91 (1st Cir. 2023) ...................................................................... 10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................... 7

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................................. 27

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ................................................................................. 12

*United States v. Antelope,*
   430 U.S. 641 (1977) .................................................................................. 34

*United States v. Holliday,*
   70 U.S. (3 Wall.) 407 (1866) .................................................................... 16

*United States v. Kagama,*
   118 U.S. 375 (1886) .................................................................................. 16

*United States v. Manzi,*
   276 U.S. 463 (1928) .................................................................................. 30

*United States v. Rahimi,*
   602 U.S. 680 (2024) ............................................................................. 34, 39

*United States v. Texas,*
   599 U.S. 670 (2023) ................................................................................. 2, 7

*United States v. Wong Kim Ark,*
   169 U.S. 649 (1898) ........................................................................... *passim*

*Vance v. Terrazas,*
   444 U.S. 252 (1980) .................................................................................. 12

*Verlinden BV v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) .................................................................................. 16

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................................... 9, 10

*Wilkins v. United States,*
   598 U.S. 152 (2023) .................................................................................. 15

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ....................................................................................... 6

*Winton v. Amos,*
   255 U.S. 373 (1921) .................................................................................. 15

## **Constitution**

U.S. Const. Art. I, § 8, Cl. 4 ........................................................................ 28

U.S. Const. amend. XIV, § 1 ............................................................... *passim*

## **Statutes**

5 U.S.C. § 704 ............................................................................................ 11

8 U.S.C. § 1185(d)(5)(C) ................................................................................... 14

8 U.S.C. § 1225(b)(3) ......................................................................................... 14

8 U.S.C. § 1226(f) ............................................................................................... 14

8 U.S.C. § 1231(a)(2)(B) .................................................................................... 14

8 U.S.C. § 1252(b)(5) ................................................................................... 12, 37

8 U.S.C. § 1253(e) .............................................................................................. 14

8 U.S.C. § 1401(a) ..................................................................................... 14, 15, 30

8 U.S.C. § 1503 ............................................................................................. 12, 37

28 U.S.C. § 2201 ................................................................................................. 12

Civil Rights Act of 1866,
    14 Stat. 27 ................................................................................................ 17, 23

Laken Riley Act,
    Pub. L. No. 119-1, 139 Stat. 3 (2025) ................................................... 13-14

Nationality Act of 1940,
    ch. 876, § 201(a), 54 Stat. 1137 ............................................................... 17

Naturalization Act of 1790,
    ch. 3, 1 Stat. 103 ........................................................................................ 30

**Rules**

Fed. R. Civ. P. 54(b)(2) ...................................................................................... 40

Fed. R. Civ. P. 65(a)(2) ...................................................................................... 40

**Legislative Materials**

2 Cong. Rec. 3279 (1874) ................................................................................... 26

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) ................................................. 18

Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) ............................................... 23

Cong. Globe, 39th Cong., 1st Sess. 1262 (1866) ............................................... 18

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866) ............................................... 24

Cong. Globe, 39th Cong., 1st Sess. 2769 (1866) ............................................... 24

Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) .................................................... 24

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) .................................................... 18

Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) .................................................... 18

Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) ..................................................... 34

Cong. Globe, 40th Cong., 2nd Sess. 967 (1868) ..................................................... 34

Cong. Globe, 40th Cong., 2nd Sess. 1130-31 (1868) ............................................. 34

**Administrative & Executive Materials**

Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20, 2025) ... 3, 27

Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025) ............................................................................................... 1, 4, 5, 36

Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025) ................................................... 3

Proclamation No. 10866, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025) ........................................................................ 3

**Other Authorities**

2 *A Digest of the International Law of the United States* (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*) ........................................................................ 25, 26, 27

2 James Kent, *Commentaries on American Law* (6th ed. 1848) ................................................... 22

Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ................................................. 25

Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019) ................................................... 4

Boyd Winchester, *Citizenship in its International Relation*, 31 Am. L. Rev. 504 (1897) ........................................................................ 25

Emmerich de Vattel, *The Law of Nations* (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.) .................................................................... 22, 29

Hannis Taylor, *A Treatise on International Public Law* (1901) ................................................... 33

Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* (1901) .................................................... 33

Henry Campbell Black, *Handbook of American Constitutional Law* (1895) .............................. 25

John Westlake, *International Law* (1904) ............................................................... 32-33

Joseph Story, *Commentaries on the Conflict of Laws* (1834) ....................................... 23

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*,
   101 Va. L. Rev. 455 (2015) ....................................................................... 26

Letter from Sen. Lyman Trumbull to President Andrew Johnson, (*in* Andrew Johnson Papers,
   Reel 45, Manuscript Div., Library of Congress) ...................................... 23

M.A. Lesser, *Citizenship and Franchise*,
   4 Colum. L. Times 145 (1891) ............................................................. 18, 25

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of
   Citizenship*,
   119 Yale L. J. 1351 (2010) ................................................................. 23, 24

Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the
   Citizenship Clause of the Fourteenth Amendment*,
   32 St. Louis U. L. Rev. 329 (2012) ....................................................... 29

Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891) .................... 25

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown,
   Assistant Attorney General* (1910) ...................................................... 32

*The Significance of Parental Domicile Under the Citizenship Clause*,
   101 Va. L. Rev. 455 (2015) ................................................................ 26

William Edward Hall, *A Treatise on International Law* (4th ed. 1895) ............................... 21, 25

## INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States.  *See* Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship (Citizenship EO or EO).  That EO recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States or the children of aliens whose presence is lawful but temporary.  Prior misimpressions of the Citizenship Clause have created a perverse incentive for illegal immigration that has negatively impacted this country's sovereignty, national security, and economic stability. But the generation that enacted the Fourteenth Amendment did not fate the United States to such a reality.  Instead, text, history, and precedent support what common sense compels: the Constitution does not harbor a windfall clause granting American citizenship to, *inter alia*, the children of those who have circumvented (or outright defied) federal immigration laws.

The Plaintiffs—in one case, a group of states and other governmental entities, and in the other, an individual and two membership organizations—filed suit within hours of the EO's issuance.  But their dramatic assertions about the supposed illegality of the EO cannot substitute for a showing that Plaintiffs are entitled to extraordinary emergency relief.  And as to each factor of that analysis, Plaintiffs have failed to carry their burden.

