# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**STATE OF NEW JERSEY, et al.,**

              **Plaintiffs,**

      -vs.-

**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**

              **Defendants.**

**Case No. 25-cv-10139-LTS**

TABLE OF CONTENTS

I. IDENTITY AND INTEREST OF *AMICI* ........................................................... 1

II. INTRODUCTION ................................................................................. 2

III. ARGUMENT ..................................................................................... 4

    A.  English Law.................................................................................... 4

    B.  The Understanding of Citizenship During the Drafting of the Fourteenth
        Amendment ............................................................................... 5

    C.  Post-Ratification Understanding of Scholars and the Supreme Court .................. 10

    D.  Plaintiffs Overread *Wong Kim Ark*.................................................. 13

    E.  Contemporary Scholars Support the Government's Views .......................... 15

    F.  "Subject to the Jurisdiction Thereof" Cannot Mean "Subject to the Laws
        Thereof" .................................................................................. 17

IV. CONCLUSION. ................................................................................. 19

## TABLE OF AUTHORITIES

### CASES

*Calvin's Case* (1608) 77 Eng. Rep. 377 ............................................................. 4

*Elk v. Wilkins*, 112 U.S. 94 (1884) ......................................................... 2, 12, 16

*Ex Parte Quirin*, 317 U.S. 1, 20 (1942) ................................................................18

*Fitisemanu v. United States*, 1 F.4th 862 (10th Cir. 2021) ................................. 2

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .........................................................17

*INS v. Pangilinan*, 486 U.S. 875, 885 (1988) ...............................................1, 3

*Kontrick v. Ryan*, 540 U.S. 443 (2004) ............................................................. 2

*Nolos v. Holder*, 611 F.3d 279 (5th Cir. 2010) ..............................................15

*Nunn v. Hazelrigg*, 216 F. 330 (8th Cir. 1914) ................................................ 8

*Oforji v. Ashcroft*, 354 F.3d 609 (7th Cir. 2003) ...........................................17

*Plyler v. Doe*, 457 U.S. 202 (1982) ..................................................................15

*Rabang v. INS*, 35 F.3d 1449 (9th Cir. 1994) .................................................15

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch.) 116 (1812) ...........14

*Tuaua v. United States*, 788 F.3d 300 (D.C. Cir. 2015) ........................... 2, 4, 15, 16

*United States v. Ginsberg*, 243 U.S. 472, 474 (1917) .......................................1, 3

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) .............................3, 13, 14, 15

*Valmonte v. INS*, 136 F.3d 914 (2d Cir. 1998) ...............................................15

*Weedin v. Chin Bow*, 274 U.S. 657 (1927) .......................................................5

### STATUTES

8 U.S.C. § 1408 ....................................................................................................1

Ch. 31, 14 Stat. 27 (1866) ................................................................................... 6

Ch. 71, 10 Stat. 604, 604 (1855) .........................................................................5

### OTHER AUTHORITIES

14 Op. Att'ys Gen. 295 (1873) ..........................................................................10

Alexander Porter Morse, *A Treatise on Citizenship* § 198 (1881)......................11

Amy Swearer, *Subject to the [Complete] Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019)................................................................................................. 6, 8, 13

Cong. Globe, 39th Cong., 1st Sess. 1291 (1866)............................................6, 9

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866)...............................................7

Cong. Globe, 39th Cong., 1st Sess. 2890 (1866)..................................................................7

Francis Wharton, *A Treatise on the Conflict of Laws* § 10 (2d ed. 1881) ......................11

G.M. Lambertson, *Indian Citizenship*, 20 Am. L. Rev. 183 (1866)................................12

George D. Collins, *Are Persons Born Within the United States Ipso Facto Citizens Thereof?*, 18 Am. L. Rev. 831 (1884)...............................................................................12

H.R. Rep. No. 43-784 (1874)..............................................................................................11

Henio Hoyo, Eur. Univ. Inst., *Report on Citizenship Law: Honduras* 5 (Apr. 2016), https://cadmus.eui.eu/bitstream/handle/1814/40848/EUDO_CIT_CR_2016_06 .pdf .................................................................................................................................. 9

James C. Ho, *Defining 'American,'* 9 Green Bag 2d 367 (2006) ....................................17

*Nationality*, Gov't of Colombia, https://www.cancilleria.gov.co/tramites_servicios/nacionalidad............................... 9

Patrick J. Charles, *Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. Pub. L. 35 (2011) ..............................................................................................................12

*Protecting the Meaning and Value of American Citizenship*, Exec. Order § 2(c) (Jan. 20, 2025)..................................................................................................................14

Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329 (2013).......................................................................................... passim

Roberto Courtney, Eur. Univ. Inst., *Report on Citizenship Law: Nicaragua* 4–5 (May 2015), https://core.ac.uk/download/pdf/45685706.pdf ................................... 9

