UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PRESIDENT DONALD TRUMP, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-10139-LTS <br><br> **BRIEF OF THE STATE OF IOWA AND 17 OTHER STATES AS** *AMICI CURIAE* **IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

i

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................................................1

ARGUMENT ..............................................................................................................................2

    I.    The Executive Order Complies With the Original Meaning of the Fourteenth Amendment ...................................................................................2

        A.    Plaintiffs' interpretation is not the settle view. ............................................2

        B.    The Fourteenth Amendment's original meaning is shown by its text and early interpretations. ..................................................................4

    II.    President Trump's Executive Order Reduces Harm to the States. .........................8

        A.    Plaintiffs' Citizenship Clause interpretation motivates illegal immigration and harms the States ......................................................9

        B.    Plaintiffs' Citizenship Clause interpretation motivates birth tourism and harms the States ..................................................................12

CONCLUSION .........................................................................................................................13

## TABLE OF AUTHORITIES

Cases

*Denezpi v. United States*,
  596 U.S. 591 (2022) .................................................................................................. 5
*Elk v. Wilkins*,
  112 U.S. 94 (1884) ................................................................................................ 6, 7
*Ex parte Quirin*,
  317 U.S. 1 (1942) ...................................................................................................... 7
*Gen. Land Off. v. Biden*,
  71 F.4th 264 (5th Cir. 2023) .................................................................................. 11
*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) .................................................................................................. 5
*Kaplan v. Tod*,
  267 U.S. 228 (1925) .................................................................................................. 8
*Marbury v. Madison*,
  5 U.S. 137 (1803) ...................................................................................................... 4
*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................. 8, 9
*Oforji v. Ashcroft*,
  354 F.3d 609 (7th Cir. 2003) .................................................................................. 3
*Slaughter-House Cases*,
  83 U.S. 36 (1872) ...................................................................................................... 6
*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024) .................................................................................. 7
*United States v. Menasche*,
  348 U.S. 528 (1955) .................................................................................................. 6
*United States v. Pahlawan*,
  2025 WL 27779 (E.D. Va. Jan. 3, 2025) ................................................................ 2
*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ............................................................................................. 4, 8
*Wilson v. Blanco*,
  4 N.Y.S. 714 (Super. 1889) ...................................................................................... 4

Statutes

8 U.S.C. § 1401(b) ............................................................................................................ 5
U.S. Const. amend. XIV, § 1 ..................................................................................... 1, 4

Other Authorities

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019) ............................................. 2, 5

James S. Parkhill, *Diplomacy in the Modern World: A Reconsideration of the Bases for Diplomatic Immunity in the Era* of Hɪɢʜ-Tᴇᴄʜ Cᴏᴍᴍᴜɴɪᴄᴀᴛɪᴏɴꜱ, 21 Hᴀstings Int'l & Comp. L. Rev. 565 (1998) .................................................................................................................. 5
Lino A. Graglia, *Birthright Citizenship for Children of Illegal Aliens: An Irrational Public Policy, 14 Tex. Rev. L. & Pol. 1 (2009)* ................................................................................... 3
Patrick J. Charles, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 Washburn L.J. 211 (2012) ..... 3

## INTEREST OF AMICI CURIAE

For the past four years, disastrous immigration policies transformed every State into a border state by flooding them with illegal aliens, including criminals convicted of crimes in their home country, violent international gang members, and suspected ISIS terrorists. Illegal immigration imposes significant costs on the States and their people. And creating incentives for illegal immigration puts lives at risk. Allowing virtually anyone born on American soil to claim American citizenship creates incentives for illegal immigration and exacerbates States' costs. Amici Curiae are the States of Iowa, Alabama, Arkansas, Florida, Idaho, Indiana, Kansas, Louisiana, Missouri, Mississippi, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Utah, and Wyoming which submit this brief in support of Defendants.

