<pre>
 1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
 2

 3     _____

 4     O. DOE, et al.,

 5            Plaintiffs,                    Civil Action No.
                                             1:25-cv-10135-LTS
 6         v.

 7     DONALD J. TRUMP, in his official
       capacity as President of the United
 8     States, et al. ,

 9            Defendants.

10     and

11     STATE OF NEW JERSEY, et al.,

12            Plaintiffs,                    Civil Action No.
                                             1:25-cv-10139-LTS
13         v.

14     DONALD J. TRUMP, in his official
       capacity as President of the United
15     States, et al.

16            Defendants.

17     _____

18          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

19                          MOTION HEARING

20                    Friday, February 7, 2025
                              9:58 a.m.
21

22     John J. Moakley United States Courthouse
       Courtroom No. 13
       One Courthouse Way
23     Boston, Massachusetts

24     Rachel M. Lopez, CRR
       Official Court Reporter
25     raeufp@gmail.com
</pre>

1                          **A P P E A R A N C E S**

2

 3    On behalf of the 10135 Plaintiffs Doe, Brazilian Worker
      Center, and La Colaborativa:

 4        LAWYERS FOR CIVIL RIGHTS
          BY:  OREN M. SELLSTROM, MIRIAN ALBERT,
 5        AND JACOB LOVE
          61 Batterymarch Street
 6        Boston, Massachusetts  02110
          (617) 988-0608
 7        osellstrom@lawyerscom.org
          malbert@lawyersforcivilrights.org
 8        jlove@lawyersforcivilrights.org

 9

10    On behalf of the 10139 Plaintiffs State of New Jersey,
      Commonwealth of Massachusetts, and State of California:

11
          MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
12        BY:  GERARD J. CEDRONE AND JARED B. COHEN
          One Ashburton Place
13        20th Floor
          Boston, Massachusetts  02108
14        (617) 963-2282
          gerard.cedrone@mass.gov
15        jared.b.cohen@mass.gov

16

17        NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
          BY:  SHANKAR DURAISWAMY
18        33 Washington Street
          Newark, New Jersey  07102
19        (908) 507-2949
          shankar@duraiswamy@njoag.gov
20

21
          OFFICE OF THE ATTORNEY GENERAL
22        BY:  IRINA TRASOVAN
          300 S. Spring Street
23        Suite 1702
          Los Angeles, California  90013
24        (213) 269-6261
          irina.trasovan@doj.ca.gov
25

1                    **A P P E A R A N C E S, Cont.**

2

3     On behalf of the Defendants:

4         US DEPARTMENT OF JUSTICE
          BY:  ERIC HAMILTON
          950 Pennsylvania Avenue, NW
5         Washington, D.C.,   20530
          (202) 514-3301
6         eric.hamilton@usdoj.gov

7

8         DEPARTMENT OF JUSTICE - CIVIL DIVISION
          BY:  BRAD P. ROSENBERG
9         1100 L Street, NW
          Washington, D.C., 20005
10        (202) 514-3374
          brad.rosenberg@usdoj.gov

11

12        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
13        BY:  MICHAEL FITZGERALD
          John Joseph Moakley Courthouse
14        One Courthouse Way, Suite 9200
          Boston, Massachusetts  02210
15        (617) 748-3266
          michael.fitzgerald2@usdoj.gov

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S

2              (In open court.)

3              THE DEPUTY CLERK:  The United States District Court

4      for the District of Massachusetts is now in session, the

5      Honorable Leo T. Sorokin presiding.

6              THE COURT:  Please be seated.

7              THE COURTROOM CLERK:  Today is Friday, February 7,

8      2025, and we are on the record in Civil Case Number

9      25-cv-10135, O. Doe, et al., versus Donald J. Trump, et al.,

10     and 25-cv-10139, The State of New Jersey, et al., versus

11     Donald J. Trump, et al.

12             Will counsel please state your name for the record.

13             THE COURT:  Hold on one second.  Give me one moment

14     just to get set up, and I want to make a note of one thing.

15             Okay.  Go ahead.

16             MR. SELLSTROM:  Good morning, Your Honor.  Oren

17     Sellstrom from Lawyers for Civil Rights on behalf of

18     Plaintiffs O. Doe, La Colaborativa, and Brazilian Workers

19     Center.

20             THE COURT:  Good morning.

21             MR. CEDRONE:  Good morning, Your Honor.  Gerard

22     Cedrone from the Massachusetts Attorney General's Office, on

23     behalf of the Commonwealth.

24             I'll let my colleagues at counsel table introduce

25     themselves, but note that we have co-counsel from several
```

 1    other jurisdictions in the courtroom today, as well.

 2              THE COURT:  Okay.

 3              MR. DURAISWAMY:  Good morning, Your Honor.  Shankar

 4    Duraiswamy from the State of New Jersey here on behalf of the

 5    plaintiffs in the 10139 action.

 6              THE COURT:  Good morning.

 7              MS. ALBERT:  Good morning, Your Honor, Mirian

 8    Albert on behalf of the Doe plaintiffs, La Colaborative, and

 9    Brazilian Workers Center.

10              THE COURT:  Good morning.

11              MR. LOVE:  Good morning, Your Honor.  Jacob Love

12    from Lawyers for Civil Rights on behalf of the Doe

13    plaintiffs.

14              THE COURT:  Good morning.

15              MS. TRASOVAN:  Good morning, Your Honor.  Irina

16    Trasovan on behalf of The State of California.

17              MR. COHEN:  Good morning, Your Honor.  Jared Cohen

18    on behalf of The Commonwealth of Massachusetts.

19              THE COURT:  Just say it again.  I didn't catch your

20    name.

21              MR. COHEN:  Jared Cohen on behalf of The

22    Commonwealth of Massachusetts.  Good morning.

23              THE COURT:  Good morning.

24              MR. HAMILTON:  Good morning, Your Honor.  Eric

25    Hamilton, deputy assistant attorney general in the Civil

1    Division of the US Department of Justice for defendants.

2              THE COURT:  Good morning.

3              MR. ROSENBERG:  Good morning, Your Honor.  Brad

4    Rosenberg, special counsel with the Federal Programs Branch

5    in the Department of Justice's Civil Division, on behalf of

6    the federal defendants.

7              THE COURT:  Good morning.  Okay.

8              All right.  So I have read all the papers that

9    you've all submitted and all the amicus briefs that I've

10   authorized that I've allowed to file.

11             Who's arguing on -- for the plaintiffs?

12             MR. SELLSTROM:  Your Honor, with the Court's

13   permission, we've spoken with the state's counsel, as well,

14   and we would propose to consolidate the arguments.  From the

15   plaintiffs' side in the two cases, I would go first on behalf

16   of the Doe plaintiffs.  The state's counsel can then pick up

17   from there on some of the shared arguments, as well as some

18   that are unique to the State.

19             THE COURT:  Okay.

20             MR. SELLSTROM:  We'd also like some rebuttal time

21   after the government's argument, as well.

22             THE COURT:  All right.  And just one person from

23   the states?

24             MR. CEDRONE:  So I think you'll be hearing from two

25   of us, with the Court's leave.  I'll be addressing the

1    standing and threshold questions, and Mr. Duraiswamy will
2    address the PI factors, so the merits in the case.
3            THE COURT:  I see.  So just the two of you?
4            MR. CEDRONE:  Correct.
5            THE COURT:  Okay.  All right.  And then one or both
6    of you on the defense side?
7            MR. HAMILTON:  Yes, Your Honor.
8            THE COURT:  Who's with you at the table, who you
9    didn't introduce?
10           MR. FITZGERALD:  Oh.  Good morning, Your Honor,
11   Michael Fitzgerald from the US Attorney's Office for the
12   defendants.
13           THE COURT:  Okay.  Good morning.  Sorry, I couldn't
14   see you right there behind them.  Washington looms large over
15   the US Attorney's Office, I guess.
16           Okay.  That's fine.  I'm not going to set time
17   limits.  I'll hear from you; then I'll hear from the
18   government.  I'll hear something more in response from you,
19   and then we might be done, or maybe depending whether you
20   want to say anything else.  But you don't -- just as sort of
21   a guide post, you don't need to say everything in your
22   briefs.  If you walked out right now, you will have waived
23   nothing.  Okay?  If you say, "I waive," everything that
24   follows is gone.  Right?  But if you don't use those words,
25   right, you have whatever is in your briefs.  So if you walked

1    out and you hadn't said part two of your brief, or what have

2    you, it's not gone.  I have it; I've read it.  I'm going to

3    think about it.  I'll consider it; I'll address it.  So in

4    that sense, you know, I don't -- just keep that in mind in

5    terms of the -- what you have to say.  Okay?

6          Go ahead.

7          MR. SELLSTROM:  Thank you, Your Honor, and we will

8    try and hit the highlights.

9          As the Supreme Court has said, it would be

10   difficult to exaggerate the value and importance of American

11   citizenship.  Citizenship carries with it a full array of

12   rights and privileges and makes one a full member of the

13   United States community.

14         Given that importance, the Supreme Court has also

15   said that stripping someone of citizenship amounts to, quote,

16   "A total destruction of the individual status in organized

17   society."

18         The declarations that we have submitted show

19   clearly how that harm would be visited upon children and

20   families if the executive order were to go into effect.  That

21   momentous act of denaturalization cannot be done by the

22   stroke of a pen, and that is because the concept of

23   birthright citizenship that anyone born on American soil is

24   an American citizen is so fundamental to the fabric of our

25   nation that it's expressly written into the Constitution.

1    That, of course, is through the 14th Amendment, passed as a

2    means to mend a broken nation and make clear in the

3    citizenship clause that the government never again can decide

4    who among disfavored classes is entitled to citizenship.

5    That is why the citizenship clause was enacted, and it makes

6    clear that all who are born here, subject only to very rare

7    exceptions, like the children of diplomats, are automatically

8    American citizens.  That basic concept has been definitively

9    endorsed and upheld by the Supreme Court, by the First

10    Circuit, and by courts around this country for generations.

11    It permeates federal agency and state agency practice and has

12    for 150 years and more.  It cannot be changed with the stroke

13    of a pen.

14            In many ways, the Court's inquiry this morning need

15    go no further than that.  The defendants may wish that the

16    Supreme Court revisit this issue.  But at this point in time,

17    First Circuit and Supreme Court jurisprudence is clear and

18    unequivocal, the citizenship clause does not turn on the

19    immigration status of one's parents, and, therefore, the

20    executive order is unconstitutional.

21            The seminal case, of course, is *Wong Kim Ark*,

22    decided by the Supreme Court at the turn of the century,

23    which outlines a long line of English history and common law

24    to arrive at its conclusion.

25            THE COURT:  Turning back, sorry, just to one thing

1    from earlier, the -- from the papers that you've submitted

2    with respect to the associations, I draw the conclusion or

3    it's established that the associations have members in

4    Massachusetts.

5            MR. SELLSTROM:  That's correct.

6            THE COURT:  But do they have members in --

7    elsewhere?

8            MR. SELLSTROM:  The members are primarily in

9    Massachusetts, Your Honor.

10            THE COURT:  And what about -- is it -- should I

11    view them as just having members in Massachusetts?  Or should

12    I view them as having members beyond Massachusetts?

13            MR. SELLSTROM:  I think viewing them as having

14    members in Massachusetts is what's supported by the

15    affidavits that we submitted.

16            THE COURT:  Okay.

17            MR. SELLSTROM:  And is fully sufficient for

18    granting the relief that we are asking for.

19            THE COURT:  All right.  Okay.

20            MR. SELLSTROM:  Which I'm happy to address, if it's

21    something that Your Honor would like to probe deeper.

22            THE COURT:  Well, one -- certainly you can address

23    that.  I intend to address all of the issues that are put to

24    me in this case, the way I would in any case.  And so one of

25    the issues, it's just, as you know, a series of steps, but

