UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil No. 25-10135-LTS |
| | ) |
| DONALD J. TRUMP et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| STATE OF NEW JERSEY et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil No. 25-10139-LTS |
| | ) |
| DONALD J. TRUMP et al., | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

In this pair of lawsuits, two groups of plaintiffs advance similar challenges to the legality

of one executive order among many issued by President Donald Trump on January 20, 2025.

The executive order is titled "Protecting the Meaning and Value of American Citizenship" ("the

EO").  Exec. Order No. 14,160 (Jan. 20, 2025).[1]  The EO identifies two "categories of

---

[1] Multiple copies of the EO have been made part of the record before the Court.  When
referencing submissions filed in Doe et al. v. Trump et al., No. 25-cv-10135, the Court will cite
to "Doe, Doc. No. __ at __."  For submissions filed in New Jersey et al. v. Trump et al., No. 25-
cv-10139, the Court will cite to "New Jersey, Doc. No. __ at __."  All such citations use the
document and page numbering appearing in the ECF header, except where pinpoint citations

individuals born in the United States" to whom the EO says "the privilege of United States citizenship does not automatically extend," then directs federal departments and agencies to cease issuing or accepting "documents recognizing United States citizenship" for such individuals born after February 19, 2025.  <u>Doe</u>, Doc. No. 1-1 §§ 1-3.

Both groups of plaintiffs assert that the EO violates the Citizenship Clause of the Fourteenth Amendment to the United State Constitution, along with other constitutional provisions and federal statutes.  Each group seeks a preliminary injunction preventing the EO from taking effect.  <u>Doe</u>, Doc. No. 10; <u>New Jersey</u>, Doc. No. 3.  The motions are fully briefed and were the subject of a motion hearing.[2]

In opposing the requests for injunctions, the defendants assert an array of arguments, which the Court addresses briefly here and in detail below.  For starters, each plaintiff has standing to sue, because the uncontested facts establish each would suffer direct injury from the EO's implementation.  The plaintiffs are also likely to succeed on the merits of their claims.  In a lengthy 1898 decision, the Supreme Court examined the Citizenship Clause, adopting the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO.  The rule and reasoning from that decision were reiterated and applied in later decisions, adopted by

---

reference enumerated sections or paragraphs within the document.  The EO appears at <u>Doe</u>, Doc. No. 1-1, and <u>New Jersey</u>, Doc. No. 1-1.

[2] The Court has accepted amicus curiae briefs from the following groups: a collection of local governments and officials representing seventy-two jurisdictions in twenty-four states; eighteen members of Congress serving on the House Judiciary Committee; the Immigration Reform Law Institute; the State of Iowa along with seventeen other states; the State of Tennessee; and former U.S. Attorney General Edwin Meese III.  <u>Doe</u>, Doc. Nos. 32, 38, 40; <u>New Jersey</u>, Doc. Nos. 88, 118, 120, 122, 127, 129.  The Court has considered these submissions only insofar as they concern legal issues and positions advanced by the parties.  <u>See</u> <u>United States v. Sturm, Ruger & Co.</u>, 84 F.3d 1, 6 (1st Cir. 1996) (explaining "an amicus cannot introduce a new argument into a case").  While several of these briefs were helpful, the submission by the State of Tennessee was especially well written.

Congress as a matter of federal statutory law in 1940, and followed consistently by the Executive Branch for the past 100 years, at least. A single district judge would be bound to apply that settled interpretation, even if a party were to present persuasive arguments that the long-established understanding is erroneous.

The defendants, however, have offered no such arguments here. Their three main contentions are flawed. First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive, as the defendants contend. Applying the defendants' view of allegiance would mean children of dual citizens and lawful permanent residents would not be birthright citizens—a result even the defendants do not support. Next, the defendants argue birthright citizenship requires the mutual consent of the person and the Nation. This theory disregards the original purpose of the Fourteenth Amendment: to recognize as birthright citizens the children of enslaved persons who did not enter the country consensually, but were brought to our shores in chains. There is no basis to think the drafters imposed a requirement excluding the very people the Amendment aimed to make citizens. Simply put, the Amendment is the Nation's consent to accept and protect as citizens those born here, subject to the few narrow exceptions recognized at the time of enactment, none of which are at issue here. Finally, the Amendment requires states to recognize birthright citizens as citizens of their state of residence. The text includes no domicile requirement at all.

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause. The Fourteenth Amendment says nothing of the birthright citizen's parents, and efforts

to import such considerations at the time of enactment and when the Supreme Court construed the text were rejected. This Court is likewise bound to reject such theories now.

The plaintiffs have also satisfied the other preliminary-injunction factors. Each plaintiff faces irreparable harm, the defendants face none, and the public interest favors enjoining the EO. Accordingly, the plaintiffs in each case are entitled to an injunction preventing implementation of the EO. The individual and two associations who are plaintiffs in the earlier-filed action will be fully protected by an injunction limited to the individual and the members of the associations. The later-filed case, brought by eighteen states and two cities, requires a broader, nationwide injunction. Applying traditional equity principles, such relief is necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions.

For these reasons, the plaintiffs' motions are ALLOWED. This ruling, explained further below and memorialized in separate Orders issued concurrently with this Memorandum, is based on straightforward application of settled Supreme Court precedent reiterated and reaffirmed in various ways for more than a century by all three branches of the federal government.

I.    BACKGROUND

Within hours of taking office, the President signed the EO, which he describes as "an integral part of [his] broader effort to repair the United States' immigration system and to address the ongoing crises at the southern border." Doe, Doc. No. 22 at 14. The EO, however, does not directly concern immigration; rather, it seeks to define the scope of birthright citizenship in the United States. In the section stating its purpose, the EO acknowledges that the Citizenship Clause and a section of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1401, confer citizenship on any person born in the United States and "subject to the jurisdiction thereof." Doe, Doc. No. 1-1 § 1. The EO goes on to identify two "categories of individuals born

4

in the United States" but "not subject to the jurisdiction thereof," to whom birthright citizenship "does not automatically extend." Id. A child falls within one of the identified categories if, at the time of their birth, their father was neither a citizen nor a lawful permanent resident ("LPR") of the United States, and their mother was 1) "unlawfully present in the United States," or 2) lawfully but temporarily present in the United States "(such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)." Id.

