## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants.*

No. 1:25-cv-10139-LTS

## RESPONSE IN OPPOSITION TO DEFENDANTS' MEMORANDUM IN RESPONSE TO THIS COURT'S JULY 2, 2025 ORDER

## **TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

      I. THE STATES MUST OBTAIN COMPLETE RELIEF HERE ................................. 3

         A.    This Court Correctly Decided The States Have Standing. ............................... 3

         B.    Plaintiffs Are Entitled To Complete Relief. ...................................................... 5

      II. THE STATES REQUIRE A NATIONWIDE INJUNCTION TO GET
          COMPLETE RELIEF, AND DEFENDANTS HAVE FAILED TO
          SUBSTANTIATE THE ALTERNATIVE FORMS OF
          RELIEF THEY RAISED ON APPEAL. .................................................................. 10

CONCLUSION ..................................................................................................... 20

i

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975)........................................................................................... 5

*Angoff v. Goldfine*,
    270 F.2d 185 (1st Cir. 1959)............................................................................ 5

*B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's*,
    110 F.4th 442 (1st Cir. 2024)........................................................................... 3

*Banco Comercial De Puerto Rico v. Boscana*,
    100 F.2d 449 (1st Cir. 1938)............................................................................ 6

*Biden v. Nebraska*,
    600 U.S. 477 (2023)......................................................................................... 3

*Brown v. Swann*,
    35 U.S. 497 (1836)........................................................................................ 2, 5

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)......................................................................................... 6

*Camp v. Boyd*,
    229 U.S. 530 (1913)......................................................................................... 5

*Clark v. Smith*,
    38 U.S. 195 (1839)........................................................................................... 8

*Dayton Bd. of Educ. v. Brinkman*,
    433 U.S. 406 (1977)......................................................................................... 6

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 19 (3d Cir. 2024) ............................................................................ 7

*Department of Commerce v. New York*,
    588 U.S. 752 (2019)..................................................................................... 3, 16

*Hefner v. Nw. Mut. Life Ins. Co.*,
    123 U.S. 747 (1887)......................................................................................... 5

*Johnson v. Yellow Cab Transit Co.*,
    321 U.S. 383 (1944)......................................................................................... 7

*Kinney-Coastal Oil Co. v. Kieffer*,
   277 U.S. 488 (1928).................................................................................... 5

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004).................................................................................... 5

*Mancini v. City of Providence ex rel. Lombardi*,
   909 F.3d 32 (1st Cir. 2018)....................................................................... 12

*McCoy v. Mass. Inst. of Tech.*,
   950 F.2d 13 (1st Cir. 1991)....................................................................... 12

*Milliken v. Bradley*,
   418 U.S. 717 (1974).................................................................................... 6

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ...................................................................... 6

*New Jersey v. Trump*,
   131 F.4th 27 (1st Cir. 2025)......................................................... 3, 4, 11, 12

*North Carolina v. Covington*,
   581 U.S. 486 (2017).................................................................................. 6, 8

*Ohio v. EPA*,
   603 U.S. 279 (2024).................................................................................. 10

*Pegasystems Inc. v. Appian Corp.*,
   633 F. Supp. 3d 456 (D. Mass. 2022) ......................................................... 8

*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946).................................................................................... 5

*Republic Molding Corp. v. B.W. Photo Utils.*,
   319 F.2d 347 (9th Cir. 1963) ...................................................................... 7

*Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*,
   135 F.4th 572 (7th Cir. 2025) ..................................................................... 6

*Terrell v. Allison*,
   88 U.S. 289 (1874)...................................................................................... 5

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) ..................................................................... 7

*Trump v. CASA, Inc.*,
  No. 24A884, 2025 WL 177363 (U.S. June 27, 2025) ..................................................... *passim*

*United States v. Texas*,
  599 U.S. 670 (2023) .............................................................................................. 6

*Winter v. NRDC*,
  555 U.S. 7 (2008) .................................................................................................. 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .............................................................................................. 9

**Statutes**

20 U.S.C. § 1435 ...................................................................................................... 18

42 U.S.C. § 1320 ...................................................................................................... 14, 15

42 U.S.C. § 1397 ...................................................................................................... 18

42 U.S.C. § 1396 ...................................................................................................... 4

8 U.S.C. § 1401 ....................................................................................................... 9

8 U.S.C. § 1611 ....................................................................................................... 14

**Regulations**

20 C.F.R. § 422.107 .................................................................................................. 15

42 C.F.R. § 435.407 .................................................................................................. 13

42 C.F.R. § 435.910 .................................................................................................. 14

42 C.F.R. § 435.945 .................................................................................................. 13

42 C.F.R. § 435.949 .................................................................................................. 13

42 C.F.R. § 435.956 .................................................................................................. 14, 15

42 C.F.R. § 435.956 .................................................................................................. 13

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ...................................................................................... 4

**Other Authorities**

J. Story, *Commentaries on Equity Jurisprudence* § 89 (6th ed. 1853) ....................................9-10

J. Story, *Commentaries on Equity Pleadings* § 72 (2d ed. 1840) .................................................. 2

Tara Watson, *Enforcement and Immigrant Location Choice*

    (Nat'l Bureau of Econ. Rsch., Working Paper No. 19626, Nov. 2013) ................................... 19

## INTRODUCTION

This Court correctly remedied the States' injuries via a nationwide injunction, based on the same complete-relief principle that the Supreme Court recently recognized and endorsed. Defendants have proffered no alternative forms of relief that would completely redress the States' harms. This Court should therefore confirm that its injunction was not "broader than necessary to provide complete relief" to the States—and thus that it is not stayed. *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *15 (U.S. June 27, 2025).

