# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEW JERSEY, *et al.*, | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 1:25-cv-10139-LTS |
| DONALD J. TRUMP, *et al.*, | : : | |
| Defendants. | : : : : | |

## <u>DECLARATION OF MEDHA D. MAKHLOUF</u>

I, Medha D. Makhlouf, declare and state as follows:

1. I am the Elsie de R. and Samuel P. Orlando Distinguished Professor and Founding Director of the Medical-Legal Partnership Clinic at Penn State Dickinson Law, in Carlisle, Pennsylvania. I am also an Assistant Professor (by courtesy) at Penn State College of Medicine in Hershey, Pennsylvania. I write this declaration in my personal capacity as an expert in support of New Jersey in the lawsuit regarding efforts by the State of New Jersey to challenge President Trump's executive order regarding birthright citizenship.

   a. I received my JD from Yale Law School and my AB from Brown University. Before joining Penn State Dickinson Law, I served as a legal services attorney. I have published more than 20 articles in legal, medical, and public health journals.

2. I am familiar with the litigation efforts brought by New Jersey along with other plaintiff states. I understand this litigation is happening as a result of President Trump's declaration

by executive order on January 20, 2025, that the Citizenship Clause of the 14th Amendment to the US Constitution does not confer birthright citizenship to children born to parents who are (1) unlawfully present or (2) lawfully but temporarily present.

3.  My research is focused on the laws and policies affecting access to health care and health-supporting public benefits for underserved communities, including immigrants. I have taught doctrinal courses in health law (Law and Medicine, Public Health Law), a seminar on health justice, as well as clinical courses focused on practicing law in an interdisciplinary context (Medical-Legal Partnership Clinic, Advanced Clinic). My work analyzes how laws create barriers to accessing health care and health-supporting public benefits for different groups.

4.  As Founding Director of the Medical-Legal Partnership Clinic at Penn State Dickinson Law, I supervise students in advising and representing people who have unmet civil legal needs and who cannot afford to hire an attorney. We primarily represent people facing barriers to accessing health care and/or public benefits; most of our clients are noncitizens.

5.  In 2021, I published an article about immigration surveillance in health care. One contribution of the article was its synthesis of research studies from multiple disciplines describing how fear of immigration consequences discourages noncitizens from seeking health care or enrolling in publicly funded health insurance even when they are legally entitled to do so. The article provides perspective on how immigration laws and policies can interfere with health policy goals such as promoting health care access, protecting public health, and using health care resources efficiently.

6.  I have attached a true and complete copy of my curriculum vitae as Exhibit 1 to this Declaration, which includes a list of all of my publications over the past 5 years.

7. All of the opinions expressed here are my own.

## Chilling Effects Based on Literature Review of
## Health Care Utilization and Health-Seeking Behavior

8. There is a large, multidisciplinary literature documenting how immigration policy affects immigrant access to health care.

   a. When immigrants are concerned about immigration surveillance (monitoring individuals or information for immigration enforcement purposes) in health care, they avoid engaging with the health care system. This might include delaying or canceling medical appointments and declining to apply for or enroll in publicly funded health insurance programs such as Medicaid. Common concerns relating to immigration surveillance include being targeted by immigration enforcement based on information disclosed in the course of obtaining health care or health insurance, and having immigration applications denied based on such information.

   b. Federal alienage restrictions in public benefit programs exclude all undocumented immigrants and many lawfully present noncitizens from federally funded health insurance programs, including Medicaid. Some states and cities have funded subsidized health insurance programs for uninsured residents who are ineligible for Medicaid.

   c. Studies have explored the social and policy determinants of limited access to health care for immigrants, which are tied to negative health consequences.[1] In general,

---

[1] *See, e.g.*, Meredith Van Natta et al., *Stratified Citizenship, Stratified Health: Examining Latinx Legal Status in the U.S. Healthcare Safety Net*, 220 SOC. SCI. & MED. 49 (2019); Heide Castañeda et al., *Immigration as a Social Determinant of Health*, 36 ANN. REV. PUB. HEALTH 375, 381 (2015);

noncitizens with more precarious immigration statuses have less access to health care, which can translate to diminished health outcomes. Other studies have used a "social determinants of health" lens to examine the health effects of immigration status itself, such as its effects on stress, mental health, depression, and feelings of self-worth.[2]

9.  Studies have shown how legal and policy changes relating to immigration status affect immigrants' health-seeking behavior.[3]

    a.  Barriers to health care that undocumented immigrants experience fall into three broad categories: the policy level, the health systems level, and the individual level. In a 2015 literature review of barriers to health care for undocumented immigrants, legal barriers to obtaining health insurance were the most-cited barrier.

    b.  One such legal barrier is the public charge statute and related regulations. The public charge statute deems immigrants who are dependent on the government for support inadmissible. Regulations describe the criteria immigration officers can consider in

---

Leo R. Chavez, *Undocumented Immigrants and Their Use of Medical Services in Orange County, California,* 74 SOC. SCI. & MED. 887, 887 (2012).

[2] *See, e.g.*, Kenneth Carswell et al., *The Relationship Between Trauma, Post-Migration Problems and the Psychological Well-Being of Refugees and Asylum Seekers*, 57 INT'L J. SOC. PSYCH. 107 (2011); James Quesada et al., *Structural Vulnerability and Health: Latino Migrant Laborers in the United States*, 30 MED. ANTHROPOL. 229 (2011); Jutta Lindert et al., *Depression and Anxiety in Labor Migrants and Refugees—A Systematic Review and Meta-Analysis*, 69 SOC. SCI. MED. 246 (2009).

