# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW JERSEY, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*<br><br>Defendants. | Civil Action No.: 1:25-cv-10139-LTS |

**SUPPLEMENTAL DECLARATION OF SARAH ADELMAN**

I, Sarah Adelman, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Commissioner of the New Jersey Department of Human Services ("the Department"). I have been employed as Commissioner since January 2021.

2. The Department administers many of New Jersey's federally funded public benefits, including Medicaid, Children's Health Insurance Program ("CHIP"), Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF").

3. As Commissioner of the Department, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on New Jersey.

4. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship"

1

("Executive Order 14160") will have on New Jersey's health insurance and other federally

funded benefits programs in the absence of a nationwide injunction, including if the

injunction is narrowed along the lines suggested by the federal government in its recent

filing.

### Verifying Eligibility for State Social Services Programs

5.  As explained in my initial declaration in support of a nationwide preliminary injunction, New

    Jersey offers a suite of free or low-cost healthcare options, including Federal-State Medicaid,

    CHIP, and the fully state-funded Cover All Kids Phase II ("CAK"), which are collectively

    referred to as "NJ FamilyCare." (Doc. No. 5-2, at 3-7.)

6.  When a family seeks health insurance for their child through the Department, the Department

    first screens for eligibility for Federal-State Medicaid and CHIP. That is because a child is

    not eligible for the fully State-funded CAK program if the child is eligible for the partially

    federally funded Medicaid or CHIP program.

7.  New Jersey adopted the CAK program because the State believes that ensuring that all

    children have access to health insurance improves public health and is more cost-effective for

    the State than providing State-funded health services to children only when they have

    medical emergencies.

### Obtaining Social Security Numbers

8.  As a condition of eligibility for benefits under Federal-State Medicaid, the State is required

    by federal statute to collect from each applicant for benefits the individual's social security

    account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

9.  Federal regulations delineate limited exceptions to this requirement. Specifically, the

    Department is not required to collect an SSN from an individual: who is not eligible to

receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, the Department may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

10. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, the Department is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

11. Ordinarily, infants born in the U.S. would have applied for an SSN at birth through the Enumeration at Birth (EAB) program. Because approximately 99 percent of SSNs for infants are assigned through the EAB program, the Department rarely encounters infants who do not have or have not applied for SSNs. (Doc. No. 5-4, at 9-11.)

12. If an applicant is eligible for an SSN but cannot recall her SSN or has not been issued an SSN, she can provisionally get benefits but will have to obtain an SSN in order to complete her application.

13. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then the Department may need to assist the parent in obtaining an SSN for the infant.

14. As with Federal-State Medicaid, the Department is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

15. The Department is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). The Department cannot conduct the search without an SSN.

16. An applicant's SSN is also the only common identifier among the various benefits programs that are administered by the Department's different subdivisions. An SSN is thus important for inter-program integrity because it enables the Medicaid division processing an NJ FamilyCare application to verify that the applicant has provided consistent information to the SNAP division.

17. For those Medicaid applicants without an SSN, their only unique identifier is their Medicaid identification number, which is specific to NJ FamilyCare. Therefore, the Department cannot use an applicant's Medicaid identification number to check for duplicate interstate accounts or inconsistent information provided to the Department's other subdivisions.

18. The Department has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for the Department to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of the Department's time and resources.

19. The Department is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f); 7 C.F.R. § 273.2(f)(1)(v).

**Verification of Citizenship or Qualifying Immigration Status**

4

20. In addition to collecting SSNs, the Department is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

21. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

22. In addition to this self-attestation, the Department must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

***Citizenship Verification***

23. If the applicant attests that they are a U.S. citizen, the Department must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub allows the Department to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

24. Based on the Department's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then there would not be any information about that infant in the Federal Data Services Hub. Thus, that infant's citizenship could not be verified via the Hub.

25. As an alternative to verifying citizenship through the Hub, the Department may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance

affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i).

26. The Department does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

27. If the Department is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then the Department has certain additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

28. The Department may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

29. The Department may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For the Department to utilize this option for a child born out of State, the Department would have to contact the birth State's vital statistics agency. The Department does not have an established process for doing this, and creating and executing such a process would require expenditure of the Department's time and resources.

30. Only if all other options are unavailable, the Department may verify citizenship (under current regulations) by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

31. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. The Department may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of the Department's time and resources.

### *Qualifying Immigration Status Verification*

32. If the applicant attests that they have a qualifying immigration status, the Department must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

33. Based on the Department's experience utilizing the Federal Data Services Hub ("the Hub"), if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then there would not be any information about that infant in the Federal Data Services Hub. Thus, that infant's qualifying status could not be verified via the Hub.

34. As an alternative to verifying immigration status through the Hub, the Department may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance

7

affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

35. The Department does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

36. There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

37. In the Department's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

38. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as the Department is statutorily required to do, would require a significant expenditure of the Department's time and resources.

***Reasonable Opportunity Period***

39. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, the Department must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

8

40. During this period, the Department is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

41. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, the Department must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

42. If the Department pays for Federal-State Medicaid benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then the Department may not receive federal matching funds for having provided those benefits.

43. Additionally, the Department may be determined to have erroneously provided benefits, leading to increased error rate and heightened risk of penalty.

44. The Department is required to collect any overissuance of benefits to a household. For every erroneously furnished benefit, the Department must expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. §§ 1320b-7(a)(4)(C), (d)(5)(B); 1396b(u)(1)(D); 7 U.S.C. § 2022(b)(1); 7 C.F.R. § 273.18.

