# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW JERSEY *et al.*,

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

    Defendants.

Civil Action No. 1:25-cv-10139-LTS

**SUPPLEMENTAL DECLARATION OF JEFFREY A. BROWN**

I, Jeffrey A. Brown, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Acting Commissioner of the New Jersey Department of Health ("DOH"). The information in the statements set forth below were compiled through personal knowledge, through DOH personnel who have assisted in gathering this information, or from documents that have been provided to and reviewed by me.

2. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on New Jersey's health insurance and other federally funded benefits programs, as well as State healthcare providers, in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

1

*Professional Background*

3. I have been serving as the DOH Acting Commissioner since April of 2025. Prior to becoming DOH's Acting Commissioner, I served as the DOH Deputy Commissioner of Health Systems, overseeing inspections, licensing, and the enforcement of regulations for licensed New Jersey health care facilities, mental health and addiction services and programs, the Office of Health Care Affordability and Transparency, and major hospital funding programs, including Charity Care. Prior to serving as the DOH Deputy Commissioner, I served as the first Executive Director of the New Jersey Cannabis Regulatory Commission (CRC), where I led and managed a newly created state commission. Prior to my position with the CRC, I served as Assistant Commissioner for Medical Marijuana within the DOH and worked within healthcare policy and healthcare quality improvement for the State of New Jersey. I graduated from Rutgers University and have devoted my career to serving the public.

## New Jersey Department of Health

4. DOH's mission is to protect public health, promote healthy communities, and continue to improve the quality of health care in New Jersey. To support that goal, DOH performs many functions, including regulating healthcare facilities across the State and overseeing the Office of Vital Statistics and Registry ("OVSR"), which registers vital events such as births.

5. The Center for Health Statistics & Informatics ("CHSI") is a program within DOH's Office of Health Care Quality and Informatics. CHSI is responsible for compiling and releasing statistical information on the health of New Jersey residents. CHSI publishes official reports on births, deaths, chronic illnesses, injuries, and behavioral risk factors, among other types of information. CHSI provides analytical support to state and other governmental agencies to

support population health initiatives. The New Jersey State Health Assessment Data System is maintained by CHSI and provides on-demand access to deidentified public health datasets, statistics, and information on the health status of New Jerseyans.

## Birth Records

6. OVSR registers vital events and maintains birth records, among other records of vital events that occur in New Jersey. OVSR does not have a longitudinal data system; it only captures the birth event, and it only does so as to births that occur in New Jersey or for adoptees born in other jurisdictions but adopted in New Jersey.

7. Under OVSR's current statute, births are statutorily required to be filed within five days of a birth by the provider where the birth occurred. N.J.S.A. § 26:8-28.

8. OVSR issues certified copies of birth certificates. Such certified copies issued by OVSR contain a raised seal. OVSR will issue a certified copy of a birth certificate only to the individual whose birth is recorded by the certificate or to an eligible requester under N.J.S.A. § 26:8-62. All others who request birth certificates can only receive non-certified copies for informational purposes only. For an eligible requester to obtain a certified copy of a birth certificate, the requester must either request the vital record directly through OVSR or contact the local registrar office for the municipality where the birth occurred.

9. DOH's understanding is that each State has its own system of state and local registration of birth events and maintenance of such records.

10. OVSR electronically shares information on vital events that occur in New Jersey via the State and Territorial Exchange of Vital Events system (STEVE).

11. STEVE handles births and deaths and is the system that feeds the Social Security Administration's birth and death master files. STEVE is a way for States to share information

about vital events in their borders so other States may have a sense of events occurring outside of their borders. However, STEVE is not a verification system; STEVE cannot be used to verify information because it is often variable or incomplete which makes verification impossible.

12. The degree of information that is entered and shared by states opting to utilize STEVE varies greatly by jurisdiction. Federal law does not require that any jurisdiction share information with STEVE and the State is only able to receive data from states and jurisdictions that have signed an agreement to share such data.

