# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.* | : |
|     Plaintiffs, | : |
| v. | : Civil Action No.: 1:25-cv-10139 |
| DONALD J. TRUMP, *et al.* | : |
|     Defendants. | : |

## **SUPPLEMENTAL DECLARATION OF LINDY HARRINGTON**

I, Lindy Harrington, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am a resident of the State of California and I am over the age of 18.

2. I am currently employed by the California Department of Health Care Services (DHCS) as the Assistant State Medicaid Director. I have held the Assistant State Medicaid Director position since 2023.

3. I have compiled the information in the statements set forth below either through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and/or on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on California.

4. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship"

1

("Executive Order 14160") will have on California's health insurance programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

### Verifying Eligibility for Medicaid and CHIP

5. As explained in my initial declaration in support of a nationwide preliminary injunction, DHCS is the single state agency authorized to administer California's Medicaid program under Title XIX of the federal Social Security Act, referred to in California as "Medi-Cal" and California's Children's Health Insurance Program (CHIP) under Title XIX and XXI of the federal Social Security Act. (Doc. No. 5-12, at 2-6.)

6. When a family enrolls their child in Medi-Cal or CHIP, they are screened for eligibility for federally-funded Medicaid and CHIP. That is because a child is not eligible for the State-only Medi-Cal program if the child is federally eligible for the Medicaid or CHIP program. (Doc. No. 5-12, at 5-7.)

### Obtaining Social Security Numbers

7. As a condition of eligibility for benefits under Federal-State Medicaid, California is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

8. Federal regulations delineate limited exceptions to this requirement. Specifically, DHCS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1).

9. U.S. citizens are eligible for SSNs. Thus, DHCS is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits, unless they fall within one of these regulatory exceptions. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

10. I am aware that ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program. (Doc. No. 5-14, at 4.)

11. DHCS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 U.S.C. § 1320b-7(d)(5)(A); 42 C.F.R. § 435.910(f).

### Verification of Citizenship or Qualifying Immigration Status

12. In addition to collecting SSNs, DHCS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

13. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

14. In addition to this self-attestation, DHCS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

15. For an infant who was born in the United States and received an SSN at birth, DHCS would confirm that information through a federal electronic service known as the Federal Data Services Hub. See 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows DHCS to access data from various federal agencies, including the Social Security Administration (SSA) and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

16. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born in the United States who never received an SSN at birth is fraught with complication and uncertainty because DHCS will not be able

3

to use currently approved methods of determining eligibility. Conducting such a verification to determine who is a child still eligible for federally-funded Medicaid under a narrower injunction, yet who does not have an SSN or citizenship status, would require a significant expenditure of the DHCS's time and resources.

17. To the extent that the federal government would deem now noncitizen children eligible for Federal-State Medicaid based on their state of birth, the DHCS would need to develop a method for accurately verifying place of birth, which would take time and resources.

**Reasonable Opportunity Period**

18. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, DHCS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

19. During this period, DHCS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

20. If DHCS pays for benefits during the reasonable opportunity period, but ultimately citizenship or immigration status cannot be verified, then DHCS will not receive federal matching funds for having provided those benefits.

### Additional Impacts of Proposed Injunction

21. DHCS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the

Plaintiff States (including California)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

22. Narrowing the injunction in this way would cause DHCS to expend time and resources training staff and community partners on the meaning and implication of the injunction. DHCS has never experienced citizenship rules varying by State. Nor has DHCS had to do this level of eligibility determination for individuals born in the United States.

23. To the extent that the federal government intends to develop a new status for federally-funded benefits-eligible noncitizens born within the U.S., DHCS would incur significant costs to train state and county staff and partners and to revise guidance documents and manuals regarding eligibility rules and procedures. DHCS will have an enormous administrative burden in training workers across 58 counties on processing Medi-Cal eligibility based on new immigration rules, which is a significant overhaul to Medi-Cal's current enrollment policies.

24. To the extent that the narrowed injunction would result in many more children within California who were born in California and did not receive an SSN at birth, DHCS will have to develop methods for verifying these children's citizenship, as discussed above, and will have to train staff and develop appropriate technology to do so. DHCS will need to revise eligibility determination policies around Medi-Cal at application, annual renewal, and changes of circumstances relating to citizenship and immigration status verifications, which can take significant time and resources to complete and operationalize due to complexity. This includes significant updates to the Medicaid application and its requisite online applications.

25. To the extent that the narrowed injunction would result in many more children within California who were born out of State, but within the U.S., and that did not receive an SSN at

5

birth due to the Executive Order, DHCS will have to develop methods for verifying these children's eligibility for Federal-State Medicaid, and will have to train staff and develop appropriate technology to do so. Eligibility verification systems used by DHCS and county agencies do not track the state of birth of U.S.-born children who apply for Medi-Cal. If the rules governing birthright citizenship varied by state of birth, these eligibility verification systems would need to be modified to track state of birth and parentage in order to determine whether a child relocating from another State is a citizen and therefore eligible for Federal-State Medicaid or CHIP. This would add further complexity to the process of updating eligibility systems described above, requiring additional expenditure of DHCS's time and resources.

**Outreach and Education Expenses**

26. DHCS expects that many impacted families it serves, especially those who may have moved into California from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally-funded benefits like Medicaid.

27. If the injunction is so narrowed, DHCS would need to develop material to inform the public and stakeholders regarding the changes towards eligibility and update our policies regarding the application process.

28. In DHCS's experience, such informing efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

29. If the injunction is narrowed as the federal government proposes, DHCS anticipates it will have to expend significant efforts to inform impacted families of their eligibility for federally funded public benefits within California.

**Chilling Effects**

30. DHCS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded Medicaid and yet whom the federal government would not otherwise treat as citizens. If this occurs, DHCS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing Medi-Cal because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on California's residents will likely include but not be limited to immigrants and their family members (including citizen household members), who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from the Medi-Cal altogether.

31. For example, DHCS has received numerous anecdotal reports from health plans, community clinics and other providers regarding increased no show rates for medical appointments for individuals with unsatisfactory immigration status.

32. DHCS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded Medicaid and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, DHCS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing Medi-Cal within California, because of fear that doing so could subject their children to a heightened risk of deportation.

33. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded Medicaid in California, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some California residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

34. Enrollment in Medi-Cal has a positive impact on public health in the state. Individuals enrolled in Medi-Cal are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Californians with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

35. Having insurance coverage also makes it less likely that Californians will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

36. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

37. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and

8

treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the State would incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

38. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

39. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Medicaid and CHIP risks the closure of healthcare facilities altogether. Many hospitals and clinics rely on Medicaid funding, especially those operating in underserved areas, in order to meet their obligations to provide emergency care under the Emergency Medical Labor & Treatment Act (EMTALA). Some of those providers may not be able to continue operating if their patients decline coverage or avoid seeking emergency care from them.

///

///

///

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of July, 2025, in Sacramento, California.

*Lindy Harrington*
_____
Lindy Harrington
Assistant State Medicaid Director
California Department of Health Care Services