To start, the states lack standing.  While they largely concede that the EO does not operate directly upon them, they nonetheless complain that the EO will force them to spend more money on public benefits.  But that is the exact sort of incidental expenditure the Supreme Court has held

insufficient.  Indeed, just two years ago, the Supreme Court rejected Texas's argument for standing based on expenditures on public programs in response to a federal policy that increased the number of illegal aliens in the state.  *See United States v. Texas*, 599 U.S. 670 (2023).  Similarly, the states here cannot satisfy Article III by claiming that they will choose to spend more money on public programs in response to a federal policy that will result in more individuals in their states being classified as illegal aliens.  Moreover, all Plaintiffs lack a cause of action—they cannot proceed under the Administrative Procedure Act (APA), nor can they bring these suits under the Citizenship Clause or the Immigration and Nationality Act (INA).

Plaintiffs are also unlikely to succeed on the merits.  As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subject to the jurisdiction" of the United States contemplates something more than being subject to this country's regulatory power.  It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power.  *Elk v. Wilkins*, 112 U.S. 94, 102 (1884).  Just as that does not hold for diplomats or occupying enemies, it similarly does not hold for foreigners admitted temporarily or individuals here illegally.  "[N]o one can become a citizen of a nation without its consent."  *Id.* at 103.  And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

Although Plaintiffs contend that the Citizenship EO upends well-settled law, it is their maximalist reading which runs headlong into existing law.  Not only is it inconsistent with the Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the Citizenship Clause, even though they were subject to the regulatory power of the United States, *id*. at 101-02, but it would render the Civil Rights Act of 1866 (which defined citizenship to cover

those born in the United States, not "subject to any foreign power") unconstitutional just two years after it was passed. But the Citizenship Clause was an effort to *constitutionalize* the Civil Rights Act. Plaintiffs also rely heavily on the Supreme Court's decision in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). The Court, however, was careful to cabin its actual holding to the children of those with a "permanent domicile and residence in the United States," *id.* at 652-53, and "[b]reath spent repeating dicta does not infuse it with life." *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 300 (1995). The Court in *Wong Kim Ark* did not suggest that it was overturning *Elk* or jeopardizing the 1866 Civil Rights Act, and reading that decision to leave open the question presented here is consistent with contemporary accounts, prior practices of the political branches, and Supreme Court decisions in the years following *Wong Kim Ark*.

Finally, the balance of the equities does not favor injunctive relief. The Court should deny the pending preliminary injunction motions in both cases.

## BACKGROUND

### I.    The Executive Order

The Citizenship EO is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025); Proclamation No. 10866, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025); Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20, 2025) (Invasion EO). As the President has recognized, individuals unlawfully in this country "present significant threats to national security and public safety," Invasion EO § 1, and the severity of these problems warrants a full panoply of immigration measures. Some of these threats are related to the United States' prior, erroneous policy of recognizing near-universal birthright citizenship. For instance,

"the nation's current policy of universally granting birthright citizenship to individuals who lack any meaningful ties to the United States provides substantial opportunities for abuse by motivated enemies." Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019).

The Citizenship EO seeks to correct the Executive Branch's prior misreading of the Citizenship Clause. It recognizes that the Constitution and the INA provide for citizenship for all persons who are born in the United States and subject to the jurisdiction thereof, and identifies two circumstances in which a person born in the United States is not automatically extended the privilege of United States citizenship:

> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Citizenship EO § 1.

Section 2(a) of the EO directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. The EO specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19. Citizenship EO § 2(b). The Citizenship EO makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship." *Id*. § 2(c).

As for enforcement, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate

4

measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." *Id*. § 3(a).  It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).

## II.    This Litigation

On January 20, 2025, the same day the EO issued, Lawyers for Civil Rights initiated a lawsuit on behalf of one individual (O. Doe, an expectant mother with Temporary Protected Status) and two membership organizations (the Brazilian Worker Center and La Colaborativa) (the private plaintiffs or *Doe* plaintiffs).  *See* Compl. ¶¶ 13-15, *Doe, et al. v. Trump, et al.*, No. 1:25-cv-10135 ("*Doe*"), ECF No. 1.  Both organizations allege that they have "numerous" members who "are undocumented or in the United States on temporary statuses and who are either pregnant or plan to grow their families in the future." *Id*. ¶¶ 14-15.  The complaint asserts claims under the Citizenship Clause (Count I), the Equal Protection Clause (Count II), and the INA (Count III).  It also asserts an APA claim challenging "arbitrary and capricious" agency actions (Count IV) and a claim pursuant to the Declaratory Judgment Act (Count V).  The *Doe* plaintiffs moved for a preliminary injunction on January 23, *see* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., *Doe* ECF No. 11 ("*Doe* Mem."), which is expressly limited to "their claims under the Citizenship Clause, 8 U.S.C. § 1401, and the APA" (Counts I, III, and IV).  *Id*. at 2 n.2.

On January 21, 2025, 18 states (plus the District of Columbia and the City and County of San Francisco) (the state plaintiffs or the states), also filed suit against the EO.  *See* Compl., *New*

5

*Jersey, et al. v. Trump, et al.*, No. 1:25-cv-10139, ECF No. 1.[1]  Claiming harm to "their residents," *id*. ¶ 4, and the loss of federal reimbursement for services the states voluntarily choose to provide, *id*. ¶ 5, the states assert claims via the Citizenship Clause (Count 1), the separation of powers (Count 2), the INA (Count 3), and the APA, to the extent the EO "directs federal agencies . . . to take actions that are contrary to the constitution and federal statutes," *id*. (Count 4, ¶ 16).  The states moved for a preliminary injunction the same day.  *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., *New Jersey* ECF No. 5 ("*New Jersey* Mem.").  On January 24, the Court entered an order relating the *Doe* and *New Jersey* cases, setting a hearing for both cases on February 7, and authorizing Defendants to file this consolidated brief opposing both motions.  *New Jersey* ECF No. 71.

**STANDARD OF REVIEW**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

---

[1] The Citizenship EO has been challenged in several other lawsuits.  On January 23, a district judge in the Western District of Washington issued a temporary restraining order "fully" enjoining the Defendants in that case "and all their respective officers, agents, servants, employees, and attorneys," from enforcing or implementing Section 2(a), Section 3(a), or Section 3(b) of the Citizenship EO.  *See* TRO, *Washington v. Trump*, No. 2:25-cv-00127-JCC (Jan. 23, 2025), ECF No. 43.  That TRO remains in effect "pending further orders from th[e] Court," *id*., and the court has scheduled a preliminary injunction hearing for February 6.  *See Washington*, ECF No. 44.