Samuel Estreicher & David Moosmann, *Birthright Citizenship for Children of Unlawful U.S. Immigrants Remains an Open Question*, Just Sec. (Nov. 20, 2018) ...............................................................................................................3, 5, 15, 16

Samuel F. Miller, *Lectures on the Constitution* 279 (1891) .........................................13

## Constitutional Provisions

U.S. Const. amend. XIV ...................................................................................................... 2

Venezuela Constitution Ch. II, § 1, art. 32 ........................................................................ 9

## I. Identity And Interest Of *Amici*

*Amici* are 18 members of Congress who serve on the Committee on the Judiciary of the U.S. House of Representatives. Chairman Jim Jordan leads this coalition and is joined by Reps. Andy Biggs, Chip Roy, Brandon Gill, Troy Nehls, Lance Gooden, Victoria Spartz, Mark Harris, Scott Fitzgerald, Robert Onder, Harriet M. Hageman, Tom McClintock, Wesley Hunt, Glenn Grothman, Ben Cline, Russell Fry, Michael Baumgartner, and Brad Knott.

*Amici* have a strong interest in the outcome of this case because Congress, as a co-equal branch of government, has an interest in the courts upholding the Constitution. Specifically, the historical record confirms that the Fourteenth Amendment does not confer citizenship on the children of aliens unlawfully present in the United States.

Because of this, "[a]n alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress," *United States v. Ginsberg*, 243 U.S. 472, 474 (1917), but Congress has never granted citizenship to the children of aliens unlawfully present, *see also* 8 U.S.C. § 1408. Thus, the other branches are forbidden from conferring such citizenship on their own, a limitation that the Executive Order ensures is followed within the executive branch. *See also INS v. Pangilinan*, 486 U.S. 875, 885 (1988) ("Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations.").

The Court should deny Plaintiffs' motion for a preliminary injunction.

## II. Introduction

The Fourteenth Amendment confers citizenship on any person who is both (1) "born or naturalized in the United States" and (2) "subject to the jurisdiction thereof." U.S. Const. amend. XIV. Each requirement invokes specialized terms of art. The first clause has been construed to exclude those born in U.S. territories, despite being literally "in" the United States.[1] And "jurisdiction" in the second clause (the "Jurisdiction Clause") invokes the historic doctrine of "*ligeantia*," meaning the person must owe direct and exclusive allegiance to the sovereign, which in turn must consent to the person's presence.

Notably, the Jurisdiction Clause does not say that the person must be subject to the *laws* of the United States, but rather subject to its *jurisdiction*. The distinction matters. Even in modern caselaw and statutes, "[j]urisdiction … is a word of many, too many, meanings," *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004), so it should come as no surprise that the meaning of that term in an amendment written nearly 160 years ago would be nuanced and invoke pre-existing doctrines.

As the D.C. Circuit has held, "birthright citizenship does not simply follow the flag." *Tuaua*, 788 F.3d at 305. Rather, "the evident meaning of the words 'subject to the jurisdiction thereof' is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* (quoting *Elk v. Wilkins*, 112 U.S. 94, 102 (1884)) (cleaned up).

There is widespread agreement that the Jurisdiction Clause means that children born in the United States to ambassadors or invading soldiers would not receive citizenship under the Fourteenth Amendment. The best reason is because they do not owe total allegiance to the United

---

[1] *See Fitisemanu v. United States*, 1 F.4th 862, 877 (10th Cir. 2021); *Tuaua v. United States*, 788 F.3d 300 (D.C. Cir. 2015).

States, rather than (as Plaintiffs contend) because those groups allegedly have immunity from federal law (in fact, they do *not* have unconditional immunity, as explained below in Part III.F). As explained in more detail below, there is a wealth of support for the proposition that the Clause applies the same to children of those illegally present in the country because they (like ambassadors and foreign soldiers) do not owe total allegiance to the United States; they remain citizens of their home countries, to whom they owe at least divided allegiance and which often imposes birthright citizenship of its own on the children born to its nationals in the United States. Allegiance is also a reciprocal relationship. The person must be present with the consent of the sovereign, a factor on which the Supreme Court extensively relied in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). But illegal aliens and their children are present in the United States without consent, *i.e.*, only by defying its laws.

Early English caselaw supports this concept of total allegiance and its role in citizenship, and even the Senators who drafted and debated the Jurisdiction Clause stated that children of "aliens" or others "owing allegiance to anybody else" would not receive citizenship. That understanding extended for decades after the ratification of the Fourteenth Amendment. And some modern scholars argue that the "core purpose of the citizenship clause [was] to include in the grant of birthright citizenship all who are *lawfully in the United States*," and scholars have also distinguished the caselaw on which Plaintiffs rely.[2]

Because the Fourteenth Amendment does not confer citizenship on the children of illegally present aliens, and because Congress has not done so by statute, the other branches cannot confer such citizenship on their own. *See Pangilinan*, 486 U.S. at 885; *Ginsberg*, 243 U.S. at 474. The

---

[2] Samuel Estreicher & David Moosmann, *Birthright Citizenship for Children of Unlawful U.S. Immigrants Remains an Open Question*, Just Sec. (Nov. 20, 2018), https://www.justsecurity.org/61550/birthright-citizenship-children-unlawful-u-s-immigrants-remains-open-question/.