The Fourteenth Amendment's Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1. On his first day in office, President Donald Trump issued an Executive Order setting forth the United States' interpretation of the Citizenship Clause. Executive Order, "Protecting the Meaning and Value of American Citizenship," Jan. 20, 2025, https://perma.cc/K2DG-HAKG. The Executive Order instructed federal officials not to issue United States citizenship documents—nor accept documents from State or other governments purporting to recognize United States citizenship, when neither of a person's parents are lawful permanent United States residents. *Id.* As Defendants argued, "That EO is an integral part of President Trump's recent actions, pursuant to his significant authority in the immigration field, to address this nation's broken immigration system and the ongoing crisis at the southern border." *Washington v. Trump*, 2:25-cv-00127, Dkt. 36, at 2–3 (Jan. 22, 2025).

Removing the incentive for illegal aliens to give birth in America will reduce illegal immigration. In turn, this will reduce States' costs from illegal immigration and births by illegal

aliens. Because the Executive Order is constitutional and vital, the Amici States urge the Court to deny a preliminary injunction.

## ARGUMENT

### I. The Executive Order Complies with the Original Meaning of the Fourteenth Amendment.

Plaintiffs claim that their interpretation of the Citizenship Clause—that citizenship is conferred on all children born in the United States except for limited exceptions, like children of diplomats (Dkt. 5 at 10)—is a rule that the "Supreme Court has twice held, in no uncertain terms." *Id.* That is wrong. Despite Plaintiffs' assertion that the Executive Order seeks to overrule precedent that has been in place for "157 years," *id.* at 19, the original meaning of the Fourteenth Amendment supports the Executive Order's interpretation of the Constitution.

#### A. Plaintiffs' interpretation is not the settled view.

Plaintiffs are wrong about the universal and unanimous acceptance of their interpretation. Earlier this month in a criminal case, for example, a federal judge observed "just how *unsettled* the term 'subject to the jurisdiction of the United States' remains." *United States v. Pahlawan*, 2025 WL 27779, at *6 (E.D. Va. Jan. 3, 2025). As the court explained, "Academic scholars continue to hotly contest the meaning of this phrase within the context of the Fourteenth Amendment and birthright citizenship, as evidenced by a lively and ongoing scholarly debate." *Id.* (citations omitted).

Indeed, many scholars who have studied the Fourteenth Amendment have reached the same interpretation reflected by the Executive Order. After carefully examining the text, history, and precedent underlying the Fourteenth Amendment, one scholar concluded, "Nonimmigrant and illegal aliens, however, are not similarly considered part of the American people, are not subject to the complete jurisdiction of the United States, and are therefore not entitled to birthright citizenship under the Constitution." Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 TEX. REV. L. & POL. 135, 209

(2019). Another scholar reached a similar conclusion: "[T]he problem of the sojourner had to come up frequently, and there is no record of any parent claiming that their children born in the United States were citizens, so on one half the problem, the historical record is clearly against the claim. And as illegality is, if anything, a more serious offense, it seems clear that if that problem had arisen, there is no reason to think that citizenship would have been granted." Richard A. Epstein, *The Case Against Birthright Citizenship*, CIVITAS INSTITUTE (Jan. 30, 2025). A third scholar agreed: "If one follows the intent of the 1866 Civil Rights Act and Citizenship Clause, there is a strong constitutional argument that [children of illegal immigrants] could be excluded because the parents have not personally subjected themselves to the jurisdiction of the United States or acquired the requisite temporary or local allegiance by complying with the immigration laws; therefore, they have not maintained a lawful residence or domicile in accordance with the law." Patrick J. Charles, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 WASHBURN L.J. 211, 252 (2012).

Nor are those the only authorities to conclude that the Fourteenth Amendment aligns with the Executive Order. According to Judge Richard Posner, the Citizenship Clause interpretation that Plaintiffs have advanced "makes no sense." *Oforji v. Ashcroft*, 354 F.3d 609, 621 (7th Cir. 2003) (Posner, J., concurring). Contrary to Plaintiffs' suggestion (Dkt. 1, at ¶¶ 2, 206), Judge Posner also doubted that a constitutional amendment was necessary to prevent birth in this country from automatically conferring American citizenship. *Oforji*, 354 F.3d at 621. "We should not be encouraging foreigners to come to the United States solely to enable them to confer U.S. citizenship on their future children." *Id.*

Plaintiffs' proffered interpretation of the Citizenship Clause is not settled, much less beyond debate. Indeed, the Clause's original meaning supports the Executive Order.