```
 1    one of the issues, if I get there, is what, if any, form of
 2    relief should be granted, and what's the scope of that
 3    relief.  So if you want to talk -- you've talked about it in
 4    your papers, but you can talk about it.
 5            MR. SELLSTROM:  Yes, absolutely.  Let me get to it,
 6    Your Honor.  As you said, the Doe plaintiffs are an
 7    individual, an expectant mother whose unborn child would be
 8    subject to the executive order, and two membership
 9    organizations, each of whom have members, as the declarations
10    attest, who are essentially similarly situated to Ms. Doe.
11    That, as Your Honor alluded to, gives them membership,
12    associational standing, something that is quite clear from
13    Supreme Court First Circuit jurisprudence, the Hunt vs.
14    Washington State Apple case, and many others that say,
15    essentially, membership organizations can bring the action on
16    behalf of individual members.
17            THE COURT:  I wasn't really asking about standing.
18    I was asking about what other members there were, in terms of
19    thinking about scope of relief.
20            MR. SELLSTROM:  That gets, then, to the question of
21    relief, Your Honor.  And I raise that because -- and we went
22    into a little bit of detail about this in our -- at the end
23    of our reply brief, citing in particular the Supreme Court's
24    decision in the Trump vs. IRAP case, because it is so similar
25    to the issue before Your Honor today in terms of those
```

1    issues.  In that case, that was also brought, the Fourth

2    Circuit case that was later consolidated with the Ninth

3    Circuit case, was brought on behalf of individuals and

4    membership organizations who were affected by the travel ban.

5    And the Supreme Court there upheld a nationwide injunction.

6    It did so by refusing a stay request from the government, but

7    it made clear that it was endorsing the nationwide relief

8    that had been granted in that case, and it did so on a number

9    of different grounds.  One, probably the most important, is

10   because it involved issues of immigration, which the Court

11   said, and the lower courts in both the Fourth and Ninth

12   Circuit also said is, you know, needs to be uniform

13   throughout the country.  That's, you know, a part of the

14   Constitution and the naturalization clause saying it has to

15   be a uniform system of naturalization.  And everyone thinks

16   of it that way, that the immigration laws, in particular, the

17   same rules need to apply to everyone.  And so for that

18   reason, there's a necessity of granting nationwide relief on

19   a facial challenge like this, that is -- that is challenging,

20   again, the analogy is clear -- an executive order that is, on

21   its face, unconstitutional.

22           There are other grounds for that same relief.

23   Again, this is in our reply brief.  We are running out of

24   room a little bit, so it's in a footnote, but the

25   Administrative Procedure Act also makes clear that nationwide

1    relief is the appropriate relief under that act, that the

2    statute says that if an enactment or an agency action is

3    found unconstitutional, the remedy is to set it aside, and

4    that, by its nature, has nationwide impact.  And that's

5    something that has -- you know, there are a number of cases

6    that we've cited that, in the regulatory context, that's the

7    case, an individual challenges something like a regulation is

8    facially unconstitutional, the result under the APA is that

9    it is set aside and nationwide relief is granted.

10           So for all of those reasons, should Your Honor find

11   in our favor, that, we believe, is the appropriate relief.

12           THE COURT:  Okay.

13           MR. SELLSTROM:  I do want to also address the

14   merits of the issue, as well, to make sure that that is laid

15   out.  And again, my brother counsel will pick up on that.

16   But the main case, going back to *Wong Kim Ark*, is cited so

17   much, because it is so decisive and so authoritative.  As

18   Your Honor knows, it is a very lengthy opinion that really

19   traverses a lot of territory, from English common law to, you

20   know, the enactments after the Revolution.  But it's

21   important not only for background, but also because it shows

22   just how wrong defendants are in their interpretation today.

23           The idea of birthright citizenship goes back to the

24   English common law, the idea that anyone born within the

25   king's dominion is automatically subject to his protection

1   and is owed allegiance to him.  And the important thing about

2   those two concepts, protection and allegiance, is that they

3   are not, in any way, subjective.  They're automatic.  It's

4   not as if the king is deciding, you know, who should I bring

5   under my protection.  It automatically adheres, at birth, to

6   anyone who is born in the king's dominion.  And on the other

7   side, the allegiance that is talked about in those cases is

8   not something that is subjective, like we think of, you know,

9   today, the Pledge of Allegiance, where somebody stands up and

10  makes that allegiance.  It's really much more fundamental

11  than that.  It is talked about in terms of the duty that is

12  owed to the king, to be subject to the king, and that is what

13  makes it automatic, that that happens whenever, you know,

14  someone is born on the country's soil.  And that is the basic

15  framework of birthright citizenship that came over to the

16  United States in the colonies, and then through the

17  constitution after the revolution.  And that's what the Court

18  in *Wong Kim Ark* makes so clear, and then takes those

19  principles and applies them to the facts of that particular

20  case.

21          Wong Kim Ark was born here in the United States, in

22  San Francisco, to parents who were Chinese citizens.  And

23  he -- then the question before the Court was he a citizen,

24  when he left the country, and then was trying to reenter.

25  And that's where the Court went into the whole concept of

1   birthright citizenship and held that, yes, because he is born

2   on American soil, he is subject to the jurisdiction of the

3   United States, under the citizenship clause.

4          The Court then illustrated that by the exceptions.

5   There are very few exceptions to that, but the Court went

6   into detail about those exceptions to essentially prove the

7   rule, to show why that rule existed.  And so, for example,

8   the Court talked about children of foreign diplomates, you

9   know, what we know today as diplomatic immunity that has long

10  existed both in England and here, the idea that those

11  individuals are not subject to the country's laws, because

12  they have that diplomatic immunity.

13         The other example given is the children of invading

14  armies during hostile occupations, who are clearly not,

15  again, subject to the country's laws.

16         The other exception that the Court raised in *Wong*

17  *Kim Ark* was something that was unique to the United States,

18  not something that existed in England, which is the case of

19  what was then referred to as Indian tribes.  The idea -- and

20  this is drawing on the earlier case, the *Elk vs. Wilkins*

21  case, authored by the same justice, by the way, who came

22  along later in *Wong Kim Ark* to then explain that in more

23  detail, that because at the time, Indian tribes, Native

24  Americans were viewed as quote/unquote, "alien nations," that

25  was essentially the same as the children of foreign

1    diplomats; that the idea, there again, is it's the exception

2    that shows the basic rule that if you are born in the United

3    States, you are subject to the United States laws.  You are a

4    citizen.  That's what the 14th Amendment was about.  That's

5    exactly what the citizenship clause was enacted to ensure,

6    and that is what *Wong Kim Ark* held.

7         That's not the only case, certainly.  It's cited to

8    so much, because it's authoritative, but there's a long line

9    of Supreme Court First Circuit cases and other cases since

10   then that make that exact same point and cite back to *Wong*

11   *Kim Ark*.  So that is the basic framework that says that you

12   cannot -- a President cannot, with the stroke of a pen, add

13   additional qualifications to that.  It's written in the

14   Constitution, and the President cannot overturn that through

15   executive order.

16        THE COURT:  Okay.  Thank you.

17        MR. SELLSTROM:  I do want to make sure that my

18   colleagues from the State have time to argue.  I did want to

19   touch, just briefly, on the equities.  Your Honor, we think

20   that on the merits, there's a high likelihood of success, and

21   that the balance of equities tips sharply in plaintiffs'

22   favor.  The declarations that we set forth go into detail

23   about that, about babies being born stateless, subject to

24   immediate deportation, all of the other consequences that

25   flow from stripping someone of citizenship, whether it's

1    health ramifications and others.  This is serious, serious

2    business to strip someone of citizenship in that way.  And

3    the Supreme Court comes back to not only that, but what the

4    Supreme Court talks about as a dignitary harm, the idea that

5    taking away someone's national identity is a grave and

6    irreparable threat.  And that's what this executive order

7    does, and that's why the balance of equities tips sharply in

8    plaintiffs' favor.

9            THE COURT:  Thank you.

10            Mr. Cedrone?

11            MR. CEDRONE:  Good morning, Your Honor, Gerard

12    Cedrone for the Commonwealth of Massachusetts and the

13    plaintiff States.  As I mentioned at the outset, I'll address

14    standing and the federal government's threshhold arguments,

15    and then Mr. Duraiswamy will address any additional points on

16    the merits and the equities of the PI.

17            THE COURT:  Just to clarify one thing, you're not

18    asserting *parens patriae* standing?

19            MR. CEDRONE:  We are not asserting that as a basis

20    here.

21            THE COURT:  I thought so, but I just wanted to be

22    sure.

23            Go ahead.

24            MR. CEDRONE:  And there are obviously weighty

25    interests here, but I'll take a moment in my portion to

explain why we are obviously the right plaintiffs or why we
obviously are proper plaintiffs to vindicate those interests.
Mindful of Your Honor's request that we keep it short, I'll
try to keep it concise, because in our view, this is not a
close case on standing, both on the facts before the court,
in the record, and on settled law in the First Circuit and
Supreme Court.  We are clearly proper plaintiffs.  I'm here
on behalf of 18 states, the District of Columbia, and the
City and County of San Francisco, who will all suffer
immediate, direct, and predictable injury if this executive
order goes into effect.

         So let me maybe take a moment to address the facts
that are before the Court, and then a moment to explain why,
under settled precedent, we clearly have standing.  We've put
in front of Your Honor declarations explaining the harms that
the jurisdictions will suffer if this order goes into effect.
I'll focus on the financial harms, because economic harm is
in the heartland of an Article III injury, and we've put
forward declarations showing the types of federal funding
that the plaintiff jurisdictions receive today, that they
will no longer receive if this order goes into effect.

         And I think it's helpful to think about it in that
but-for way, to consider what federal funding are we
receiving now, what federal funding will the plaintiffs'
jurisdictions not receive if this order goes into effect.

1    And Your Honor has declaration after declaration explaining

2    those injuries.

3              Just speaking for the Commonwealth, millions of

4    dollars in Medicaid funding, thousands of dollars from the

5    Social Security Administration for processing Social Security

6    applications will be lost if a whole class of children are

7    considered undocumented or without lawful status.  That's

8    just what the Commonwealth has put forward.  Our colleagues

9    in other states have addressed Title IV-E funding,

10   school-based health services, really vital programs that are

11   assisted by federal dollars to help some of our most

12   vulnerable citizens, where the states will receive less

13   funding if this order goes into effect.

14             I don't take the federal defendants to dispute that

15   that federal funding will be lost.  They simply dispute

16   whether this rises to the level of an Article III injury, and

17   whether we have standing.  For the reasons we said in our

18   papers, we clearly do.  The two points that I'll just

19   reiterate today are that, essentially, every objection to

20   standing that the federal defendants make is resolved by the

21   *Biden vs. Nebraska* case in the Supreme Court, and the

22   *Massachusetts vs. HHS* case in the First Circuit.  In the

23   first case, the Biden case was a state-led challenge to then

24   President Biden's plan to forgive student loans.  The

25   argument for standing there was that this quasi-governmental

1    entity of the state --

2            THE COURT:  You view yourselves as in similar shows

3    to the Missouri entity.

4            MR. CEDRONE:  That's exactly right.  I think we're

5    actually in a stronger position.  In that case there was a

6    question of whether that quasi-governmental entity, MOHELA,

7    was really an arm of the state, such that injuries to MOHELA

8    counted as injuries to Missouri.  Here we don't even have

9    that question.  The money that we're talking about comes

10   directly to the Treasury of the Commonwealth and the

11   plaintiff jurisdictions, and will be lost otherwise.

12           So I don't think there's a way to find no standing

13   in this case, without -- without directly conflicting with

14   that case and with the *Massachusetts vs. HHS* case in the

15   First Circuit.

16           And I will note that just yesterday a judge in the

17   Western District of Washington agreed on this exact standing

18   question on exactly those grounds.

19           I think the only other point that I would like to

20   emphasize --

21           THE COURT:  Am I right that there are certain state

22   laws that turn on citizenship?

23           MR. CEDRONE:  That's right, Your Honor.  There are

24   a number of state laws about participation in civic life that

25   turn on state citizenship.  There are --

```
1              THE COURT:  On US citizenship?