The second section announces that it is "the policy of the United States that no department or agency" of the federal "government shall issue [or accept] documents recognizing United States citizenship" of children within the identified categories. Id. § 2. The stated policy "shall apply only to persons who are born" after February 19, 2025. Id. The EO expressly does not restrict the ability of U.S.-born children of LPRs to receive or use documents recognizing "their United States citizenship." Id. Next, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with" the EO, and that no one within any identified department "act[s], or forbear[s] from acting, in any manner inconsistent with" the EO. Id. § 3(a). The EO further requires "[t]he heads of all executive departments and agencies" to "issue public guidance" by February 19, 2025, regarding implementation of the EO. Id. § 3(b).

In a complaint filed the day the EO issued, an individual plaintiff and two nonprofit associations challenged its legality and sought equitable relief preventing its implementation. See generally Doe, Doc. No. 1. The individual plaintiff, proceeding under the pseudonym "O. Doe," is "an expectant mother" who is lawfully present in the United States "through Temporary

Protected Status" ("TPS").  Id. ¶ 13.  Doe's husband, the father of the child due to be born next

month, is neither a citizen nor LPR of this country.  Id.  The baby will be Doe's second child; her

first, now seven years old, also was born in the United States.  Doe, Doc. No. 11-1 ¶ 3.

Doe's co-plaintiffs are La Colaborativa and the Brazilian Worker Center, two

membership organizations located in eastern Massachusetts who provide immigration-related

assistance, among other services.  Doe, Doc. No. 1 ¶¶ 14-15.  Both organizations have members

who are unlawfully present in the United States, some of whom "are either pregnant or plan to

grow their families in the future."  Id.; see Doe, Doc. No. 11-2 ¶ 4; Doe, Doc. No. 11-3 ¶¶ 8-10.

Though the present record does not conclusively establish where the organizations' members

live, counsel at the motion hearing suggested the Court could view the members as located

"primarily" (though perhaps not exclusively) in Massachusetts.  Mot. Hr'g Tr. at 10, 76.[3]  Doe

and the organizations' members have submitted unrebutted declarations describing the harms

they allege the EO will cause the children it targets, who will be treated as noncitizens lacking

any recognized, lawful immigration status.  See generally Doe, Doc. Nos. 11-1 to -3.

The day after Doe and her co-plaintiffs filed suit, New Jersey and a group of seventeen

other states, along with the District of Columbia and San Francisco (collectively, "the State

plaintiffs"), instituted a separate action also challenging the EO under provisions of the

Constitution and other federal statutes.[4]  New Jersey, Doc. No. 1.  Along with their complaint,

---

[3] The transcript of the February 7, 2025, hearing on the motions appears on both dockets.  Doe,
Doc. No. 44; New Jersey, Doc. No. 142.
[4] Besides New Jersey, the plaintiffs in this action are Massachusetts, California, Colorado,
Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan (through its Attorney General),
Minnesota, Nevada, New Mexico, New York, North Carolina, Rhode Island, Vermont, and
Wisconsin.  Venue is proper in the District of Massachusetts because the defendants are all
officers or agencies of the United States, and at least one plaintiff in each case resides in
Massachusetts.  See 28 U.S.C. § 1391(e)(1)(C).

the State plaintiffs filed a motion for a preliminary injunction supported by a memorandum and more than two dozen exhibits.  New Jersey, Doc. Nos. 3, 5, 5-1 to -27.  The exhibits include declarations by various representatives of state agencies describing financial and administrative burdens they anticipate will result from the EO.  See, e.g., New Jersey, Doc. Nos. 5-2, 5-8, 5-14, 5-18 (describing impacts of EO on federal funding related to state health insurance programs, education, foster care, and hospital-based process for acquiring Social Security numbers at birth).

Both complaints name as defendants the President, the State Department, the Secretary of State, the Social Security Administration, and the Acting Commissioner of Social Security.  The State plaintiffs also sued the United States, the Department of Homeland Security, the Secretary of Homeland Security, the Department of Health and Human Services, and the Acting Secretary of Health and Human Services.

On January 23, 2025, the Doe plaintiffs filed their own motion for a preliminary injunction, supporting memorandum, declarations, and other exhibits.  Doe, Doc. Nos. 10, 11, 11-1 to -10.  After hearing from the parties, the Court deemed the cases related to one another and set a consolidated briefing schedule.  New Jersey, Doc. No. 71; Doe, Doc. No. 12.  The defendants opposed both motions, challenging the State plaintiffs' standing to sue, arguing no plaintiff has advanced a valid cause of action, and urging that the plaintiffs have not satisfied the test governing preliminary-injunctive relief.  See generally Doe, Doc. No. 22.  Both sets of plaintiffs replied.  Doe, Doc. No. 33; New Jersey, Doc. No. 123.  The Court heard argument from all parties on February 7, 2025.

II.  DISCUSSION

Before addressing the factors governing requests for injunctive relief, the Court disposes of two preliminary challenges that the defendants suggest foreclose consideration of the merits of the plaintiffs' motions.  As the Court will explain, the defendants' opening pair of procedural

challenges, like their substantive arguments opposing the motions, wither in the face of settled and binding Supreme Court precedent.

    A.    <u>Threshold Issues</u>

        1.   *Standing*

The defendants first argue that the State plaintiffs lack standing to bring the claims alleged in their complaint.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-22.  They are wrong.

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).  To establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).  This test is satisfied if state- or local-government plaintiffs show that an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which they otherwise would be entitled.  <u>See</u> <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 767 (2019).  Such a showing establishes injury that is "sufficiently concrete and imminent" and "fairly traceable" to the challenged action, thereby satisfying Article III.  <u>Id.</u>

The State plaintiffs easily meet this standard.[5]  Uncontested declarations from officials representing several State plaintiffs articulate various forms of federal funding that will be

---

[5] The defendants direct their standing challenge against the State plaintiffs as a group.  They have not contested the showing made by any individual State plaintiff or subset of State plaintiffs.  Even if the defendants had done so, the result would be the same.  The record before the Court includes sworn declarations establishing standing on the part of at least several State plaintiffs.  No more is required at this juncture.  <u>See</u> <u>Nebraska</u>, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); <u>United States v. Texas</u>, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

diminished as a direct result of the EO.  States receive federal funding to cover portions of services like health insurance, special education, and foster care in amounts that depend on how many "eligible" children receive such services.  Citizenship is one component of eligibility for purposes of these programs.  Pursuant to the EO, fewer children will be recognized as citizens at birth.  That means the number of persons receiving services who are "eligible" under the identified federal programs will fall—and, as a direct result, the reimbursements and grants the State plaintiffs receive for these services will decrease.  The reduction to such funding is a concrete and imminent injury directly and fairly traceable to the EO, redressable by the injunctive relief the State plaintiffs seek.