The Supreme Court's holding that "universal" injunctions—*i.e.*, injunctions designed to protect nonparties—likely exceed the statutory authority of the federal courts, *see id.* at *6-8, has no bearing on this case. The Court recognized that the injunction that "the District Court for the District of Massachusetts" already issued "does not purport to directly benefit nonparties." *Id.* at *11. Instead, the Court acknowledged that this Court had decided that a nationwide injunction "was necessary to provide the States *themselves* with complete relief." *Id*. And the Supreme Court "agree[d] that the complete-relief principle has deep roots in equity." *Id.* at *10.

The Supreme Court noted that Defendants' appellate filings had suggested two alternative forms of relief that, Defendants argued, satisfied the complete-relief principle for the States and made a nationwide order unnecessary. *Id.* at *12. Rather than "take up these arguments in the first instance," *id.*, the Court left it to "[t]he lower courts" to review those arguments and decide whether the existing injunction is "broader than necessary to provide complete relief," *id.* at *15. It thus falls to this Court now to consider whether those alternatives are in fact workable and would provide the States complete relief, or whether it is still true that this Court's previous nationwide order is not "broader than necessary" to ensure complete relief in this extraordinary case. *Id*.

Defendants misunderstand this case's posture, questions, and proper outcome. Many of their arguments do not even address the question before the Court—*how* to ensure the States get

1

complete relief for their own harms from a flagrantly unconstitutional Order that violates over a century of Supreme Court precedent, statutes, and executive practice. Defendants first suggest that the States should get no relief because they have no standing, but that is contrary to binding decisions of both this Court and the First Circuit. And those holdings are correct: the States would suffer millions in pocketbook injuries and profound injuries to their sovereign interests. Doc. No. 5 at 11. Defendants also resist that the States should get *complete* relief, instead demanding that they bear some of the costs from the challenged Order ("EO 14160"). But complete relief is the norm in equity, with "complete justice" representing its "constant aim." J. Story, *Commentaries on Equity Pleadings* § 72, at 74 (2d ed. 1840); *see also Brown v. Swann*, 35 U.S. 497, 503 (1836) (same). And complete relief is especially warranted given the strength of the States' argument on the merits: because it is so clear that EO 14160 violates the Constitution and federal statutes alike, and a century of settled precedent from the Supreme Court, it is wrong to require the States to shoulder any burdens from the Executive's illegality. Nor do Defendants identify equities, let alone sufficiently compelling ones, to justify deviating from the complete relief aim.

Instead, on the central question now before this Court—whether there are alternative ways to grant the States complete relief short of a nationwide order—Defendants come up empty. They largely complain that they should not bear a "burden" to explain how the alternatives they have been proffering to the First Circuit and Supreme Court for months could or would actually work or ensure complete justice. Defendants offer *zero* factual information, let alone declarations, to demonstrate their alternatives could do so, meaning nothing undermines this Court's past findings that a nationwide order is needed for complete relief. To the contrary, a voluminous and compelling record confirms that a nationwide order is necessary.

## ARGUMENT

### I.     THE STATES MUST OBTAIN COMPLETE RELIEF HERE.

Rather than identify ways to fully remedy the States' injuries absent nationwide relief, Defendants dedicate most of their filing to arguing that the States cannot obtain *any* relief or should not obtain *complete* relief in the first place. But the former is foreclosed by decisions from this Court and the First Circuit, and the latter is contrary to precedent and history alike.

#### A.     This Court Correctly Decided The States Have Standing.

Initially, this Court should not entertain Defendants' misguided argument that the States lack standing—arguments that are contrary to the decisions of this Court and the First Circuit in this case. This Court already concluded that EO 14160 would impose considerable costs on the States, relying on extensive record evidence for that conclusion. *See* Doc. No. 144 at 8-9. And the First Circuit agreed, holding that these harms justified standing in the same way that pocketbook injuries supported standing in *Department of Commerce v. New York*, 588 U.S. 752 (2019), and *Biden v. Nebraska*, 600 U.S. 477 (2023). *See New Jersey v. Trump*, 131 F.4th 27, 35-38 (1st Cir. 2025). These prior holdings are binding on this Court in this posture. After all, Defendants contend that this proceeding before this Court is a continuation of the stay proceeding, to determine the extent of the Supreme Court's own stay. But the Supreme Court explicitly did not address the States' standing. *See CASA*, 2025 WL 1773631, at *4 n.2. And so this Court's and the First Circuit's prior holdings on standing issued at the stay-pending-appeal stage, by Defendants' own logic, are still binding. *See B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's*, 110 F.4th 442, 447 (1st Cir. 2024) (discussing law-of-the-case doctrine).

Plus, those decisions are plainly correct: the States introduced uncontested evidence that they will lose millions in Medicaid, CHIP, TANF, SNAP, and Title IV-E funding that supports critical health and child welfare services; lose federal funds they receive for processing SSN

applications; and incur substantial costs to create new verification systems to comply with federal eligibility rules—systems they are required by federal law to maintain to verify residents' eligibility for federally funded programs like Medicaid, CHIP, Title IV-E, TANF, and SNAP. *See, e.g.*, 42 U.S.C. §§ 1396a(a)(5), 1396c, 671(a)(27); Doc. No. 5 at 9-13. Were the EO to take effect, the States would need to (1) identify the kinds of evidence now sufficient to prove a child's citizenship; (2) modify their eligibility verification systems to incorporate information about the parents' immigration status; (3) implement new measures to process applications and track citizenship status; (4) train staff, partner organizations, and healthcare providers on new policies and procedures; and (5) revise existing eligibility guidance and manuals. *See* Doc. No. 5 at 13-14. Further, as this Court recognized, the Executive's attempt to rewrite the Citizenship Clause— which determines who is a citizen of "the State wherein they reside"—impacts the States' "general sovereign interests in which persons are their citizens." Doc. No. 144 at 10 n.7. It is thus easy to see why this Court and the First Circuit have already held that the States have standing.