[3] Karen Hacker et al., *Barriers to Health Care for Undocumented Immigrants: A Literature Review*, 8 RISK MANAGEMENT & HEALTHCARE POL'Y 175 (2015).

determining whether an applicant for admission is a public charge. In 2019, a new regulation permitted immigration officers to consider enrollment in Medicaid (among other public benefits) as a negative factor in public charge analyses. That regulation was rescinded in 2021. Researchers have studied the chilling effects of the 2019 expansion of public charge policy on immigrants' health care and public benefits utilization.[4] After implementation, noncitizens were more likely than citizens to disenroll from publicly funded health coverage, and more likely to choose not to apply for publicly funded health coverage in the first place. Routine health care utilization also decreased among immigrant families with young children. Inaccurate beliefs about the immigration consequences of falling ill and/or enrolling in public benefits tied to the policy change, including that enrollment in publicly funded health insurance programs could lead to deportation, were widespread among immigrants. These beliefs arose from sensationalized news coverage of deportations of immigrants with medical conditions; internalization of political rhetoric about immigrants misusing public benefits and as burdens on the government; and lack of information about the availability of publicly funded health

---

[4] *See, e.g.*, Stephanie Ettinger de Cuba et al., *Reduced Health Care Utilization Among Young Children of Immigrants After Donald Trump's Election and Proposed Public Charge Rule*, 1 HEALTH AFF. SCHOLAR 1 (2023); Carol L. Galletly et al., *US Public Charge Policy and Latinx Immigrants' Thoughts About Health and Healthcare Utilization*, 28 ETHNICITY & HEALTH 96 (2023); Errol L. Pierre, Citizenship as a Social Determinant of Health: Healthcare Access and Utilization in the Wake of the Public Charge Policy Change (2022) (unpublished manuscript), available at https://academicworks.cuny.edu/bb_etds/130/.

services, healthcare options more generally, or patient financial assistance programs offered by healthcare providers that are not considered in public charge analyses.

c.  Uptake of prenatal care among uninsured immigrant mothers is also affected by changes in immigration law and policy that heighten the risk, or perceived risk, of negative immigration consequences for them and their family members.

i.  In 2023, I coauthored a study showing that, after the 2018 proposed expansion of the public charge policy, uninsured pregnant immigrants were less likely than before the changes were proposed to initiate prenatal care in the first trimester. We also found that they were more likely than before the changes were proposed to delay initiating prenatal care until delivery. Although the data set we analyzed did not distinguish between different categories of immigrants, it presumably included uninsured lawfully present and uninsured undocumented immigrants.

ii.  Other studies have also demonstrated increased rates of pregnant immigrants delaying or avoiding prenatal care and Medicaid enrollment due to fear of negative immigration consequences as early as 2017, when a draft Executive Order regarding the expansion of public charge policy was leaked to the media.[5]

iii.  States that have elected the Children's Health Insurance Program From Coverage to End of Pregnancy option (formerly called the "unborn child option") receive federal reimbursement for providing pregnancy-related care to residents,

---

[5] *See, e.g.*, Scarlett Sijia Wang et al., *Changes in the Public Charge Rule and Health of Mothers and Infants Enrolled in New York State's Medicaid Program, 2014-2019*, 112 AM. J. PUB. HEALTH 1747 (2022).

regardless of their immigration status. The rationale for this policy is that the coverage will benefit the U.S. citizen child born of the pregnancy, regardless of the immigration status of the mother. In a patchwork citizenship regime, pregnant uninsured immigrants residing in the 9 non-plaintiff states that have elected this option will presumably no longer be eligible for coverage of pre- and peri-natal care.[6] If those children later move to New Jersey or another plaintiff state and enroll in Medicaid, plaintiff states will be responsible for costs associated with any health problems that arose from the lack of prenatal care.

10. The scholarly literature suggests that when immigrants are chilled from accessing preventive or routine health care, utilization is likely to shift toward more inefficient and expensive forms of health care.

    a.  This was the primary concern that motivated Congress to pass legislation in 2009 permitting states to access federal funding to subsidize care for lawfully present immigrant children and pregnant women who had lost Medicaid coverage under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Congress was persuaded by evidence that immigrant children and pregnant women were, without publicly funded health coverage, less likely to access preventive care. This would, in turn, lead to delayed diagnoses of acute and chronic conditions, preventable health complications, and a shift to care-seeking in hospital emergency

---

[6] The states that have elected this option and are not plaintiffs in this litigation or the similar litigation pending in *Washington v. Trump* (Case No. 2:25-cv-00127) are: Arkansas, Louisiana, Montana, Nebraska, Oklahoma, South Dakota, Tennessee, Texas, and Virginia. Oregon and Washington are not plaintiffs in this litigation but are plaintiffs in *Washington v. Trump*.

departments. Concerns about the law's negative effects on the health outcomes of immigrant children and pregnant women and on its financial implications for the federal government motivated the 2009 reform.

b. States have also relied on such evidence to enact policy reforms that expand subsidized care for immigrants excluded from federally funded health coverage. For example, studies showing that emergent-only hemodialysis for patients with end-stage renal disease is more than triple the cost of scheduled hemodialysis were influential in Colorado's decision to recognize end-stage renal disease as an emergency medical condition with treatment eligible for reimbursement from emergency Medicaid.[7] These studies also found that scheduled dialysis was associated with reduced hospitalizations and mortality. In Illinois, state funds are used to cover the cost of kidney transplants for uninsured residents, regardless of immigration status, in large part because of the cost savings relative to paying for years of hemodialysis.

**<u>Chilling Effects Based on Experiences In Legal Services And Clinic Directorship</u>**

11. I have represented immigrants in immigration and public benefits matters as a legal services attorney and in partnership with legal services organizations. From 2008-2013, I worked on numerous immigration matters as a Public Interest Fellow at the Political Asylum / Immigration Representation Project in Boston, MA, as a Legal Advocate at Asylum Access in Quito, Ecuador, and as an Associate at Ropes & Gray LLP in Boston,

---

[7] *See, e.g.*, Lilia Cervantes et al., *Economic Impact of a Change in Medicaid Coverage Policy for Dialysis Care of Undocumented Immigrants*, 34 J. AM. SOC'Y NEPHROLOGY 1132 (2023).