### **Additional Impacts of Proposed Injunction**

45. The Department understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders

of the Plaintiff States (including New Jersey)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

46. The Department is statutorily required to verify eligibility for federally funded benefits. The federal government's proposed injunction would create uncertainty in determining the qualifying status of a child covered by the Executive Order and cause the Department to expend time and resources on revised practice, policy, and training to determine qualifying status for federal benefit eligibility.

### Staff Training Expenses

47. Narrowing the injunction in this way would cause the Department to expend time and resources training staff and community partners on the meaning and implication of the injunction. The Department has never experienced citizenship rules vary by State.

48. To the extent that the federal government intends to develop a new status for federally-funded benefits for eligible noncitizens born within the U.S., the Department would need to train its staff on this new status and how to verify it through the Hub. To the extent that the federal government does not redesign the Hub to recognize and verify this new status, the Department would need to develop its own system that accounts for and documents verification of this new status. And the HHS Secretary would have to approve this new system.

49. To the extent that the narrowed injunction would result in many more children within New Jersey who were born out of State, but within the U.S., and did not receive an SSN at birth, the Department will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

50. The Department is not aware of any administrative process in which it could seek reimbursement of these increased staff training costs from the federal government if Executive Order 14160 were found unconstitutional.

**Outreach and Education Expenses**

51. The Department expects that many impacted families it serves, especially those who may have moved into New Jersey from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally-funded benefits like Medicaid, SNAP, and TANF.

52. If the injunction is so narrowed, the Department would have to engage in education and outreach efforts to inform impacted families about the impact of the injunction. For example, the Department is required to have a plan in place describing "the steps the State is taking to identify and enroll all uncovered children who are eligible to participate in" CHIP, 42 U.S.C. § 1397bb(a)(2), and how the Department will "increase coverage of children," 42 U.S.C. § 1397bb(a)(3).

53. In the Department's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

54. For example, the Department spent $3,000,000 on outreach connected to Cover All Kids, New Jersey's public health insurance program for undocumented immigrant children, in State fiscal year 2024.

55. If the injunction is narrowed as the federal government proposes, the Department anticipates it would have to spend significantly more on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within New Jersey.

56. The Department is not aware of any administrative process in which it could seek reimbursement of increased outreach and education costs from the federal government if Executive Order 14160 were found unconstitutional.

## Chilling Effects

57. The Department understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government otherwise would not treat as citizens. If this occurs, based on the Department's experience in conducting outreach to various immigrant communities, the Department anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on New Jersey residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, there is a high risk that individuals will forgo benefits for which they are eligible or disenroll themselves and their families from the federal-state healthcare program, NJ FamilyCare, altogether.

58. The Department's staff are unfamiliar with enrolling U.S.-born children in NJ FamilyCare who are neither citizens nor immigrants of any kind. To the extent such children would be eligible for Federal-State Medicaid, staff would have to be trained to identify such children and ensure they are enrolled in the Federal-State Medicaid component of NJ FamilyCare rather than the purely State-funded Cover All Kids component of NJ FamilyCare. Because of the novelty of this situation and the fact that children who are not citizens and who lack a qualifying immigration status are generally enrolled in the purely State-funded Cover All Kids program, there is a significant risk that such children would be mistakenly enrolled in

Cover All Kids despite their Federal-State Medicaid eligibility. This would result in greater cost to the State than if they had enrolled in Federal-State Medicaid.

59. The Department further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government otherwise would not treat as citizens outside of the Plaintiff States' borders. If this occurs, the Department still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within New Jersey, because of fear that doing so could subject their children to a heightened risk of deportation.

**Costs to the State of Chilling Effects**

60. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in New Jersey, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some New Jersey residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would undermine New Jersey's efforts to enroll all eligible children in federally-funded Medicaid, given how cost-effective the program is for the State and the positive impact it has on public health more generally. It would also unwind years of investment in expanding health coverage and access.

61. Indeed, New Jersey's legislature has committed "to ensuring access to quality health care for pregnant women and children as a means of improving the health of State residents and reducing overall State expenditures" and to "provid[ing] early comprehensive ... health care for infants and young children to reduce infant deaths and morbidity, to improve child health

13

status, and to realize a substantial reduction in costly hospitalization." N.J. Stat. Ann. § 30:4D-2.1(d), (e). To that end, New Jersey has taken express measures to simplify enrollment practices to increase healthcare access by reducing barriers to enrollment. *See* N.J. Stat. Ann. § 30:4D-3b.

62. Further, should the chilling effect come to pass, New Jersey will incur greater costs in conducting statutorily-required outreach to enroll families and children in federally-funded programs because it will be more difficult to encourage enrollment.

63. Enrollment in NJ FamilyCare has a positive impact on public health in the state. Individuals enrolled in NJ FamilyCare are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick New Jerseyans with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

64. Having insurance coverage also makes it less likely that New Jerseyans will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

65. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

66. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and

mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

67. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

68. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all New Jersey residents who need healthcare services.

69. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, such as SNAP, in New Jersey, to forego such enrollment, this chilling effect would have negative consequences for the State. For low-

income families, SNAP benefits are often the only means to access food for basic nutrition

and sustenance. Depressed SNAP enrollment in New Jersey would lead to food insecurity,

which has far-reaching consequences. Children who experience malnutrition and hunger are

more likely to suffer deficits in cognitive development, suffer poor health, and enroll in

behavioral programs. The Department in turn would face increased costs in education, social

services, and health care to meet the heightened need and demand for supportive services.


    I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

    Executed this 15th day of July, 2025, in Trenton, New Jersey.

_____
Sarah Adelman, Commissioner
New Jersey Department of Human Services