13. Based on the limited available information from STEVE, 6,000 children on average are born out of state to New Jersey residents each year. Because the data from STEVE is limited, this number is likely an underestimate.

## Charity Care

14. In New Jersey, "[n]o hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." N.J.S.A. § 26:2H-18.64.

15. The State offsets some of the costs that eligible hospitals sustain as a result of treating uninsured patients through the New Jersey Hospital Care Payment Assistance Program, commonly known as Charity Care, administered by DOH. *See* Health Care Cost Reduction Act, N.J.S.A. § 26:2H-18.50 (1992).

16. Charity Care provides eligible hospitals with financial support in the form of a yearly subsidy that is administered by DOH. N.J.S.A. § 26:2H-18.51. Charity Care relies on intergovernmental funding; the State and federal government contribute equally to the program. Charity Care does not reimburse individual claims made by individual patients.

4

17. From the patient's perspective, Charity Care offers free or reduced-charge care to patients who receive inpatient and outpatient services at acute care hospitals throughout the State. Hospital assistance and reduced charge care are available for medically necessary hospital care.

18. A New Jersey resident is eligible to receive free or reduced-charge services through Charity Care if (a) they meet specific income and asset–eligibility criteria, (b) are ineligible for any private or government-sponsored coverage (such as Medicaid), and (c) have no health coverage or coverage that pays only for part of the bill. N.J.A.C. § 10:52-11.10(a) (assets eligibility); N.J.A.C. § 10:52-11.8(c) (income eligibility). A New Jersey resident may be eligible for Charity Care services without regard to immigration status.

19. The Hospital Services Manual Rules, N.J.A.C. § 10:52, govern Charity Care eligibility and coverage. When a patient who is underinsured or uninsured receives medical care from an acute care hospital and seeks financial assistance to cover the cost of the care received, the hospital is required to screen the patient for Charity Care eligibility. N.J.A.C. § 10:52-11.5. If the patient meets the eligibility requirements, then the patient's medically necessary hospital services are fully or partially covered by Charity Care, with certain exemptions discussed further below. *See* N.J.A.C. § 10:52-1.6.

20. The funding source for Charity Care is the Health Care Subsidy Fund, which is dedicated for use by the State to distribute Charity Care subsidy payments to eligible hospitals. N.J.S.A. § 26:2H-18.58(a).

Uncompensated Care Fund

21. In addition to funding Charity Care, the Health Care Subsidy Fund also funds the Federally Qualified Health Center Expansion, commonly known as the Uncompensated Care Fund. *See* N.J.S.A. § 26:2H-18.58(a), (d). Through the Uncompensated Care Fund, the State provides funding so Federally Qualified Health Centers are able to offer free or subsidized primary care, dental care, and mental health services to uninsured and underinsured New Jersey residents who are otherwise ineligible for Medicaid and have an income at or below 250% of the federal poverty level.

22. Federally Qualified Health Centers are required to serve all individuals, regardless of the individual's ability to pay. Federally Qualified Health Centers all provide primary care services and some are a "one-stop" health centers with co-located services (medical, dental, and behavioral health) that make health care more accessible for eligible New Jersey residents. By comparison, the acute care hospitals covered by Charity Care provide emergency medicine to individuals experiencing acute medical conditions.

23. In New Jersey, there are twenty-three Federally Qualified Health Centers and two "look-alike" centers, which function as Federally Qualified Health Centers for purposes of the Uncompensated Care Fund.

24. The Uncompensated Care Fund is funded exclusively by the State. Through the program, the State pays Federally Qualified Health Centers a flat rate for uninsured and underinsured patient visits: $114 per visit for primary and dental care, and $74 per visit for mental health services.

25. In State Fiscal Years 2022, 2023, and 2024, New Jersey spent $26,030,696, $28,701,063, and $32,163,822, in payments to Federally Qualified Health Centers.