## ARGUMENT

### I.    The State Plaintiffs Lack Standing.

The state plaintiffs' preliminary injunction motion should be denied at the outset because the states have not established that they are likely to meet Article III standing requirements. First, the direct harms that they allege to have suffered as states are insufficient to confer Article III standing. And second, the state plaintiffs lack third-party standing to assert Citizenship Clause claims on behalf of their residents.

1.    To establish Article III standing, the states must show that they have suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The states attempt to satisfy that requirement primarily by asserting incidental "proprietary harms" and "fiscal injuries." *New Jersey* Mem. at 8. Those harms—which boil down to the contention that states will have to "assume a greater fiscal responsibility for providing critical services and assistance" to residents who are classified as aliens under the EO, *id*. at 4—do not satisfy Article III.

As an initial matter, the Supreme Court rejected those types of incidental economic harms as a basis for standing in *United States v. Texas*. There, Texas and Louisiana challenged federal actions that, in their view, increased the number of noncitizens in their states, which imposed various costs on the states (*e.g.*, costs from continuing to "supply social services . . . to noncitizens"). *See Texas*, 599 U.S. at 674. Those costs were insufficient for standing:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

That holding forecloses the state plaintiffs' standing here.  Just as in *Texas*, where it was insufficient for the challenger states to identify monetary costs stemming from the presence of aliens, these states cannot rely on social services expenditures to challenge the federal government's regulation of others.  The Citizenship EO simply regulates how the federal government will approach certain individuals' citizenship status.  The state (or municipality) where such individuals live has no legally cognizable interest in the recognition of citizenship by the federal government of a particular individual—let alone economic benefits or burdens that are wholly collateral to citizenship status.  Whatever potential downstream effects might arise for state programs in response cannot establish standing.  *See E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that states lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative.").

Accepting the states' theory of injury here—that states suffer Article III injury whenever a federal policy allegedly results in an increase in state expenditures or loss in state revenues—would eliminate any limits on state challenges to federal policies.  *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?").  Indeed, the states' claimed interest in future fees under their contract with the Social Security Administration (SSA), *New Jersey* Mem. at 6, highlights the breadth of their theory—asserting that a discrete contract with SSA grants them Article III license to challenge any federal action that conceivably lowers the birthrate within their states.

Moreover, the states' asserted injuries are also not traceable to the Citizenship EO.  Nothing

in the EO requires the states to provide "low-cost health insurance," "certain educational services," or "child welfare services," *New Jersey* Mem. at 4, to aliens.  Nor have the states identified any other source of federal law that compels them to provide the referenced services—indeed, as they recognize, federal law makes clear that if states choose to offer otherwise reimbursable services and benefits to individuals who are not citizens, the federal government will not provide reimbursement.  *See, e.g.*, *id*.  Because the states have *voluntarily* chosen to provide such benefits, the costs they incur to do so are the result of an independent choice made by the states' legislatures and not attributable to the Citizenship EO itself.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (holding that "respondents' self-inflicted injuries" were insufficient for Article III standing, because they "are not fairly traceable" to the challenged government action); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand.").

The state plaintiffs likewise cannot rely on "administrative and operational burdens" that they claim will result from the Citizenship EO, *New Jersey* Mem. at 7, which does not require states to change their systems or impose any penalty for failing to do so.  Thus, these claimed harms are not attributable to the federal policy itself.  And again, the notion that states can assert standing based on putative harms from changing their systems to adapt to new federal policies would create automatic standing to challenge every new federal policy.  That is not the law, for states or other organizations.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024).

2.    "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement," "the plaintiff generally must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citation omitted).  A plaintiff "cannot rest his claim to

relief on the legal rights or interests of third parties." *Id.* Thus, constitutional claims generally may be brought only by "one at whom the constitutional protection is aimed." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted).

Relatedly, the Supreme Court has foreclosed states from suing the federal government in *parens patriae* actions to protect their citizens. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) ("[I]t is no part of [a state's] duty or power to enforce [its people's] rights in respect of their relations with the federal government."); *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) ("States do not have standing as *parens patriae* to bring an action against the Federal Government." (internal quotation marks & citation omitted)). The same principles apply to entities like San Francisco, which "derive their existence from the state and function as political subdivisions of the state." *Town of Milton v. FAA*, 87 F.4th 91, 96 (1st Cir. 2023) (citation omitted).

Applying those principles, the Supreme Court has held that states lack standing to bring claims under Section 1 of the Fourteenth Amendment against the federal government. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Court held that South Carolina lacked standing to challenge a federal statute under the Due Process Clause. *See id.* at 323-324. The "States of the Union" have no rights of their own under that clause; "[n]or does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Court held that Texas lacked standing to challenge a federal statute under the Equal Protection Clause. Texas "ha[d] no equal protection rights of its own," and Texas could not "assert equal protection claims on behalf of its citizens because 'a State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* at 294-295 (brackets and citation omitted).

Those precedents control this case. Just as South Carolina and Texas could not sue the

federal government under the Fourteenth Amendment's Due Process and Equal Protection Clauses, the state plaintiffs here may not sue the federal government under the Citizenship Clause. Neither the states, nor the City and County of San Francisco, which is "organized and existing under and by virtue of the law of the State of California," *New Jersey* Compl. ¶ 66, "ha[ve] [any] [citizenship] rights of their own," and given established "limits on *parens patriae* standing," they also may not "assert [Citizenship Clause] claims on behalf of [their residents]." *Brackeen*, 599 U.S. at 294-95 & n.11.

## II.    Plaintiffs Lack A Valid Cause of Action.

The Court should also deny both motions for the threshold reason that neither group of Plaintiffs are likely to show that they have a valid cause of action. Plaintiffs cannot proceed under the APA because they fail to identify any final agency action and because the INA provides an adequate remedy. And Plaintiffs cannot assert the claims at issue in this lawsuit directly under the Citizenship Clause or the INA.

### A.    Plaintiffs' APA Claims Fail.

Both sets of Plaintiffs purport to assert APA challenges to agency action implementing the EO. But the APA only authorizes judicial review over "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Neither requirement is met here.

*First*, Plaintiffs do not even attempt to "identify the final agency action being challenged." *Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011). They do not identify *any* agency action that has been taken, much less final agency action that is reviewable under the APA. The EO does not qualify as an agency action because the President is not an "agency" within the meaning of the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Until such time as an agency named in the complaints takes action by determining rights

or obligations, or otherwise causes legal consequences, *see, e.g.*, *U.S. Army Corps of Eng'rs  v. Hawkes Co.*, 578 U.S. 590, 597 (2016), Plaintiffs' APA claims are not cognizable.