Executive Order at issue here properly ensures that rule is followed within the executive branch, and thus the Order should not be enjoined.

### III.  Argument

### A.    English Law

In *Calvin's Case*—which the Supreme Court later cited in *Wong Kim Ark*, discussed below—Lord Coke explained what made someone subject to the jurisdiction of English courts. *Calvin's Case* (1608) 77 Eng. Rep. 377, 385. He noted that "it is *nec cælum, nec solum*, neither the climate nor the soil, but *ligeantia* [allegiance] and *obedientia* [obedience] that make" one "subject" to the laws of the country. *Id.* Jurisdiction in that sense does not turn simply on whether the person was present within the territory or subject to its *laws*, but whether he owed allegiance to the sovereign. As the D.C. Circuit has explained, *Calvin's Case* means "[t]hose born 'within the King's domain' and 'within the obedience or ligeance of the King' were subjects of the King, or 'citizens' in modern parlance." *Tuaua*, 788 F.3d at 304 (quoting 77 Eng. Rep. at 399).

Lord Coke cited several prior cases to make the point. Most notable was *Perkin Warbeck's Case*, where a Dutchman declared himself the rightful heir to the English throne, then traveled to England in an attempt to take the throne. He was captured, but the English court concluded he "could not be punished by the common law" because he was not subject to the civil courts' jurisdiction. *Calvin's Case*, 77 Eng. Rep. at 384. There was no state of war between the countries, but his mere presence was unlawful, and thus he had never been under the "protection of the King, nor ever owed any manner of ligeance unto him." *Id.*

As Professor Estreicher explains, "Warbeck's very setting foot on English soil as a pretender to the throne made him a criminal in the eyes of English law, one who had never claimed the protection of the king by virtue of his lawful presence in the realm. Thus, it was the illegality

of Warbeck's presence that placed him outside of the ordinary jurisdiction of English law." Estreicher, *supra* note 2.

**B.    The Understanding of Citizenship During the Drafting of the Fourteenth Amendment**

The concept that "jurisdiction" included two concepts—i.e., being subject to a nation's laws but also holding allegiance to the sovereign—continued into international relations and American practice in the leadup to the Fourteenth Amendment.

"The status of dual allegiance, ordinary as it seems today, seemed anomalous and inappropriate" in the 1860s, as "the general view was that 'no one can have two countries.'" Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329, 334 (2013). Thus, at the time of the Fourteenth Amendment's drafting and ratification, the term "'immigration status' … would have been meaningless" because the United States had only minimal immigration laws in the modern sense, and instead the crucial inquiry was "the parents' allegiance to a foreign country." *Id.*

That is because the general, albeit not completely uniform, rule at the time was that citizenship of a child followed the parents' citizenship, and their original sovereign would often "claim[] the allegiance of the child" regardless of where he was born, as "British law at the time plainly did." *Id.* at 358. United States law was the same: in 1855, Congress enacted a law dictating that "persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were or shall be at the time of their birth citizens of the United States, shall be deemed and considered and are hereby declared to be citizens of the United States," except for "persons whose fathers never resided in the United States." Ch. 71, 10 Stat. 604 (1855); *see Weedin v. Chin Bow*, 274 U.S. 657, 659 (1927). Accordingly, "in 1866 … a foreigner could be domiciled in the United States but remain subject to a foreign power." Mensel, *supra*, at 356.

With this background, the terminology used by the drafters of the Jurisdiction Clause makes more sense to modern readers.

The history of the Jurisdiction Clause begins with the Civil Rights Act of 1866, which stated: "[A]l persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Ch. 31, 14 Stat. 27, 27 (1866) (emphasis added). Senator John Bingham, a principal author of the future Fourteenth Amendment, said this provision meant that "every human being born within the jurisdiction of the United States of parents *not owing allegiance to any foreign sovereignty*" would be a citizen. Cong. Globe, 39th Cong., 1st Sess. 1291 (1866) (emphasis added). This invoked the concept of total allegiance to the United States—a concept defeated if the parents (and thus their child) owed any allegiance to their home country.

There were, however, serious doubts whether Congress had constitutional authority to enact the 1866 Act—President Johnson vetoed it in part on that basis, but the veto was overridden—and so "it was clear to many in the Republican majority that a constitutional amendment would be needed to give the Civil Rights Act a solid foundation on which to survive future legal challenges." Amy Swearer, *Subject to the [Complete] Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 147–48 (2019). Accordingly, it "cannot be seriously doubted" that what would become the Jurisdiction Clause was intended to have the exact same meaning as the Act, which referenced foreign allegiance. *Id.* at 147.