3

### B. The Fourteenth Amendment's original meaning is shown by its text and early interpretations.

The merits of Plaintiffs' case turns on interpreting the Citizenship Clause's phrase "and subject to the jurisdiction thereof." Plaintiffs' interpretation renders the phrase superfluous. Plaintiffs' interpretation is also inconsistent with the Supreme Court's earliest opinions relating to the Citizenship Clause.

*1. The Fourteenth Amendment's text supports the Executive Order.*

Start with the Citizenship Clause's full text, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1. Thus, to become a citizen, a person must be (1) born or naturalized in the United States, and (2) subject to the jurisdiction thereof. *See id.*

The entire Clause must have meaning. "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it." *Marbury v. Madison*, 5 U.S. 137, 174 (1803). Jurisdiction, then, must be different than the location of birth.

Plaintiffs suggest that "subject to the jurisdiction thereof" means that a person is "born within the United States's sovereign territory." Dkt. 5 at 1. Plaintiffs contend that the only four groups to which citizenship does not attach at birth, if born on United States soil, are those identified in *Wong Kim Ark. Id.* at 10–11. That means children born to members of Indian tribes, to foreign sovereigns or their ministers, those born on foreign ships, or enemies within and during a hostile occupation of our territory. *Id.* (quoting *Wong Kim Ark*, 169 U.S. at 693).

But Plaintiffs' interpretation brings two problems into stark relief. First, *w*hen the Fourteenth Amendment passed, the legal fiction of extraterritoriality meant that diplomats were "not an inhabitant of the country to which he is accredited, but of the country of his origin, and whose sovereign he represents, and within whose territory he, in contemplation of law, always abides." *Wilson v. Blanco*, 4 N.Y.S. 714 (Super. 1889). "According to the theory, all actions performed by the ambassador were considered, legally, to have occurred in the emissary's home

4

state within the control of the home state's laws, police force and judicial system." James S. Parkhill, *Diplomacy in the Modern World: A Reconsideration of the Bases for Diplomatic Immunity in the Era of High-Tech Communications*, 21 HASTINGS INT'L & COMP. L. REV. 565, 571-72 (1998); *see also* Swearer, *supra*, at 143 n.14 (quoting FRANCIS WHARTON, LL.D., A TREATISE ON THE CONFLICT OF LAWS, OR PRIVATE INTERNATIONAL LAW 56 (1872) ("The house of an ambassador, or minister extraordinary, is regarded as part of the territory which he represents. No matter how long he may stay, therefore, in the country to which he is accredited, his domicil is unchanged. This same rule applies to consuls sent out from the state of their domicil to represent such country in a foreign land.")).

Thus, the children of foreign diplomats in the United States were not born in the United States. Because those children do not satisfy the first part of the Citizenship Clause requiring birth in the United States, they cannot be the reason for the "subject to the jurisdiction thereof" language without rendering it redundant. "[T]he Court will avoid a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).

The second problem with Plaintiffs' theory relates to Native Americans, who are both born in the United States and must comply with U.S. law. *Cf. Denezpi v. United States*, 596 U.S. 591, 605 (2022). Under Plaintiffs' Citizenship Clause interpretation, Native Americans should have American citizenship at birth under the Fourteenth Amendment. But as Plaintiffs admit, Indian Tribes were not originally found to be subject to the jurisdiction thereof—indeed, "Congress ultimately granted children of tribal members citizenship by *statute* in 1924." Dkt. 5 at 10–11; *see also* Dkt. 1, ¶ 88. If a statute was required to grant citizenship to those children—parents of whom could still have been prosecuted by States for violating State laws—the status quo is not so clear as Plaintiffs imply. *Id.* (citing 8 U.S.C. § 1401(b)). Because the Citizenship Clause does not apply to Native Americans born in the United States and subject to our country's laws, Plaintiffs' interpretation cannot be correct.