2              MR. CEDRONE:  That's right.  For jury service, for

3    example.  And also in these joint federal state programs that

4    we've talked about, things like Medicaid, there's obviously

5    federal law that implements Medicaid, and state law that

6    implements Medicaid that tracks federal law or has to comply

7    with federal law.  But that's correct.

8              So we think this is a straightforward case on

9    standing.  I'll just mention briefly, the government -- the

10   federal government's argument that we lack a proper cause of

11   action.  Our argument on that, I think, is addressed by the

12   papers.  I'll just mention two things that are new since we

13   submitted our reply brief.  One is that, again, a judge in

14   the Western District of Washington found that --

15             THE COURT:  I read his decision.

16             MR. CEDRONE:  Exactly.  And the only other thing

17   I'll mention is that the government -- the federal government

18   is talking a little bit out of both sides of its mouth on

19   this.  The government just filed a complaint yesterday in the

20   Northern District of Illinois, the case is 25-cv-1285, the

21   United States vs. Illinois, and it challenges so-called

22   sanctuary policies seeking to enjoin state and city officers

23   in Illinois and Chicago and Cook County from implementing

24   those policies.  As I read that complaint, it relies on the

25   exact same ultra vires cause of action that we bring in
```

1    Count 1 and 2 of our complaint.  So I would submit that even
2    the federal government, by its actions in other cases,
3    recognizes that this cause of action to enjoin
4    unconstitutional actions by executive office holders clearly
5    exists and is recognized.
6            Unless Your Honor has further questions, I'll --
7            THE COURT:  No.  Thank you.
8            MR. DURAISWAMY:  Good morning, Your Honor.  On
9    behalf of the 18 plaintiff states, the District of Columbia,
10   and the City of San Francisco, we ask for a nationwide
11   injunction to remedy the profoundly harmful effects of the
12   President's executive order, not only the effect on millions
13   of children who will now be born without any legal status,
14   but the immense disruption to the operation of plaintiffs,
15   child health and welfare programs, and the loss of millions
16   and millions of dollars in federal funding to support those
17   programs.
18           I want to touch on the merits, Your Honor, briefly.
19   But before I get to that, with respect to the Court's earlier
20   question about the scope of relief, I want to be clear that
21   in order to remedy the harms to the plaintiffs that
22   Mr. Cedrone identified, nationwide relief is absolutely
23   essential, for the simple reason that those harms will not be
24   remedied if children living in states outside of the
25   plaintiffs' jurisdiction are denied birthright citizenship,

1    because those families can move into plaintiffs'

2    jurisdictions, and, in fact, there may be families who live,

3    for example, in Massachusetts, who, for whatever reason, give

4    birth in New Hampshire.  So for that fundamental reason that

5    people are mobile, the harms cannot be remedied without full,

6    nationwide relief.

7            Let me start with the merits.  And I don't intend

8    to repeat everything that Mr. Sellstrom said, but with the

9    Court's indulgence, I do think it's critical to reiterate the

10   historical context for this executive order.

11           150 years ago, in the wake of the civil war, the

12   framers of the 14th Amendment enshrined the right to

13   birthright citizenship in the Constitution as a reaction to

14   the *Dred Scott* decision, which itself was an aberration from

15   the well-recognized common law rule that a person born on

16   American soil was an American citizen.  Moreover, the reason

17   the framers chose to enshrine birthright citizenship as a

18   constitutional right was to ensure that it would never again

19   be subject to the vicissitudes of fleeting political

20   considerations.  In the years since, as Mr. Sellstrom has

21   explained, the Supreme Court has made explicit that

22   birthright citizenship is subject only to certain very narrow

23   and precisely defined exceptions, exceptions that were

24   articulated in *Wong Kim Ark*.  And it has also been explicit

25   that these exceptions do not include the children of

1    undocumented immigrants or those who are here on a temporary

2    basis.

3            And for the more than 100 years, the executive

4    branch has acted in accordance with this bedrock

5    constitutional principle, recognizing citizenship for all

6    children born here without regard to the lawfulness or

7    duration of their parents' presence in the United States.  In

8    the face of this century-plus of unbroken precedent and

9    practice, the President issued an executive order summarily

10   declaring that these children are not, in fact, entitled to

11   birthright citizenship, and directing every federal agency to

12   execute his order by stripping them of that right.

13           The order is flatly unconstitutional and *ultra*

14   *vires*.  Not only does it directly conflict with the

15   longstanding understanding of the scope of the citizenship

16   clause, it conflicts with a congressionally enacted statute

17   that codified that understanding into law.  And although

18   defendants attempt to justify the executive order by

19   resorting to purported policy concerns, those must be

20   addressed through lawful means, not by disregarding the

21   Constitution and statutory limits.  And indeed, the very

22   purpose of the citizenship clause was, as the office of legal

23   counsel said, 30 years ago, to remove the right of

24   citizenship by birth from transitory political pressures.

25           Mr. Sellstrom discussed *Wong Kim Ark* in depth, so I

won't repeat that, but I do want to focus on defendants'
argument that *Wong Kim Ark* is not controlling because it
involved the child of permanent residents, not undocumented
immigrants or individuals here on a temporary basis.  And
they premised this argument on the distinction between
whether parents are domiciled here long-term or they're not.

This argument is flawed for multiple reasons,
Your Honor, but first start with Supreme Court case law.
*Plyler v. Doe* held that undocumented immigrants fell within
the jurisdiction of the United States for the purposes of the
14th Amendment because they were subject to the full range of
obligations imposed by the State's civil and criminal laws.
The Court further explained that there was no distinction in
that regard between those who resided here lawfully and those
who resided here unlawfully.  And in several cases, the Court
has specifically recognized the citizenship of children born
to undocumented immigrants, as well as those here
temporarily.

In 1957, in *Hintopoulos vs. Shaughnessy*, the Court
considered a case involving two crew members of a foreign
ship who had been granted temporary permission into the
United States and who overstayed.  They gave birth to a
child, and the Court explained that, quote, "Of course, the
child is an American citizen by birth."

In *INS v. Rios-Pineda*, which also involved a

1    petition for suspension of deportation proceedings, the

2    Supreme Court stated plainly that the undocumented immigrant

3    in that case had given birth to a child who, quote, "Born in

4    the United States, was a citizen of this country."

5           In *Hamdi v. Rumsfeld,* the Supreme Court considered

6    the legality of the government's detention of a person born

7    in the United States on the ground that he was an enemy

8    combatant.  An amicus brief argued that the individual in

9    question was not actually a citizen because his parents were

10   on temporary visas in the country when he was born.  The

11   Court did not adopt that view, and they proceeded to analyze

12   his due process rights as a, quote/unquote, "citizen

13   detainee."

14          The First Circuit has also recognized this.  In

15   2011, in *Mariko v. Holder* -- Your Honor, I identified this

16   case after the close of briefing, so I'll give the cite.

17   It's 632 F.3d 1.  The Court considered the case of a child

18   born in the United States to parents who had entered

19   unlawfully and had removal proceedings initiated against them

20   and noted that the child simply, quote, "is a United States

21   citizen."

22          So defendants' domicile theory is squarely at odds

23   with binding Supreme Court case law.

24          Second, it's at odds with the plain language of

25   *Wong Kim Ark*.  And I won't repeat all of these quotations,

because we discussed them at length in our reply brief.  But the Court there made clear that whether one is subject to the jurisdiction is independent of their intention to continue such residence or domiciliation; that one is subject to the jurisdiction even if they are, quote/unquote, "merely temporarily sojourning"; that one is subject to the jurisdiction even if they are here, quote/unquote, "for business or pleasure."

And for that proposition, they point to Chief Justice Marshall's explication of jurisdiction in the seminal case *The Schooner Exchange,* where he explained that even a merchant vessel that is here for purposes of trade is subject to the jurisdiction of the United States, because if they were not, it would subject the nation's laws to continual infraction.

No one, Your Honor, least of all the federal defendants, would suggest that individuals who are here undocumented or are here on a temporary bases are free to disregard the full range of civil and criminal laws of the United States simply because of their status.

Although there are parts of *Wong Kim Ark* that refer to the fact that the parents of Wong Kim Ark were here as permanent residents, that discussion is applying the holding of the case to the facts before the Court.  In no way did it qualify the court holding and the precisely defined

1    exceptions that Mr. Sellstrom identified.

2           Finally, Your Honor, if you unpack the reasoning of

3    defendants' domicile argument, it falls apart pretty quickly.

4    It hinges on references in both *Wong Kim Ark* and

5    *Elk v. Wilkins* to owing allegiance, and they never explain

6    what that means.  They never explain what they think it means

7    to owe allegiance or why one has to be domiciled here to owe

8    allegiance.  By contrast, *Wong Kim Ark* makes very clear what

9    they mean -- what allegiance means and what it means simply

10   is a duty to obey the law.

11          Finally, Your Honor, if domicile were a proxy for

12   allegiance as defendants posit, that would not explain why

13   Native Americans were found not to be subject to the

14   jurisdiction.  They are, after all, domiciled long term

15   within the territorial boundaries of the United States.

16          One more point on defendants' arguments,

17   Your Honor, with respect to this issue.  The notion of

18   consent.  They attempt to rely on *Elk's* comment that no one

19   can become a citizen of the nation without its consent.  That

20   statement is taken out of context clearly.  Because *Elk*

21   involved a situation where someone who -- a Native American

22   who had been born within the jurisdiction of a tribal nation,

23   subsequently attempted, through his own volition, to subject

24   himself to the jurisdiction of the United States.  And the

25   Court treated that, essentially, as a naturalization

1    question.  And their point was that you cannot naturalize

2    yourself, only the nation can consent to your naturalization.

3         At bottom, Your Honor, defendants are not really

4    litigating the scope of Supreme Court precedents.  They're

5    seeking to relitigate those precedents directly.  That's

6    clear from the recitation of historical sources that were

7    largely cited in the dissent in *Wong Kim Ark* that were known