This is all the Constitution requires.  Two decisions of the Supreme Court, both authored by Chief Justice Roberts, make the point.  In 2023, the Chief Justice, joined by five other Justices, explained that Missouri had standing to challenge executive action discharging federal student loans, where a quasi-state agency stood to lose fees it would have collected for servicing the forgiven loans.  Nebraska, 143 S. Ct. at 2366.  A few years earlier, the Chief Justice conveyed the Supreme Court's unanimous conclusion that "at least some" states had standing to challenge executive action revising the United States census.  New York, 588 U.S. at 767-68.[6] The proposed changes at issue raised the likelihood that persons without lawful immigration status would be undercounted, and states faced reductions in federal funds allocated according to population.  Id.  The State plaintiffs here challenge the EO based on precisely the same sort of direct financial impacts.  They have identified federal grants and reimbursements to which they

---

[6] Though some Justices parted ways as to other issues in the case, all agreed as to standing.

are entitled that will diminish under the EO.  As in Nebraska and New York, therefore, the State plaintiffs have Article III standing.[7]

The defendants have neither disputed the State plaintiffs' showing of harm nor materially distinguished the Chief Justice's analysis.  Their standing challenge hinges on an attempt to analogize this case to United States v. Texas.  There, the Supreme Court held state plaintiffs lacked standing to compel the federal government to pursue more "arrests and prosecutions" for violations of immigration laws.  599 U.S. at 678-79.  The analogy is inapt.[8] Texas involved "novel" theories of standing and a "highly unusual" claim that the Executive Branch was not sufficiently vigorous in exercising its prosecutorial discretion.  Id. at 681, 684. This case, however, concerns the bounds of citizenship guaranteed by the Constitution—not an

---

[7] The Court does not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it.  The State plaintiffs also probably have standing based on their sovereign interests.  The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside.  U.S. Const. amend. XIV, § 1. States have general sovereign interests in which persons are their citizens.  They very likely also have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship.  E.g., N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws ch. 234A, § 4.  The defendants essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories, but suggested the theories were "forfeited," at least "[f]or purposes of deciding [the pending] motion[s]," because they were not advanced in the State plaintiffs' submissions thus far.  Mot. Hr'g Tr. at 40, 63.  The defendants cited no authority for their forfeiture theory.  The plaintiffs generally endorsed the sovereign-interest theories during the hearing.  Given the strength of the plaintiffs' showing of direct financial harms, the Court need not resolve whether the State plaintiffs' sovereign interests supply an alternative basis for satisfying Article III.

[8] In fact, the defendants' discussion of Texas in their papers verges on misleading.  The language upon which they most heavily rely appears in a footnote quoted in their opposition memorandum and referenced during the motion hearing.  See New Jersey, Doc. No. 92 at 18-19 (quoting Texas, 599 U.S. at 680 n.3).  Contrary to the defendants' characterization, that footnote is not a "holding," and it does not "foreclose[]" the State plaintiffs' standing in this case.  Id.  Rather, it acknowledges that "States sometimes have standing to sue . . . an executive agency or officer," and though it warns that "standing can become more attenuated" when based on "indirect effects" of federal action, it stops short of saying such effects could never satisfy Article III.  Id. This case, in any event, concerns direct effects.

area typically reserved for executive discretion.  The theory of standing advanced by the State

plaintiffs—direct financial harm—is ordinary.[9]  Texas simply does not aid the defendants here.

The defendants have not challenged the standing of Doe or her co-plaintiffs to sue—nor

could they.  Doe has plainly established injury, to herself and her unborn child, that is concrete,

imminent, traceable to the EO, and redressable by the relief she seeks in this lawsuit.  The same

is true of the association plaintiffs, which provide services impacted by the EO and have

described one or more members facing the same type of injury as Doe.  See Summers v. Earth

Island Inst., 555 U.S. 488, 498 (2009) (requiring, for associational standing, "specific allegations

establishing that at least one identified member had suffered or would suffer harm"); see also

United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 551-53 (1996)

(describing test for associational standing).

Accordingly, the defendants' standing challenge fails.  All plaintiffs before the Court

have satisfied Article III.

### 2.  *Cause of Action*

Next, the defendants assert the Court must deny the pending motions because no plaintiff

has a valid cause of action under the Citizenship Clause or the identified federal statutes.  This is

meritless.

As Justice Scalia observed, "[t]he ability to sue to enjoin unconstitutional actions by state

and federal officers is the creation of courts of equity, and reflects a long history of judicial

---

[9] The harms the State plaintiffs have identified are not "indirect"—indeed, when specifically
asked, the defendants failed to identify any "extra step" separating the loss of funding identified
by the State plaintiffs from the EO's direct effects.  Mot. Hr'g Tr. at 37-39.  Nor do they arise, as
defendants argue, exclusively from services "the states have *voluntarily* chosen to provide."
New Jersey, Doc. No. 92 at 20; see Plyler v. Doe, 457 U.S. 202, 230 (1982) (holding states are
required by federal law to provide public education services to all children, regardless of
immigration status).

review of illegal executive action, tracing back to England." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law" planned or committed by "state officers" or "by federal officials." Id. at 326-27. The plaintiffs here ask the Court to do just that.[10]

Limitations that apply where plaintiffs seek damages, rather than equitable relief, have no bearing on the claims pending here. See New Jersey, Doc. No. 92 at 24 (citing DeVillier v. Texas, 601 U.S. 285, 291 (2024)). Nor can the defendants short-circuit this lawsuit by pointing to a narrow provision of the INA providing an avenue for a "national of the United States" to challenge discrete denials of rights or privileges. See id. (invoking 8 U.S.C. § 1503(a)). That statute does not facially create an exclusive remedy for such claims, nor does it offer an adequate alternative to the claims advanced in these actions—including, but not only, because it is not a mechanism through which the State plaintiffs can obtain relief. Cf. Rusk v. Cort, 369 U.S. 367, 375 (1962) (considering related provisions of same statute and concluding they were not exclusive means of asserting rights associated with citizenship).

The defendants' threshold challenges fail under clear Supreme Court precedent. The plaintiffs assert valid causes of action and have standing to pursue them. The Court, therefore, turns to the substance of the pending motions.

---

[10] In fact, the Department of Justice is doing precisely what it says the plaintiffs cannot do. The day before this Court's motion hearing, the United States sued Illinois and various state and local officials, seeking equitable relief via claims brought directly under the Supremacy Clause. See Compl., United States v. Illinois, No. 25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; cf. New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (discussing equitable doctrine of "judicial estoppel," which in some circumstances prevents parties that have taken one legal position from reversing course "simply because [their] interests have changed" (cleaned up)). During the motion hearing, the State plaintiffs raised this issue, and the defendants offered no response.