Defendants again press the view that third-party standing doctrine bars the States from remedying their Article III injuries, but the First Circuit rightly rejected that position. *See New Jersey v. Trump*, 131 F.4th at 38-40. That makes sense, as the States are not "third parties" to the Citizenship Clause, which "defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside." Doc. No. 144 at 10 n.7; *see* U.S. Const. amend. XIV, § 1. Said another way, by its explicit terms, the Clause defines the members of the States' citizenry—controlling the States' profound sovereign interests in defining their own citizens. It is thus bizarre for Defendants to argue that States cannot get redress for their own Article III harms flowing from a violation of the Citizenship Clause—a provision that discusses the States explicitly and defines their citizenry. Far from resting on a "constitutional protection"

that "is aimed" only at another—the premise of Defendants' third-party standing argument, *see Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)—the States are seeking relief from their own pocketbook harms and from direct injuries to the sovereign interests that the Citizenship Clause describes and controls. They may seek such relief.

### B.    Plaintiffs Are Entitled To Complete Relief.

Defendants get no further contending that this Court should remedy less than all of the States' irreparable injuries. In equity, the traditional remedy was to ensure complete relief for the injured party. Given the overwhelming merits and overwhelming equities, there is no basis to deviate from that traditional approach here.

To begin, complete relief, while "not a guarantee," *CASA*, 2025 WL 1773631, at *12, is nevertheless the traditional equitable remedy. As *CASA* states, "the complete-relief principle has deep roots in equity." *Id.* at *10; *accord id.* at *11 ("The equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). "The great principles of equity" endeavor to "secur[e] complete justice," not partial relief. *Brown*, 35 U.S. at 503; *accord* J. Story, *supra*, § 72, at 74 (describing "complete justice" as equity's "constant aim"); *Angoff v. Goldfine*, 270 F.2d 185, 190 (1st Cir. 1959) (describing "complete relief" as "a cardinal principle of equity"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (describing "complete justice" as "the historic purpose of equity"). Equity serves to "do complete rather than truncated justice." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Camp v. Boyd*, 229 U.S. 530, 551 (1913) ("A court of equity ought to do justice completely, and not by halves."); *Hefner v. Nw. Mut. Life Ins. Co.*, 123 U.S. 747, 756 (1887) (collecting cases). Consistent with equity's aim, courts should strive to award plaintiffs complete relief. *See, e.g.*, *Terrell v. Allison*, 88 U.S. 289, 291 (1874) ("It is a rule of that court [of equity] to do complete justice when that is practicable, not

merely by declaring the right, but by affording a remedy for its enjoyment."); *Banco Comercial De Puerto Rico v. Boscana*, 100 F.2d 449, 452 (1st Cir. 1938) ("The rule is well settled that the equity court having taken jurisdiction, full relief will be given between the parties.").[1]

Both history and logic confirm that complete relief is especially critical when a party's likelihood of success is particularly strong. "[I]n equity," *CASA* emphasized, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." 2025 WL 1773631, at *12 (citation omitted); *accord United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring). That is why the Court has long held that under "principles of equity jurisprudence," the "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Milliken v. Bradley*, 418 U.S. 717, 744 (1974) ("The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation."); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 419-20 (1977) (collecting cases). In other words, when this Court determines the "proper remedy" for the States' harms, including whether to grant them complete relief from the established harms, the "severity and nature of the particular constitutional violation" is an "obvious consideration[]." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam). And for good reason: the more likely it is that a party will prevail at the end of the case, the less tolerable it is that the party should have to suffer any of the harms from a flagrantly unlawful action. That is why the four *Winter* factors, used to determine the extent of relief to award

---

[1] That venerable principle continues to the present day. *See, e.g.*, *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 589-92 (7th Cir. 2025) (affirming a complete-relief nationwide injunction "subject of course to the district court's continuing jurisdiction and power to modify the injunction" upon defendant's motion if "not-yet-defined contexts" arose); *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) ("[I]njunctions *should* be crafted to provide complete relief to the plaintiffs." (emphasis added) (cleaned up)).

for a party, have always considered the likelihood of success on the merits. Simply put, the history of equity, logic, and precedent all prove the same: a stronger likelihood of success on merits can strengthen the need for a party to get complete relief. *See CASA*, 2025 WL 1773631, at *12.

Of course, there may be cases in which the "necessities of the particular case" call for less than complete relief, as when there are particularly strong countervailing equities that reveal "a narrower injunction" may be "appropriate." *Id.* at *12, *15 (explaining "that a court *can* award complete relief is not to say that it *should* do so" under other "principles of equity"). As one example, a particular plaintiff may "also [be] blameworthy" under the unclean-hands doctrine, but even that does not mean the plaintiff gets no relief. Rather, the court "weigh[s] the substance of the right asserted by [the] plaintiff" against the "relative extent of each party's wrong upon the other and upon the public" to strike an "equitable balance" that could leave a challenger with less than complete relief. *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963); *see, e.g.*, *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387-88 (1944) (explaining doctrine turns on "considerations that make for the advancement of right and justice" rather than a "rigid formula which trammels the free and just exercise of discretion" (cleaned up)). As another example, a plaintiff's delay might impact the equitable relief to which it is entitled—including the extent of that relief, such as a remedy short of complete relief. *See, e.g.*, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 206 (3d Cir. 2024) (emphasizing delay can impact relief to a party following the "classic maxim of equity … that it assists the diligent, not the tardy" (cleaned up)); *Texas v. United States*, 126 F.4th 392, 422 (5th Cir. 2025) (staying remedy given countervailing reliance equities that developed in the years in which Texas declined to sue). Simply put, a defendant may resist complete relief only by showing some compelling countervailing "interest" that justifies narrower relief. *See Winter v. NRDC*, 555 U.S.

7

7, 23-24 (2008); *cf. Pegasystems Inc. v. Appian Corp.*, 633 F. Supp. 3d 456, 473 (D. Mass. 2022) (Saris, J.) (placing "burden" of identifying countervailing delay-related equities on the defendant).