MA, providing *pro bono* services. From 2013-2015, I served as a Staff Attorney at Community Legal Aid / Central West Justice Center in Worcester, MA, directing the organization's medical-legal partnerships. My caseload there was diverse, but most of my clients needed counsel on public benefits and immigration matters.

12. In 2016, I founded the Medical-Legal Partnership Clinic at Penn State Dickinson Law to address the health-harming legal needs of community members through joint advocacy with health care providers.

    a. The Clinic is committed to improving the health and well-being of vulnerable populations through joint medical-legal advocacy; the professional preparation of students and trainees who will serve the legal and health care needs of others; and the discovery of knowledge that will benefit all.

    b. By design, nearly all of the Clinic's clients are referred to us by health care providers who have identified patients with unmet civil legal needs.

    c. In the last few years, the Clinic has focused on direct representation of individuals in public benefits and limited immigration matters.

13. In my legal practice, I frequently hear concerns and questions from immigrant clients about whether enrolling in public benefits, including Medicaid, will affect their ability to remain in the United States.

    a. Some clients worry that applying for public benefits will make them or their family members targets of immigration enforcement. Public benefits applications ask for substantial personal information such as home address, telephone number, immigration status, employer name, proof of income, and the names and

immigration statuses of family members. Without assurance that the law protects information submitted on public benefits applications from being used for immigration enforcement purposes, I believe that many clients would not risk applying.

b.  More often, clients worry that enrolling in public benefits will negatively affect their or their family members' pending or future immigration applications. Often, this concern is based on an inaccurate understanding of public charge policy. The confusion is understandable because the policy is complex. In my experience, nearly every immigrant client seeking advice regarding Medicaid eligibility asks about public charge, but the policy applies to very few of them. Based on my experience, if a parent believes that enrolling their child in public benefits will create negative immigration consequences for the child, they will hesitate to apply for public benefits. By contrast, if a parent understands that enrolling in public benefits will not create negative immigration consequences for the child, the parent will be much more comfortable proceeding with the application.

c.  When health care provider staff—typically, social workers, care coordination team members, or community health workers—refer patients to the Clinic, it is usually because the patient needs medical treatment, does not have health insurance, and cannot afford to pay for the treatment out of pocket. Sometimes, the patient has already applied for Medicaid and the application has been denied. Often, staff members feel unprepared to answer the patient's questions about public benefits and immigration status and they are grateful to have a resource to which to refer the patient.

14. Medical-legal partnerships are designed to reach people who otherwise would not likely have sought or received legal services for their unmet civil legal needs. Although health care providers are often aware that unmet civil legal needs negatively affect patients' health, they can be wary of screening for such needs because they do not have the skills to address them or resources to which to refer such patients. Medical-legal partnerships fill the gap. Health care providers are trained to identify patients with unmet civil legal needs and refer them to a trusted legal services provider. Legal services providers, in turn, can rely on referring health care providers to provide clinical expertise that can be helpful in the legal matter, such as letters describing diagnoses and necessary treatment, disability-related forms, and relevant medical records.

   a. Trust is what makes for a successful medical-legal partnership. Only patients who trust their health care providers will accept a referral to a legal services provider. Often, my students or I will meet with newly referred patients at the health care provider site to reinforce that trust and to communicate that we are "on the same side" as their health care provider.

   b. Based on my experience, it is clear how easy it would be for many immigrant families to fall through the cracks of the healthcare system and never engage with legal services regarding their lack of health insurance. First, our clients typically do not understand a lack of health insurance or a denial of Medicaid as an issue that could be addressed through legal advocacy. Prior to working with medical-legal partnerships, I believe many healthcare providers would feel the same. Second, many of our clients cannot afford to pay an attorney and do not know that organizations providing free legal services exist. Third, many clients have

preconceived negative conceptions of lawyers, either based on stereotypes or their prior experiences. Some clients may believe that legal services provided for free could not be of high quality. Fourth, many of our clients are ill, facing financial challenges, dealing with immigration-related stressors, and have transportation-related barriers. Medical-legal partnerships are designed to serve those clients with complex health and social needs.

15. Based on my professional experience and scholarly research, it is my opinion that a patchwork citizenship regime would add to the confusion and wariness that immigrants already experience when faced with the decision of whether and how to apply for public benefits.

    a. As a direct legal services provider, I am deeply familiar with the kinds of concerns that immigrants and immigrant parents have in navigating a complex welfare eligibility environment. I have observed clients hesitating to take any action that they believe would risk negative immigration consequences for their children, even if the alternative is delaying or going without preventive medical care.

    b. Under a regime in which citizenship turns "on and off" with respect to public benefits, existing concerns about potential negative effects of enrolling will be magnified. It is highly likely that immigrant parents will be wary of enrolling children in public benefits, including Medicaid, even when they are eligible because of concerns that this information will one day be used to threaten their child's ability to remain in the United States.

    c. Even if an immigrant parent of a child subject to the Order who moved to New Jersey (or another plaintiff State) were to decide to enroll the child in Medicaid, they would

likely encounter obstacles in providing the required verifications to the state Medicaid agency as a result of the patchwork citizenship regime. For example, the parents of a child born in a Pennsylvania hospital would not be able to apply for a Social Security number for a child at the hospital during the birth registration process. As a general rule, applicants for Medicaid must provide their Social Security number. The parents would have to apply for it after moving to a plaintiff State.