### Impacts on Hospital System of Increased Uninsured Population

26. DOH understands that the narrowed injunction could result in children within the State who are eligible for federally funded benefits and yet whom the federal government otherwise would not treat as citizens. If this occurs, DOH anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, including health insurance, because of fear that doing so could subject their children to a heightened risk of deportation.

27. DOH further understands that the narrowed injunction could, alternatively, result in children within the State who are eligible for federally funded benefits and yet whom the federal government otherwise would not treat as citizens outside of the Plaintiff States' borders. If this occurs, DOH still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within New Jersey, because of fear that doing so could subject their children to a heightened risk of deportation.

28. To the extent a narrowed injunction of Executive Order 14160 would result in more uninsured children within New Jersey, the narrowed injunction would have negative consequences for the State's public health system.

29. Specifically, an increase in the uninsured child population would result in greater uncompensated care costs borne by New Jersey hospitals.

30. An increase in the uninsured child population would also result in greater State expenditures on services provided by Federally Qualified Health Centers to such children.

31. Public health will also suffer. Uninsured individuals are less likely to seek preventive care or attend routine health screenings and may delay necessary medical care due to prohibitive

costs. Foregoing such services can result in negative health outcomes, such as emergency medical care with longer hospital stays, increased mortality rates, and higher costs.

### Impacts of Increased Population of Infants Who Lacked Access to Prenatal Care

32. To the extent that children who were born out of State were not eligible for publicly funded prenatal care and thus never received such care, such children have an increased risk of preterm births, low birth weight infants, and congenital defects.

33. If such children then move into New Jersey, regardless of whether they become insured, the State and its public health system will bear the costs of providing services to such infants—costs that are higher than if the infant had received appropriate prenatal care.

34. Additionally, children with early health issues such as preterm birth are more likely to need early intervention services, which the State is federally required to provide to residents. *See* Doc. No. 5-4, ¶¶17-24. Providing EIS services for income-eligible children results in costs to the State. *See id.*

### Early Intervention Services

35. As required by state and federal law, New Jersey provides access to EIS to all children aged 0-3 in New Jersey. Under either proposed narrowed injunction, DOH anticipates that there is a likelihood that the parents of covered children would be chilled from accessing federally funded benefits within New Jersey including EIS, because of fear that doing so could subject their children to a heightened risk of deportation. Doc. No. 5-4, ¶¶17; N.J.S.A. § 26:1A-36.7.

36. To provide access to EIS services to all eligible children in New Jersey, regardless of immigration status, as required by federal and state laws, New Jersey will have to spend additional funds on outreach and education. New Jersey has an obligation under federal law

to ensure that infants and toddlers are appropriately identified for services as to "reduce the need for future services." 20 U.S.C. § 1435.

37. The State is substantially likely to have to spend more money on outreach if eligible children are chilled from accessing EIS. The State has committed $275,000 over the last two years for outreach under current conditions. Under the narrowed injunctions, there is a substantial likelihood that there will be a decline in the number of referrals of children for services. In that situation, the State will need to enhance outreach efforts to meet the federal and State law requirements—particularly under a new and confusing legal framework.

38. Further, if children who are otherwise eligible for EIS services are chilled from accessing those services, they are more likely to experience more severe issues with cognitive and physical development. Early intervention is designed to provide early care to mitigate longer term issues. Support and education for children with more severe cognitive and physical developmental issues is more expensive for the State than if the State was able to administer early preventative and intervening care.

39. Alternatively, the State provides access to care regardless of availability to provide verification of citizenship. Therefore, if individuals are not chilled from receiving EIS services but cannot be enrolled in Medicaid due to administrative complexities or for other reasons, the State would have to provide those services entirely covered by state funds and without federal reimbursement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July, 2025, in Trenton, New Jersey.

Jeffrey A. Brown
Acting Commissioner
New Jersey Department of Health

10