*Second*, the INA provides an adequate alternate remedy for review of citizenship determinations. *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) ("[T]he Supreme Court interpreted [5 U.S.C.] § 704 as precluding APA review where Congress has otherwise provided a 'special and adequate review procedure.'" (citation omitted)).    Pursuant to the INA's comprehensive statutory framework for judicial review, disputes regarding the citizenship of an individual within the United States are resolved by the individual filing an action for declaratory relief once he is denied a right or privilege as a U.S. national.  8 U.S.C. § 1503(a).  Thus, "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," then that person may institute an action under 8 U.S.C. § 1503(a), in conjunction with 28 U.S.C. § 2201, for a declaratory judgment that he is a U.S. national.  *See id.* § 1503(a).[2]  Under section 1503, district courts conduct *de novo* proceedings as to the person's nationality status.  *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985).

Because "Congress intended § 1503(a) to be the exclusive remedy for a person within the United States to seek a declaration of U.S. nationality following an agency or department's denial of a privilege or right of citizenship upon the ground that the person is not a U.S. national," *Cambranis v. Blinken*, 994 F.3d 457, 466 (5th Cir. 2021), courts have consistently concluded that

---

[2] If an individual is placed in removal proceedings, Section 1503 is unavailable and the individual can raise the issue of citizenship in those proceedings.  8 U.S.C. § 1252(b)(5) (if an alien appeals a removal order to a circuit court, that court, upon finding a genuine issue of material fact as to U.S. citizenship, transfers the proceeding to the district court for an evidentiary hearing).

section 1503(a) offers an adequate alternative remedy to—and thus precludes—APA review.  *See, e.g.*, *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 326-27 (D.D.C. 2018); *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021); *Ortega-Morales v. Lynch*, 168 F. Supp. 3d 1228, 1233-34 (D. Ariz. 2016).

### B.    Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA Claims.

Both groups of Plaintiffs primarily assert claims under the Fourteenth Amendment's Citizenship Clause.  As discussed above, the state plaintiffs lack standing to assert such claims.  But even setting that aside, it is well established that the Constitution does not generally provide a cause of action to pursue affirmative relief.  *See, e.g.*, *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("[C]onstitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose.").  Neither group of Plaintiffs identifies any "independent cause of action"[3] that would enable them to enforce the Citizenship Clause.  *Id.* at 291.

As for the INA claims, Congress provided a specific remedy for individuals within the United States to seek judicial resolution of disputes concerning their citizenship.  *See supra* Sec. II.A.  The exclusive remedy for an individual in the U.S. who claims to be a U.S. citizen denied a right or privilege of citizenship is to institute an action for declaratory relief under section 1503(a).  The INA does not provide for states or organizations to sue under section 1503(a), either on their own account or on behalf of residents or members—a particularly telling omission, given that some provisions of the INA—as amended by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3

---

[3] As discussed above, Plaintiffs assert separate claims under the APA.  But they do not allege that their constitutional or INA claims are pursuant to the APA cause of action, and in any event Plaintiffs have failed to assert a proper APA claim based on the defects described above.

(2025)—expressly authorize states to bring enforcement actions.  *See* 8 U.S.C. §§ 1185(d)(5)(C), 1225(b)(3), 1226(f), 1231(a)(2)(B), 1253(e).  And even with respect to an individual like Ms. Doe, the statute requires any dispute over a citizenship determination to be resolved in individual declaratory judgment proceedings once a right or privilege is actually denied.  It does not permit Ms. Doe to file a facial challenge seeking to permanently enjoin enforcement of an executive order nationwide before any right has been denied to her.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (citation omitted)).

## III.    Plaintiffs Are Not Likely To Succeed On the Merits.

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  And the INA grants U.S. citizenship to any "person born in the United States, and subject to the jurisdiction thereof."  8 U.S.C. § 1401(a).  Plaintiffs contend that the EO violates both the Citizenship Clause and the INA, but they are mistaken.[4]

To obtain U.S. citizenship under the Citizenship Clause, a person must be: (1) "born or naturalized in the United States" and (2) "subject to the jurisdiction thereof."  U.S. Const. amend XIV, § 1.  The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not subject to the jurisdiction of the United States: children of foreign sovereigns or their diplomats, children of alien

---

[4] The *Doe* plaintiffs recognize that their statutory claim rises and falls with their constitutional claim, *see Doe* Mem. at 10, and while the states contend that the Citizenship EO "independently violate[s]" the INA, *New Jersey* Mem. at 14, they do not meaningfully explain how the two are distinct—nor do they identify any legal authority suggesting any intentional delta between the two sources of law.  Rather, in using the exact text of the Citizenship Clause in the INA, Congress imported its exact scope.  Because the two provisions are coterminous, Defendants focus here on the constitutional provision.

enemies in hostile occupation, children born on foreign public ships, and certain children of members of Indian tribes.[5]  *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898).  The Citizenship EO recognizes an additional category of persons not subject to the jurisdiction of the United States: children born in the United States of foreign parents whose presence is either unlawful or lawful but temporary.

### A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.

"Jurisdiction . . . is a word of many, too many, meanings."  *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted).  Plaintiffs equate "jurisdiction" with something akin to regulatory power, arguing that anyone "to whom United States law applies" is subject to the jurisdiction of the United States.  *Doe* Mem. at 7; *see also New Jersey* Mem. at 9-10.  But that interpretation is incorrect.  It conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

1.    Most importantly, Plaintiffs' understanding of the term "jurisdiction" conflicts with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause.  For example, the Supreme Court has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States.  *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82.  Yet members of Indian tribes and their children are plainly subject to the United States' regulatory power.  "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations."  *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see*

---

[5]  Although the Citizenship Clause has always been understood to exclude certain children of members of Indian tribes from a constitutional right to citizenship by birth, Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe."  8 U.S.C. § 1401(b).

*Brackeen*, 599 U.S. at 272-73.  For example, Congress may regulate Indian commercial activities, see *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); and Indian adoptions, see *Brackeen*, 599 U.S. at 276-280.  And the United States may punish Indians for crimes.  *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886).  If, as Plaintiffs argue, "subject to the jurisdiction thereof" means subject to U.S. law, this longstanding exception for Indians would be inexplicable.