The earliest draft of the Fourteenth Amendment originally included no citizenship clause, but in May 1866, Senator Benjamin Wade sought to replace the word "citizen" in the privileges-or-immunities clause with the phrase "persons born in the United States or naturalized by the laws

thereof." Cong. Globe, 39th Cong., 1st Sess. 2768 (1866). This prompted a discussion of whether that was actually the proper definition of "citizen." *See* Mensel, *supra*, at 362–63.

Senator Jacob Howard, a sponsor of the Fourteenth Amendment, soon proposed a new clause that invoked the historic term of art "jurisdiction": "[A]ll persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866).

Importantly, Howard explained that "[t]his will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors [sic] or foreign ministers accredited to the Government of the United States, but will include every other class of persons." *Id.* This express reference to "aliens" suggests that even the drafter did not believe it would apply only narrowly to children of ambassadors, who are listed separately.

The primary focus of debate during this time was whether the Jurisdiction Clause would extend to Indians, who were not expressly mentioned in the Clause. Senator Edgar Cowan noted that "[i]t is perfectly clear that the mere fact that a man is born in the country has not heretofore entitled him to the right to exercise political power." *Id.* at 2890. "[S]ojourners" or "travelers," for example, have a "right to the protection of the laws; but he is not a citizen in the ordinary acceptance of the word." *Id.* The right to protection of the laws invoked the narrower sense of jurisdiction, but to become a citizen, something more was required.

Senator Lyman Trumbull, who was Chair of the Senate Judiciary Committee and seen as the Senate expert on the closely aligned Civil Rights Act of 1866, was asked what the Jurisdiction Clause meant in this context. He replied: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means." *Id.* at 2893. He further stated: "'subject to the jurisdiction thereof' ... means 'subject to the complete jurisdiction

thereof.'" *Id.* Any divided loyalty meant no citizenship, just as it did in the Civil Rights Act of 1866.

Applying that test to Indians was seen as so straightforward that the drafters decided against including an express exception for "Indians not taxed," as they had done in the 1866 Act and would also do in Section Two of the Fourteenth Amendment. Federal law had long applied to Indians, *see, e.g.*, 1 Stat. 137 (1790), but they owed at least partial loyalty to their tribes—and thus the Jurisdiction Clause *unambiguously* meant the Fourteenth Amendment would not confer citizenship on their children. Congress later granted Indians citizenship via statute,[3] but until that time, "the Indians were regarded as alien people residing in the United States" and thus "were not 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the fourteenth amendment of the Constitution." *Nunn v. Hazelrigg*, 216 F. 330, 332–33 (8th Cir. 1914).

As modern scholars have recognized, "Senator Trumbull and those who agreed with him spoke of the jurisdiction arising from allegiance." Mensel, *supra*, at 369. Thus, everyone recognized the narrow form of jurisdiction, meaning entitlement to protection of the laws. But it "is clear that the men who drafted and passed the Citizenship Clause … recognized a second degree of subjection to a country's jurisdiction—a subjection to its 'complete' jurisdiction in ways more closely associated with the rights, duties, and deeply rooted natural allegiance inherent to long-term residence in, and meaningful interaction with, a particular society." Swearer, *supra*, at 150. And that more complete form of jurisdiction was needed for citizenship. Merely being born in the United States and being subject to its laws was insufficient. If the parents or child had divided allegiances, the child would not be a U.S. citizen under the Jurisdiction Clause.

---

[3] *See, e.g.*, Ch. 233, 43 Stat. 253 (1924).

That approach directly tracked the Civil Rights Act of 1866, which the Jurisdiction Clause constitutionalized, as noted above. Recall that Act excluded those who "ow[e] allegiance to any foreign sovereignty." Cong. Globe, 39th Cong., 1st Sess. 1291 (1866). That same limitation was carried into the Jurisdiction Clause, except the latter was stated affirmatively vis-à-vis the United States (i.e., must owe allegiance to the United States), whereas the Act had been stated negatively vis-à-vis foreign sovereigns (i.e., cannot owe allegiance to another sovereign). But they meant the same thing.

As noted, the most common example at the time of someone who lacked complete allegiance to the United States would be the children of Indians, but the same "rationale that excluded the children of Indians would exclude the children of Europeans, born in the United States, if the European power involved claimed the allegiance of the child," which—most notably—"British law at the time plainly did." Mensel, *supra*, at 358. Because no one could owe allegiance to two sovereigns at that time (*see supra*), such children could not claim total allegiance to the United States and thus would not be citizens under the Fourteenth Amendment, just as they would not be citizens under the Civil Rights Act of 1866.[4]