5

Adopting Plaintiffs' interpretation would not "give effect, if possible, to every clause and word of" the Citizenship Clause. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955). The Court must therefore look beyond Plaintiffs' interpretation to determine the meaning of the Citizenship Clause.

*2. The Supreme Court's interpretation supports the Executive Order.*

The Supreme Court's earliest discussions of the Citizenship Clause excluded children born to individuals who were not lawfully and permanently present in the United States. Just six years after ratification, the Court explained that "[t]he phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States." *Slaughter-House Cases*, 83 U.S. 36, 73 (1872). Though dicta, that explanation reflects the Executive Order's interpretation that excludes births when neither parent is a lawful, permanent United States resident.

The Supreme Court's first decision examining the meaning of the Citizenship Clause, in the context of citizenship for Native Americans, also supports the Executive Order. *See Elk v. Wilkins*, 112 U.S. 94, 102 (1884). According to the Supreme Court, "[t]he evident meaning" of the "subject to the jurisdiction thereof" phrase was "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id*. This must exist at the time of birth or naturalization. *Id*.

The Court found Native Americans' allegiance to a foreign sovereign to be dispositive:

> Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indiana tribes, (an alien though dependent power,) although in a geographical sense born in the United States, are no more 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.

6

*Id.* The Court also approvingly quoted the district court's decision in the case: "'Being born a member of 'an independent political community'-the Chinook-he was not born subject to the jurisdiction of the United States-not born in its allegiance.'" *Id.* at 109 (citation omitted).

The Executive Order follows the path charted by *Elk*—it does not recognize citizenship if neither parent is a lawful, permanent resident of the United States. Because at the time of their child's birth, illegal aliens and birth tourists are members of an independent political community and owe allegiance to their home country to which they are citizens. Under *Elk*, citizenship is not conferred to their children under the Fourteenth Amendment.

Consider a not-too-distant hypothetical, in which America's enemies "landed from [a] submarine in the hours of darkness" and, upon landing "buried their uniforms . . . and proceeded in civilian dress to New York City." *Ex parte Quirin*, 317 U.S. 1, 21 (1942). Imagine if one had brought a pregnant wife along for the journey, who then gave birth on American soil. While all parties agree about enemy combatants, this type of infiltration is categorically different. Granting citizenship to such a plain-clothes saboteur's child stresses "subject to the jurisdiction" beyond the breaking point. Those illegal entrants to our country cannot have been guaranteed by the Constitution birthright citizenship rights—such an interpretation of the Fourteenth Amendment is absurd.

Similar strong arguments support the concept that birthright citizenship does not naturally follow an invading force. *See*, *e.g.*, Josh Blackman, *An Interview with Judge James C. Ho*, https://perma.cc/X3FP-ZJ8X ("No one to my knowledge has ever argued that the children of invading aliens are entitled to birthright citizenship."). The President has explicitly declared a state of invasion. *See* Executive Order, "Guaranteeing the States Protection Against Invasion," Jan. 20, 2025, https://perma.cc/K2DG-HAKG. And judges too have recognized the status of what is occurring at the southern border as an invasion even before the President's declaration. *See United States v. Abbott*, 110 F.4th 700, 726–27 (5th Cir. 2024) (Ho, J., concurring).

7

Plaintiffs heavily rely on a later Supreme Court decision that cannot bear the weight that Plaintiffs thrust upon it. Dkt. 5 at 10-11 (discussing *United States v. Wong Kim Ark*, 169 U.S. 649 (1898)). Plaintiffs claim that *Wong Kim Ark* applies to the "children born to foreign visitors or resident aliens" including those in the country illegally. Dkt. 5 at 11. But *Wong Kim Ark* repeatedly emphasized that its facts involved lawful, permanent United States residents. *Wong Kim Ark*, 169 U.S. at 652, 653, 705. Even its holding stressed the importance of lawful residence: "so long as they are permitted by the United States to reside here." *Id.* at 694. *Wong Kim Ark* did not address children born to illegal immigrants or birth tourists. Since the Executive Order does not apply to any child of a lawful, permanent immigrant, *Wong Kim Ark* does not control.