8    to and considered by the majority, and that were rejected in

9    the majority's holding.  It's clear from the defendants'

10   attempt to rely on the language of the 1866 Civil Rights Act,

11   which *Wong Kim Ark* expressly discussed and explained the

12   language of which was no different than the meaning of

13   subject to jurisdiction as they articulated it in that

14   opinion.  And it's clear from the policy argument that

15   defendants advance that dual citizenship is problematic, that

16   the government must have tools to address unlawful entry, and

17   the like.

18        To be clear, Your Honor, the executive branch does

19   have some discretion when it comes to the enforcement of

20   immigration laws with respect to the entry, admission, and

21   removal of noncitizens.  But this is not a case about the

22   entry, admission, or removal of noncitizens.  This is a case

23   about children who are born in the United States.  And the

24   executive branch has no more power to take away their

25   constitutional rights to birthright citizenship because they

believe it will disincentivize unlawful entry than they have
the power to take away their First Amendment rights, their
due process rights, or their equal protection rights because
they believe it may disincentivize illegal reentry.

Finally, Your Honor, even if the Court believed
that *Wong Kim Ark* was wrongly decided and even if it had the
power to overturn that precedent, plaintiffs would still
prevail on their *ultra vires* claims based on the Immigration
and Nationality Act, because Congress, at the time of
enacting that statute, codified the then existing
understanding of what it meant to be subject to the
jurisdiction, which was articulated in *Wong Kim Ark*.

Let me move quickly, Your Honor, to the equities.
Mr. Cedrone has already explained the harms to the states.
There's no serious argument that they are not irreparable.  I
think it's undisputed that many of the harms could not be
addressed, many of the fiscal harms could not be remedied
through any administrative channel.  And even as to the ones
that involve reimbursement programs, like Medicaid,
defendants ask the question as to whether they could be
recovered through administrative processes, but the fact that
they don't answer that question is very telling.  They don't
actually identify any administrative process they have where
plaintiffs could recover those funds.

On the public interest, I think it's quite

1    straightforward, Your Honor.  I think this is really

2    derivative of the merits.  Once the Court answers the merits,

3    the government has no public interest in violating a

4    constitutional principle in order to address policy concerns.

5         So finally, as I mentioned, Your Honor, we are

6    seeking nationwide relief for the reasons I mentioned before.

7    And I would say that the government raises, in their

8    opposition brief, in a footnote or request that the PI

9    proceedings be consolidated on the merits and that the Court

10   proceed to a final judgment, plaintiffs' position is --

11   Your Honor, is that if the Court is inclined to grant relief,

12   then the record is complete in terms of supporting that

13   relief, and we fully support granting a full and final

14   permanent injunction.

15        THE COURT:  So are you saying that you support me

16   consolidating -- that this is the trial on the merits?  You

17   support that?

18        MR. DURAISWAMY:  We do.  Obviously to the extent

19   the Court believes that there's some defect in the record

20   that would not support --

21        THE COURT:  If I think that everything -- if I

22   think I don't need -- there isn't any -- are you asking for

23   the possibility of more?  Are you saying that if I don't

24   think there's anything else needed, I should just proceed to

25   enter final judgment?

1          MR. DURAISWAMY:  I think what we're saying,

2    Your Honor, is if you're prepared to enter relief, then

3    certainly we think that that relief can proceed by way of a

4    permanent injunction.

5          THE COURT:  I see.  So if you persuade me that a

6    preliminary injunction is appropriate, then what you're

7    saying is I should enter a permanent final injunction.

8          MR. DURAISWAMY:  That's exactly right, Your Honor,

9    because to reach that conclusion, I think that would -- the

10   record would be sufficient to support a permanent injunction,

11   as well.  And I would also point out that nothing that we've

12   submitted in the factual record has been disputed by the

13   defendants in any way.  So we really are here on legal

14   arguments.

15         THE COURT:  Okay.  Thank you.

16         Is it Mr. Hamilton or Mr. Rosenberg?

17         MR. HAMILTON:  Good morning, Your Honor.  Eric

18   Hamilton again for the defendants.

19         This Court should deny the plaintiffs' motion for a

20   preliminary injunction.  Our brief identifies a number of

21   threshold problems with plaintiffs' claims.  I want to start

22   by highlighting just one.  That is the lack of standing of

23   the New Jersey plaintiffs.  The New Jersey case is a group of

24   18 states, the District of Columbia, and the City and County

25   of San Francisco.  They lack standing under the

1    *United States vs. Texas* case of the Supreme Court.  In that

2    case, two states, Texas and Louisiana, challenge a federal

3    immigration policy, and they premised their challenge on

4    incidental economic harms.

5            Now, plaintiffs respond that

6    *United States vs. Texas* dealt with what the Court called an

7    unusual lawsuit seeking the enforcement of federal law, and

8    that's true.  But it is also true that there's language in

9    *Texas* that is specific to issues of state standing.  We

10   highlight Footnote 3 of that opinion, which calls out the

11   problem of states resting theory on incidental economic

12   harms, which we view as an identical problem to that here.

13           If plaintiffs --

14           THE COURT:  Is direct injury, financial injury

15   enough, or not?

16           MR. HAMILTON:  A direct injury would be different.

17   And that distinguishes *Biden vs. Nebraska*, as well as the

18   Department of Commerce case.  In *Biden vs. Nebraska* that's

19   actually --

20           THE COURT:  But why isn't the injury they advance

21   direct?

22           MR. HAMILTON:  Well, it's an incidental one,

23   because it sort of depends on a chain of --

24           THE COURT:  Well, you -- the President determines

25   or directs that person -- Doe's child -- nowhere in your

1    brief challenged Doe's standing, right?

2              MR. HAMILTON:  That's right.  That's right.

3              THE COURT:  So actually, the lack of standing is

4    not a basis to deny the injunction.

5              MR. HAMILTON:  Well, you're talking about the --

6              THE COURT:  I can't -- it would be wrong for me to

7    deny both motions for injunction for lack of standing.  Do

8    you agree with that?

9              MR. HAMILTON:  Well, I'm not sure, Your Honor,

10   because we have two separate cases right now --

11             THE COURT:  I asked for both.  So you made a

12   challenge to standing of the state plaintiffs' case, right?

13             MR. HAMILTON:  Exactly.  The argument I'm making

14   right now has nothing to do with the --

15             THE COURT:  So it's not a basis to deny both

16   motions for injunction.

17             MR. HAMILTON:  Right.  Right.

18             THE COURT:  In fact, it would be wrong for me to

19   deny injunctive relief only on standing grounds, if I applied

20   that to both cases.

21             MR. HAMILTON:  For the Doe case, yes.  For the New

22   Jersey case --

23             THE COURT:  Right.

24             MR. HAMILTON:  Yes.  No -- yes, though.

25             THE COURT:  So you agree with me that I would

1    commit legal error if I denied both motions for injunctive

2    relief and the only reason I cited was the lack of standing.

3              MR. HAMILTON:  That's right.  That's right.

4              THE COURT:  So the reason the Doe plaintiff, if I

5    understand it correctly, has standing, given the -- her

6    pregnancy and the birth of her child anticipated to occur

7    after the effective date of the executive order, is that that

8    would cause her direct injury.

9              MR. HAMILTON:  Exactly.  Exactly.

10             THE COURT:  All right.  So my question is, since

11   the executive order would -- what follows from the executive

12   order is that Doe's child is not a citizen under the

13   executive order, right?

14             MR. HAMILTON:  Yes.

15             THE COURT:  And so -- and that causes her direct

16   injury sufficient for Article III, right?

17             MR. HAMILTON:  Yes.

18             THE COURT:  So why -- and since what the states

19   point to is various monies they get based on people being

20   citizens, right?

21             MR. HAMILTON:  Yes.

22             THE COURT:  And so the money they would get for

23   Doe's child being a citizen, they're not going to get if the

24   executive order is in place, right?

25             MR. HAMILTON:  Yes.  But there's more steps

1    involved to get there.  And again, it's a problem that

2    *United States vs. Texas* addressed.  States are unique kinds

3    of plaintiffs, and if these incidental economic harms were

4    sufficient to confer standing --

5              THE COURT:  I guess that's my question.  What does

6    it mean to you, or what do you think it meant to the Supreme

7    Court to be incidental?

8              MR. HAMILTON:  Well, I think it means where

9    there's -- there's kind of a leap you have to take, and it's

10   not a direct regulation.  I think, again, the *Nebraska*

11   against *Biden* case is actually unhelpful for plaintiffs,

12   because there there was multiple states that were challenging

13   the policy.  And the Court didn't hold that all the states

14   had standing --

15             THE COURT:  Didn't Justice Roberts say that the

16   standing of one state was sufficient for him to proceed in

17   his opinion to address the merits?

18             MR. HAMILTON:  It is, but the standing that was

19   sufficient there was specific to a very unique state program,

20   where the state --

21             THE COURT:  Well, but wasn't the standing there

22   that the Supreme Court said that the elimination of the

23   program -- the elimination -- the forgiveness, rather, of the

24   loans would mean that the entity, as a downstream effect,

25   would no longer receive fees for managing those loans, right?

1          MR. HAMILTON:  Yes, but it was unusual that
2    Missouri --
3          THE COURT:  But it wasn't that the federal
4    regulation said anything directly to that entity.  It was
5    just a consequence of the -- forgiving the loans, right?
6          MR. HAMILTON:  Yes.  But it had a direct effect on
7    federal loan servicers, which is the business that the State
8    of Missouri decided to get into.
9          THE COURT:  So but why is that a direct -- you
10   concede that's a direct effect in that case.
11         MR. HAMILTON:  Yes.
12         THE COURT:  And so if that's a direct effect, why
13   isn't it a direct effect to say that we will -- the number of
14   people we're going to pay you for processing Social Security
15   numbers, for example, is going to be less, because there's
16   going to be, under this order, less birthright citizens.
17         MR. HAMILTON:  Because the persons directly
18   affected are people like O. Doe, people whose citizenship
19   hinges on the executive order.
20         THE COURT:  Well, no, but they get money for
21   submitting the applications, just the way the servicer got
22   money for servicing the loans.  What's the difference?
23         MR. HAMILTON:  Well, there's still that extra step
24   between the individuals within the states and then the
25   incidental effects that the states --