B.    <u>Preliminary Injunction Analysis</u>[11]

The familiar standard governs the plaintiffs' requests for interlocutory relief.  To secure

the "extraordinary remedy" provided by preliminary injunctions, each group of plaintiffs "must

establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer

irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their]

favor," and 4) "an injunction is in the public interest."  <u>Winter v. Nat. Def. Res. Council, Inc.</u>,

555 U.S. 7, 20 (2008).

"The first two factors of the traditional standard are the most critical."  <u>Nken v. Holder</u>,

556 U.S. 418, 434 (2009).  Courts consider them in tandem.  <u>See</u> <u>Vaqueria Tres Monjitas, Inc. v.</u>

<u>Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but

rather "a sliding scale, working in conjunction with" the first factor); <u>EEOC v. Astra U.S.A.,</u>

<u>Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a

movant can show somewhat less in the way of irreparable harm and still garner preliminary

injunctive relief.").  The third and fourth factors of the injunction test "merge when the

Government is the opposing party."  <u>Nken</u>, 556 U.S. at 435.

---

[11] The defendants proposed, in a footnote, that the Court proceed now to enter or deny a final, permanent injunction.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 50 n.6.  The plaintiffs expressed no objection to this proposal during the motion hearing, agreeing that the Court could now enter a final injunction if it concluded an injunction was warranted.  After consideration, the Court resolves now only the plaintiffs' original requests for preliminary relief.  The defendants are correct that the plaintiffs' causes of action "are purely legal," <u>id.,</u> but they are wrong to imply that facts are immaterial here.  The test for injunctive relief requires the plaintiffs to prove, and the Court to evaluate, questions of harm that bear on the scope of any permanent relief ultimately awarded.  Though the defendants have leveled no challenges to the plaintiffs' factual submissions, the Court has an independent duty to ensure that any relief provided is appropriately tailored to address the harms established by the parties before it.  <u>Cf.</u> <u>DraftKings</u> <u>Inc. v. Hermalyn</u>, 118 F.4th 416, 423 (1st Cir. 2024) (noting trial judge is "uniquely placed to design" injunctive relief that corresponds to "specific harm" proven based on facts found by judge).  To that end, further factual development may be required before the Court crafts a final judgment.

Measured against these standards, the plaintiffs' submissions support entry of the injunctions they seek, with only minor adjustments explained below.

    1. *Likelihood of Success*

"The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). This factor weighs strongly in the plaintiffs' favor. The plain language of the Citizenship Clause—as interpreted by the Supreme Court more than a century ago and routinely applied by all branches of government since then— compels a finding that the plaintiffs' challenges to the EO are nearly certain to prevail.

The Citizenship Clause speaks in plain and simple terms. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The words chosen by the drafters and ratified by the states, understood "in their normal and ordinary" way, United States v. Sprague, 282 U.S. 716, 731 (1931), bestow birthright citizenship broadly to persons born in the United States. The text is directed at the person born (or naturalized). It does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents. So, at the outset, the EO and its focus on the immigration status of a child's parents find no support in the text.

One phrase in the Citizenship Clause is at the heart of the parties' disagreement. The constitutionality of the EO, and the success of the plaintiffs' claims, turns on the meaning of "subject to the jurisdiction thereof." To understand that phrase, however, this Court need look no further than United States v. Wong Kim Ark, 169 U.S. 649 (1898).[12] In that case, the

---

[12] In a line of cases not directly relevant here, courts have considered whether a person born in an unincorporated territory of the United States—such as American Samoa or, for a time, the

Supreme Court meticulously reviewed the contours of citizenship under English and early

American common law, under the 1866 Civil Rights Act and the Fourteenth Amendment, and as

reflected in legal scholarship and court decisions in the decades leading up to the turn of the

twentieth century.  See generally id. at 653-704.  From these sources, the Supreme Court

concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and

fittest words," the following categories of persons: "children of members of the Indian tribes,"

"children born of alien enemies in hostile occupation, and children of diplomatic representatives

of a foreign state."[13]  Id. at 682.  As to all other persons, "the fundamental rule of citizenship by

birth within the dominion of the United States, notwithstanding alienage of parents," applied.  Id.

at 689.[14]

Applying this longstanding and "fundamental rule of citizenship," the Supreme Court

held that the petitioner—born in the United States to Chinese-citizen parents, who were living

and working in the United States at the time of the child's birth, but who were prevented by law

from naturalizing and eventually returned to China—was a citizen "by virtue of the

---

Philippines—was born "in the United States" for purposes of the Citizenship Clause.  E.g.,
Tuaua v. United States, 788 F.3d 300, 302 (D.C. Cir. 2015).  That language is not the focus of
the present dispute, nor was it the Supreme Court's focus in Wong Kim Ark.

[13] Neither the EO nor the defendants' brief has suggested that all (or any) persons within the
EO's categories are "children born of alien enemies in hostile occupation," specified which
portions of the country are presently so occupied, or identified which foreign powers or
organizations are the "enemies" presently controlling those areas.  See New Jersey, Doc. No. 92
at 38 (quoting another Executive Order and summarily stating that plaintiffs' view might grant
citizenship to children of "unlawful enemy combatants who enter this country in an effort to
create sleeper cells or other hostile networks").  Accordingly, the Court need not consider this
exception to birthright citizenship.

[14] This rule has been reiterated by the Supreme Court.  See, e.g., Perkins v. Elg, 307 U.S. 325,
329 (1939) (citing Wong Kim Ark majority's "comprehensive review" supporting "decision . . .
that a child born here of alien parentage becomes a citizen of the United States"); Weedin v.
Chin Bow, 274 U.S. 657, 660, 670 (1927) (stating "learned and useful opinion" of Wong Kim
Ark majority "held that . . . one born in the United States, although . . . of a parentage denied
naturalization under the law, was nevertheless . . . a citizen" under Fourteenth Amendment).

[C]onstitution itself." Wong Kim Ark, 169 U.S. at 652-53, 703-05.  This holding followed

"irresistibly" from the extensive analysis the majority articulated.  Id. at 693.  Throughout that

analysis, the availability of birthright citizenship "irrespective of parentage" was repeatedly

emphasized.  E.g., id. at 690.  The duration of the parents' residency in the United States was not

assessed, nor did laws preventing the parents from seeking naturalization influence the Court's

determination of the petitioner's status.  The question was resolved, for purposes of the

Citizenship Clause, by the location of the petitioner's birth, and the inapplicability of the narrow

exceptions to birthright citizenship that had been identified by the Court.  Understood this way—

indeed, the way all branches of government have understood the decision for 125 years—Wong

Kim Ark leaves no room for the defendants' proposed reading of the Citizenship Clause.  Of

course, the defendants can seek to revisit this long-settled rule of law, but that is a matter for the

Supreme Court, not a district judge.