These principles make abundantly clear that the States must receive complete relief in this case. Not only is complete relief the equitable norm, *see supra* at 5-6, but this Court has *already* crafted an injunction in order to "provide the States *themselves* with complete relief." *CASA*, 2025 WL 1773631, at *11 (crediting this Court with relying on the complete-relief tradition). Nothing in Defendants' briefing shows that this Court should suddenly veer from that path now. Just the opposite: the "severity and nature" of the constitutional violation, *Covington*, 581 U.S. at 488, makes the States' "story" for getting complete relief unusually compelling, *CASA*, 2025 WL 1773631, at *12. Indeed, this Court already (and correctly) held that EO 14160 is "nearly certain" to violate the Citizenship Clause. Doc. No. 144 at 14-24. And it is no minor violation: the EO contravenes the Citizenship Clause's plain text, disregards an unbroken tradition—dating back to the English common law—through every period of the Nation's history other than the *Dred Scott* era, and violates 127 years of Supreme Court precedent. It is difficult to imagine a stronger story, and thus difficult to understand why Defendants believe the States should get less than complete relief—and suffer harms—from an order that is so flagrantly unlawful and so unlikely to be upheld.

Moreover, the States have established an "independent avenue to prevailing" via a violation of federal statute. Doc. No. 144 at 19-20 & n.18. That Congress "conferred birthright citizenship via statute" "using language mirroring the Citizenship Clause," *id.*, is directly relevant to the scope-of-relief question: "there is inherent in the Courts of Equity a jurisdiction to … give effect to the policy of the legislature." *Clark v. Smith*, 38 U.S. 195, 203 (1839). Where, as here, "Congress itself has struck the balance" between "conflicting public interests," the "court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion." *Youngstown*

8

*Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609-10 (1952) (Frankfurter, J., concurring). Congress chose to codify birthright citizenship into law. *See* 8 U.S.C. § 1401(a). Giving the States *less* than complete relief despite such a clear violation of Congress's choice to protect birthright citizenship thus upsets legislative policy too. Equity, once again, does not countenance such a result.

Not only do the Defendants fail to rebut anything about the States' especially powerful story on the merits, but they also fail to establish any compelling equities to justify awarding less than the traditional complete-relief remedy. Defendants do not (and could not) argue that the States have unclean hands or delayed in seeking relief for their injuries, nor do they (or could they) argue that the Executive has some reliance interest on a new order that is contrary to over a century of executive practice in the years since *Wong Kim Ark*. Instead, they complain that the States' alleged "residual injury" and "administrative burden" that will exist under any narrower non-nationwide relief is not enough to "justify expanding the injunction here to cover everyone in the nation." Doc. No. 193 at 13-14. But that gets things backwards: given that equity traditionally aims to ensure complete relief, *see supra* at 5-6, and given the strength of the story in this case under the *Winter* factors, *see supra* at 8-9, *Defendants* must show why it would be equitable to force the States to make do with less than complete relief. Their only effort to meet their burden is to argue that it would not be "inequitable to expect the States to take relatively minor steps to facilitate their own relief." Doc. No. 193 at 14. That is wrong: in equity, "where an inequitable loss or injury will otherwise fall upon a party from circumstances beyond his own control, or from his own acts done in entire good faith, and in the performance of a supposed duty, without negligence, Courts of Equity will interfere to grant him relief." J. Story, *Commentaries on Equity Jurisprudence* § 89, at

109 (6th ed. 1853). Because the States are subject to a flagrantly unlawful policy outside their control that they swiftly challenged in good faith, it is inequitable to force them to incur costs.[2]

Complete relief is the traditional goal of equity. It is especially important where, as here, the challenges present such a lopsided merits case—and thus where it is particularly unfair to make the States suffer costs from any patchwork citizenship regime, which neither the Citizenship Clause nor federal law contemplates. And Defendants identify no countervailing interests that can overcome these equitable principles and thus nothing to justify this Court changing course from its ruling that the States are entitled to complete relief.

## II.    THE STATES REQUIRE A NATIONWIDE INJUNCTION TO GET COMPLETE RELIEF, AND DEFENDANTS HAVE FAILED TO SUBSTANTIATE THE ALTERNATIVE FORMS OF RELIEF THEY RAISED ON APPEAL.

Because the States are entitled to complete relief, the sole remaining question is whether there are remedies other than a nationwide injunction that would ensure complete relief in a practically and legally workable fashion. Defendants have identified no such alternatives, as they refuse to substantiate even their own threadbare proposals, and the facts thoroughly rebut them.

1. This Court found that nationwide relief was "necessary to prevent [the States] from suffering irreparable harm." Doc. No. 144 at 29. It further found that the States faced "continuing losses coupled with serious administrative upheaval" caused by EO 14160's denial of citizenship to covered children, stripping their eligibility for benefits the States administer. *Id.* at 24-25; *see* Doc. No. 5 at 21-23. And it found that these harms would persist absent nationwide relief, as they

---

[2] For this reason, "that other states object" to the ordered relief, Doc. No. 193 at 13, is a non-sequitur. Even if those other States had "strong arguments about the harms they face and equities involved" from the status quo in place since the Civil War ended and the Court decided *Wong Kim Ark*—which they do not—that would be all the more reason for the scope of relief to "turn[] on the merits." *Ohio v. EPA*, 603 U.S. 279, 291-92 (2024). For good reason: a State is more entitled to get full relief from an unlawful policy that is harming it, than a State is to benefit from unlawful action. And as this Court has held, those merits overwhelmingly favor Plaintiff States.

"arise not only from births within [the States'] borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions." Doc. No. 144 at 4; *see* Doc. No. 5 at 25-26; Lapkoff Decl. (Ex. B) ¶13 (2,182 non-citizen adults with a related child in the household moved to New Jersey from non-Plaintiff States in 2023); Brown Decl. (Ex. G) ¶13 (6,000 babies are born out-of-State to New Jersey residents each year); Figueroa Decl. (Ex. CC) ¶13.