d. The process for obtaining such verifications is not always straightforward, and it can take time and money. I offer the Clinic's experience assisting a client with obtaining an out-of-state birth certificate and applying for a Social Security number (SSN) for his child: My students spent several hours conducting research on the internet and on the phone with both the out-of-state hospital where the child was born and the state agency in order to determine the process for obtaining a birth certificate for a child born in that state and having it mailed securely to Pennsylvania. They then completed the request form with the client and mailed it to the out-of-state state agency with the required fee. They completed forms to request the child's birth records from the out-of-state hospital, which were needed as a form of identity for the SSN application, and they arrived after about one month. They also spent several hours on hold with the Social Security Administration to determine if the child already had a SSN. Upon learning that he did not, they assisted our client with completing the form to apply for a new SSN and researched ways to prove the relationship between our client and the child, since our client was not named as a parent on the birth certificate. When the birth certificate arrived a few weeks later,

the students accompanied our client to the Social Security Administration office with all of the required documents, where they waited in line before meeting with an officer, a process which took approximately two hours. Our client lost income that day because he had to take off work. Overall, the experience was confusing, time-consuming, and expensive. The Pennsylvania Department of Human Services, which administers Medicaid in Pennsylvania, did not assist with obtaining any of these verifications. In my experience, the case managers at state Medicaid agencies do not have the bandwidth to do more than provide cursory advice to applicants who are missing required verification documents.

16. Based on my expertise, experience, and understanding, it is my opinion that many more noncitizens in need of medical care will recede into the shadows if Executive Order 14160 takes effect anywhere. This includes expectant undocumented mothers, who I believe may be less likely to seek out prenatal care.  It also includes undocumented or lawfully but temporarily present parents, whom I believe would be significantly less likely to enroll their eligible children in public health insurance if those children are undocumented and thus deportable than if their children were citizens and thus not deportable. Parents will be faced with the devastating choice of declining to access affordable health insurance for their young children or else subjecting their child to a heightened risk of deportation to a country the child has never known. Based on my professional experience and scholarly research, I believe many parents faced with this catch-22 would shelter their child from deportation even if it means foregoing preventive and routine health care. Altogether, it will likely contribute to negative health outcomes in immigrant communities, with

consequences for the larger communities in which they live, health care providers, and the health care system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this <u>14th</u> day of July, 2025, in Essexville, Michigan.

_____
Medha D. Makhlouf
Professor of Law
Penn State Dickinson Law

# EXHIBIT 1

## TO MAKHLOUF

## DECLARATION

# MEDHA D. MAKHLOUF

150 South College Street ◆ Carlisle, PA 17013 ◆ (717) 241-3521 ◆ mdm5849@psu.edu

## ACADEMIC APPOINTMENTS

**THE PENNSYLVANIA STATE UNIVERSITY**
Dickinson Law

| | |
|---|---|
| *Professor* (with tenure) | 2023 – Present |
| *Elsie de R. and Samuel P. Orlando Distinguished Professor* | 2022 – Present |
| *Associate Professor* | 2022 – 2023 |
| *Assistant Professor* | 2017 – 2022 |
| *Director, Medical-Legal Partnership Clinic* | 2015 – Present |
| *Clinical Professor* | 2015 – 2017 |

College of Medicine

| | |
|---|---|
| *Assistant Professor*, Department of Public Health Sciences | 2019 – Present |

Courses:    Public Health Law; Law and Medicine; Health Justice Seminar; Medical-Legal Partnership Clinic; Advanced Clinic

Honors:    Penn State Dickinson Law Phillip M. Scott Teaching Excellence Award (2024)
Penn State Dickinson Law Faculty of the Year (2020)
Atlantic Fellow for Health Equity, Milken Institute School of Public Health, George Washington University (2020)
American Society of Law, Medicine & Ethics and Saint Louis University Center for Health Law Studies – Health Law Scholar (2017)

## EDUCATION

**YALE LAW SCHOOL,** J.D., 2008
Honors:    Yale Law School Public Interest Fellowship
Mary A. McCarthy Fellowship in Public Interest Law
Initiative for Public Interest Law at Yale Grant
Activities:  *The Yale Law Journal*, Senior Editor
*Yale Journal of Health Policy, Law & Ethics*, Articles Editor
Immigration Legal Services Clinic (Student Director)

**BROWN UNIVERSITY,** A.B., *magna cum laude*, Human Biology (Honors) and Middle East Studies, 2005
Honors:    Phi Beta Kappa
Sigma Xi, The Scientific Research Society
Activities:  Study Abroad at the American University in Cairo, Egypt, Spring 2004
Teacher of English for Speakers of Other Languages

## SELECTED PUBLICATIONS

### Law Journals

*Beyond Medical Tourism: Pressured Exits and Global Health Justice,* 98 Tul. L. Rev. Online 1 (2024).
- Solicited response to Jayesh Rathod, *Pressured Exit*, 98 Tul. L. Rev. 805 (2024).

*Charity Care for All: State Efforts to Ensure Equitable Access to Financial Assistance for Noncitizen Patients*, 23 Houston J. Health L. & Pol'y 55 (2024) (symposium issue: States as Health Policy Laboratories).

*INTRODUCTION: Medical-Legal Partnerships: Equity, Evolution, and Evaluation*, 51 J.L. Med. & Ethics 732 (2023) (with Katherine K. Kraschel, James Bhandary-Alexander, Yael Z. Cannon, Vicki W. Girard, Abbe R. Gluck, and Jennifer L. Huer).

*Interagency Dynamics in Matters of Health and Immigration*, 103 B.U. L. Rev. 1095 (2023).
- Cited in Proposed Interventors' Memorandum of Law in Support of Their Motion to Intervene as Defendants at 5, Kansas et al. v. United States of America et al., No. 1:24-cv-00150-DMT-CRH (D.N.D.).

*Stemming the Shadow Pandemic: Integrating Sociolegal Services in Contact Tracing and Beyond*, 50 J.L. Med. & Ethics 719 (2023) (peer-reviewed) (special issue: Health Justice: Engaging Critical Perspectives in Health Law and Policy).

*Immigration Reforms as Health Policy*, 15 St. Louis U. J. Health L. & Pol'y 275 (2022) (with Patrick J. Glen) (special issue: Health Care after the 2020 Election).