In fact, Plaintiffs' reading cannot even explain the exception to birthright citizenship for "children of foreign sovereigns or their ministers."  *Wong Kim Ark*, 169 U.S. at 693.  Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of common law, the Constitution allows Congress to abrogate that immunity or to make exceptions to it.  *See Verlinden BV v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).  And to the extent Plaintiffs argue that children of foreign leaders or diplomats are not subject to the United States' jurisdiction because the U.S. *chooses* to extend immunity to them, their theory would allow Congress to turn the Citizenship Clause on and off at will by extending or retracting immunity.

Against the surplusage canon, on Plaintiffs' reading, the phrase "subject to the jurisdiction thereof" adds nothing to the phrase "born . . . in the United States."  Because the United States is sovereign over its territory, everyone who is born (and so present) in the United States would necessarily be subject, at least to some extent, to the United States' regulatory authority.  *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812).  But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and therefore such a construction is inadmissible."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

2.     Instead of equating "jurisdiction" with regulatory authority, the Supreme Court has held that a person is "subject to the jurisdiction" of the United States under the Citizenship Clause

if he is born "in the allegiance and under the protection of the country." *Wong Kim Ark*, 169 U.S. at 693. That allegiance to the United States, the Court has further held, must be "direct," "immediate," and "complete," unqualified by "allegiance to any alien power." *Elk*, 112 U.S. at 101-02. In other words, a person is subject to the jurisdiction of the United States within the meaning of the Clause only if he is *not* subject to the jurisdiction of a foreign power, and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Elk*, 112 U.S. at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction … must be traced up to the consent of the nation itself").

That reading of the Citizenship Clause reflects its statutory background. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27 (1866) (emphasis added). There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment as broader than the phrase "not subject to any foreign power" in the Act—in no small part, because doing so would render the Civil Rights Act unconstitutional. And as telling, the Act's citizenship language remained on the books until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138— suggesting that Congress regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction" requirement. The Act thus confirms that, to be subject to the jurisdiction of the United States under the Clause, a person must owe "no

allegiance to any alien power." *Elk*, 112 U.S. at 101.

Debates on the Act and the Amendment show that members of Congress shared that understanding. During debates on the Act, Senator Lyman Trumbull explained that the purpose of the Act was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). And Representative John Broomall explained that the freed slaves were properly regarded as U.S. citizens by birth because they owed no allegiance to any foreign sovereign. *See id*. at 1262. Similarly, during debates on the Amendment, Senator Trumbull explained: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means. . . . It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'" *Id.* at 2893. Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. And Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power . . . shall be considered as citizens." *Id.* at 2893.

The full text of the Citizenship Clause reinforces that reading of the Clause's jurisdictional element. The Clause provides that persons born in the United States and subject to its jurisdiction "are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Clause uses the term "reside[nce]" synonymously with "domicile." *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship requires "a fixed permanent domicile in that State"). And then as now, domicile was understood to have two components—presence that is both permanent and lawful. *See* M.A. Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145, 146 n.3 (1891) (explaining the term "'resident' … 'is applied exclusively to one

who lives in a place and has a fixed *and legal* settlement'" (citations omitted) (emphasis added)). The Clause thus confirms that citizenship flows from lawful domicile.

Finally, as a decisive cross-check, the government's reading, unlike Plaintiffs' interpretation, is the only one that fully explains the Supreme Court's precedents on citizenship by birth in the United States. It was "never doubted" that "children born of citizen parents" owe allegiance to the United States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. 162, 167 (1874). In *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese descent, who at the time of his birth [were] subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity" by China are likewise subject to the jurisdiction of the United States. 169 U.S. at 653. The Court explained that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance . . . of the United States." *Id*. at 693. By contrast, children of diplomats, children of certain alien enemies, and children born on foreign public ships are not subject to the jurisdiction of the United States because they all owe allegiance to foreign sovereigns under background principles of common law. *See id.* at 655. And the Court has held that certain children of members of Indian tribes are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99.

**B.    Children Born of Unlawfully Present Aliens or Lawful But Temporary Visitors Fall Outside the Citizenship Clause.**

1.    To determine which sovereign may properly claim a person's allegiance, the Supreme Court has looked to the background principles of the common law and the law of nations, as understood in the United States at the time of the ratification of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 653-55. Under those principles, a child born of foreign parents

other than lawful permanent residents is domiciled in, and owes a measure of allegiance to, his

parents' home country. As a result, such a child is not subject to the jurisdiction of the United

States within the meaning of the Citizenship Clause.

Under the common law, a person owes a form of "allegiance" to the country in which he

is "domiciled." *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 155 (1872); see *Pizarro*, 15 U.S.

(2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance to

the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile of

[his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *see Mississippi Band of Choctaw Indians

v. Holyfield*, 490 U.S. 30, 48 (1989) ("Since most minors are legally incapable of forming the

requisite intent to establish a domicile, their domicile is determined by that of their parents.").

Temporary visitors and unlawfully present aliens, however, are not domiciled here but in

foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true,

fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporary visitors

to the United States, by definition, retain permanent homes in foreign countries. And illegal aliens,

by definition, have no right even to be present in the United States, much less a right to make

*lawful* residence here. Instead, as a matter of law, illegal aliens formally retain their foreign

domiciles, because they have not yet been accepted to reside anywhere else. *See, e.g.*, *Elkins v.

Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the

ability of foreigners to establish domiciles in the United States). And if a temporary visitor or

illegal alien domiciled in a foreign country has a child with another temporary visitor or illegal

alien while in the United States, the child's domicile also lies in the foreign country, and the child

owes allegiance to that country. That "allegiance to [an] alien power" precludes the child from

being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment

20

requires.  *Elk*, 112 U.S. at 101-02.

Indeed, the Citizenship EO follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of members of the Indian tribes."  *Wong Kim Ark*, 169 U.S. at 682.  Indian tribes form "an intermediate category between foreign and domestic states."  *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted).  The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations."  *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.).  Yet the Court has held that "an Indian, born a member of one of the Indian tribes," has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe. *Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-682.

Illegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes.  "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life."  *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring).  If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with illegal aliens and temporary visitors even more obviously does not do so.  *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

2.     The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful or lawful but temporary are not.  Under the common law, "[t]wo things usually concur to create

21

citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted); *see* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848) ("To create [citizenship] by birth, the party must be born, not only within the territory, but within the ligeance of the government"). The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

 Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status.  "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens."  Emmerich de Vattel, *The Law of Nations* § 212, at 101 (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.).  Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]."  *Id.* § 213, at 102 (emphasis omitted); *see also id.* § 215, at 102.  According to Vattel, citizenship does not extend, however, to children of those foreigners who lack "the right of perpetual residence" in the country.  *Id.* § 213, at 102.  Such persons would instead owe allegiance to their parents' home countries, in accord with the principle that "children follow the condition of their fathers."  *Id.* § 215, at 102.

Justice Story also understood that birthright citizenship required more than mere physical presence.  He explained in a judicial opinion later quoted in *Wong Kim Ark* that "children of even aliens born in a country, *while the parents are resident there*," "are subjects by birth."  *Inglis v.*

*Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (emphasis added) (quoted in *Wong Kim Ark*, 169 U.S. at 660). He also wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

  3. Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm that children born in the United States to non-resident aliens lack a right to U.S. citizenship because they are not subject to U.S. jurisdiction. For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). But he recognized "except[ions]" to that general rule for "children born on our soil to *temporary sojourners* or representatives of foreign Governments." *Id.* (emphasis added).

  When Congress was considering the Civil Rights Act, Senator Trumbull, "who wrote [the Act's] citizenship language and managed the Act in the Senate, wrote a letter to President Andrew Johnson summarizing the bill." Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010) (footnotes omitted). The Act, as noted above, provided that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens." Civil Rights Act § 1, 14 Stat. 27 (emphasis added). Senator Trumbull summarized that provision: "The Bill declares 'all persons' *born of parents domiciled in the United States*, except untaxed Indians, to be citizens of the United States." Shawhan, *supra*, at 1352-53 (emphasis added) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, (*in* Andrew Johnson Papers, Reel 45, Manuscript

Div., Library of Congress)). "Trumbull thus understood the Act's 'not subject to any foreign [p]ower' requirement as equivalent to 'child of parents domiciled in the United States.'" *Id.* at 1353 (footnote omitted).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction"). Cong. Globe, 39th Cong., 1st Sess. 2768 (1866). One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2769, and is accordingly not constitutionally entitled to citizenship by birth. Likewise, Senator Howard stated that the Clause "of course" would not include the children of "foreigners" or "aliens." *Id.* at 2890.

4.    Contemporary understanding following ratification accords with that reading of the Fourteenth Amendment. Perhaps most telling, right on the heels of the Citizenship Clause, the Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States* born within the United States." *The Slaughterhouse Cases*, 83 U.S. 36, 73 (1873) (emphasis added). That is wholly consistent with the Citizenship EO.

Contemporary commentators expressed similar views:

- "Indians are held not within this clause, not being 'subject to the jurisdiction of the United States.' The same reasoning, it may be argued, would exclude children born in the United States to foreigners here on transient residence, such children not being by the law of nations 'subject to the jurisdiction of the United States.'" 2 *A Digest of International Law of the United States* § 183, at 393-394 (Francis Wharton ed., 2d ed. 1887) (*Wharton's Digest*) (citation omitted).

- "The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States." Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881).

- "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such a child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891).

- "Indians are no more 'born within the United States *and* subject to the jurisdiction thereof,' within the meaning of the XIVth amendment, than the children of foreign subjects, born while the latter transiently sojourn here." M.A. Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145, 146 (1891).

- "[I]f a stranger or traveler passing through the country, or temporarily residing here, . . . has a child born here, who goes out of the country with his father, such child is not a citizen of the United States, because he was not subject to its jurisdiction. But the children, born within the United States, of permanently resident aliens, . . . are citizens." Henry Campbell Black, *Handbook of American Constitutional Law* 458-459 (1895) (footnote omitted).

- "In the United States it would seem that the children of foreigners in transient residence are not citizens." Hall, *supra*, 236-237.

- "[T]he requirement of personal subjection to the 'jurisdiction thereof' . . . excludes Indians, the children of foreign diplomatic representatives born within the limits of the United States, and *the children of persons passing through or temporarily residing in this country*." Boyd Winchester, *Citizenship in its International Relation*, 31 Am. L. Rev. 504, 504 (1897) (emphasis added).

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895). In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right of citizenship." *Id.* at 698 (emphasis added)

(quoted in *Wong Kim Ark*, 169 U.S. at 692).  And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment.  For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship."  2 Cong. Rec. 3279 (1874).  The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a citizen thereof."  *Id.*  Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy."  Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015).  The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident alien parents are not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents.  In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States."  2 *Wharton's Digest* § 183, at 397.  Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship."  *Id.* at 398.

26

Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, issued an opinion denying a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany." *Id.* at 399.  Secretary Bayard explained that the applicant "was no doubt born in the United States, but he was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'  He was not, therefore, under the statute and the Constitution a citizen of the United States by birth." *Id.* at 400.

5.        Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682.  Here, the President has determined that the United States has experienced "an unprecedented flood of illegal immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats to national security and public safety"—have entered the country in violation of federal law. Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities").   Plaintiffs' maximalist reading of the Citizenship Clause would require extending birthright citizenship to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks.

**C.        Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause.**

1.        "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).  "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution."  *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted).

The government's reading of the Citizenship Clause respects that principle, while

Plaintiffs' reading violates it. The Citizenship Clause sets a constitutional floor, not a constitutional ceiling. Although Congress may not deny citizenship to those protected by the Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. Art. I, § 8, Cl. 4; *see Wong Kim Ark*, 169 U.S. at 688. The government's reading would thus leave Congress with the ability to extend citizenship to the children of illegal aliens or of temporary visitors, just as it has extended citizenship to the children of members of Indian tribes. Plaintiffs' reading, by contrast, would for all time deprive the political branches of the power to address serious problems caused by near-universal birthright citizenship.

As a "sovereign nation," the United States has the constitutional power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens. *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909). Interpreting the Constitution to require the extension of birthright citizenship to the children of illegal aliens directly undermines that power by holding out a powerful incentive for illegal entry. Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591 U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

2.    The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). Although the United States tolerates dual citizenship

in some circumstances, it has "long recognized the general undesirability of dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950). "One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

History shows that competing claims of allegiance can even lead to "problems for the governments involved." *Bellei*, 401 U.S. at 832. For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as American citizens. *See* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. L. Rev. 329, 345 (2012). And during the years preceding the adoption of the Fourteenth Amendment, the United States faced diplomatic clashes with the United Kingdom and other European powers "with respect to the allegiance of persons with links to both countries." *Id.* at 348.