---

[4] Even now, many countries claim children born abroad to citizens. *See, e.g.*, Venezuela Constitution Ch. II, § 1, art. 32 ("Are Venezuelans by birth: … Any person who was born in a foreign territory, and is the child of a father and mother who are both Venezuelans by birth."); *Nationality*, Gov't of Colombia, https://www.cancilleria.gov.co/tramites_servicios/nacionalidad (Article 96 of the Colombian Political Constitution deems "Colombian nationals by birth" those "[c]hildren of a Colombian father or mother who were born in a foreign land and then resided in Colombian territory or registered in a consular office of the Republic"); Henio Hoyo, Eur. Univ. Inst., *Report on Citizenship Law: Honduras* 5 (Apr. 2016), https://cadmus.eui.eu/bitstream/handle/1814/40848/EUDO_CIT_CR_2016_06.pdf (Honduran Constitution awards "*ius sanguinis* for children born abroad to those born from Honduran citizens by birth"); Roberto Courtney, Eur. Univ. Inst., *Report on Citizenship Law: Nicaragua* 4–5 (May 2015), https://core.ac.uk/download/pdf/45685706.pdf (Nicaraguan law grants citizenship to "the children of Nicaraguans born overseas regardless of any other nationalities they may have.").

This focus on allegiance continued in the years immediately after the Fourteenth Amendment was ratified, as explained next.[5]

## C.    Post-Ratification Understanding of Scholars and the Supreme Court

In the years immediately after ratification of the Fourteenth Amendment, scholars and the Supreme Court viewed the Jurisdiction Clause as extending well beyond children of ambassadors and foreign soldiers, confirming the view that "jurisdiction" was a term of art referring to a specific type of relationship between the individual and the sovereign.

In 1872, just four years after ratification, the Supreme Court noted that "[t]he phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and *citizens or subjects of foreign States born within the United States*." *Slaughter-House Cases*, 83 U.S. 36, 73 (1872) (emphasis added). To be sure, this was likely *dicta*, but it reflected the contemporaneous understanding that the Jurisdiction Clause was not a narrow exception solely for "ministers," "consuls," and invading soldiers, but applied also to children whose parents remained citizens of another country. All of these groups had one thing in common: they lacked total allegiance to the United States.

One year later, the U.S. Attorney General (who had been a Senator during the debates over the Fourteenth Amendment) issued a formal opinion explaining that "[t]he word 'jurisdiction' must be understood to mean absolute or complete jurisdiction, such as the United States had over its citizens before the adoption of this amendment." 14 Op. Att'ys Gen. 295, 300 (1873). "Aliens, among whom are persons born here and naturalized abroad, dwelling or being in this country, are

---

[5] For those who may wish to consider contemporaneous public discussion of the Jurisdiction Clause, unfortunately "there was little in the newspapers on the technical issue of jurisdiction within the meaning of the citizenship clause." Mensel, *supra*, at 372.

subject to the jurisdiction of the United States only to a limited extent. Political and military rights and duties do not pertain to them." *Id.* Again, note the two different forms of "jurisdiction."

The next year, the House of Representatives issued a report stating that "[t]he United States have not recognized a 'double allegiance.' By *our* law a citizen is bound to be 'true and faithful' alone to our Government." H.R. Rep. No. 43-784, at 23 (1874). This again equates citizenship with the concept of total allegiance, not mere partial allegiance by the individual, nor partial authority by the sovereign over that individual.

The 1881 *A Treatise on Citizenship* by Alexander Porter Morse adopted the Attorney General's 1873 view, reiterating that "[a]liens, among whom are persons born here and naturalized abroad, dwelling or being in this country, are subject to the jurisdiction of the United States only to a limited extent," and thus their children would not be citizens. Alexander Porter Morse, *A Treatise on Citizenship* § 198, at 237–38 (1881).

Contemporary scholars further confirmed that "jurisdiction" had two meanings, one limited and one more complete. Francis Wharton's 1881 edition of *A Treatise on the Conflict of Laws* recognized that "[i]n one sense" a child born in the United States is necessarily subject to its jurisdiction in the simple sense that "[a]ll foreigners are bound to a local allegiance to the state in which they sojourn." Francis Wharton, *A Treatise on the Conflict of Laws* § 10, at 34–35 (2d ed. 1881). "Yet the term 'subject to the jurisdiction,' as above used, must be construed in the sense in which the term is used in international law as accepted in the United States as well as in Europe." *Id.* § 10, at 35. And "by this law the children born abroad of American citizens are regarded as citizens of the United States, with the right, on reaching full age, to elect one allegiance and repudiate the other, such election being final. The same conditions apply to children born of foreigners in the United States." *Id.*

11

George Collins, who was later appointed *amicus* in *Wong Kim Ark*, explained in 1884 that "[t]he phrase ... 'subject to the jurisdiction thereof' does not mean territorial jurisdiction, as has been held in some cases, but means national jurisdiction; that is the jurisdiction which a nation possesses over those who are its citizens or subjects as such." George D. Collins, *Are Persons Born Within the United States Ipso Facto Citizens Thereof?*, 18 Am. L. Rev. 831, 837 (1884).[6]

In 1884, the Supreme Court decided *Elk v. Wilkins*, 112 U.S. 94, which held that Indians were not citizens under the Fourteenth Amendment, as they owed allegiance to their tribes. The Court held that the "evident meaning" of the Jurisdiction Clause was that a person was "not merely subject in some respect or degree to the jurisdiction of the United States, but *completely* subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* at 102 (emphasis added).