Another useful contrast can be found where the Supreme Court recognized that a minor daughter living in the United States for nine years did not automatically become a citizen when her father was naturalized because she was in the country illegally. *See Kaplan v. Tod*, 267 U.S. 228, 229–30 (1925). The Court cautioned that "[n]aturalization of parents affects minor children only if 'dwelling in the United States.'" *Id.* at 230. Despite living in the United States for close to a decade, for purposes of jurisdiction she was "at the boundary line and had gained no foothold in the United States." *Id.* That principle holds true today.

The Supreme Court's earliest decisions establish that the Citizenship Clause did not confer citizenship to children born to individuals who were not lawfully and permanently present in the United States. *Wong Kim Ark* is not to the contrary. Accordingly, the Court should find that the Executive Order is consistent with the original meaning of the Fourteenth Amendment. Plaintiffs thus are not likely to prevail on the merits of their case. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## II. President Trump's Executive Order Reduces Harm to the States.

Besides being wrong, Plaintiffs' Citizenship Clause interpretation will continue to attract illegal immigration and birth tourism. As Chairman of the House Judiciary James Wilson (R-IA) recognized while drafting the Fourteenth Amendment, the Amendment was not to "establish new

8

rights, but to protect and enforce those which belong to every *citizen*." James Wilson, March 1, 1866. Cong. Globe, 39th Cong., 1St Sess. 39 (1866) 1117 (emphasis added). The costs surrounding these births harm the States in several ways. Contrary to the Plaintiffs' claims, *see, e.g.*, Dkt. 1, ¶ 5, President Trump's executive order will reduce harm to the States. Indeed, given the dangers of crossing illegally into the United States, stopping the incentive to try to cross the border will likely save many would-be border crossers' lives. When the Court considers the equities and the public interest, *Nken*, 556 U.S. at 434, these factors weigh against granting a preliminary injunction.

### A. Plaintiffs' Citizenship Clause interpretation motivates illegal immigration and harms the States.

Plaintiffs' erroneous Citizenship Clause interpretation will continue the powerful incentive for citizens of foreign countries to give birth on American soil, even if they must illegally enter this country to do so.

The lure of American citizenship motivates pregnant women to travel to America to give birth. *See, e.g.*, Heidi de Marco, *In Tijuana, expectant moms hope for U.S. asylum*, NBC NEWS (July 24, 2019), https://perma.cc/6Y9A-274Q. Indeed, pregnant illegal aliens admit their belief that American citizenship "would guarantee their children access to health care and other vital benefits during their childhood, and provide a foundation for them to build successful lives as fully integrated Americans." Miriam Jordan, *Undocumented Women Ask: Will My Unborn Child Be a Citizen?*, THE NEW YORK TIMES (Jan. 21, 2025), bit.ly/4hr3iHz.

Some women, desperate to give birth in the United States, cross the border the day they deliver their baby. *See, e.g.*, Jasmine Perry, *Venezuelan migrant gives birth in U.S. before Mother's Day*, KTSM (May 12, 2023), https://bit.ly/3E5142u. One border hospital administrator witnessed "[m]others about to give birth that walk up to the hospital still wet from swimming across the river in actual labor … dirty, wet, cold," who were "[h]ere to have a child in the U.S." Byron Pitts, *Illegal Immigrant Births – At Your Expense*, CBS NEWS (Apr. 7, 2008), https://perma.cc/66JV-

9

9CVB. Some women even give birth at the border just minutes after illegally crossing. *See, e.g.*, Nathaniel Puente, *Border Patrol agents assist with baby's birth near Rio Grande on cold winter night*, KVEO (Feb. 13, 2021), https://bit.ly/40MmH0g; Karen Kucher, *Woman suspected of illegally crossing into U.S. gives birth at Border Patrol office*, LOS ANGELES TIMES (Feb. 19, 2020), https://perma.cc/YY86-M9YD.