```
 1              THE COURT:  What's the extra step?
 2              MR. HAMILTON:  Well, the extra step is that the
 3     states are claiming that they're going to receive certain
 4     funds or not --
 5              THE COURT:  Well, you haven't disputed that.
 6              MR. HAMILTON:  We haven't disputed that.
 7              THE COURT:  So that's a fact.  That's a fact that
 8     you conceded, essentially.
 9              MR. HAMILTON:  Yes.  But there's still --
10              THE COURT:  Yes, you conceded it.
11              MR. HAMILTON:  Yes.  Yes.
12              THE COURT:  Right.  So that is a fact that they
13     will lose that money.
14              MR. HAMILTON:  We're not challenging that on the
15     present record.  But Your Honor --
16              THE COURT:  Or seeking to expand the record.
17              MR. HAMILTON:  Correct.  Correct.
18              THE COURT:  So if they are losing that, why isn't
19     that direct?  I'm just misunderstanding -- I'm just not
20     understanding what is this extra step?  I mean, because what
21     seems like the analogy is you would agree with me that in the
22     Nebraska case, the loans that were forgiven were not the --
23     were the loans owed by borrowers, right?
24              MR. HAMILTON:  Right.
25              THE COURT:  And not loans owed by that Missouri
```

1  entity.

2          MR. HAMILTON:  Yes.  I think, though, that the

3  boundaries and standing are frequently fuzzy, but we have

4  *Biden vs. Nebraska* and *United States vs. Texas*.  Those are

5  two very recent state standing cases in the US Supreme Court.

6  In the end, we think this case is more analogous to the

7  *United States vs. Texas* case.

8          But even aside from state standing, the Court

9  should also deny the motion for preliminary injunction,

10 because none of the plaintiffs have shown --

11          THE COURT:  Can I ask one other question before --

12 you're moving on to something else, right?

13          MR. HAMILTON:  I am.

14          THE COURT:  Just before you go on to that, one

15 other question about standing.

16          You would agree with me, or do you agree with me,

17 is maybe a better way to ask the question, do you agree with

18 me that a person who acquires birthright -- in birthright

19 United States citizenship, under the Section 1 of the 14th

20 Amendment, by virtue of that clause, automatically acquires

21 citizenship in the state in which they reside?

22          MR. HAMILTON:  I do, yes.

23          THE COURT:  Which means that a person who has

24 birthright -- who is born, say, in Massachusetts,

25 Massachusetts -- that person, if they are a person who

1    gets -- you concede there are people who get birthright

2    citizenship, even after the EO, right?

3                MR. HAMILTON:  Yes, of course.

4                THE COURT:  Right.  Of course.  Okay.  So somebody

5    is born, let's just say Massachusetts, and they're born in

6    Massachusetts, and they're a person who acquires birthright

7    citizenship.  Okay?  They -- Massachusetts has to give them,

8    recognize them as citizens of Massachusetts.  As a citizen of

9    Massachusetts, right?

10               MR. HAMILTON:  It does.

11               THE COURT:  And so why doesn't that fact that -- so

12   in that sense, that clause operates directly on the states.

13   Right?

14               MR. HAMILTON:  It does.  And candidly, I think

15   Your Honor has articulated a theory of standing that is

16   stronger than anything the plaintiffs have suggested.  They

17   did not make that argument.  Arguments in favor of standing

18   are forfeited.  But even then, I would still question the

19   state standing, because the 14th Amendment would just set a

20   floor for state citizenship.  It isn't necessarily the case

21   that the --

22               THE COURT:  But it severs the unitary connection.

23   The 14th Amendment established this unification between

24   citizenship of the United States and a state.

25               MR. HAMILTON:  It did.

1          THE COURT:  And your interpretation severs that, to

2     some degree, because it, first of all, narrows it, right?

3          MR. HAMILTON:  Yes.

4          THE COURT:  It puts it in a narrower interpretation

5     than theirs.

6          MR. HAMILTON:  It would affect who becomes a

7     citizen of the State, but, again, this is a forfeited

8     argument by the state and plaintiffs.

9          Turning, though, to the likelihood of success on

10    the merits --

11         THE COURT:  Well, I just -- okay.  I understand.

12    Go ahead.

13         MR. HAMILTON:  Plaintiffs -- none of the plaintiffs

14    show a likelihood of success on the merits, which, of course,

15    is also a requirement for a preliminary injunction.  That's

16    because all of the plaintiffs arguments rest on a misreading

17    of the 14th Amendment of the Constitution.  The 14th

18    Amendment was enacted to repudiate the US Supreme Court's

19    shameful decision in *Dred Scott vs. Sanford*, and ensure it

20    would never again be the law of this country that an

21    African-American might be denied American citizenship based

22    on his or her race.  But the framers of that amendment did

23    not intend to, and did not, in fact, create a loophole to be

24    exploited by temporary visitors to the country and illegal

25    aliens.  The 14th Amendment says that all persons --

1          THE COURT:  So just to stop you there.  So your
2     position is that the definition of who is and who is not a
3     birthright citizen, articulated in the EO is what the 14th
4     Amendment always meant?
5          MR. HAMILTON:  Yes.
6          THE COURT:  And so to the extent it's been
7     construed, understood, or applied differently, those are, as
8     you put it, misimpressions or misreadings?
9          MR. HAMILTON:  Yes.
10         THE COURT:  And am I correct that prior to -- well,
11    even up to today, people who the EO says don't -- are not
12    birthright citizens have been recognized by the United States
13    government as birthright citizens?
14         MR. HAMILTON:  Yes.  This would be a change in
15    policy.
16         THE COURT:  And so those people, under this Trump
17    administration, have been recognized as birthright citizens,
18    right?
19         MR. HAMILTON:  Yes, the policy was not slated to
20    take effect until the future.
21         THE COURT:  Right.  So even before -- putting aside
22    the injunctions issued by the other judges, the -- this
23    administration has been recognizing people who fall into
24    the -- who otherwise, executive order applied to, they have
25    been recognized as US citizens, right?

1          MR. HAMILTON:  Correct.  Nothing has changed in

2    executive practice.

3          THE COURT:  I'm not asking about change.  I'm

4    asking about --

5          MR. HAMILTON:  Yeah.

6          THE COURT:  The federal government has been

7    recognizing them as citizens, right?

8          MR. HAMILTON:  Yes.

9          THE COURT:  And that was true under the Biden

10   administration, right?

11         MR. HAMILTON:  Yes.

12         THE COURT:  And that was true under the first Trump

13   administration, right?

14         MR. HAMILTON:  Yes.

15         THE COURT:  And that was true at least back to

16   World War II, if not earlier.

17         MR. HAMILTON:  Yes.

18         THE COURT:  And so my question then is -- and your

19   interpretation is that -- or your view is that all of

20   those -- those are wrong.  Correct?

21         MR. HAMILTON:  Yes.

22         THE COURT:  So that, in fact, in law, really, the

23   people who were born -- who were born in the United States --

24   forgetting about the injunctions, but prior to February 19th,

25   okay, who are children of -- who would fall within the two

1     categories of executive orders, they are not -- the proper

2     reading of the clause one of the 14th Amendment, they are not

3     birthright citizens.

4               MR. HAMILTON:  That's right.

5               THE COURT:  So if that's true, then how do they

6     have citizenship?

7               MR. HAMILTON:  Well, this --

8               THE COURT:  And how do you lawfully -- like you

9     have just told me, essentially, that people that the federal

10    government is now recognizing as US citizens, even putting

11    before -- putting aside the injunctions, before the

12    injunctions were into place, whatever it was the other day,

13    that they were not -- they were -- you were recognizing

14    people as citizens who are not birthright citizens under the

15    United States Constitution, right?

16              MR. HAMILTON:  Right.  So the executive order is

17    forward looking only, and that is consistent with how the US

18    Supreme Court has handled the misapplication of

19    constitutional law in the immigration context previously.

20    The *Sessions vs. Morales-Santana* case corrected a -- a -- it

21    corrected a constitutional rule of law, and at the end of

22    that opinion, the Court announces that it is applying its

23    rule prospectively only, and so the path that this executive

24    order takes is consistent with that.

25              And I'd also note --

```
 1              THE COURT:  So you're suggesting that when you
 2    identify -- when -- the President's not the Supreme Court,
 3    right?  They're different.
 4              MR. HAMILTON:  Of course.
 5              THE COURT:  Right.  So you're suggesting that that
 6    principle, then, that you're articulating on behalf of the
 7    executive branch, is that the executive branch identifies an
 8    error in the application of constitutional law, that's what
 9    we're talking about, that's the executive branch's position,
10    right?
11              MR. HAMILTON:  Yes.
12              THE COURT:  And that then the executive branch can
13    choose or must apply it prospectively?
14              MR. HAMILTON:  Yeah, I don't know that we've taken
15    a position on that, but in this case, it was the President's
16    judgment that a forward-looking policy was --
17              THE COURT:  I'm asking what the law is.
18              MR. HAMILTON:  We haven't taken a position on that.
19              THE COURT:  So -- as you stand here now, you don't
20    know whether or not the executive branch has the authority to
21    make it not prospective or -- I'm sorry.  That's a bad
22    question.
23              Is it -- you don't know whether that you must make
24    it, under the law, prospective?
25              MR. HAMILTON:  Yeah, it's not something that we've
```

taken a position on, but the executive order's path is
consistent with the line that the US Supreme Court drew in
that *Sessions* case in recent turns.

THE COURT:  So you're not taking a position, either
way, as to whether or not it would be either required to say
to people who prior -- who are born prior to February 19th
that they don't have citizenship.  You're not taking a
position whether or not it's required for you to do that,
assuming you prevail on your view.

MR. HAMILTON:  Well, that is certainly not the
policy of the executive order.

THE COURT:  I understand.  Right.  The executive
order doesn't say that.  But my question is whether the
law -- you're not taking a position on whether the law, if
you're correct on the meaning of the Constitution, would
require to apply it to people before February 19th.

MR. HAMILTON:  Oh, no.  That is not something that
we're arguing.  We do not think of that as a requirement
under the *Sessions* case.

THE COURT:  You don't think the law requires you to
do that.

MR. HAMILTON:  Exactly.

THE COURT:  Okay.

MR. HAMILTON:  Apologies if I misunderstood
Your Honor's questions.

```
 1              THE COURT:  No problem.

 2              So -- and whether you have discretion to do that is

 3     something that you're not taking a position on now.

 4              MR. HAMILTON:  That's right.

 5              THE COURT:  Okay.  So your view is -- I don't want

 6     to put words in your mouth, I just want to make sure I

 7     understand.  You're not required -- your view is the law does

 8     not require, when you're correcting a constitutional

 9     interpretation, to apply it to all people who would be

10     subject to it.  You can apply it instead prospectively.

11              MR. HAMILTON:  That's right.

12              THE COURT:  So the law doesn't require that and

13     you're not taking a -- that is, you're not saying you do have

14     discretion to apply it retroactively -- or not retroactively.

15     You're saying you do -- you're not -- you're taking no

16     position as to whether or not you -- the executive branch has

17     the discretion to say to someone born before February 19th,

18     you're not a United States citizen, because you're not under

19     the proper interpretation of the clause.

20              MR. HAMILTON:  Correct, but it definitely is not a

21     requirement to do that.  The executive orders forward-looking

22     policy is consistent with law.

23              And I'd also note, because Your Honor referenced

24     that recent executive practice has been something different.

25     That recent Supreme Court decisions have -- have not been
```

1    afraid to chart a different course, despite recent practice.

2    For example, in the *Chadha* case, the legislative veto was on

3    the books --

4              THE COURT:  So your position is that -- well,

5    that's for the Supreme Court, right?  It's not for me to

6    chart a different course under constitutional law than the

7    Supreme Court has chartered, right?

8              MR. HAMILTON:  Supreme Court precedent is, of

9    course, binding, but we think that the language that

10    plaintiffs are leaning into is *dicta*.

11              THE COURT:  Right.  So your position is that the --

12    I can deny the injunction because this case is not controlled

13    by the Supreme Court precedent?

14              MR. HAMILTON:  Exactly.

15              THE COURT:  Okay.  I got it.  Go ahead.

16              MR. HAMILTON:  So I'll return to the 14th Amendment

17    citizenship clause, and specifically that subject to the

18    jurisdiction thereof clause, because that is what is at

19    issue --

20              THE COURT:  By the way, one of your arguments for

21    the subject, too, is that -- that it's premised on mutual

22    consent between the person and the polity, right?

23              MR. HAMILTON:  Yes.

24              THE COURT:  Okay.  That's that the polity, that's

25    that the government, right, consents to the person's

1    citizenship, right?

2         MR. HAMILTON:  Right.

3         THE COURT:  And that the person consents to being a

4    citizen, right?

5         MR. HAMILTON:  Yes.

6         THE COURT:  And you agree that the 14th Amendment,

7    that when it became -- the moment it became part of the

8    Constitution, the moment it was enacted and became law, that

9    the children born to enslaved people in the United States, at

10   that moment, they became citizens.  The US born, natural

11   born, born in the United States children of enslaved peoples,

12   they became citizens at that moment.

13        MR. HAMILTON:  Yes.

14        THE COURT:  But their parents, you agree, came to

15   the United States or many of them, in chains.

16        MR. HAMILTON:  (Nods head.)

17        THE COURT:  Yes?

18        MR. HAMILTON:  Yes.

19        THE COURT:  And they did not consent to come to the

20   United States, those people who came in chains.

21        MR. HAMILTON:  No.

22        THE COURT:  Any hesitation?

23        MR. HAMILTON:  Well --

24        THE COURT:  As to whether they consented to come to

25   the United States?