The defendants accept that this Court is bound by the prior holdings of the Supreme

Court.  See New Jersey, Doc. No. 92 at 44; Mot. Hr'g Tr. at 48.  Nevertheless, they urge the

Court to essentially ignore all but a handful of sentences from Wong Kim Ark, arguing the bulk

of the majority's lengthy opinion is dicta.  See New Jersey, Doc. No. 92 at 44 (urging Wong Kim

Ark resolved only whether Citizenship Clause extended to "children of parents with 'a

permanent domicile and residence in the United States,'" and that "[t]he case should not be read

as doing anything more than answering that question" (quoting 169 U.S. at 653)).  At the motion

hearing, the defendants doubled down on this point, brazenly claiming that "dicta can be

disregarded."  Mot. Hr'g Tr. at 75.  That position reflects a serious misunderstanding at best—

and a conscious flouting at worst—of the judicial process and the rule of law.

Lower federal courts are not merely obligated to apply the holdings of Supreme Court decisions; they also "are bound by the Supreme Court's 'considered dicta.'" United Nurses & Allied Prof'ls v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)). "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). If such a statement "bears the earmarks of deliberative thought purposefully expressed," concerns an issue that was "thoroughly debated in the recent past," and "has not been diluted by any subsequent pronouncement" of the Supreme Court, a lower federal court must adhere to it. Id.

To the extent the thorough analysis in Wong Kim Ark of the Fourteenth Amendment's common-law foundations, the purpose and intent of its drafters, and its application during the first thirty years after its ratification can be called "dicta" at all, it is undoubtedly the "considered" and "authoritative" sort that this Court is bound to apply. The sheer detail and length of the discussion by the Court's majority make this plain. Add to that the fact that the opposite view—the one the defendants advance to justify the EO—was rejected by the majority in Wong Kim Ark (in the portions of the decision now labeled "dicta" by the defendants) and endorsed only by the dissent. See 169 U.S. at 705-32. The plaintiffs are not relying on a stray "remark" that lacks "care and exactness," standing "wholly aside from the question in judgment" and "unsupported by any argument, or by any reference to authorities," that might not "control the judgment" of a lower court. 169 U.S. at 678. They are "leaning into" the central reasoning of the Supreme Court in support of its holding. Mot. Hr'g Tr. at 48. The defendants' argument to the contrary invites the Court to commit legal error.

Whether "holding" or "considered dicta," the straightforward rule and limited exceptions identified in Wong Kim Ark and summarized above have been applied repeatedly and without hesitation, including by the Supreme Court and the First Circuit.  For example:

- In Morrison v. California, despite statutes that then rendered Japanese persons "ineligible" for citizenship via naturalization, the Supreme Court stated without qualification: "A person of the Japanese race is a citizen of the United State if he was born within the United States."  291 U.S. 82, 85 (1934).

- In Dos Reis ex rel. Camara v. Nicolls, the First Circuit described a person "born in Massachusetts" as having become "an American citizen, not by gift of Congress, but by force of the constitution," despite his parents' status as foreign nationals "never naturalized in the United States," and despite his own "dual nationality" that led to his "service as a draftee in the Portuguese army."  161 F.2d 860, 861-62 (1st Cir. 1947).

- In Kawakita v. United States, a person "born in this country in 1921 of Japanese parents who were citizens of Japan" was "a citizen of the United States by birth"—a status the person did not lose despite later committing treason by acts of cruelty undertaken while working at a Japanese camp for American prisoners during World War II.  343 U.S. 717, 720 (1952).  See also Nishikawa v. Dulles, 356 U.S. 129, 131 (1958) (finding Japanese military service during World War II was basis for expatriation of U.S.-born citizen of Japanese-citizen parents only if service was voluntary); Hirabayashi v. United States, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law").

- In United States ex rel. Hintopoulous v. Shaughnessy, all members of the Supreme Court considered a child born to foreigners, both of whom had entered the U.S. with temporary permission but remained after their authorization expired, to be "of course[] an American citizen by birth," despite the parents' "illegal presence."  353 U.S. 72, 73 (1957); see id. at 79 (reflecting dissent's agreement that the child was a citizen).

- In INS v. Errico, two different children "acquired United States citizenship at birth" despite their parents having gained admission to this country by misrepresenting material facts about themselves and thereby evading statutory restrictions on lawful immigration. 385 U.S. 214, 215-16 (1966).

- In INS v. Rios-Pineda, a unanimous Supreme Court viewed a child "born in the United States" as "a citizen of this country," even though the father had entered the country "illegally" on his own and "returned to Mexico . . . under threat of deportation"; both parents had then "paid a professional smuggler . . . to transport them" across the border; and the father, when apprehended again, had failed to depart voluntarily "as promised." 471 U.S. 444, 446 (1985).

18

- In <u>Hamdi v. Rumsfeld</u>, at least six Justices treated the petitioner as a citizen of the United States based on his birth in Louisiana, without even discussing his parents' status (they were present lawfully but temporarily), despite the petitioner's active participation in a foreign terrorist organization.  542 U.S. 507, 510 (2004).[15]

- In <u>Mariko v. Holder</u>, a panel of the First Circuit considered a child "born in the United States" to be "a United State citizen" despite the parents' concession that both of them "were here illegally" and therefore removable.  632 F.3d 1, 3, 8 n.4 (1st Cir. 2011).

- In <u>Hasan v. Holder</u>, a different panel of the First Circuit similarly viewed as "a U.S. citizen" a child born in California to foreign-national parents who had overstayed their nonimmigrant visas.  673 F.3d 26, 28 & n.1 (1st Cir. 2012).

This line of decisions—which is not limited to the cases described above—further undermines the defendants' proposed interpretation.[16]

If that were not enough to find that the plaintiffs are likely to succeed on the merits (and it is), the fact that Congress incorporated the language of the Citizenship Clause into provisions of the INA passed more than forty years after <u>Wong Kim Ark</u> cements the meaning of the disputed phrase and provides the plaintiffs an independent avenue to prevailing here.  In the INA, Congress conferred birthright citizenship via statute on several categories of individuals, the first of which is described using language mirroring the Citizenship Clause.  8 U.S.C.