The central question is not whether those factual findings were correct (Defendants have not seriously contested them) but whether there are alternative remedies short of this nationwide order that would still ensure complete relief. On that, Defendants failed to present *any* evidence to substantiate that their alternatives can fully redress the States' harms or be practically or legally workable. They instead complain that they should not "bear the burden to establish the scope of an appropriate preliminary injunction." Doc. No. 193 at 6-8. Defendants suggest it is a plaintiff's burden to imagine and then negate every possible alternative form of relief, an insurmountable barrier for which they cite nothing. But the States *already* established they need complete relief and would suffer injuries if they secured less than a nationwide order.

Instead, Defendants—for the first time on appeal, *see New Jersey v. Trump*, 131 F.4th 27, 42-44 (1st Cir. 2025)—asserted alternatives they said could offer a full remedy. *CASA* even noted that they raised these approaches on appeal and remanded for their consideration. 2025 WL 1773631, at *12. It is not "burden shifting" to ask Defendants to show how the alternatives *they proposed* would operate and ensure complete relief. Their supplemental filing does not do so, just as they have declined, at every stage of this litigation, to substantiate their claims.

2. In any event, an extensive factual record demonstrates that these alternative remedies for granting complete relief would fail at that task—so a nationwide injunction is still required. Defendants suggest that the States should not be allowed to introduce any facts, *see* Doc. No. 193

11

at 7 (insisting no further declarations are permissible),[3] but this Court should reject that remarkable assertion out of hand. Defendants raised these alternative arguments only for the first time on appeal, depriving both this Court and the States of any previous opportunity to develop facts on whether they are workable and would ensure complete relief. *See New Jersey*, 131 F.4th at 42-43 (emphasizing this point). Defendants should not be rewarded for that approach by again avoiding factual development in this court. *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 46-47 (1st Cir. 2018) (two-sentence argument presented to district court was "the merest of skeletons" and thus procedurally defaulted); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991) ("[A] party has a duty 'to spell out its arguments squarely and distinctly.... [rather than being] allowed to defeat the system by seeding the record with mysterious references ....'"). Indeed, it makes little sense for this Court to decide this immensely consequential question blind to the real harms that would unfold if Defendants' barely developed remedial alternatives were adopted. And as the facts make clear, Defendants' alternatives do not provide complete relief.

a. The factual record on Defendants' main proposal—that this Court narrow the injunction such that it "at most" requires federal agencies "to reimburse Plaintiffs for services provided to persons covered by the Executive Order as though they were citizens," but permits Defendants to deny citizenship to these children, Doc. No. 193 at 11—confirms that it would both impose harms and leave unaddressed harms, depriving States of complete relief. To start, the proposal would do nothing to address the injury to the States' sovereign interests, *see supra* at 4-5, including the denial of citizenship to a large swath of their residents who are constitutionally entitled to it—depriving

---

[3] At the same time that Defendants assert the States should be precluded from introducing evidence on this posture, they claim they cannot explain how a narrower injunction would remedy the States' harms until the States "put on … evidence of their injuries in the context of the Supreme Court's decision in *CASA*." Doc. No. 193 at 8. Defendants cannot have it both ways.

them not only of U.S. citizenship but of citizenship of the Plaintiff "State wherein they reside." *See also* Doc. No. 144 at 10 n.7. Nor would it address the undisputed pecuniary harm to States via EAB payment losses, *see* Doc. No. 144 at 7; Doc. No. 5 at 12-13, because under Defendants' proposal, covered children would not be eligible to receive SSNs at birth, *see* Doc. No. 193 at 11 (Defendants' proposal would require them to treat covered children as citizens *only* for the purpose of providing States with federal matching funds). But beyond that, the proposal would impose other injuries on the States. First, it would inflict administrative chaos and impose costly burdens on state agencies, who still do not know or understand how such an order could be implemented consistent with their statutory obligations to verify federal benefits eligibility, and—assuming that they can devise a lawful way to do so—will incur costs educating and training staff to implement it. Further, the proposal would make parents less likely to enroll covered children in federal benefits programs, increasing the cost of mandated outreach and education, undercutting progress towards the States' ongoing efforts of enrolling eligible children in low-cost health insurance, and burdening our public hospitals with uncompensated care costs.

The administrative chaos and implementation burdens from the seismic change in federal-benefits eligibility Defendants propose would be considerable. State agencies are obligated by federal law to secure SSNs and verify eligibility for Medicaid, SNAP, and TANF—backed by a risk of penalties and lost federal funding. *See, e.g.*, 42 U.S.C. § 1320b-7(a); Adelman Decl. (Ex. F) ¶¶42-44; Boyle Decl. (Ex. GG) ¶16. For Medicaid, a complex web of regulations spells out permissible verification methods for identity, citizenship, and immigration status. Ex. F ¶¶20-24 (describing identity and citizenship verification requirements); 42 C.F.R. §§ 435.407, 435.945(k), 435.949, 435.956(a) (same). But there is no verification method for an infant child who is neither a citizen (under Defendants' proposed order) nor an immigrant of any kind. Indeed, a child falling

within this sui generis category does not appear to fit any of the status prerequisites for federal-benefits eligibility. *See* 42 U.S.C. § 1320b-7(d); *cf.* 8 U.S.C. § 1611(a). Reasonably, then, agencies do not know how they could comply with their statutory obligations to verify the eligibility of these children in order to lawfully provide them with benefits. Ex. F ¶¶47-50; Harrington Decl. (Ex. J) ¶¶22-25; Mohr Peterson Decl. (Ex. O) ¶¶37-39. Defendants have no answer for this.