*Towards Racial Justice: The Role of Medical-Legal Partnerships*, 50 J.L. Med. & Ethics 117 (2022) (peer-reviewed) (special issue: Health Law and Anti-Racism).

*Setting the Health Justice Agenda: Addressing Health Inequity and Injustice in the Post-Pandemic Clinic*, 28 Clinical L. Rev. 45 (2021) (with Emily A. Benfer, James Bhandary-Alexander, Yael Cannon, and Tomar Pierson-Brown) (symposium issue: 2020 Hindsight: The Pandemic, Protests, and Political Perils).

*Health Care Sanctuaries*, 20 Yale J. Health Pol'y, L. & Ethics 1 (2021) (peer-reviewed).
- Cited in Amici Curiae Brief of AANHPI, Black, and Immigrant Women's Organizations in Support of Petitioners at 30, FDA v. Alliance for Hippocratic Medicine, 602 U.S. __ (2024) (No. 23-235).
- Cited in Congressional Research Service, Noncitizens' Access to Health Care (CRS Report No. R47351), (Nov. 14, 2024).
- Reviewed in The Regulatory Review (June 6, 2022).
- Featured in Legal Theory Blog (Nov. 15, 2021).

*A Pathway to Health Care Citizenship for DACA Beneficiaries*, 12 Calif. L. Rev. Online 29 (2021) (with Patrick J. Glen).
- Selected by ImmigrationProf Blog as Immigration Article of the Day (Nov. 13, 2021).

*Laboratories of Exclusion: Medicaid, Federalism, and Immigrants*, 95 N.Y.U. L. REV. 1680 (2020).
- Cited in Brief of Amici Curiae Immigration Law Professors in Support of Appellees' Petition for Rehearing En Banc at 14, John Doe #1 et al. v. Donald Trump et al., No. 19-36020 (9th Cir. 2021).
- Reviewed in Jessica Lind Mantel, *Federalism and Health Care: Lessons from State Policies on Immigrants' Eligibility for Medicaid*, JOTWELL (Nov. 18, 2020).
- Selected by ImmigrationProf Blog as Immigration Article of the Day (May 27, 2020).

*Immigrants and Interdependence: How the COVID-19 Pandemic Exposes the Folly of the New Public Charge Rule*, 115 NW. U. L. REV. ONLINE 146 (2020) (with Jasmine Sandhu).

*The Ethics of DNA Testing at the Border*, 46 AM. J.L. & MED. 253 (2020) (peer-reviewed) (symposium issue: Emerging Issues in Bioethics).
- Featured in HealthLawProf Blog (Sept. 26, 2020).

**Medical and Public Health Journals**

*Can Medical-Legal Partnerships Do More to Advance Reproductive Justice After Dobbs?*, 26 AMA J. ETHICS E655 (2024) (with Natasha Rappazzo).

*Uninsured Immigrants in the United States Significantly Delayed the Initiation of Prenatal Care After the Changes to the Public Charge Rule*, 225 PUB. HEALTH 1 (2023) (with Sung W. Choi, Edeanya Agbese, Gunah Kim, and Douglas Leslie).

*Expanding Access to Health Care for DACA Recipients*, 389 NEW ENG. J. MED. 387 (2023) (with Jin K. Park and Rachel Fabi).

*State Flexibility in Emergency Medicaid to Care for Uninsured Noncitizens*, 4 JAMA HEALTH F. e231997 (2023) (with Jin K. Park and Clarisa Reyes-Becerra).

*Highlighting State Innovation to Close Coverage Gaps for Perinatal Care for Noncitizens*, 330 JAMA 215 (2023) (with Jin K. Park and Clarisa Reyes-Becerra).

**Book Chapters**

*Reflective Practice for Antiracist Teaching and Learning*, *in* ANTIRACIST TEACHING AND LEARNING __ (forthcoming 2026) (with Lucy Johnston-Walsh).

*Gendered Effects of U.S. Pandemic Border Policy on Migrants from Central America*, *in* ROUTLEDGE GENDER COMPANION TO GENDER AND COVID-19 247 (Linda C. McClain & Aziza Ahmed eds., 2024).

*Destigmatizing Disability in the Law of Immigration Admissions*, *in* DISABILITY, HEALTH, LAW, AND BIOETHICS 187 (I. Glenn Cohen, Carmel Shachar, Anita Silvers, Michael Ashley Stein eds., 2020).
- Selected by ImmigrationProf Blog as Immigration Article of the Day (May 19, 2020).

## OP-EDS AND WRITING FOR PUBLIC AUDIENCES

*Regulating Skin Lightening Products: A Case Study of Structural Forces Shaping Inequities in Health*, JOTWELL (August 16, 2024) (reviewing Colleen Campbell, *Intersectionality Matters in Food and Drug Law,* 95 UNIV. COLO. L. REV. 1 (2024)).

*Addressing the Harms of Bureaucratization in the Public Home Care System*, JOTWELL (Sept. 15, 2023) (reviewing Yiran Zhang, *The Care Bureaucracy*, 99 INDIANA L.J. 1241 (2024)).

*Opinion: Faster is Not Always Better: We Must Reform the Asylum Process the Right Way*, PENNLIVE (Dec. 9, 2022) (with Dr. Zeina Saliba).

*Paid Sick Leave and Health Justice*, JOTWELL (Nov. 11, 2022) (reviewing Shefali Milczarek-Desai, *Opening the Pandemic Portal to Re-Imagine Paid Sick Leave for Immigrant Workers*, 111 CALIF. L. REV. 1171 (2023)).

*Opinion: Biden Must Stop Using "Public Health" Excuse To Immediately Expel Migrants*, HOUSTON CHRON. (Mar. 20, 2022) (with Dr. Sarah Battistich).