Plaintiffs' reading of the Citizenship Clause invites just such problems. For centuries, countries have extended citizenship to the foreign-born children of their citizens. Vattel wrote that children born abroad "follow the condition of their fathers," so long as "the father has not entirely quitted his [home] country." Vattel, *supra*, § 215, at 102. England has extended citizenship to certain foreign-born children of English subjects since at least the 14th century. *See Wong Kim Ark*, 169 U.S. at 668-71. In 1790, the First Congress extended citizenship to "children of citizens" born "out of the limits of the United States," with the proviso that "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States."

29

Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104.  Today, federal law recognizes as a citizen any "person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States."  8 U.S.C. § 1401(c).  Many other countries have similar laws.  *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J., dissenting).

3.      Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant."  *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967).  For the reasons discussed above, the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of illegal aliens or of temporary visitors.  To the extent any ambiguity remains in the Clause, however, the Court should resolve it against extending citizenship.

### D.      Plaintiffs' Contrary Arguments Are Unpersuasive.

1.      Plaintiffs rely heavily on *Wong Kim Ark*, *see Doe* Mem. at 9-10; *New Jersey* Mem. at 10-11, but they misread that precedent.  *Wong Kim Ark* did not concern the status of children born in the United States to parents who were illegal aliens or temporary visitors.  To the contrary, the Court precisely identified the specific question presented:

> whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Wong Kim Ark*, 169 U.S. at 653 (emphasis added).

In analyzing that question, the Court repeatedly relied on fact that the parents were permanent residents.  For example, it quoted an opinion in which Justice Story recognized that

"the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, . . . are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)).  It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that *when the parents are domiciled here*, birth establishes the right to citizenship."  *Id.* at 692 (emphasis added; citation omitted).  It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added).  And it noted that "Chinese persons . . . owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens *residing* in the United States." *Id.* at 694 (emphasis added).

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born of *resident* aliens." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added).  Although the Amendment is subject to certain "exceptions" (*e.g.*, for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added).  The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiffs' position. But *Wong Kim Ark* never purported to overrule any part of *Elk*, and the Supreme Court has previously (and repeatedly) recognized *Wong Kim Ark*'s limited scope. In one case, the Court stated that

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (emphasis added; citation omitted). In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S. citizen by birth if "he was born to [foreign subjects] *when they were permanently domiciled in the United States*." *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise explained that the decision "goes no further" than addressing children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship. It was not so held in the Wong Kim Ark case." *Id.* at 124. Commentators, too, continued to acknowledge the traditional rule denying citizenship to children of non-resident foreigners. *See*, *e.g.*, John Westlake, *International Law* 219-20 (1904) ("[W]hen the father has domiciled himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality.");

Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) ("[M]ere birth within American territory does not always make the child an American citizen. . . . Such is the case with children of aliens born here while their parents are traveling or only temporarily resident, or of foreign ministers.").

In short, only "those portions of [an] opinion necessary to the result . . . are binding, whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." 169 U.S. at 679 (citation omitted). The only question that was presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicile and residence in the United States." *Id.* at 653; *see id.* at 705. The case should not be read as doing anything more than answering that question.

2.    Nor do Plaintiffs advance their argument by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), a case they admit "involved the threshold question of which persons fall 'within [the United States's] jurisdiction' for purposes of the Fourteenth Amendment's Equal Protection Clause." *New Jersey* Mem. at 11 (quoting U.S. Const. amend. XIV, § 1). But the phrase "*within* its jurisdiction" in the Equal Protection Clause, which focuses on a person's geographic location, differs from the phrase "*subject to* the jurisdiction thereof" in the Citizenship Clause, which focuses on an individual's personal subjection or allegiance to the United States. As Supreme Court cases illustrate, a person may fall outside the scope of the Citizenship Clause even if the person or his parents falls within the scope of the Equal Protection Clause. For example, certain children of

members of Indian tribes lack a constitutional right to U.S. citizenship by birth, *see Elk*, 112 U.S. at 102, but Indians *are* entitled to the equal protection of the laws, *see United States v. Antelope*, 430 U.S. 641, 647-650 (1977). Children of foreign diplomats also are not entitled to birthright citizenship, *see Wong Kim Ark*, 169 U.S. at 682, but Plaintiffs do not offer any authority suggesting such individuals are not subject to the Equal Protection Clause.

Plaintiffs also invoke the "common law view known as 'jus soli,'" *i.e.*, that "citizenship is acquired by birth within the sovereign's territory." *Doe* Mem. at 7-8; *see also New Jersey* Mem. at 12. But the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022) (citation omitted). And that admonition holds particular force here. *Cf. United States v. Rahimi*, 602 U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring). The English *jus soli* tradition was premised on an unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) (statement of Rep. Woodward) (calling the British tradition an "indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey) (calling it a "slavish" doctrine); *id.* at 1130-31 (statement of Rep. Woodbridge) (saying it conflicts with "every principle of justice and of sound public law" animating America and its independent identity).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from English common law in important respects. For example, the Clause's exception for certain children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169 U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967). This Court should thus interpret

the Citizenship Clause in light of *American* common-law principles, and as shown above, those

principles do not support birthright citizenship for children of illegal aliens or temporary visitors.

Plaintiffs also point to 20th century Executive Branch precedent that accords with their

view. *See New Jersey* Mem. at 13. But the scope of the Citizenship Clause turns on what it meant

in 1868, not on what the Executive Branch assumed it meant during parts of the 20th century. *See*,

*e.g.*, *Bruen*, 597 U.S. at 66 n.28 (declining to consider "20th-century evidence" in interpreting the

Constitution). Nor is it unusual for the Supreme Court, after fully exploring a legal issue, to reach

a conclusion that conflicts with earlier assumptions. *See*, *e.g.*, *Oklahoma v. Castro-Huerta*, 597

U.S. 629, 644-45 (2022) (holding that states may prosecute non-Indians for crimes against Indians

in Indian country despite decades of contrary Supreme Court dicta); *District of Columbia v. Heller*,

554 U.S. 570, 624 n.24 (2008) (holding that the Second Amendment protects an individual right

even though lower courts had long read it to protect a collective right); *INS v. Chadha*, 462 U.S.

919, 944-45 (1983) (holding the legislative veto unconstitutional even though Congress had

enacted, and the President had signed, almost 300 legislative-veto provisions over the preceding

50 years).