Moving beyond the context of Indians, the Court explained that the Fourteenth Amendment would confer citizenship only on those children whose parents are "owing no allegiance to any alien power." *Id.* at 101. But "an emigrant from any foreign state cannot become a citizen of the United States without a formal renunciation of his old allegiance, and an acceptance by the United States of that renunciation through such form of naturalization as may be required law." *Id.* Again, note the concepts of total allegiance by the individual and an "acceptance by the United States." *Id.* "Jurisdiction" in the Jurisdiction Clause invoked that reciprocal relationship.

---

[6] Numerous other contemporaneous law articles reiterated that jurisdiction meant a reciprocal relationship, with the individual owing total allegiance to the sovereign, which consented to that person's presence. "'[B]orn in the United States' means born, not alone on the soil of the United States, but within its allegiance .... To be a citizen of the United States is a political privilege, which no one not born in it can assume, without its consent in some form." G.M. Lambertson, *Indian Citizenship*, 20 Am. L. Rev. 183, 185 (1866); *see* Patrick J. Charles, *Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. Pub. L. 35, 72 (2011) (collecting authorities).

In lectures posthumously published in 1891, Supreme Court Justice Samuel Miller likewise explained the Jurisdiction Clause extended beyond mere ambassadors: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel F. Miller, *Lectures on the Constitution* 279 (1891).

Given this body of evidence, modern scholars have recognized there was "significant agreement among contemporary legal scholars" and "Executive Branch officials during this same time, including Secretaries of State," that the Jurisdiction Clause invoked the concept of total allegiance to the United States. Swearer, *supra*, at 169–72 (collecting additional examples).

## D.    Plaintiffs Overread *Wong Kim Ark*

Plaintiffs chiefly rely on the Supreme Court's decision in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), but their reliance is misplaced because—as explained below—the Court tied allegiance to whether the United States had "permitted" or "consent[ed]" to the parents being permanently present in the United States at the time of the child's birth, *id.* at 684, 686, 694. Illegal aliens, by definition, are not present with the consent of the United States, and accordingly it makes little sense to argue that *Wong Kim Ark* dictates citizenship for their children.

*Wong Kim Ark* involved a person who was born in the United States to alien parents who, at the time of the child's birth, "enjoy[ed] a permanent domicile and residence" in the United States, with the sovereign's permission. *Id.* at 652. The Court held that such a child "becomes at the time of his birth a citizen of the United States." *Id.* at 705. Invoking the old concept of allegiance, the Court held that foreigners present in the United States "are entitled to the protection of and owe allegiance to the United States, *so long as they are permitted* by the United States to reside here." *Id.* at 694 (emphasis added).

Continuing with the theme of sovereign consent as an aspect of allegiance, the Court held it was "incontrovertible" that "the jurisdiction of every nation within its own territory is exclusive and absolute" and may only be qualified by the "consent, express or implied," of the sovereign. *Id.* at 686. That traced Chief Justice Marshall's opinion in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch.) 116 (1812), which addressed the rights of Americans whose ship had been seized at sea by Napoleon's agents and then sailed into Philadelphia under a French flag. *Id.* at 117–18. Echoing language later found in the Fourteenth Amendment, the Court held that the "jurisdiction of the nation within its own territory is necessarily exclusive and absolute," and thus "[a]ll exceptions" to it "must be traced up to the consent of the nation itself." *Id.* at 136. Rights could not be gained against the sovereign by those acting in defiance of its laws.

*Wong Kim Ark* concluded that foreigners owe the requisite allegiance when the United States permits them to be here permanently. One need not decide whether *Wong Kim Ark* was fully correct on that score because the test it imposes still resolves the question here: by definition, illegal aliens do not have "consent" to be here, are not "permitted" to "reside here," nor have they been given "permanent domicile and residence in the United States." *Wong Kim Ark*, 169 U.S. at 653, 686, 694.

The Executive Order at issue here notably excludes "children of lawful permanent residents," *Protecting the Meaning and Value of American Citizenship*, Exec. Order § 2(c) (Jan. 20, 2025), which is the modern equivalent to the parents in *Wong Kim Ark*. The Court's holding extended no further.