Attracting illegal aliens to give birth in America imposes significant costs on all States, including Amici States. For example, between 225,000 to 250,000 U.S. births in 2023—about 7% of all births in the United States, and more than births in any State besides Texas or California—were to illegal immigrants. Michael Dorgan, *Up to 250,000 Children Born to Illegal Migrants in 2023: Preliminary Report*, Fox News, Jan. 25, 2025, https://perma.cc/P5HW-AYXN. In Texas and Georgia, "three-fourths of births to illegal immigrants were likely paid for by taxpayers." Steven A. Camarota *et al.*, *Births to Legal and Illegal Immigrants in the U.S.*, CENTER FOR IMMIGRATION STUDIES (Oct. 9, 2018), https://bit.ly/4jxah3C. In total, States pay an estimated $938 million in Medicaid costs for births to illegal aliens. *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023*, FEDERATION FOR AMERICAN IMMIGRATION REFORM (2024), at 47, https://perma.cc/293X-4DY9.

States bear many costs associated with births to illegal aliens. For example, Texas estimates that perinatal coverage for illegal aliens through the Children's Health Insurance Program costs its state between $30 million and $38 million. *AG Paxton: Illegal Immigration Costs Texas Taxpayers Over $850 Million Each Year*, OFFICE OF THE TEXAS ATTORNEY GENERAL (Mar. 31, 2021), https://perma.cc/3FU5-F3LU. And because the mother and any other family members accompanying the new baby often stay in the United States, States end up paying for their health care as well. Texas estimates that its people pay as much as $700 million each year "for public hospital districts to provide uncompensated care for illegal aliens," and up to $90 million "to include illegal aliens in the state Emergency Medicaid program." *Id.* Over the course of their lives, each illegal immigrant in this country imposes an estimated "lifetime fiscal drain (taxes paid minus

10

costs)" of $68,000. Testimony of Steven A. Camarota, *The Cost of Illegal Immigration to Taxpayers*, "The Impact of Illegal Immigration on Social Services," Immigration Integrity, Security, and Enforcement Subcommittee of the U.S. House Judiciary Committee, Jan. 11, 2024, at 2, https://perma.cc/R6VP-GWBE.

And that does not include the costs of every extra crime committed by an illegal immigrant that should not be in the country at all. Some of those crimes have elicited national outrage and bipartisan response. *See, e.g.*, Julia Johnson, *Laken Riley Act Set to Become One of First Bills to Hit President Trump's Desk*, FOX NEWS, Jan. 20, 2025, https://perma.cc/DX6C-5P4L; Brianne Pfannenstiel, *Iowa Republicans Get 'Sarah's Law' Honoring Sarah Root Included in Laken Riley Act*, DES MOINES REGISTER, Jan. 22, 2025, https://perma.cc/RVS4-5ZPX.

The total costs to States from illegal immigration are enormous. When health care costs, public education costs, welfare costs, and other state program costs for illegal aliens and their children are added together, States and their localities pay an estimated $115 billion each year because of illegal immigration. *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023*, *supra*, at 40. For a State such as Iowa, the cost of illegal immigration has been more than a hundred million dollars for decades. Dennis Prouty, *Undocumented Immigrants' Cost to the State*, Iowa Legislative Services Agency Fiscal Services, https://perma.cc/ALE5-NJZY. Because Plaintiffs' Citizenship Clause interpretation increases illegal immigration through the incentive of citizenship, it also increases the costs of illegal immigration.

Babies born in America to illegal aliens also will impose costs on the States throughout their lives. These babies likely would have been born in a different country but for the incentive of American citizenship. But as American citizens, these children may, for example, participate in state welfare programs (Dkt. 1, ¶¶ 114, 164–75), receive state healthcare (*id.* at ¶¶ 123–48), and obtain a driver's license (*id.* at ¶ 118). The States will incur costs from participation in each of these programs. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (citation omitted)

11

("at least some illegal aliens who otherwise would have been prevented from entering Texas will seek driver's licenses, education, and healthcare from Texas").

### B. Plaintiffs' Citizenship Clause interpretation motivates birth tourism and harms the States.

Plaintiffs' incorrect Citizenship Clause interpretation will also encourage the criminally fraudulent phenomenon of birth tourism. Birth tourism is when pregnant mothers, often affluent, travel from other countries to the United States for the sole purpose of obtaining American citizenship for their babies.