```
1              MR. HAMILTON:  No, they certainly did not.

2              THE COURT:  And they didn't consent to become part

3     of this polity, correct?

4              MR. HAMILTON:  No.

5              THE COURT:  So -- okay.  Well, that's just what I

6     wanted to understand the theory.  Go ahead.

7              MR. HAMILTON:  Yeah, I mean, obviously --

8              THE COURT:  But they did -- but their children

9     became citizens of the United States, if they were born in

10    the United States.

11             MR. HAMILTON:  Yes.  Yes.

12             THE COURT:  And that was one of the points of the

13    14th Amendment.

14             MR. HAMILTON:  Absolutely.  Absolutely.

15    Repudiating Dred Scott vs. Stanford was the central purpose

16    of the citizenship clause.

17             THE COURT:  But those people didn't consent.

18             MR. HAMILTON:  That's -- that's right, but it

19    was -- I mean, slavery --

20             THE COURT:  That is right, isn't it?

21             MR. HAMILTON:  Yes.  Yes.  Elk vs. Wilkins and Wong

22    Kim Ark.

23             THE COURT:  So consent wasn't a part of the meaning

24    of the 14th Amendment.

25             MR. HAMILTON:  Well, I don't think it's the sole
```

1    meaning of the subject to the jurisdiction thereof.  I'd

2    start with --

3              THE COURT:  But you've advanced that as an argument

4    that if you didn't -- if they didn't have those consents, you

5    were outside the scope of the 14th Amendment, but you just

6    agreed with me that there's a whole swath of people they had

7    in mind, who, in law, became citizens and that was their

8    intent.  That was the purpose of those words, and they didn't

9    consent.

10             MR. HAMILTON:  Right.  I think consent is

11   frequently relevant, but, perhaps, not with every

12   application.

13             Being born into the allegiance of the country is

14   the concept that *Elk vs. Wilkins* and *Wong Kim Ark* both

15   identify as -- as --

16             THE COURT:  Were those children, when they were

17   born in the United States, and they were enslaved, were they

18   born into allegiance to the United States?

19             MR. HAMILTON:  I'm sorry, I missed the first part.

20             THE COURT:  Were the children who were born in the

21   United States, who became citizens under the 14th Amendment,

22   when they were born, the relevant time is birth, right?

23             MR. HAMILTON:  Yes.

24             THE COURT:  When they were born, were they born

25   into allegiance to the United States?

1          MR. HAMILTON:  I think it would have to be

2    understood that way to reconcile that with *Wong Kim Ark* and

3    *Elk vs. Wilkins*.

4          I'd also want to highlight the Civil Rights Act of

5    1866, which is important because it was drafted by the

6    Congress at, basically, the same time that the 14th Amendment

7    was drafted by Congress, both were passed in the first half

8    of 1866.  And that act uses slightly different language.  It

9    says that all persons born in the US and not subject to any

10    foreign power, excluding Indians not taxed, are hereby

11    declared to be citizens.  And it was just a few months later

12    that the 14th Amendment was passed by the Congress and sent

13    out for ratification.

14          I know Your Honor has read our briefs.  I do want

15    to highlight one piece of legislative history in our briefs,

16    it's from Senator Lyman Trumbull who was one of the principle

17    authors of the 14th Amendment.  He said during the

18    congressional debates, what do we mean by subject to the

19    jurisdiction of the United States not owing allegiance to

20    anybody else.  That is what it means.  And that understanding

21    of subject to the jurisdiction thereof is --

22          THE COURT:  Owing no allegiance to anyone else.

23    That's your position, right?

24          MR. HAMILTON:  Right.

25          THE COURT:  Complete, with no allegiance to anyone

1    else, to another country.

2    MR. HAMILTON:  And that's what *Elk vs. Wilkins*

3    says.  It talks about direct and immediate allegiance and

4    that's language that reappears --

5    THE COURT:  So how can the -- you agree with me

6    that lawful permanent residents are obviously not citizens of

7    the United States, right?

8    MR. HAMILTON:  That's right.

9    THE COURT:  And they are, in most, if not all

10   cases, citizens of another country, right?

11   MR. HAMILTON:  Yes.

12   THE COURT:  And they owe allegiance, in some form,

13   to those other countries.

14   MR. HAMILTON:  Yes.  Yes.

15   THE COURT:  And yet their children -- you agree

16   that their children, if born in the United States, are

17   birthright citizens?

18   MR. HAMILTON:  Yes.  Because the common law

19   recognizes that --

20   THE COURT:  But they owe allegiance to other

21   people, their parents owe allegiance to another country.

22   MR. HAMILTON:  Right.

23   THE COURT:  But even if you owe allegiance to

24   another country, your child can be a birthright citizen.

25   MR. HAMILTON:  That's right.  The allegiance.

1          THE COURT:  So why is it complete.

2          MR. HAMILTON:  The allegiance inquiry doesn't turn

3     on whether there exists another allegiance based on some

4     foreign body of law, it turns on whether there's an

5     allegiance to the United States or not, under controlling

6     American law.  And the common law recognized that individuals

7     owe an allegiance to the country where their domicile is.

8     And so lawful permanent residents do have a domicile in the

9     United States, and so they have that allegiance to the United

10    States, as well.

11         I also want to say a few words about plaintiffs'

12    theory of the clause, because it makes subject to the --

13         THE COURT:  So if lawful permanent residents were

14    here and they -- the -- one of them was -- the mother was

15    pregnant, and then they went overseas, like, what is the

16    child's domicile -- you're saying it's the domicile of the

17    parents?

18         MR. HAMILTON:  Yes.  Well, if the parents went

19    overseas, then the child would not be born in the United

20    States.

21         THE COURT:  (Nods head.)

22         MR. HAMILTON:  But I do want to address plaintiffs'

23    theory.  The Doe plaintiffs say that subject to the

24    jurisdiction thereof means anyone --

25         THE COURT:  I'm sorry, wait.  So Canadians who

1    cross the border to give birth in an American hospital,

2    they're not birthright US citizens?

3         MR. HAMILTON:  Well, it would depend on whether

4    they were a citizen or lawful permanent resident.

5         THE COURT:  No, they're Canadian citizens, like in

6    some places, Canadians, the border is close.  They live --

7    many Canadians live close to the border.  If they happen to

8    either be in the United States for the day, for shopping, or

9    whatever, and went into labor, and went to a US hospital, or

10   maybe the closest medical facility is a US medical facility,

11   but for whatever reason -- a Canadian citizen who -- not

12   lawful permanent resident, just Canadian citizens, came over

13   to the hospital, gave birth there, then they wouldn't be

14   birthright citizens.

15        MR. HAMILTON:  That's right.  Temporary visitors to

16   the United States do not have a domicile in the United

17   States.  They do not owe an allegiance to the United States.

18        THE COURT:  So the allegiance comes from the

19   domicile of the parents.

20        MR. HAMILTON:  It does.  It does, as well as the

21   citizenship.

22        THE COURT:  Okay.  Go ahead.

23        MR. HAMILTON:  Again, the Doe plaintiffs say that

24   this clause applies to anyone to whom United States law

25   applies.  The states say that it means being subject to US

1    authority.  That would render subject to the jurisdiction

2    thereof redundant, because anyone who is in the United States

3    that would be true for.

4        Plaintiffs' theory also does not explain the

5    categories of individuals that *Elk* and *Wong Kim Ark* say are

6    not subject to the jurisdiction thereof.  *Elk* holds that

7    Indians are not subject to the jurisdiction thereof, but the

8    US can regulate Indian commercial activities, property, and

9    adoptions, can also punish Indians for crimes.  Foreign

10   diplomats are also subject to US law.  It's true that they do

11   have a limited immunity, but foreign diplomats can still be

12   sued in civil courts and that immunity is subject to

13   abrogation.  Surely it isn't the case that the citizenship

14   clause turns on Congress's expansion and contraction of

15   diplomatic immunity.

16       I also want to address the Plyler against --

17       THE COURT:  So that's not really the immunity that

18   they're talking about, right?

19       MR. HAMILTON:  I understood them to --

20       THE COURT:  I mean, police officers have qualified

21   immunity, right?

22       MR. HAMILTON:  Yes.

23       THE COURT:  Nobody is suggesting that because a

24   police officer has qualified immunity that if he has a

25   child -- the plaintiffs aren't suggesting that if he has a

1    child, that that's the kind of immunity that they're talking

2    about with respect to subject to the jurisdiction, assuming

3    the police officer is a citizen and has a child born in the

4    United States.  That's not the kind of immunity they're

5    talking about.  They're talking about --

6            MR. HAMILTON:  I agree.  They're talking about

7    diplomatic immunity, but that is still something that

8    Congress has the authority to alter.

9            THE COURT:  Yes.  But they were talking about its

10   understanding of what they were -- what they meant by those

11   words then, not whether there was any possibility of that

12   shifting.  I mean, in fairness, like their argument, you're

13   transforming their argument into a regulatory argument that

14   anybody to whom US law has any sort of application to.

15   That's not what their interpretation of what the subject to

16   means.

17           MR. HAMILTON:  I respectfully disagree.  I'll just

18   read from page 10 of the State's briefs.  They say that

19   subject to the jurisdiction thereof means, quote, "subject to

20   US authority."  And I think that's very difficult to square

21   at least with the *Elk vs. Wilkins* case, holding with respect

22   to Indians.

23           THE COURT:  If you interpret authority to mean the

24   application of any civil law to the person.

25           MR. HAMILTON:  Well, but also criminal.  There are

1    statutes.

2         THE COURT:  Well, civil or criminal.

3         MR. HAMILTON:  Yes.  Also, I'll say a few words on

4    scope of relief issues, since Your Honor asked my friends on

5    the other side about that.

6         THE COURT:  Yes, of course.

7         Before you get to that, I have one other, just,

8    question.

9         So this -- under the EO, citizenship turns -- you

10   agree with me that, before the EO, whether right or wrong,

11   misimpression, misreading or not, the way citizenship,

12   birthright citizen was applied was you just looked at where

13   the person was born, correct?  At least for within the United

14   States -- the 50 states.

15        MR. HAMILTON:  Well, no, because you do have

16   *Elk vs. Wilkins* and then the categories of individuals in

17   *Wong Kim Ark* that are recognized as not being subject to the

18   jurisdiction thereof.

19        THE COURT:  So there's a few people -- so in that

20   sense, you're saying even before the EO, or -- and the way

21   it's been done, a birth certificate alone -- determining the

22   fact that you were born here did not necessarily completely

23   resolve the question of whether you were a birthright

24   citizen.

25        MR. HAMILTON:  Yes.  And let me add one point to

1    the answer.  There is a statute, 8 USC 1401, that expands

2    citizenship --

3              THE COURT:  Sure.

4              MR. HAMILTON:  -- beyond the citizenship clause.

5    That is the reason that Indians have birthright citizens in

6    the United States.

7              THE COURT:  So but my -- under the EO, there is

8    a -- you are expanding the number of people who fall into the

9    category, who, merely looking at their birth certificate

10   doesn't establish their citizenship.

11             MR. HAMILTON:  That's right.  The EO mandates the

12   change of --

13             THE COURT:  So you would have to have -- in order

14   to have -- to determine whether someone is a citizen going

15   forward, not just on February 25th, but as this goes --

16   because the intent is to have this be -- this is the

17   proper -- the intent of the executive branch is that this is

18   how it should be forever, because that is how it was

19   established in 1868, right?

20             MR. HAMILTON:  Exactly.  The executive order wants

21   to align executive practice with what the law requires.

22             THE COURT:  Well, what the clause says.

23             MR. HAMILTON:  Yes, which is what the law and 8 USC

24   1401 requires.  Both are relevant authorities in determining

25   citizenship.