---

[15] Justice Scalia, joined by Justice Stevens, referred to Hamdi as a "presumed American citizen." 542 U.S. at 554 (Scalia, J., dissenting); <u>see</u> <u>Hamdi v. Rumsfeld</u>, 243 F. Supp. 2d 527, 534 (E.D. Va. 2002) (noting Hamdi had "identified himself as a Saudi citizen who had been born in the United States" when detained and interrogated by the American military).  No justice took up the invitation of one amicus in the case to revisit the meaning of the Citizenship Clause, correct the "erroneous interpretation" adopted in <u>Wong Kim Ark</u>, and conclude Hamdi was not a citizen because his parents, though living in Louisiana lawfully at the time of his birth, had only temporary work visas authorizing their presence in this country.  <u>See</u> Br. Amicus Curiae The Claremont Inst. Ctr. Const. Jurisprudence at 2-3, 5, <u>Hamdi v. Rumsfeld</u>, No. 03-6696, 2004 WL 871165 (U.S. Mar. 29, 2004).

[16] So does the fact that the Supreme Court has cited <u>Wong Kim Ark</u> as an example of how to properly assess the original meaning of language in the Constitution or a federal statute.  <u>See</u> <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 59 & n.6 (1911); <u>cf.</u> <u>BNSF Ry. Co. v. Loos</u>, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (citing <u>Wong Kim Ark</u> majority opinion as authority reflecting "everyone agrees" that "record of *enacted* changes Congress made" to relevant text "over time" is "textual evidence" that "can sometimes shed light on meaning").

§ 1401(a) (confirming citizenship of "a person born in the United States, and subject to the jurisdiction thereof").  As the plaintiffs point out, this provision was enacted in 1940 and "re-codified" in 1952.  See Doe, Doc. No. 33 at 2; see also Doe, Doc. No. 11 at 15 (raising statutory claim and advancing brief but distinct argument about likelihood of success thereunder). Because it uses the same language chosen by the Fourteenth Amendment's drafters—words that had been studied in Wong Kim Ark decades earlier—the statute must be understood to have incorporated the Supreme Court's interpretation of those words.  See Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020) (explaining statute "normally" is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").[17]

Here, the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts.  See Taggart v. Lorenzen, 587 U.S. 554, 560 (2019) (recognizing "longstanding interpretive principle" that if statutory term "is obviously transplanted from another legal source, it brings the old soil with it" (cleaned up)).  Thus, the statute supports a related but distinct claim upon which the plaintiffs are likely to succeed.[18]

---

[17] Justice Gorsuch went on to explain why this is so: "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, . . . we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations."  Bostock, 590 U.S. at 654-55.

[18] The defendants advance no separate challenge to the plaintiffs' statutory claim, choosing to "focus . . . on the constitutional provision" which is "coterminous" with the statute.  New Jersey, Doc. No. 92 at 25 n.4.  By opting not to address the statute, or the manner in which its enactment necessarily strengthens the plaintiffs' interpretation of the relevant language, the defendants have waived any discrete argument related to the statutory claim for purposes of the pending motions. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived").

Beyond sidestepping Wong Kim Ark, the defendants urge the Court to read three specific requirements into the phrase "subject to the jurisdiction thereof." The defendants contend these requirements are necessary to ensure adherence to the phrase's original meaning. None of these requirements, however, find support in the text itself or the cases construing and applying it. And, more importantly, each of them, if applied as argued, would prevent the Citizenship Clause from reaching groups of persons to whom even the defendants concede it must apply.

First, the defendants suggest the "jurisdiction" phrase is satisfied only by persons who owe the United States "allegiance" that is "direct," "immediate," "complete," and "unqualified by allegiance to any alien power." New Jersey, Doc. No. 92 at 27-28 (cleaned up). Certainly, allegiance matters. Various sources link the "jurisdiction" phrase and concepts of allegiance, including Wong Kim Ark. See, e.g., 169 U.S. at 654 (noting English common law provided citizenship to those "born within the king's allegiance, and subject to his protection"). The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. If that were so, then the children of dual citizens or LPRs could not receive birthright citizenship via the Fourteenth Amendment. A dual citizen necessarily bears some allegiance to both the United States and the second nation of which they are a citizen. LPRs, unless and until naturalized, remain foreign nationals who are citizens of other countries bearing some allegiance to their places of origin. This principle would also rule out the petitioner in Wong Kim Ark, whose parents resided for years in the United States but remained "subjects of the emperor of China" (and, indeed, returned to China when their U.S.-born son was a teenager). 169 U.S. at 652-53. The defendants, however, agree that children of dual citizens and LPRs are entitled to birthright citizenship, and that the petitioner in Wong Kim Ark was as well.

These anomalies are avoided by focusing on the allegiance of the child, not the parents. As noted earlier, the Citizenship Clause itself speaks only of the child. A child born in the United States necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law. That is, they are born "locally within the dominions of" the United States and immediately "derive protection from" the United States. Id. at 659. A child born here is both entitled to the government's protection and bound to adhere to its laws. This is true regardless of the characteristics of the child's parents, subject only to the narrow exceptions identified in Wong Kim Ark. Allegiance, in this context, means nothing more than that. See id. at 662 ("Birth and allegiance go together."). As James Madison explained:

> It is an established maxim that birth is a criterion of allegiance. Birth however derives its force sometimes from place and sometimes from parentage, but in general place is the most certain criterion; it is what applies in the United States; it will be therefore unnecessary to investigate any other.

Founders Online, Citizenship, Nat'l Archives (May 22, 1789), https://founders.archives.gov /documents/Madison/01-12-02-0115 [https://perma.cc/ZC4B-NS9R]. So, "allegiance" does not mean what the defendants think it means, and their first proposed rule founders.[19]

Next, the defendants seek to graft concepts of social-contract theory onto the "jurisdiction" clause of the Fourteenth Amendment by arguing birthright citizenship requires "mutual consent between person and polity." New Jersey, Doc. No. 92 at 45. The defendants again center their argument on the parents at the expense of the child whose birthright is at stake—perhaps, in part, because infants are incapable of consent in the legal sense. In the

---

[19] To the extent the defendants believe temporary, lawful visitors to this country are people who "do not owe an allegiance to the United States," Mot. Hr'g Tr. at 55, the Supreme Court disagrees, see Wong Kim Ark, 169 U.S. at 685 (quoting Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812), and its description of the "temporary and local allegiance" private visitors from other countries owe the United States while passing through or doing business here).

defendants' view, mutual consent is lacking where a person (the parent) has entered the United States without permission to do so, or without permission to remain here permanently. The absence of "mutual consent" in those circumstances means, according to the defendants, that the children of such parents fall beyond the "jurisdiction" of the United States for Fourteenth Amendment purposes.