Even assuming that state agencies could use the verification path for citizens under Defendants' putative injunction, significant burdens remain because, *inter alia*, these children would not have received SSNs at birth. Doc. No. 5 at 12. If they are treated as citizens for SSN-eligibility purposes, then to complete their benefits applications, SSNs would have to be obtained, *see* 42 U.S.C. § 1320b-7(a)(1), 42 C.F.R. § 435.910(a), and 7 C.F.R. § 273.6(b), a process which is more cumbersome, *see* Makhlouf Decl. (Ex. D) ¶15d, requiring support and assistance from the state agencies themselves, when completed outside the EAB process. *See* Davis Decl. (Ex. Y) ¶¶5-10; Bush Decl. (Ex. V) ¶¶6, 10; Standridge Decl. (Ex. FF) ¶22; 42 C.F.R. § 435.910(h), (e); 42 C.F.R. §§ 435.407(e), 435.956(b)(1)(i); 7 C.F.R. § 273.6(b), (d); *compare* Doc. No. 5-4 ¶¶9-11. States' agencies would have to provisionally grant benefits to an otherwise eligible applicant pending the SSN's issuance, *see* 42 C.F.R. § 435.910(f) (Medicaid), but this creates integrity risks. *See* Ex. F ¶¶16-17, 43-44; Campbell Decl. (Ex. L) ¶21; Connolly Decl. (Ex. R) ¶¶ 8-11, 30-32. And if the covered child ultimately fails to produce an SSN, or otherwise prove status, then the States will lose the associated federal matching funds. Ex. F ¶42; Groen Decl. (Ex. Q) ¶13; Costantino Decl. (Ex. M) ¶26. If these children are *not* treated as citizens for SSN-eligibility purposes, then their application may be processed without an SSN (for Medicaid, but not necessarily SNAP or TANF), *see* Ex. F ¶9; 42 C.F.R. § 435.910(h)(1)(i), but verifying citizenship becomes harder, Ex. F ¶9. States' agencies likely would have to either contact the birth State's

vital events agency or, if that option fails, obtain a birth record and a distinct medical record. *Id.* These are burdens on state agencies. *Cf.* Ex. D ¶15d.

Likewise, there is no straightforward way for States' agencies to use the verification procedure for qualifying noncitizens. Medicaid regulations require that noncitizens' eligibility be verified through an electronic service that would not have information on a U.S.-born child who had never interacted with the U.S. Department of Homeland Security. *See* Ex. F ¶¶32-38; 42 C.F.R. §§ 435.945(k), 435.956(a)(2). And while States may be permitted to set up an alternative procedure, that would require DHS approval for Medicaid purposes and potentially coordination with DHS for Medicaid, SNAP, and TANF. 42 U.S.C. §§ 1320b-7(b)(2), (4); 42 C.F.R. §§ 435.956(a)(2), 435.945(k); *see also* Ex. F ¶¶25-27, 34-36. This would impose substantial administrative burdens on the States and could also subject to them to losing the full protection of a safe-harbor that shields them from penalties if they make a faulty status determination. *See* 42 U.S.C. § 1320b-7(e).[4] Defendants do not address such costs.

Whichever verification procedure were adopted for this unprecedented situation, the States' agencies would have to spend significant time and resources devising a new procedure and training staff to implement it. *See* Ex. F ¶¶35-38, 46-50; Hadler Decl. (Ex. K) ¶¶27-32, 40; Ex. L ¶¶13-14; Ex. J ¶¶22-25; Ex. O ¶¶37-39; Armenia Decl. (Ex. X) ¶12; Ehrlich Decl. (Ex. Z) ¶13; Merolla-Brito Decl. (Ex. EE) ¶¶43-35; Ex. GG ¶¶43-45. Defendants' proposal would thus force the States to bear the cost of new verification procedures—and the risk of consequences if they make mistakes—in order to provide public benefits to covered children. And the States are

---

[4] To the extent the covered children would be eligible for SSNs, States would also have to assist with that process, which would be especially difficult because non-citizens seeking an SSN "must submit, as evidence of alien status, a current document issued by the Department of Homeland Security in accordance with that agency's regulations." 20 C.F.R. § 422.107(e)(1). It is unclear what DHS document could apply to children born here.

unaware of any administrative processes by which they could recover the lost time and resources they spend developing, seeking approval for, and implementing an eligibility verification process for these children. *See* Ex. F ¶¶50, 56. Although Defendants dismiss these serious administrative burdens on state agencies as "attenuated" and "hypothetical," Doc. No. 193 at 9, they are direct and factually substantiated. The States necessarily cannot receive federal reimbursements for providing services to covered children without verifying their eligibility for these federal programs, and agencies have attested that they will encounter these administrative burdens, with costs and resource drains, if the injunction is narrowed as Defendants propose. *See supra* 13-15. These administrative burdens are thus based on "the predictable effect of Government action," not "mere speculation." *Dep't of Com.*, 588 U.S. at 768. This Court has already found that the States' evidence of irreparable harm includes the "serious administrative upheaval" that would occur if EO 14160 took effect. Doc. No. 144 at 25. Given the unlikelihood that this Order will be upheld, there is no basis to force the States to bear all these costs.

But the harms do not even stop with these grave administrative burdens. The unprecedented eligibility regime that Defendants press will also substantially deter participation in the federally funded benefits programs that the States administer—by causing widespread confusion and fear among families whose children are newly (and unlawfully) at risk of deportation. The States will bear the resulting costs of this deterrence, which makes complying with their statutory duties to educate and assist eligible families more difficult, and increases expenditures on uncompensated care and other services when these families avoid federal programs for fear of risking their covered child's removal. And this will undermine States' efforts to enroll all eligible children in federally funded Medicaid, despite how cost-effective the program is for the State and the positive impact it has on public health more generally. *See, e.g.*, Doc. No. 5-2 ¶¶12-15.