*Compounding Vulnerability: Hospital Emergency Rooms as Sites of Race- and Class-Based Police Surveillance*, JOTWELL (Nov. 10, 2021) (reviewing Ji Seon Song, *Policing the Emergency Room,* 134 HARV. L. REV. 2646 (2021)).

*Health Justice for Immigrants Revisited*, BILL OF HEALTH (Sept. 17, 2021) (digital symposium: Health Justice).

*An Equitable Distribution of COVID-19 Vaccine Must Include Noncitizens*, THE HILL (Jan. 26, 2021) (with Raúl M. Grijalva, Dr. Megan L. Srinivas, and Dr. Gilberto Lopez).

*Addressing Racism through Medical-Legal Partnerships*, BILL OF HEALTH (Sept. 24, 2020) (digital symposium: Understanding the Role of Race in Health).
- Reprinted in CLEA NEWSLETTER (Clinical Legal Educ. Ass'n, Pa.), Apr. 27, 2021, at 13.

## SELECTED SCHOLARLY PRESENTATIONS

*Health Justice for Migrants*
- 2025 American Society for Law, Medicine & Ethics (ASLME), Health Law Professors Conference, Boston University School of Law, Boston, MA.
- 2025 Migration and Diversity Initiative Paper Workshop, Penn State.
- 2025 Health Law and Policy Workshop, UCLA Law, Los Angeles, CA.
- 2024 ASLME Health Law Professors Conference, Temple University Beasley School of Law, Philadelphia, PA.

*The Legal Construction of Health Emergencies*
- 2024 AALS Annual Meeting, Section on Poverty Law, Selected Presenter, Washington, D.C.
- 2023 ASLME Health Law Professors Conference, University of Maryland Francis King Carey School of Law, Baltimore, MD.

*Charity Care for All: State Efforts to Ensure Equitable Access to Financial Assistance for Noncitizen Patients*
- 2023 Migration and Diversity Initiative Paper Workshop, Penn State.

- 2022 *Houston Journal of Health Law & Policy* Symposium, Invited Presenter, University of Houston Law Center.

*Gendered Effects of U.S. Pandemic Border Policy on Migrants from Central America*
- 2022 Migration and Diversity Initiative Paper Workshop, Penn State.
- 2022 Gender and COVID-19 Handbook Workshop, UC Irvine Law.

*Towards Racial Justice: The Role of Medical-Legal Partnerships*
- 2022 *Journal of Law, Medicine & Ethics* Symposium, Invited Presenter, University of Pennsylvania Carey Law School, Philadelphia, PA.
- 2021 AALS Virtual Poverty Law Workshop, Selected Presenter.

*Interagency Dynamics in Matters of Health and Immigration*
- 2022 AALS Virtual Health Law Workshop.
- 2022 Health Law Beyond Health Law Workshop, Petrie-Flom Center for Health Law Policy, Bioethics, and Biotechnology, Harvard Law School.
- 2021 *Clinical Law Review* Writers' Workshop, NYU School of Law.

*Stemming the Shadow Pandemic: Integrating Sociolegal Needs Screening with Health Care in Contact Tracing and Beyond*
- 2022 *Journal of Law, Medicine & Ethics* Symposium, Invited Presenter, UCLA Law, Los Angeles, California.
- 2021 AALS Annual Meeting, Section on Law, Medicine, and Health Care, Selected Presenter.

*Health Care Sanctuaries*
- 2021 Network for Public Health Law & American Society for Law, Medicine & Ethics, Public Health Law Conference, Selected Presenter, Baltimore, MD.
- 2021 Privacy Law Scholars Conference, Selected Presenter.
- 2020 AALS Virtual Health Law Workshop.
- 2020 *Annals of Health Law & Life Sciences* Annual Symposium on Health Care and Policy: Viewing Health Justice Through the Lens of Public Health Crises, Selected Presenter, Beazley Institute of Health Law and Policy, Loyola University Chicago School of Law.
- 2020 *Clinical Law Review* Writers' Workshop, NYU School of Law.

*Immigrants and Interdependence: How the COVID-19 Pandemic Exposes the Folly of the New Public Charge Rule*
- 2020 Mini-Conference on Coronavirus and Law, University of Oklahoma School of Law.

*The Ethics of DNA Testing at the Border*
- 2020 *American Journal of Law & Medicine* Symposium: Emerging Issues in Bioethics, Selected Presenter, Boston University School of Law, Boston, MA.

*Laboratories of Exclusion: Medicaid, Federalism, and Immigrants*
- 2020 AALS Virtual Poverty Law Workshop, Invited Presenter.

## **OTHER SELECTED PRESENTATIONS**

*Makhlouf*                                    5

"Plenary Panel: Key Updates for a Tumultuous Time," ASLME Health Law Professors Conference, Invited Panelist, June 5, 2025.

"Lessons from Reproductive Justice: What the Movement Can Teach Other Doctrines, from the Nascent to the Stagnant," AALS Annual Meeting, Invited Panelist, Jan. 10, 2025.

"Supporting the Student Scholar," AALS Annual Meeting, Selected Panelist, Jan. 10, 2025.

"Plenary Session: Professional Development, Leadership and Visibility," AAPI/MENA Women in the Legal Academy Workshop, William & Mary Law School, Invited Panelist, Oct. 26, 2024.

"The Law and Policy of Immigrant Access to Health Care," Health Law Class, University of Michigan Law School, Invited Speaker, Oct. 8, 2024.

"The Impact of *SFFA* on the Health of Traditionally Marginalized Populations," The Future of Health Equity after the End of Affirmative Action, 2024 Annual Health Law Conference, Center for Health Policy and Law, Northeastern University School of Law, Invited Panelist, Apr. 12, 2024.

"Immigrants and Public Benefits: Eligibility, Advocacy, and Partnering with Legal Services," Social Work Education Series, Penn State College of Medicine, Invited Speaker, Mar. 26, 2024.