## IV. Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This Lawsuit.

As discussed above, the state plaintiffs lack standing to challenge the Citizenship EO; by

definition, they cannot show that it will cause them irreparable harm. In any event, the states fail

to establish that their claimed pecuniary harms are irreparable. The states' asserted "operational

chaos" and costs associated with developing new citizenship "eligibility verification systems,"

*New Jersey* Mem. at 16, for example, are not directly attributable to the EO and hardly "threaten

the existence of [their] business." *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,

927 F.3d 1, 5 (1st Cir. 2019) (citation omitted). And even assuming *arguendo* that financial harms

could be irreparable if they were unable to be "recouped," *New Jersey* Mem. at 15, the state plaintiffs fail to show that their feared loss of federal funding and reimbursements are truly unrecoverable. For instance, they do not explain how they would be unable to adjudicate their claims in separate proceedings when they seek reimbursement or whether there are any available administrative processes to recover federal monies to which the states claim entitlement after the conclusion of this litigation. *Cf. Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003) (finding that a party asserting a claim for Medicare reimbursement would not be irreparably harmed by exhausting claims through an administrative review process).

The private plaintiffs similarly fail to establish any injury "of such imminence that there is a 'clear and present need for relief to prevent irreparable harm.'" *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (citation omitted). They claim that the EO would "render [covered] newborns . . . deportable at birth," *Doe* Mem. at 9, or "stateless," *id.* at 13. But the Citizenship EO does not, by its terms, mandate that outcome with certainty for any plaintiff in this case. As discussed above, Section 1 declares the Executive Branch's policy against recognizing birthright citizenship in certain situations, but the implementation and enforcement of the Citizenship EO are left to agencies under Section 3. *See* Citizenship EO § 3(a)-(b). That implementation and enforcement have yet to occur, and no agency has taken any action pursuant to the EO to determine the immigration status of Ms. Doe or the organizational plaintiffs' identified members, much less initiate any deportation actions.

Indeed, Ms. Doe and her husband have "pending asylum applications." Decl. of O. Doe ¶ 2, *Doe* ECF No. 11-1. Were such applications to be granted, they would receive "a path to citizenship, eligibility for certain government benefits, and the chance for family members to receive asylum as well." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 32

(D.D.C. 2020).  Moreover, if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the subject of the action could assert their claim to citizenship as defense in that proceeding.  *See* 8 U.S.C. § 1252(b)(5).  Because the precise effects of the EO are yet to materialize, Plaintiffs must speculate at what specific harms the Citizenship EO might ultimately cause.  *See, e.g.*, *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

This same rationale undercuts the *Doe* plaintiffs' remaining arguments that "children subject to the EO" would be deprived of the benefits of citizenship and "suffer compromised health and decreased housing access."  *See Doe* Mem. at 14 (capitalization normalized).  Setting aside that some of these claimed harms (*e.g.*, denial of rights to vote or hold public office) could not happen to anyone for many years, the *Doe* plaintiffs generally describe the population-wide effects of the EO.  They offer no concrete evidence that Ms. Doe's child or the children of any identified member of the organizational plaintiffs plans to travel internationally or will lose access to healthcare or housing as a result of the EO during the pendency of this litigation.  *See Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) ("simply showing some possibility of irreparable injury" is insufficient) (citation omitted).  And in any event, if an individual were actually "denied" any "right or privilege" of citizenship, 8 U.S.C. § 1503 provides an adequate legal remedy to avoid any irreparable harm.  *See supra* Sec. II.A; *Charlesbank Equity Fund II*, 370 F.3d at 162 (a party cannot show irreparable harm if it has an "adequate" "legal remedy").

## V.    The Public Interest Does Not Favor an Injunction.

Plaintiffs' asserted harms are outweighed by the harm to the government and public interest

that would result from the extraordinary relief Plaintiffs request. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balancing of harms and public interest requirement for emergency injunctive relief merge when "the Government is the opposing party"). As the Supreme Court has recognized, Executive officials must have "broad discretion" to manage the immigration system. *Arizona v. United States*, 567 U.S. 387, 395-96 (2012). It is the United States that has "broad, undoubted power over the subject of immigration and the status of aliens," *id*. at 394, and providing Plaintiffs with their requested relief would mark a severe intrusion into this core executive authority, *see INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury" (citing *Maryland v. King*, 567 U.S. 1301 (2012)).

## VI.  Any Relief Should Be Limited.

For the reasons above, the Court should deny Plaintiffs' motions in their entirety. But even if the Court determines that a preliminary injunction is appropriate, it should limit its scope in at least three ways. *First*, nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Although the state plaintiffs suggest that a nationwide injunction is necessary because, in their view, "the issue [of the scope of birthright citizenship] has already been settled for this Nation," *New Jersey* Mem. at 19, the propriety of a plaintiff's remedy "must be tailored to redress the plaintiff's particular injury"—not to how correct a plaintiff believes his position to be. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). And while the states contend that allowing the EO to take effect in other states and

not theirs would have spillover effect on state expenditures, *see New Jersey* Mem. at 19, that is the case with any nationwide policy and is not sufficient to justify nationwide relief.  To prevent ordering "the government to act or refrain from acting toward nonparties in the case," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief.

*Second*, "courts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin*, 505 U.S. at 802–03 ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).  Accordingly, the Court lacks jurisdiction to enter Plaintiffs' requested relief against the President and should dismiss him as a defendant in both actions.

*Third*, the Court should reject Plaintiffs' facial challenges to the Citizenship EO so that its lawfulness can be determined in individual as-applied challenges, consistent with the process established by the INA.  To mount a successful facial challenge, a plaintiff must show that "no set of circumstances exists" under which the challenged provision "would be valid," *Rahimi*, 602 U.S. at 693 (citation omitted), and as explained in the merits section of the brief, Plaintiffs have failed to do so here.  *See supra* Sec. III.[6]

---

[6] Because Plaintiffs' claims are purely legal and fully addressed in the parties' briefing on the instant motions, Defendants request that the Court consolidate the February 7 preliminary injunction hearing with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). *See also* Fed. R. Civ. P. 54(b)(2) (allowing a court to "direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay").

## CONCLUSION

For the foregoing reasons, the Court should deny the preliminary injunction motion that has been filed in each of the related cases.

Dated: January 31, 2025

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

LEAH B. FOLEY
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)
YURI S. FUCHS
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: January 31, 2025

<u>*/s/ R. Charlie Merritt*</u>
R. Charlie Merritt