Plaintiffs rely on a few broad statements in *Wong Kim Ark*, but ironically the opinion itself cautioned against relying on such statements. "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control

the judgment in a subsequent suit when the very point is presented for decision." *Wong Kim Ark*, 169 U.S. at 679. Accordingly, circuit courts across the country have long read *Wong Kim Ark* narrowly, in light of its specific facts. *See Tuaua*, 788 F.3d at 305 (citing *Nolos v. Holder*, 611 F.3d 279, 284 (5th Cir. 2010); *Valmonte v. INS*, 136 F.3d 914, 920 (2d Cir. 1998); *Rabang v. INS*, 35 F.3d 1449, 1454 (9th Cir. 1994)).

One final note: Justice John Marshall Harlan—the patron of interpreting the Constitution as color-blind and the sole dissenter in *Plessy v. Ferguson*—joined Chief Justice Fuller's dissent in *Wong Kim Ark,* arguing that Wong "never became and is not a citizen of the United States." *Wong Kim Ark*, 169 U.S. at 732 (Fuller, C.J., dissenting). Clearly, Justice Harlan viewed the government's position as fully consistent with our Nation's commitment to equal protection.[7]

### E.    Contemporary Scholars Support the Government's Views

Modern scholars and jurists have signaled agreement with the government's interpretations of the Jurisdiction Clause, *Wong Kim Ark*, or both. As noted above, Professor Estreicher, a nationally renowned scholar, has written that reliance on *Wong Kim Ark* for applying birthright citizenship to children of illegal aliens is "misplaced." Estreicher, *supra note 2*. "*Wong* by its facts

---

[7] Plaintiffs' reliance on a footnote in *Plyler v. Doe*, 457 U.S. 202 (1982), is also misplaced. *First*, the footnote "is *dicta* referring to *dicta*," because it was unnecessary to the analysis in *Plyler* itself and also relied on *dicta* from *Wong Kim Ark*. Swearer, *supra*, at 198. *Second*, the *Plyler* footnote mentioned the same limitations that were present in *Wong Kim Ark*, i.e., the concept that "jurisdiction" is "bounded only, if at all, by principles of *sovereignty and allegiance*."457 U.S. at 212 n.10 (emphasis added). *Third*, there are several textual differences between the equal protection clause (at issue in *Plyler*) and the citizenship clause (at issue here). The former refers to persons "*within* the jurisdiction" of a *state*, whereas the latter clause refers to persons "*subject to* the jurisdiction" of the *United States*. If the Framers had intended the two to mean the same thing, they would have used the same phrase, especially because they used very Specific terminology throughout Section One of the Fourteenth Amendment. Scholars have argued that "subject to the jurisdiction" referred to the concept of "total allegiance" to the national sovereign as discussed above, whereas "within the jurisdiction" referred to the separate, "local allegiance to the state in which they sojourn," i.e., the state they are "within." Wharton, *supra*, § 10, at 34–35; *see* Swearer, *supra*, at 199–200. That tracks the historic discussion recounted above, where the Framers and contemporary scholars acknowledged that those illegally present might receive protection of the laws and thus were subject to a lesser form of jurisdiction, but their children would not receive the permanent status and benefits of citizenship because they lacked total allegiance.

(and some of its language) is limited to children born of parents who at the time of birth were in the United States lawfully and indeed were permanent residents." *Id.*

As Professor Estreicher explains, "the circumstances of *Wong Kim Ark* differ from the unlawful immigration context. Wong's parents were clearly permitted to be within the United States at the time of his birth. A second respect in which the facts of the case differ is that, unlike for children of unlawful immigrants, there was no U.S. prohibition of Wong's presence at time of his birth. His birth and presence within the United States was entirely lawful." *Id.* And that distinction matters given that *Wong Kim Ark* itself repeatedly referred to the importance of the sovereign's consent.

Modern jurisprudence has likewise rejected the notion that the Jurisdiction Clause looks only to whether the child would be subject to the laws of the United States. The D.C. Circuit held just a few years ago that "the concept of allegiance is manifested by the Citizenship Clause's mandate that birthright citizens not merely be born within the territorial boundaries of the United States but also 'subject to the jurisdiction thereof.'" *Tuaua*, 788 F.3d at 305. And "the evident meaning of the words 'subject to the jurisdiction thereof' is, not merely subject in some respect or degree to the jurisdiction of the United States, but *completely* subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* (quoting *Elk*, 112 U.S. at 102) (cleaned up) (emphasis in original).

Again, this makes clear that the question is not simply whether "ultimate governance remains" with "the United States Government," *e.g.*, whether the United States has jurisdiction to prosecute the person, *id.* at 306, but rather whether there is a reciprocal relationship where the person owes total allegiance to the sovereign, which allows the person to be present.