Birth tourism is booming. Some estimate that 20,000 to 26,000 birth tourists visit the United States each year, with some paying up to $100,000 to do so. Kevin Berghuis, *Stopping the Practice of Citizenship for Sale*, CENTER FOR IMMIGRATION STUDIES (Aug. 10, 2020), https://bit.ly/40Q3FoL. China and Russia provide many of the birth tourists visiting the United States. *See, e.g.*, Iuliia Stashevska, *Mother Russia: South Florida sees a boom in 'birth tourism'*, THE ASSOCIATED PRESS (Mar. 22, 2019), bit.ly/40rPKox.

Criminal activity has accompanied birth tourism. Federal prosecutors recently obtained conspiracy and international money laundering convictions against two California residents operating a birth tourism scheme. Amy Taxin, *California pair convicted in Chinese birth tourism scheme*, THE ASSOCIATED PRESS (Sept. 13, 2024), https://bit.ly/4auMai4. These convictions stemmed from federal indictments of 19 individuals operating three birth tourism schemes in Southern California. Dan Whitcomb, *U.S. Charges 19 in Chinese 'Birth Tourism' Scheme in California*, REUTERS (Jan. 31, 2019), https://bit.ly/4hwT4pn. Federal prosecutors charged six others for a birth tourism scheme in New York. Anna Schecter and Rich Schapiro, *6 Charged in 'Birth Tourism' Scheme That Cost U.S. Taxpayers Millions*, NBC NEWS (Dec. 2, 2020), https://perma.cc/TV2E-X53A.

Birth tourism has harmed the States. State Medicaid programs have been defrauded. *See id.* In other instances, States had to pay outstanding medical bills that birth tourists declined to pay.

*See* Committee on Homeland Security and Governmental Affairs Minority Staff Report, *Birth Tourism in the United States*, United States Senate (Dec. 20, 2022), at iii, 23, https://perma.cc/BS2W-4LA3. And as already identified by Plaintiffs, *see* Dkt. 1, ¶¶ 123–82 (listing costs borne by States), babies that return to the United States as American citizens may create costs to States from state welfare programs, state healthcare, driver's licenses. *See Gen. Land Off.*, 71 F.4th at 273.

States have been, and will continue to be, harmed by the Citizenship Clause interpretation advanced by Plaintiffs. Plaintiffs have no likelihood of success on the merits and the equities and public interest strongly weigh against Plaintiffs' interpretation and the resulting harm to States and the public. Based on these factors and Plaintiffs' unlikeliness to succeed on the merits, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

| | |
|---|---|
| BRENNA BIRD<br>  *Attorney General*<br>  *State of Iowa*<br>ERIC WESSAN<br>  *Solicitor General*<br>Iowa ICIS: AT0014313<br>(515) 823- 9177<br>eric.wessan@ag.iowa.gov<br>1305 E Walnut Street | By: */s/ Nathaniel M. Lindzen*<br><br>NATHANIEL M. LINDZEN<br>MA Bar No. 689999<br>Law Office of Nathaniel M. Lindzen<br>57 School Street<br>Wayland, MA 01778<br>Phone: (212) 810-7627<br>Email: nlindzen@corpfraudlaw.com |

Dated: February 4, 2025

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

TIM GRIFFIN
Attorney General of Arkansas

JOHN GUARD
Acting Attorney General of Florida

RAÚL R. LABRADOR
Attorney General of Idaho

THEODORE E. ROKITA
Attorney General of Indiana

KRIS KOBACH
Attorney General of Kansas

LIZ MURRILL
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ANDREW T. BAILEY
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

DREW WRIGLEY
Attorney General of North Dakota

GENTNER DRUMMOND
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

DEREK E. BROWN
Attorney General of Utah

BRIDGET HILL
Attorney General of Wyoming

## CERTIFICATE OF SERVICE

I certify that on February 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via email in PDF format.

*/s/ Nathaniel M. Lindzen*
NATHANIEL M. LINDZEN