```
 1              THE COURT:  So to then determine who's a citizen,
 2    you have to look into who the parents are going forward,
 3    right?
 4              MR. HAMILTON:  Yes.
 5              THE COURT:  In almost every case, more so -- more
 6    and more as time goes forward?
 7              MR. HAMILTON:  Yes.  Yes.
 8              THE COURT:  And so -- well, one, doesn't that make
 9    citizenship more like bloodline citizenship as a general
10    proposition?
11              MR. HAMILTON:  I don't think so.  The rule that
12    we're proposing is both citizenship and domicile and --
13              THE COURT:  And to sort of, just as a practical
14    matter, to effectuate that, aren't you going to need a list
15    of people?
16              MR. HAMILTON:  I -- so the executive order directs
17    federal agencies to work through implementation issues during
18    the 30-day period.  That has not happened because of the
19    temporary restraining order.
20              THE COURT:  Well, presumably they started that
21    before.  Those orders only went into effect 48 hours ago.
22              MR. HAMILTON:  Oh, Your Honor, a federal judge in
23    Seattle entered --
24              THE COURT:  Oh, the TRO.  Right.  I forget about
25    that.  I'm sorry.  Yes, I forgot.
```

1          MR. HAMILTON:  So I'm not able to answer questions

2     about implementation.  That's something that the executive

3     order excepted.

4          THE COURT:  So you have no idea, for example,

5     whether or not this would require the federal government or

6     whether the -- what comes out of this is the federal

7     government would require every person -- keep a list of every

8     person, whether they were citizen or not, so that it could be

9     determined when the State Department was issuing passports or

10    whether there was any other question that they would need to

11    reference that list.  You have no idea whether or not that

12    that's what's contemplated?

13         MR. HAMILTON:  Correct.  It's Section 3 of the EO

14    that directs agencies to work on guidance and work through

15    the implementation issues.  That work was not allowed to go

16    forward under the TRO issued in Seattle just days after the

17    EO was signed.

18         THE COURT:  It doesn't prevent -- the TRO or the

19    PIs don't prevent thinking about that issue, right?

20         MR. HAMILTON:  I don't know that we've taken a

21    position on that, but it did -- it did enjoin Section 3, as

22    well as other portions of the executive order --

23         (Counsel confers.)

24         MR. HAMILTON:  And we've interpreted it as a

25    pencils down executive order -- or sorry.  A pencils down

1    temporary restraining order.

2              THE COURT:  I see.  Okay.  Go ahead.

3              MR. HAMILTON:  On the scope of relief, so the state

4    standing issue that I began with is important because the --

5              THE COURT:  So just turning back to that, it may be

6    or it may be not, but it may be that it would require

7    everybody to register, or maybe not.  You just don't know and

8    haven't addressed it.

9              MR. HAMILTON:  I can't --

10             THE COURT:  You can't answer.

11             MR. HAMILTON:  I can't answer any implementation

12   questions.

13             THE COURT:  Okay.  Go ahead.

14             MR. HAMILTON:  To the extent the Court is inclined

15   to enter injunctive relief, there should not be a nationwide

16   injunction.  The plaintiff states lack standing, and the

17   associational plaintiffs have acknowledged that their members

18   are limited to Massachusetts.  And so there's no

19   justification for a nationwide injunction, which also is

20   inconsistent with Article III authority, which is limited to

21   resolving cases and controversies not to setting nationwide

22   rules of policy applicable to parties not before the Court.

23             THE COURT:  When just circling -- I'm sorry.  Do

24   you have something else?

25             MR. HAMILTON:  No, Your Honor.

1          THE COURT:  Okay.  One last question about

2   forfeiting.  Does that principle come into play in the PI

3   when there hasn't been an answer, there hasn't been a motion

4   to dismiss?

5          MR. HAMILTON:  I think so.  I don't know how we

6   could --

7          THE COURT:  When did -- so at what point do people

8   forfeit standing arguments?

9          MR. HAMILTON:  Well, standing arguments are --

10          THE COURT:  There's a different question -- I'm

11   sorry to interrupt.  Let me just divide it.  I understand it

12   to say hey, they didn't address it, Judge, I didn't get a

13   chance to respond to it.  That's not a forfeit argument.

14   That's just an argument that it's not fair, either you

15   shouldn't consider it, or I should get a chance to respond,

16   but a forfeit argument is it's gone from the case.  That's

17   what you mean by forfeit.

18          MR. HAMILTON:  Right.  Right.

19          THE COURT:  And so my question is then do you

20   forfeit it if you don't articulate it in the complaint, or

21   like if they had -- when -- when are you locating it under

22   the federal rules that they forfeited it.

23          MR. HAMILTON:  For purposes of deciding this

24   motion, it is forfeited because it doesn't appear anywhere in

25   the papers, but I suppose Your Honor would have to anticipate

1    that the states would have a different standing theory in the

2    future that they haven't taken yet.  But again, even if that

3    happened, we don't think that theory of standing is

4    sufficient, because the citizenship clause is just setting a

5    floor for citizenship.  We don't see anything in there that

6    would prevent states.

7           THE COURT:  Well, doesn't it affect, for example,

8    if you lower the floor, that's essentially what you're doing.

9    You're saying you're lowering the floor back to what it

10   should be.  But you certainly -- however you characterize it,

11   you're lowering it, but it's a narrower floor, or a lower

12   floor than what they've articulated or what was previously

13   was misimpressed or --

14          MR. HAMILTON:  Yes.  Yes.

15          THE COURT:  So that effects states in terms of the

16   number of citizens in the state, right?

17          MR. HAMILTON:  In a sense.  But at bottom.

18          THE COURT:  Well, not in a sense.  I mean, the

19   Doe's child born here, without the executive order, would

20   have been treated as a birthright citizen, right?

21          MR. HAMILTON:  Yes.

22          THE COURT:  And so with the executive order, if

23   it's enforced, she would not be treated as a citizen, Doe's

24   child.

25          MR. HAMILTON:  That's right.  That's right.

1          THE COURT:  And so that -- actually, not in a
2     sense, that actually reduces by one the number of US citizens
3     in Massachusetts, right?
4          MR. HAMILTON:  Yes.  But, again, we're talking
5     about a theory of standing that plaintiffs have not argued.
6          THE COURT:  Right, but then you were explaining to
7     me why it didn't work as a theory.  That's what I'm wondering
8     about.
9          MR. HAMILTON:  Right.  Right.  And it also doesn't
10    work because the states would be able to still extend
11    citizenship to --
12         THE COURT:  But not United States citizenship --
13         MR. HAMILTON:  That's right.
14         THE COURT:  -- which would matter for various
15    things -- for example, apportionment -- aren't
16    representative's apportionment based on the population,
17    right?
18         MR. HAMILTON:  Yes.
19         THE COURT:  Or just population.  But aren't there
20    provisions in the Constitution, I think, that relate to the
21    number of citizens?
22         MR. HAMILTON:  There are provisions in the
23    constitution that relate to the number of citizens.  I'm not
24    prepared to spell them out all here.
25         THE COURT:  Right.  Okay.  Thank you.

1          MR. HAMILTON:  Thank you, Your Honor.

2          THE COURT:  Anything you want to say in response?

3          MR. SELLSTROM:  Thank you, Your Honor, and I'll be

4    brief, just a couple of points to respond to.  I think, in

5    particular, the colloquy between the Court and defense

6    counsel about the retroactive nature of the executive order

7    really highlights what the defendants are asking to do and

8    wanting to do, which is to take the place of what the Supreme

9    Court does.  The whole idea that there is an effective date

10   to the executive order and the particular categories that are

11   called out really shows that this is something that is not

12   executing laws and Constitution that exists now by asking to

13   change that.  The similar -- very similar in the arguments

14   that defense counsel was making about the *Wong Kim Ark* case

15   and domicile and subject to the jurisdiction of, all of those

16   arguments are specifically addressed by the *Wong Kim Ark* case

17   that domicile is not the controlling factor there, and that

18   the consent is not what is at issue here.  These are issues

19   that are addressed to the Supreme Court and are not

20   controlling law that exists today.  And that's from *Wong Kim*

21   *Ark*, along to the *Hintopoulos* case that we cited in note 11,

22   and all of the other cases that have since -- come since

23   then.

24          Finally, I just wanted to go to the point where the

25   state had said that they would consent to converting the

1     preliminary injunction hearing into a permanent injunction.

2     The Doe plaintiffs also agree with that, that on the record

3     that Your Honor has, should the Court be inclined to issue a

4     preliminary injunction, we believe a permanent injunction

5     would also be appropriate.

6                    THE COURT:  Okay.

7                    Anything else you want to add?

8                    MR. CEDRONE:  Two brief points on standing,

9     Your Honor.  First on the question of whether we've forfeited

10    standing on the basis of the sovereign harms to the

11    plaintiffs, we don't think we have, for the reason that your

12    question highlighted.  This is a preliminary posture, there

13    hasn't been an answer, there hasn't been a motion to dismiss.

14    We put forward in our PI papers what we think was the

15    clearest and most straightforward path to finding standing in

16    this case, with the limited space we had to do so.  I don't

17    think we forfeited other arguments.

18                    Your Honor has heard fulsome argument on it here

19    today, and to the extent you were -- had questions about the

20    basis for standing that we included in the papers, but

21    thought that there was another more straightforward path, we

22    could also put in supplemental briefing on that issue.

23                    I don't -- that brings me to my second point, which

24    is I don't think the Court needs to go down that path,

25    because the grounds for standing in the briefing make this a

1    very straightforward case.  The federal defendants rely on
2    *United States vs. Texas* to try to make this seem like a muddy
3    or fuzzy, in their words, issue.  This is not that case.
4    That case, the opinion of the Supreme Court was infused with
5    the fact that the plaintiff states in that case had a really
6    *sui generis* request.  They were asking federal courts to
7    issue a mandatory injunction to the federal government to
8    arrest more people.  And the Court's opinion made clear that
9    that was such an unprecedented request that it bore on the
10   state's standing.  Even assuming there's some kind of fuzzy
11   line between what's direct and what's indirect, this case is
12   clearly on the direct side of the line.
13           Your Honor can take everything that Mr. Hamilton
14   said about why the government views this case as not direct
15   and apply it to the situation in *Biden vs. Nebraska*, and
16   apply it to the situation in *Massachusetts vs. HHS*.  You're
17   familiar with the facts in *Biden vs. Nebraska*.  There were
18   student loans.  The President had a policy to forgive them.
19   That policy was obviously immediately directed at the student
20   loan holders, but it had a direct financial impact on MOHELA,
21   that state entity.
22           We're in the same position here.  We have a