This argument fares even worse than the first. The Fourteenth Amendment enshrined in the Constitution language ensuring "the fundamental principle of citizenship by birth" in the United States applied regardless of race—including, and especially, to formerly enslaved persons. 169 U.S. at 675; see Afroyim v. Rusk, 387 U.S. 253, 262-63 (1967). The defendants do not (and could not) deny this. Enslaved persons, of course, did not "consent" to come to the United States or to remain here. They were brought here violently, in chains, without their consent. These conditions persisted after their arrival. Against this backdrop, it verges on frivolous to suggest that Congress drafted, debated, and passed a constitutional amendment, thereafter enacted by the states, that imposed a consent requirement necessarily excluding the one group of people the legislators and enactors most specifically intended to protect.

Finally, the defendants seek to transform the use of the term "reside" at the end of the Citizenship Clause into a basis for finding that the "jurisdiction" phrase eliminates any person without a lawful "domicile" in the United States. The defendants contend that persons here with temporary visas retain "domiciles" in their native countries, and persons here without lawful status cannot establish a true "domicile." And so, the argument goes, they cannot "reside" in any state, and they remain outside the "jurisdiction" of the United States for Fourteenth Amendment purposes. This, once again, shifts the focus away from the child and the location of birth to the parents and the status and duration of their presence in this country.

23

The word "reside" appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live.  For example, a state within the former Confederacy (or any other state) could not constitutionally deny state citizenship to the child of a formerly enslaved person who lived and gave birth there.  The word "reside" does not inject a "domicile" requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents.  See New Jersey, Doc. No. 123 at 11-12 (articulating the flaws in this theory).  In any event, it is not so clear that "illegal entry into the country would . . . , under traditional criteria, bar a person from obtaining domicile within a State." Plyler, 457 U.S. at 227 n.22.

In sum, the defendants invite the Court to adopt a set of rules that work (except when they don't).  None of the principles the defendants advance are sturdy enough to overcome the settled interpretation and longstanding application of the Citizenship Clause described above. Each principle, applied uniformly, would lead to unintended results at odds with the text, meaning, and intent of the Fourteenth Amendment—and, in some instances, with the parameters set out in the EO itself.

For all these reasons, the Court finds the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims.  This conclusion would allow the plaintiffs to "show somewhat less in the way of irreparable harm."  Astra U.S.A., 94 F.3d at 743.  That relaxed burden, however, is not essential, as the second factor also favors the plaintiffs strongly.

### 2.    *Irreparable Harm*

The plaintiffs have supported their assertions of irreparable harm with numerous declarations detailing the imminent and damaging impacts they anticipate will flow from the EO.

24

See Doe, Doc. Nos. 11-1 to -10; New Jersey, Doc. Nos. 5-2 to -21, -23.[20]  Upon review, the Court accepts and credits those declarations, which the defendants have not disputed or rebutted in any way.  The declarations establish that the State plaintiffs do not stand to lose discrete amounts of one-time funds; they face unpredictable, continuing losses coupled with serious administrative upheaval.  They have established irreparable harm.

As for the Doe plaintiffs, what is at stake is a bedrock constitutional guarantee and all of its attendant privileges.  The loss of birthright citizenship—even if temporary, and later restored at the conclusion of litigation—has cascading effects that would cut across a young child's life (and the life of that child's family), very likely leaving permanent scars.  The record before the Court establishes that children born without a recognized or lawful status face barriers to accessing critical healthcare, among other services, along with the threat of removal to countries they have never lived in and possible family separation.[21]  That is irreparable harm.[22]

---

[20] Not every State plaintiff has submitted its own declarations, but the complaint alleges that all face the same categories of harm.  E.g., New Jersey, Doc. No. 1 ¶ 122.  The record supports that allegation, for example, by reflecting that each official attesting to health-insurance-related impacts describes the same federal programs used the same way and forecasts the loss of the same types of federal reimbursements.  See, e.g., Doc. Nos. 5-2, -6, -11, -12, -16, -19.  At this stage, that is enough to find that all State plaintiffs would suffer irreparable harm absent injunctive relief.  The defendants do not contend otherwise.

[21] Doe, for example, has a pending asylum petition and an older child who is a U.S. citizen by birthright—assuming the defendants do not later reconsider the effective date contained in the EO and opt to apply their reading of the Citizenship Clause retroactively, a possibility they did not definitively rule out during the motion hearing.  Mot. Hr'g Tr. at 45-47.  Her family would be placed at a distressing crossroads if her new baby were to face removal from the country.

[22] The defendants' only responses are to suggest that the plaintiffs wait and see how the EO will be implemented, and hope that Doe's asylum application is granted.  Or, in the worst case, "if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the [child] subject of the action could assert their claim to citizenship as defense in that proceeding."  New Jersey, Doc. No. 92 at 48.  That answer is not persuasive.  Cf. Texas v. EEOC, 933 F.3d 433, 448 & n.29 (5th Cir. 2019) (stating "it would strain credulity to find that an agency action targeting" conduct the agency has deemed "presumptively unlawful" would not trigger implementation "immediately enough to constitute" nonspeculative injury).

The plaintiffs in both cases have shown they are likely to suffer substantial and irreparable harm in the absence of a preliminary injunction. Thus, the two most important factors strongly favor the plaintiffs.

### 3. *Balance of Harms and Public Interest*

The final merged factors also support the plaintiffs' requests for relief. On the plaintiffs' side of the scales, there is a grave risk of significant and irreparable harm arising from the EO. Children not yet born will be stripped of birthright citizenship constitutionally guaranteed to them, as confirmed by settled law and practice spanning more than a dozen decades. They will be deprived of a "title" that is, as "Justice Brandeis observed, . . . superior to the title of President." Tuaua, 788 F.3d at 301. And that harm will arise from an EO that is unconstitutional on its face—an assessment that has now been echoed by multiple federal courts in different jurisdictions. E.g., Prelim. Inj. Order at 6, N.H. Indonesian Cmty. Support v. Trump, No. 25-cv-38 (D.N.H. Feb. 11, 2025), ECF No. 79.

It is difficult to imagine a government or public interest that could outweigh the harms established by the plaintiffs here. Perhaps that is why the defendants have identified none. Instead, they point only to the Executive Branch's discretion in matters of immigration. New Jersey, Doc. No. 92 at 49. But this case is not about how "to manage the immigration system." Id. It is about the Constitution's guarantee of citizenship by virtue of birth. When this right was enshrined in the Fourteenth Amendment, it was moved firmly beyond the bounds of the "core executive authority" the defendants invoke. Id.; see Afroyim, 387 U.S. at 263 (noting framers of Fourteenth Amendment "wanted to put citizenship beyond the power of any governmental unit to destroy"). The defendants' only argument, therefore, adds nothing to their side of the scales.