Families are likely to be confused if federal benefits eligibility—let alone U.S. citizenship—differs by State. *See* Wong Decl. (Ex. E) ¶¶8b, 15, 21. Such a patchwork regime will be especially confusing for thousands of non-citizen parents who move into Plaintiffs' jurisdictions each year. *See* Ex. B ¶14 (in 2023, an estimated 26,916 non-citizen adults with a related child in the household moved from non-Plaintiff States into Plaintiff States). Parents of a covered child born in a non-Plaintiff State would be told at the time of birth that the child is not eligible for federal benefits because they lack lawful status—a belief that may reasonably stick with the parents even if they move into Plaintiff States. *See* Ex. D ¶¶15(b), (c), (d); Ex. K ¶51. If parents mistakenly believe that their child lacks the citizenship or immigration status necessary to qualify for federal benefits, they will be less likely to try to access those benefits, and thus less likely to enroll their child. *See* Ex. E ¶¶8b, 15; Ex. K ¶¶55-56. And even if a parent understands that her child, though stripped of lawful status by EO 14160, is eligible for federal benefits, the parent may be chilled from accessing her child's benefits for fear of subjecting the child to removal. Ample evidence substantiates this: when immigrants fear that accessing a public benefit subjects them or their child to a heightened risk of deportation, they are significantly less likely to access that benefit. *See* Barreto Decl. (Ex. A) ¶¶12(b), (e) 16, 19; Ex. E ¶¶12-16; Ex. K ¶56; Fink Decl. (Ex. N) ¶20. So it is entirely predictable that parents of covered children will be less likely to enroll their children in federal benefits when the Federal Government considers those children to be undocumented. Ex. A ¶¶12(b), (c), 17; Ex. E ¶11; Ex. G ¶¶26-27; Ex. F ¶¶59-61; Ex. K ¶56; Ex. J. ¶¶33-34; Acon Decl. (Ex. I) ¶¶10-11; Ex. N ¶20; Ex. Q ¶43; Barone Decl. (Ex. AA) ¶¶8-11; Ex. EE ¶50.

To offset the confusion and chilling effect, Plaintiff States' agencies that administer federal benefits programs will have to invest significant time and resources on the education and outreach efforts in which federal laws require them to engage. *See* Ex. G ¶37; Ex. F ¶¶51-56; Ex. J ¶¶27-

29; Ex. I ¶13; Ex. O ¶¶40-42; Ex. D ¶¶15, 16; López Decl. (Ex. P) ¶66;  Ex. R ¶43; Connors Decl. (Ex. BB) ¶¶9-12; Groginsky Decl. (Ex. II) ¶¶12-14; *see, e.g.*, 42 U.S.C. §§ 1397bb(a)(3), (a)(6), (c), 1397ff(d)(1) (requiring state outreach to potential enrollees in their States receiving federal CHIP funding); 20 U.S.C. § 1435(a)(2), (5), (6) (requiring identification of children who need early intervention services and public awareness efforts). Yet even with intensive educational efforts, it is likely that some number of eligible children will not be enrolled in federal benefits, significantly straining State budgets. Take, for example, Medicaid and CHIP—health insurance programs for which the Federal Government covers between 50 and 90 percent of all costs. Families that avoid enrolling in these programs are less likely to receive preventive non-emergent necessary care, but when they inevitably have a medical emergency, public hospitals—whom federal law requires to treat patients regardless of ability to pay—will be forced to absorb the high costs of providing emergency care. *See* Ex. G ¶31; Huck Decl. (Ex. H) ¶¶8, 12; Lucia Decl. (Ex. C) ¶16; Ex. E ¶13-14; Ex. Z ¶¶4, 8; Ex. N ¶¶21-24; Ex. Q ¶44; Underwood Decl. (Ex. T) ¶¶16-17. A decline in Medicaid enrollment will thus predictably increase uncompensated care costs, which are borne by public hospitals and state uncompensated care funds. Ex. G ¶¶24, 29; Ex. H ¶8; Ex. C ¶16; Ex. N ¶23; Ex. P ¶72; Ashmont Decl. (Ex. U) ¶¶9-12; Armijo Decl. (Ex. JJ) ¶16; *e.g.*, Johnson Decl. (Ex. DD) ¶7 (just ten uninsured patients cost public hospital $8 million in 2025). Plus, to the extent children born out of State were ineligible for publicly funded prenatal care, the mother and baby alike suffer health consequences, with attendant burdens on Plaintiff States' health systems. Ex. G ¶¶32-33; DeBlassie Decl. (Ex. HH) ¶24. Further, decreased utilization of federal benefits like SNAP and TANF will impose greater burdens on state social service agencies to fill the safety net gap, while risking children's cognitive, behavioral, and physical development. Ex. F ¶69; Moore Decl. (Ex. S) ¶¶36-37. And children with early health issues due to a lack of

federally supported health care or nutrition assistance are more likely to need state-funded early intervention services. Ex. F ¶69; Ex. G ¶34; Kimple Decl. (Ex. W) ¶¶17-18; Ex. AA ¶¶11-12.

Defendants' proposed half-measure would introduce a new set of fiscal harms, directly imposing on States the increased costs for statutorily mandated outreach and education, plus uncompensated care burdens, as hundreds of thousands of families with covered children seek to make sense of the injunction and protect their children from deportation. Defendants fail to say how States might ever be able to recover these costs in a "separate proceeding[]." Doc. No. 193 at 11. Only a full injunction of EO 14160 would protect States against the administrative burdens and fiscal injuries that even partially implementing the EO would impose.

b. In the Supreme Court, Defendants also proposed that States' harms could be remedied by an order enjoining EO 14160's application "within the respondent States, including to children born elsewhere but living in those States." *CASA*, 2025 WL 1773631, at *12 (citing Defendants' stay application at 23). Defendants appear to have abandoned that proposal.

In any event, such a proposal would also fail to provide the States with the complete relief to which equity entitles them in this case. For one, under a regime in which families can secure citizenship for their children simply by crossing a state line, families will have a powerful incentive to move into Plaintiff States. *Cf.* Tara Watson, *Enforcement and Immigrant Location Choice* (Nat'l Bureau of Econ. Rsch., Working Paper No. 19626, Nov. 2013). The predictable influx of families will cause Plaintiff States to expend greater resources providing social services to these families. *See, e.g.*, Doc. No. 5-2 ¶¶19, 25; Doc. No. 5-5 ¶18.

Further, this proposal presents its own costly administrative burdens for state agencies. The influx of families into Plaintiff States who have covered children born in non-Plaintiff States will present all the same administrative challenges for enrolling children in federally funded programs

who lack SSNs. *See supra* at 13-16. While it is hard to quantify how many families would move into Plaintiff States to secure the immense benefits of citizenship for otherwise status-less children, even without that incentive, the record shows that there is substantial routine movement of young children from non-Plaintiff States into Plaintiff States every year. *See* Ex. B ¶¶11-14. Thus, the number of citizen-children arriving without SSNs would be significant, and it would be far more challenging to enroll them in federally funded benefits than if they had received an SSN at birth.

Finally, a partial injunction of EO 14160 would also again chill participation in the States' benefits programs. If EO 14160 were fully effective in nearly half the country, there is a substantial risk that Plaintiff States' residents would fear for the security of their covered children even within Plaintiffs' borders, due to confusion arising from national citizenship entitlement varying by State. *See* Ex. A ¶¶12(d), (f), 122; Ex. D ¶¶13(a), (b). After all, even now Plaintiff States are unsure and cannot understand this proposal—whether, *e.g.*, an ICE removal proceeding that begins for a child born in Philadelphia must end when the child moves to Camden, and whether it may restart again if a family moves to Pennsylvania from New Jersey. This could again result in the States' own residents being chilled from accessing federally funded benefits for their young children, for the reasons discussed above, and with the attendant uncompensated care costs and strain on State services. *See supra* at 16-18. In other words, the only other proposal that Defendants have pressed—which they did not press in their most recent filing—incurs the same extraordinary costs, but adds new costs to boot. Neither is a workable way to achieve complete relief for the States. Only the nationwide injunction that this Court already ordered achieves complete relief.

## CONCLUSION

This Court should reaffirm its prior finding that this nationwide injunction is not "broader than necessary to provide complete relief" to the States.

July 15, 2025

ANDREA JOY CAMPBELL
  ATTORNEY GENERAL OF MASSACHUSETTS

David C. Kravitz (BBO No. 565688)
  *State Solicitor*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Commonwealth of*
*Massachusetts*


ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

Denise Levey*
  *Deputy Attorney General*
Michael L. Newman
  *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
  *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
denise.levey@doj.ca.gov

*Counsel for the State of California*

Respectfully submitted.

MATTHEW J. PLATKIN
  ATTORNEY GENERAL OF NEW JERSEY

Viviana M. Hanley (BBO No. 707266)
  *Deputy Attorney General*
Jeremy M. Feigenbaum*
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Shefali Saxena*
Elizabeth R. Walsh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
viviana.hanley@njoag.gov

*Counsel for the State of New Jersey*


PHIL WEISER
  ATTORNEY GENERAL OF COLORADO

Shannon Stevenson*
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

WILLIAM M. TONG
  ATTORNEY GENERAL OF CONNECTICUT

William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
janelle.medeiros@ct.gov

*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
  ATTORNEY GENERAL OF DELAWARE

Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
  ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA

Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney
  General for the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

ANNE E. LOPEZ
  ATTORNEY GENERAL OF HAWAIʻI

Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

AARON M. FREY
  ATTORNEY GENERAL OF MAINE

Sean D. Magenis (BBO No. 658578)
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
sean.d.magenis@maine.gov

*Counsel for the State of Maine*

ANTHONY G. BROWN
  ATTORNEY GENERAL OF MARYLAND

Adam D. Kirschner*
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
akirschner@oag.state.md.us
(410) 576-6424

*Counsel for the State of Maryland*

22

DANA NESSEL
  ATTORNEY GENERAL OF MICHIGAN

Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov

*Counsel for Attorney General Dana Nessel*
  *on behalf of the People of Michigan*

KEITH ELLISON
  ATTORNEY GENERAL OF MINNESOTA

John C. Keller*
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
  ATTORNEY GENERAL OF NEVADA

Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
hstern@ag.nv.gov

*Counsel for the State of Nevada*

RAÚL TORREZ
  ATTORNEY GENERAL OF NEW MEXICO

James W. Grayson*
  *Chief Deputy Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

LETITIA JAMES
  ATTORNEY GENERAL OF NEW YORK

Zoe Levine*
  *Special Counsel for Immigrant Justice*
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

*Counsel for the State of New York*

JEFF JACKSON
  ATTORNEY GENERAL OF NORTH CAROLINA

Daniel P. Mosteller*
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

23

PETER F. NERONHA
  ATTORNEY GENERAL OF RHODE ISLAND

Katherine Connolly Sadeck (BBO No. 681501)
  *Solicitor General*
Leonard Giarrano IV*
  *Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2480
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*

CHARITY R. CLARK
  ATTORNEY GENERAL OF VERMONT

Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for the State of Vermont*

JOSHUA L. KAUL
ATTORNEY GENERAL OF WISCONSIN

Gabe Johnson-Karp*
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
P.O. Box 7857
Madison, WI 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

DAVID CHIU*
  CITY ATTORNEY, CITY AND COUNTY
  OF SAN FRANCISCO

Yvonne R. Meré*
  *Chief Deputy City Attorney*
Sara J. Eisenberg*
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
1390 Market Street, 6th Floor
San Francisco, CA 94102-5408
(415) 505-0844
david.louk@sfcityatty.org

*Counsel for the City and County of San Francisco*

* admitted *pro hac vice*