"The End of the COVID-19 Public Health Emergency: Lessons Learned and the Future of Pandemic Law & Policy," 2024 AALS Annual Meeting, Panel Organizer and Moderator, Jan. 5, 2024.

"Testimony on Ending Medical Deportations (Bill No. 230649)," Committee on Public Health and Human Services, Council of the City of Philadelphia, Philadelphia, PA, Nov. 21, 2023.

"Immigrant Access to Public Benefits," Public Health Law Seminar, Boston University School of Public Health, Invited Guest, Nov. 1, 2023.

"The Role of MLP in Advancing Racial Justice," Medical-Legal Partnerships: Equity, Evaluation, and Evolution, Yale Law School, Panel Organizer and Moderator, Mar. 3, 2023.

"Public Health is Universal: Building Better Engagement via Scholarship & Curriculum," ASLME Health Law Professors Conference, Sandra Day O'Connor College of Law, Arizona State University, Invited Panelist, June 3, 2022.

"Lessons for Clinicians from *The Art of Gathering* and Beyond," AALS Conference on Clinical Legal Education, Panel Organizer, May 12, 2022.

"Mind the Gap: Immigration Policies Can Harm Health Outcomes in the USA," Jaharis Podcast on Health and Intellectual Property, Mary and Michael Jaharis Health Law Institute, DePaul College of Law, Invited Guest, May 9, 2022.

"Immigration and Health Justice," *Georgetown Immigration Law Journal* Scholar Series, Invited Panelist, Mar. 21, 2022.

"Immigration and Disability Law," Getting Radical in the South Conference, University of Texas School of Law, Invited Moderator, Feb. 15, 2022.

"Medical-Legal Partnerships: Taking Interprofessional Advocacy to the Next Level," Summit on Health Justice, Penn State College of Medicine, Dec. 10, 2021.

"Immigrant Access to Health Care," Penn Law American Constitution Society, Invited Speaker, Dec. 1, 2021.

"Appointments Committee Workshop," American Association of Law Schools, Invited Panelist, Aug. 5, 2021.

"Health Equity for Children and Youth Post-COVID," ASLME Health Law Professors Conference, Northeastern University School of Law, Panelist, June 9, 2021.

"Jay Healey Teaching Session: Radical Humanity, Vulnerability, and Community in Law Teaching and Learning," ASLME Health Law Professors Conference, Northeastern University School of Law, Invited Panelist, June 7, 2021.

"The Law and Policy of Immigrant Access to Health Care," Hall Center Virtual Grand Rounds, Indiana University Robert H. McKinney School of Law, Invited Speaker, Apr. 16, 2021.

"Medicaid, Federalism, and Immigrants," Law and Inequality Class, University of Pennsylvania Carey Law School, Invited Guest, Apr. 15, 2021.

"The Public Charge Law and the Pandemic," Public Health Law Class, Indiana University Robert H. McKinney School of Law, Invited Guest, Mar. 29, 2021.

"Immigrant Health: Policy and Health Services," Migration and Health Class, Arizona State University School of Transborder Studies, Invited Guest, March 25, 2021.

"Immigrant Access to Health Coverage: Law and Policy," The Division of Health Services and Behavioral Research Seminar Series, Penn State College of Medicine, Invited Guest, Nov. 17, 2020.

"COVID-19 Law and Policy Briefings: Immigration," Public Health Law Watch, Invited Guest (with Wendy E. Parmet and Nicolas Terry), Apr. 28, 2020.

## SELECTED MEDIA APPEARANCES

Web Article Interview, Dan McKay, *Hospitals Brace for Immigration Agents, Legal Clashes*, LAW360, Jan. 28, 2025.

Web Article Quote, Xiomara Moore, *Texas' 90,000 DACA Recipients Can Sign Up For Affordable Care Act Coverage – For Now*, TEX. TRIBUNE, Nov. 12, 2024.

Web Article Interview, Catherine Caruso, *A Lehigh Valley Hospital Is Trying To Deport An Undocumented Comatose Patient*, BUCKS COUNTY BEACON, Mar. 10, 2023.

Web Article Interview, Mike LaSusa, *Budget Bill May Boost Unauthorized Immigrants' Health Care*, LAW360, Nov. 19, 2021.

Web Article Interview, Harri Leigh, *As Officials Urge Student Vaccinations, Some Colleges Considering Vaccine Requirements*, Fox43, Apr. 14, 2021.

Web Article Interview, Aubrey Whelan, *Vulnerable Immigrants in Philly Are Scrambling to Get COVID-19 Vaccine with Few Resources or Outreach*, Philadelphia Inquirer, Mar. 2, 2021.

Web Article Interview, Candice Norwood, *Trump Restricts Immigration Amid the Pandemic. Critics See it as an Excuse to Push His Own Agenda*, PBS News Hour, July 28, 2020.

## LEGAL EXPERIENCE

**COMMUNITY LEGAL AID / CENTRAL WEST JUSTICE CENTER,** Worcester, MA          2013 –2015
*Staff Attorney*. Directed the day-to-day operations of the organization's medical-legal partnerships with area community health centers and hospitals.
- Provided holistic legal services to address the underlying social and environmental causes of poor health in low-income communities. Areas of practice included health care and other public benefits, fair housing rights, homelessness prevention, immigration, education, and family law.
- Trained medical providers and community advocates on the laws and programs that safeguard health and welfare.
- Advocated for laws and policies that promote the health of vulnerable populations.

**ROPES & GRAY LLP,** Boston, MA          2010 - 2013
*Associate*. Diverse practice focused on complex business litigation. Researched and wrote legal memoranda, pleadings, motion papers, and briefs. Participated in all stages of discovery, including reviewing documents, preparing expert reports, managing expert discovery, and preparing materials and witnesses for depositions. Maintained a robust pro bono practice, including:
- Serving as the Immigration Team Leader for the firm's medical-legal partnership and representing numerous applicants for humanitarian immigration benefits.
- Supervising and advising associates and law students in immigration matters, including asylum, VAWA, and family-based petitions; student visa extensions; adjustments of status; and naturalizations. Interviewed potential clients and identified legal issues relating to housing, education, income supports, family, and immigration.

**ASYLUM ACCESS ECUADOR,** Quito, Ecuador          2009 - 2010
*Legal Advocate*. Represented more than 50 asylum applicants in Ecuador, and advocated for clients' rights relating to employment, education, and public safety.

**POLITICAL ASYLUM/IMMIGRATION REPRESENTATION PROJECT,** Boston, MA          2008 - 2009
*Yale Public Interest Fellow.* Represented non-citizens in Immigration Court and before U.S. Citizenship and Immigration Services, with a focus on gender-based asylum claims. Won all cases.

## INTERPROFESSIONAL EDUCATION & COLLABORATION

- Director, Joint Degree Programs in Law and Public Health at Penn State Dickinson Law and Penn State College of Medicine, 2017-present
- Working Group Member, Penn State Migration and Diversity Initiative, 2022-present
- Leadership Team Member for Health Equity Immersion: Harrisburg (an immersive 5-hour learning experience offered each semester for law and medical students and medical residents

developed to educate learners about the social and political roots of health disparities in the region in conjunction with Penn State College of Medicine faculty), 2022-2023

- Co-faculty for joint sessions of Penn State Dickinson Law students enrolled in the Medical-Legal Partnership Clinic and Penn State College of Medicine students enrolled in the Global Health Scholars Program and the Health Equity Scholars Program, 2022-present
- Executive Planning Team Member and Guest Editor, Medical-Legal Partnerships: Equity, Evaluation, and Evolution (a March 2023 conference focused on academic MLPs co-hosted by Yale Law School, Georgetown Law, and Penn State Dickinson Law, accompanied by a special issue of the *Journal of Law, Medicine, and Ethics*), 2022-23
- Member, Penn State University Public Health Program Community Advisory Board, 2017-2023
- Executive Planning Team Member, Summit on Health Justice (a convening focused on research, teaching, and service to advance health equity), in conjunction with Penn State College of Medicine, 2021-22
- Co-Director, Treating Medical Errors: A Medical-Legal Colloquium (a day-long trial simulation and discussion for law students and medical residents co-taught with Penn State College of Medicine faculty), 2016-17

## ACADEMIC SERVICE AND ACTIVITIES

- Penn State Dickinson Law Faculty Committees
  - Admissions Committee, 2015-19 and 2021-24
  - Appointments Committee, 2016-18 and 2019-22 (Chair, 2019-22)
  - Curriculum and Sabbatical Committee, 2022-24
  - Faculty Rights and Responsibilities Committee, 2019-20
  - Honor Code Committee, 2018-19
  - International Programs & Graduate Education Committee, Chair, 2023-24
  - Law Review Committee, 2016-19 (Chair, 2018-19)
  - Orientation Committee, 2021-22
  - Promotion & Tenure Committee, Secretary, 2023-24
- Ad Hoc Committees
  - Dean Search Committee, 2018-19
  - Law School Reunification Panel, 2023
  - Academic Administrative Evaluation Committee, 2023-24
- Professional Doctoral Committee Appointment
  - Jamelia Graham, Doctor of Public Health Program (DrPH), Penn State College of Medicine, Committee Member, 2023-present
- Faculty Advisor, Health Law and Policy Society (student group), 2017-present
- Faculty Advisor, Health Law and Policy Certificate, 2018-present
- Faculty Advisor, *Dickinson Law Review*, 2020-23
- Faculty Advisor, Middle Eastern and South Asian Law Students Association, 2021-present
- Member, Dickinson Law's Law and Healthcare Trusted Advisors, 2015-20

## SELECTED PROFESSIONAL ACTIVITIES

- Multisector Partner Group, Center for Health Justice, Association of American Medical Colleges (AAMC), 2025-present
- Board of Directors, American Society of Law, Medicine & Ethics, 2022-present

- Executive Committee, Section on Law, Medicine, and Health Care, Association of American Law Schools, 2025-present; Chair, 2024; Chair-Elect, 2023; Secretary, 2022
- Senior Fellows Advisory Board, Atlantic Fellows for Health Equity, 2022-23
- Virtual Community Ambassador, Collaborative for Health Equity: Act, Research, Generate Evidence (CHARGE), Center for Health Justice, AAMC, 2021-22
- Contributing Editor, *JOTWELL*, Health Law Section, 2021-present
- Board of Advisors, *Georgetown Journal on Poverty Law and Policy*, 2021-present
- Peer Reviewer
  - *American Journal of Law & Medicine*
  - *American Journal of Public Health*
  - *Family Practice*
  - *Health Affairs*
  - *Health Affairs Scholar*
  - *Journal of Health Care for the Poor and Underserved*
  - *Journal of Immigrant and Minority Health*
  - *Journal of Law, Medicine & Ethics*
  - *New England Journal of Medicine*
- Member, Clinical Legal Education Association, 2015-present

## COMMUNITY SERVICE

- Vice Chairperson, Partnership for Better Health, 2023-24; Secretary, 2022-23; Chair, Health Equity Impact Review Committee, 2022-24; Board of Trustees, 2021-24; Member, Community Policy & Engagement Committee, 2020-24.
- Advisory Board Member, Humanitarian Immigration Law Clinic, Compass Immigration Legal Services, 2020-21.

## BAR ADMISSIONS

Massachusetts (2008); New York (2009); U.S. District Court for the District of Colorado (2012); Pennsylvania (2015).

## LANGUAGES

- Spanish – proficient in reading, writing, and speaking
- Arabic – conversational, basic reading ability
- Hindi-Urdu – conversational, basic reading ability
- Kannada – conversational

[This CV is current as of July 10, 2025]