Judge Richard Posner, before he retired, also wrote about the Jurisdiction Clause, arguing in a concurrence that the interpretation espoused by Plaintiffs here "makes no sense," and he

"doubt[ed]" it was correct even under existing caselaw because many aliens present in the United States owe no allegiance to it. *Oforji v. Ashcroft*, 354 F.3d 609, 621 (7th Cir. 2003) (Posner, J., concurring). He noted that hundreds of thousands of foreign nationals have come to the United States solely to give birth, without the slightest hint of owing allegiance to the United States. "[T]here is a huge and growing industry in Asia that arranges tourist visas for pregnant women so they can fly to the United States and give birth to an American. Obviously, this was not the intent of the 14th Amendment; it makes a mockery of citizenship." *Id.*[8]

## F.    **"Subject to the Jurisdiction Thereof" Cannot Mean "Subject to the Laws Thereof"**

As recounted above, the historical record and both contemporary and modern scholarship demonstrate that the Jurisdiction Clause looks beyond the simple question of whether the person is subject to the laws of the United States. There are additional reasons to reject Plaintiffs' simplistic view.

*First*, it would have been easy enough to say "subject to the laws" of the United States, but instead the drafters used a different term: "jurisdiction." That was intentional. And it invoked a term of art with a nuanced history and understanding, as explained above. But Plaintiffs never provide an answer for why the drafters did not use far simpler language if they meant only to invoke the simple concept of being subject to U.S. law.

*Second*, the laws surrounding immunity further demonstrate why Plaintiffs' interpretation is incorrect. Plaintiffs acknowledge that children of ambassadors and invading soldiers are not entitled to birthright citizenship under the Fourteenth Amendment. But Plaintiffs are wrong to

---

[8] Further, in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), which addressed the detention of a man who claimed to be a U.S. citizen, Justices Scalia and Stevens wrote separately in part to note that they were merely "presum[ing]" the plaintiff to be an "American citizen," even though he had been born in Louisiana, *id.* at 554 (Scalia, J., dissenting). Hamdi's parents were not U.S. citizens nor lawful permanent residents but rather were present in the United States only on temporary work visas when Hamdi was born. James C. Ho, *Defining 'American,'* 9 Green Bag 2d 367, 376 & n.42 (2006).

contend that this is because those groups are supposedly immune from U.S. law. Federal law *does* apply at least in part to invading soldiers and even more obviously to their newborn children, who would not be enemy combatants. *See Ex Parte Quirin*, 317 U.S. 1, 20 (1942) (upholding convictions of German soldiers captured in the United States). And U.S. law also applies to most diplomatic officials, as only a narrow set has anything approaching full immunity, which itself can always be waived case-by-case by the home country. *See Diplomatic and Consular Immunity*, U.S. Dep't of State, July 2019, https://www.state.gov/wp-content/uploads/2019/07/2018-DipConImm_v5_Web.pdf. Further, there is no diplomatic official who is fully immune from all forms of *civil* liability, i.e., being haled into the jurisdiction of a court. *See id.*, App. C (for example, all types of diplomatic officials can be issued traffic citations).

This means none of Plaintiffs' examples holds up. Every type of person they list as falling within the Jurisdiction Clause is *already* subject to at least some of the laws of the United States, and they could be subjected to even more laws on a case-by-case basis. At best, they have qualified, partial, or contingent immunity. Plaintiffs have no way to explain how individuals who are clearly subject to at least some of the laws of the United States are nonetheless *not* subject to the laws of the United States. The answer is that Plaintiffs' test is just the wrong one.

*Third*, Plaintiffs' interpretation proves too much. If qualified, partial, or contingent immunity were sufficient to render diplomatic officials not subject to the jurisdiction of the United States, then domestic officials who receive such immunity—e.g., judges and prosecutors—would likewise not be subject to the jurisdiction of the United States, and their children would not be citizens under the Fourteenth Amendment. That is wrong, of course. And the reason is because domestic judges and prosecutors—unlike ambassadors and invading soldiers—have total allegiance to the United States and are present with its consent. They are therefore subject to its jurisdiction, and their children born or naturalized in the United States are citizens.

* * *

For all these reasons, the touchstone for birthright citizenship under the Fourteenth Amendment is allegiance to the United States, rather than merely being subject to its laws or some subset thereof.[9]

## IV. Conclusion.

The Court should deny Plaintiffs' motion for a preliminary injunction.

---

[9] Plaintiffs' reliance on statutory citizenship fails because it uses the same language as the Jurisdiction Clause. 8 U.S.C. § 1401(a) (requiring the person be "subject to the jurisdiction thereof").

Dated: February 3, 2025                    Respectfully submitted,


*/s/ George W. Vien*
George W. Vien (BBO No. 547411)
Pietro A. Conte (BBO No. 707055)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
T: (617)-720-2880
F: (617)-720-3554
gwv@dcglaw.com
pac@dcglaw.com

*/s/ R. Trent McCotter*
R. Trent McCotter, Esq. (pending *pro hac vice* admission)
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
T: (202)-955-0620
tmccotter@boydengray.com

*/s/ Daniel Epstein*
Daniel Epstein, Esq. (pending *pro hac vice* admission)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, D.C. 20006
T:  (713)-504-1785
daniel.epstein@aflegal.org

*Attorneys for Amici Curiae Members of Congress*