23   contract with the federal government, for example, to process
24   Social Security numbers, and the federal government doesn't
25   dispute the factual premise that that contract, other

1    arrangements with the federal government, will result in a

2    direct financial harm -- or result in a financial harm to the

3    plaintiffs, and that is clearly direct within the meaning of

4    both *Biden vs. Nebraska*, and *Mass. vs. HHS* in the First

5    Circuit.

6              THE COURT:  Thank you.

7              MR. CEDRONE:  Thank you.

8              MR. DURAISWAMY:  Just one point, Your Honor, on

9    this issue of allegiance and owing allegiance to a foreign

10   power.  So again, I think it's unclear what the government

11   thinks allegiance means.  They don't -- what it means to owe

12   allegiance, they don't really say that.  To the extent that

13   it just means having a tie of some sort to another foreign

14   power, then that would apply equally to people who are lawful

15   permanent residents, and it would convert the citizenship

16   clause into something that absolute -- that prohibits dual

17   citizenship or dual nationality, which we know it does not.

18             What allegiance means, as *Wong Kim Ark* has

19   explained, is a duty to obey, and so owing allegiance to a

20   foreign power is problematic from the standpoint of the

21   citizenship clause only when, while you are in the United

22   States, you have a principal duty to a foreign power that is

23   effectively operating with the express or implied consent of

24   the United States, as Chief Justice Marshall explained in the

25   *Schooner Exchange*, where that foreign power is effectively

1  operating within the territorial boundaries of the United

2  States.

3           So that is the case with respect to tribal nations,

4  which were considered in the 19th Century to be alien powers

5  within the United States.  That is the case when there is a

6  hostile entity that is occupying part of the territory of the

7  United States, and that is the case when you have foreign

8  representatives of a foreign government, who are allowed into

9  the country, and are acknowledged to be essentially operating

10  within the United States as emissaries of their foreign

11  government.  It is not the case with respect to lawful

12  permanent residents, as -- which defendants do not dispute,

13  and there is no reason, if it's not the case with respect to

14  lawful permanent residents that it should be the case with

15  respect to those who are here long term, short term,

16  whatever, but who are not here under the domain and under the

17  auspices, or as representatives of a foreign power.

18           THE COURT:  Thank you.

19           You didn't have anything else, right?

20           MR. HAMILTON:  I'll just make one comment on

21  Rule 65, consolidation of trial on the merits with the PI.

22  We agree with that, with the Doe plaintiffs' concession that

23  their members are only in Massachusetts.

24           Thank you, Your Honor.

25           THE COURT:  That is your position, right?  They're

1    only in Massachusetts?  The members of the associations, for

2    purposes of preliminary and permanent relief.

3            MR. SELLSTROM:  That's right.

4            THE COURT:  Just one last question, Mr. Hamilton.

5            One of the things, just so I understand correctly,

6    that you're urging that I do is conclude that -- on the

7    merits, putting aside standing and cause of action, but on

8    the merits, deny the injunction, because the -- I have the --

9    you think I have the authority to do that within the case law

10   from the Supreme Court?

11           MR. HAMILTON:  Exactly.

12           THE COURT:  And you've read -- I'm not going to get

13   the name of the case right, there's a lot of cases that I've

14   read in the last two weeks, it's a 1985 decision by unanimous

15   Supreme Court, so nine to zero, Justice White, I think, wrote

16   the opinion for the Court *INS v.* -- I think it was *Rios*.  Are

17   you familiar with that case?

18           MR. HAMILTON:  I am not, Your Honor.

19           THE COURT:  Let me explain it to you and then

20   just -- I want to understand the position that you're urging

21   on me.

22           In that case, according to the Supreme Court, the

23   only opinion that they issued, the father and mother paid a

24   professional smuggler to illegally bring them into the United

25   States, and they came into the United States without

1    inspection.  So they would be undocumented, or illegal

2    aliens, or whatever term you want to use, right?  You agree?

3              MR. HAMILTON:  That sounds right.

4              THE COURT:  It seems right.  I'm just telling you

5    what they said as I read it, as I understand it.

6              And they then had a child in the United States,

7    according, again, to the opinion from the Supreme Court.  And

8    they, in immigration proceedings, asserted that to deport

9    them, the parents, was to *de facto* deport their child.  And

10   they lost that claim in the immigration proceedings and they

11   went to the Supreme Court.  And I think the question in the

12   Supreme Court turned on whether they were entitled to have --

13   it was a question of just the scope of the attorney general's

14   discretion to reopen that proceeding, given that was what

15   they were urging, and so that's the context of the case.

16             And you're in all of these cases, right?  Or are

17   you just in the case before me?

18             MR. HAMILTON:  You're asking about my role in the

19   different cases?

20             THE COURT:  Yeah.

21             MR. HAMILTON:  I --

22             THE COURT:  It doesn't matter.  You don't have to

23   tell me, but I would assume that all of you are talking to

24   each other, but you don't have to tell me that, either.

25             So in any event, the Supreme Court called that

1    child a United States citizen, born in the United States and,

2    therefore, was a citizen.  And so I guess my question is, I

3    know one answer you'll give me is the express holding of that

4    case was not -- the question -- I'm sorry, the question

5    presented to the Supreme Court was not was that child a

6    United States citizen, so, therefore, there's not a four

7    corners.  So that's one answer I'm sure you would give me,

8    right?

9            MR. HAMILTON:  Yes.  Yes.

10           THE COURT:  And so my related, follow-up question

11   is you're telling me that in the face of that context of that

12   case, where citizenship -- the underlying claim turned on the

13   citizenship of the child, that -- and the unanimous Supreme

14   Court saying those things, nonetheless, as a district judge,

15   I have the authority to say they're wrong, effectively.

16           MR. HAMILTON:  We read comments like that to be

17   *dicta*.  And *dicta* is something that even *Wong Kim Ark* talks

18   about.  *Wong Kim Ark* cites the *Cohens* case and warns against

19   overreading *dicta*.

20           THE COURT:  So your position is, (a), that

21   statement, assuming I've accurately described it to you, is

22   wrong --

23           MR. HAMILTON:  Yes.

24           THE COURT:  -- that the person was a United States

25   citizen.  The nine justices when they said that, they were

1    wrong.

2              MR. HAMILTON:  From my understanding of --

3              THE COURT:  From the way I've described it,

4    assuming if I've described it fairly.

5              MR. HAMILTON:  Yes.

6              THE COURT:  Then they would be wrong.

7              MR. HAMILTON:  Yes.  And I --

8              THE COURT:  And then I have -- because it's *dicta*,

9    in your view, as I've described it, then I have the authority

10   to disregard that?

11             MR. HAMILTON:  Yes.  But if I could add, our brief

12   does cite some post-*Wong Kim Ark* cases of the Supreme Court

13   decided in 1902 and 1920.  This is page 32 of our brief, that

14   include the domicile condition we've identified in stating

15   *Wong Kim Ark's* rule.  So I think there are conflicting --

16             THE COURT:  But the power of the 1985 decision

17   would be more -- since it's more recent since the 1902

18   decision, might have more -- neither -- not necessarily

19   binding.  I don't think it's a binding holding about that

20   question.  I'm only asking you, just a narrow question, and I

21   think your answer is yes, that I -- I think the answer is, A,

22   those nine justices were wrong when they said that, assuming

23   my recitation of the facts is correct.  They were wrong, and

24   B, I'm not bound by that.

25             MR. HAMILTON:  Yes.

1          THE COURT:  And therefore, I would be -- it would

2    be appropriate for me to not follow that statement.

3          MR. HAMILTON:  That's right.

4          THE COURT:  Okay.

5          MR. HAMILTON:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          MR. SELLSTROM:  Your Honor, could I raise one more

8    point on the issue of the membership?

9          THE COURT:  So just to be clear, so I'm only

10   bound -- in the view of the Department of Justice, I am only

11   bound to the four corners of holdings of the United States

12   Supreme Court?

13         MR. HAMILTON:  Well, I think the rules are also

14   applicable, but I don't think plaintiffs --

15         THE COURT:  No, no.  I'm just asking, am I bound --

16   I think what you're saying to me is I'm only bound by the

17   holdings?

18         MR. HAMILTON:  Yes.

19         THE COURT:  And not anything more.

20         MR. HAMILTON:  Yes.  Yes.

21         THE COURT:  And then I'm -- not -- so just the

22   holdings, that's all that binds me, in any case.

23         MR. HAMILTON:  And *dicta* can be disregarded.

24         MR. SELLSTROM:  The final point that I wanted to

25   make, Your Honor, on that was just to make sure the record is

1    clear, that the membership is primarily Massachusetts

2    residents.  I don't want to represent to the Court all of the

3    membership, but it is certainly primarily --

4              THE COURT:  I think the question -- what

5    Mr. Hamilton meant by that, and you'll correct me,

6    Mr. Hamilton, if I'm not reciting it accurately.  I think

7    what he meant by that is for purposes of this case in

8    deciding all of the issues in play, by the motion, I should

9    decide it as if the members were only from Massachusetts, not

10   that that -- and that assumption would not be binding in any

11   other case involving the association, simply that we would be

12   deciding that that's what this case was deciding.

13              That's -- is that what you were saying,

14   Mr. Hamilton?

15              MR. HAMILTON:  Yes, Your Honor.

16              THE COURT:  That's how I understand.

17              MR. SELLSTROM:  That is correct in terms of

18   primarily membership that is residents of Massachusetts,

19   correct.

20              THE COURT:  So if I proceed to final determination,

21   I should -- I would be assuming and accepting, just for

22   purposes of this case, that the only association members are

23   in Massachusetts.

24              MR. SELLSTROM:  That's correct, Your Honor.

25              THE COURT:  Okay.  And that just to be clear, so,

1    like, that wouldn't bind -- you could come forward in the

2    next case, filed in four minutes or in four years, or

3    whenever, and take the position that members of the

4    association, some, many, lots of them, are elsewhere, and you

5    wouldn't be bound by this assumption or this determination

6    that I made, even if it's necessary to the judgment, right?

7                MR. SELLSTROM:  Yes, Your Honor.

8                THE COURT:  You agree with that, Mr. Hamilton?

9                MR. HAMILTON:  Yes, Your Honor.

10                THE COURT:  Okay.  All right.  So I'll take it

11    under advisement.  I intend to issue a written decision

12    promptly, but I don't think you should expect it today, and I

13    want to think about all the issues.  They're important and

14    serious, and I thank you very much.  You have a good day.

15                (Court in recess at 11:29 a.m.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of February, 2025.


/s/ RACHEL M. LOPEZ


_____
Rachel M. Lopez, CRR
Official Court Reporter