Though the government has waived any other arguments on these final factors by not developing them in their opposition memorandum, see Zannino, 895 F.2d at 17, the Court makes

two more observations.  First, the government has no legitimate interest in pursuing
unconstitutional agency action; "it is always in the public interest to prevent the violation of a
party's constitutional rights." Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned
up); accord League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  Second, an
injunction will do no more than maintain a status quo that has been in place for well over a
century.  The defendants have not even attempted to demonstrate how they or the public will be
harmed by continuing, for the duration of this action, to adhere to the interpretation of birthright
citizenship that has been consistently applied by the Executive Branch throughout that time
period—including under this President during his first term in office.

The scales tip decisively toward the plaintiffs.  Because all factors favor entry of
injunctive relief, the Court ends by explaining the appropriate parameters of such relief.

C.    Scope of Injunction

Both sets of plaintiffs ask the Court to universally enjoin the defendants from
implementing the EO.  That is, they seek an order that prevents the defendants from applying the
EO not only to them—to Doe, to members of the plaintiff associations, and to the State
plaintiffs—but at all, to anyone, anywhere.  Orders like those the plaintiffs seek here have
become "increasingly common" over the last twenty years.  Dep't of Homeland Sec. v. New
York, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in grant of stay); see generally
Developments in the Law—District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev.
1701, 1703-15 (2024) (quantifying rise in such injunctions and examining consequences).  That
trend raises meaningful concerns about the appropriate scope of a single district judge's
equitable powers.  See Trump v. Hawaii, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring)
(examining reasons to be "skeptical that district courts have the authority to enter universal
injunctions").

27

Alluding to such concerns, the defendants urge the Court to enter relief that is limited in scope. New Jersey, Doc. No. 92 at 49-50. Though the defendants have not proposed specific terms, two of the limitations they urge merit consideration.[23] First, the defendants argue "the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief." Id. at 50. As explained above, the Court has concluded all plaintiffs are so entitled. But that conclusion does not alone justify relief that is universal in scope. The Court still must confront the general principle that injunctive relief should be tailored to the parties before it. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). Here, the Court finds this principle leads to different results for the two sets of plaintiffs.

For Doe and the members of the two plaintiff organizations, the record before the Court does not demonstrate that universal relief is necessary to "provide complete relief to," and protect the rights of, those parties. An injunction that prevents the defendants and their agents from implementing and applying the EO against Doe or any member of either plaintiff organization suffices to protect them from harm during the pendency of this lawsuit. The record does not establish how awarding similar relief to other persons or organizations that are not parties to this lawsuit is necessary to provide complete relief to the Doe plaintiffs.

_____

[23] The third, which urges the Court to reject any facial challenge to the EO and require "individual as-applied challenges," can be rejected out of hand. The plaintiffs have advanced substantial facial challenges that the Court has deemed likely to succeed. The defendants do not explain how their third proposal, which is supported only by a citation to general language from a criminal case in which injunctive relief was not at issue, has anything to do with the scope of injunctive relief. See New Jersey, Doc. No. 92 at 50.

Different considerations arise as to the State plaintiffs. They have identified harms that do not hinge on the citizenship status of one child, or even of all children born within their borders. The harms they have established stem from the EO's impact on the citizenship status—and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction. For example, Massachusetts will suffer the identified harms not only if children born and living there are unlawfully denied citizenship, but also if a pregnant woman living in the northeastern part of the Commonwealth gives birth across the border in a nearby New Hampshire hospital, or if a family moves to Massachusetts from Pennsylvania (or any other state that has not joined this lawsuit) after welcoming a new baby. These examples illustrate why injunctive relief limited to the State plaintiffs is inadequate. In both, children born in states that are not parties to this lawsuit (such as New Hampshire and Pennsylvania) would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here.

That result not only fails in providing complete relief to the State plaintiffs, but also risks creating a new set of constitutional problems. See Saenz v. Roe, 526 U.S. 489, 500-04 (1999) (identifying as component of "right to travel" protected by Fourteenth Amendment "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State"). For the State plaintiffs, then, universal or nationwide relief is necessary to prevent them from suffering irreparable harm. Cf. Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-83 (2017) (narrowing in part but upholding in part injunction that protected nonparties similarly situated to the plaintiffs).

Only one issue remains. The defendants assert the Court may not enjoin the President.[24] New Jersey, Doc. No. 92 at 50. The Doe plaintiffs offer no response to this point, see generally Doe, Doc. No. 33, but the State plaintiffs disagree in a footnote citing instances where executive orders have been enjoined, see New Jersey, Doc. No. 123 at 15 n.8. Assuming without deciding that this Court is empowered to issue an injunction directly constraining the President's actions in any set of circumstances, nothing in the record suggests such relief is necessary here. The President has signed the EO. No further action by him is described by the EO or predicted by the plaintiffs. Other officers and agencies within the Executive Branch are responsible for implementing the EO, and it is their conduct that the plaintiffs really seek to restrain. Thus, for purposes of the preliminary injunction, the relief will be awarded against all other defendants besides the President, and against any other officers or agents acting on behalf of the President, but not against the President himself.[25]

### III.    CONCLUSION

"What the Constitution has conferred neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip away." Nishikawa, 356 U.S. at 138 (Black, J., concurring). Here, the Constitution confers birthright citizenship broadly, including to persons within the categories described in the EO. Under the plain language of the Citizenship Clause and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to the EO are likely to prevail, the plaintiffs face serious and irreparable harm in the absence of relief,

---

[24] They also suggest the Court should dismiss the President as a defendant, New Jersey, Doc. No. 92 at 50, but a request like that is properly advanced in a motion (not an opposition brief), after conferral and in compliance with the Local Rule governing motion practice in this Court. See generally L.R. 7.1.

[25] Should circumstances arise that merit reconsideration of this aspect of the injunction, the plaintiffs may bring them to the Court's attention via an appropriate motion.

the defendants face no cognizable harm from a preliminary injunction, and the public interest is served by preventing the implementation of a facially unconstitutional policy.

Accordingly, the plaintiffs' motions (Doe, Doc. No. 10, and New Jersey, Doc. No. 3) are ALLOWED as described herein.  Separate orders will issue in each case memorializing the preliminary injunctions entered by the Court.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge