# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW JERSEY, *et al.* | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : Civil Action No.: 1:25-cv-10139 <br> : |
| DONALD J. TRUMP, *et al.* | : <br> : |
| Defendants. | : <br> : <br> : |

**SUPPLEMENTAL DECLARATION OF PETER HADLER**

I, Peter Hadler, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Deputy Commissioner for the Connecticut Department of Social Services (DSS). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families block grant, the Low-Income Home Energy Assistance block grant and numerous other public assistance programs.

2. I am an attorney with a juris doctor degree from Boston University and am admitted to the bar in both Connecticut and New York.

1

3. I have compiled the information in the statements set forth below on my personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Connecticut.

4. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Connecticut's HUSKY program and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

## Verifying Eligibility for State Social Services Programs

5. As explained in my initial declaration in support of a nationwide preliminary injunction, Connecticut offers a suite of free or low-cost healthcare options, including Federal-State Medicaid, CHIP, and the fully state-funded HUSKY which are collectively referred to as "HUSKY Health" or "HUSKY".

6. When a family seeks health insurance for their child through DSS, the DSS first screens for eligibility for Federal-State Medicaid and CHIP. That is because a child is not eligible for the fully State-funded health care coverage if the child is eligible for the partially federally funded Medicaid or CHIP program.

**Obtaining Social Security Numbers**

7. As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

8. Federal regulations delineate limited exceptions to this requirement. Specifically, DSS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, DSS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

9. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, DSS is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

10. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

11. If a citizen-applicant cannot recall her SSN or has not been issued an SSN, federal regulations require DSS to assist the applicant in completing an application for an SSN; including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

12. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then DSS must assist the parent in obtaining an SSN for the infant.

13. As with Federal-State Medicaid, DSS is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

14. DSS is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). DSS cannot conduct the search without an SSN.

15. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that DSS complete an application for an SSN for the individual, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2)(i).

16. To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, as long with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

17. DSS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth

through the EAB program. It would be burdensome for DSS to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of DSS's time and resources.

18. DSS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

19. If DSS were to grant coverage for services to a child born in the United States that it believes is otherwise eligible, and is not able to ultimately obtain an SSN for such child due to partial national implementation of Executive Order 14160, DSS would be at risk of increased error rates, which in turn could result in financial penalties to Connecticut.

**Verification of Citizenship or Qualifying Immigration Status**

20. In addition to collecting SSNs, DSS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

21. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

22. In addition to this self-attestation, DSS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

23. If the applicant attests that they are a U.S. citizen, DSS must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows DSS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

24. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

25. Based on DSS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

26. As an alternative to verifying citizenship through the Hub, DSS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i).

27. DSS does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of the DSS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

28. If DSS is unable to verify citizenship through the Federal Data Services Hub, then DSS has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

29. DSS may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

30. DSS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For DSS to utilize this option for a child born out of State, DSS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

31. Only if all other options are unavailable, DSS may verify citizenship by accepting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

32. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. DSS may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of DSS's time and resources. Furthermore, there is no guarantee that states not covered by an injunction will even continue to issue birth

7

certificates for children born in their territorial boundaries who are no longer considered citizens due to implementation of Executive Order 14160. If some states were to decide, as a matter of state law, to no longer issue birth certificates under these circumstances, it would make it that much more difficult and time consuming for DSS to verify the citizenship of an infant born out of State.

**Qualifying Immigration Status Verification**

33. If the applicant attests that they have a qualifying immigration status, DSS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

34. Based on DSS's experience utilizing the Federal Data Services Hub ("the Hub"), if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Hub. Thus, that infant's qualifying status could not be verified via the Hub.

35. As an alternative to verifying immigration status through the Hub, DSS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

36. DSS does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

37. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, DSS would need to develop a method for accurately verifying place of birth. DSS does not currently verify place of birth for infants born out of State. Doing so would likely require arranging information sharing agreements with other State's vital statistics agencies, to the extent such non-plaintiff states' vital statistics agencies would even continue to record such births. DSS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

38. There are no alternatives to verify qualifying immigration status other than through the Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

39. In DSS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

40. DSS has experienced situations where inquiries to the Hub for newly recognized groups of humanitarian parolees (such as Afghan evacuees and Ukrainian immigrants fleeing the Russian invasion of Ukraine), who are to be treated as refugees and asylees for purposes of determining eligibility for federal benefits, will return confusing or incorrect results, such as a result suggesting that the non-citizen is precluded from receiving benefits for five years after being admitted to the United States in such status. In these cases, DSS staff must manually intervene to confirm the non-citizen's eligibility and override the incorrect response returned by the Hub, and if staff fails to catch and correct the error, it is likely that the improperly denied non-citizen will request a fair hearing.

41. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received

an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as DSS is statutorily required to do, would require a significant expenditure of DSS's time and resources.

**Reasonable Opportunity Period**

42. If either citizenship or immigration status cannot be fully verified through the Hub or documentary evidence at the time of application, DSS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

43. During this period, DSS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

44. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, DSS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

45. If DSS pays for benefits after the reasonable opportunity period without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then DSS will not receive federal matching funds for having provided those benefits.

46. Additionally, DSS may be determined to have erroneously provided benefits, leading to increased error rate and heightened risk of penalty.

## Additional Impacts of Proposed Injunction

47. DSS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this

litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Connecticut)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

48. Narrowing the injunction in this way would cause DSS to expend time and resources training staff and community partners on the meaning and implication of the injunction. DSS has never experienced citizenship rules that vary by State.

49. To the extent that the federal government intends to develop a new status that would allow States to provide federally funded benefits to eligible noncitizens born within the U.S., DSS would need to train its staff on this new status and how to verify it.

50. To the extent that the narrowed injunction would result in many more children within Connecticut who were born out of State, but within the U.S., and did not receive an SSN at birth, DSS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Outreach and Education Expenses**

51. DSS expects that many impacted families it serves, especially those who may have moved into Connecticut from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

52. If the injunction is so narrowed, DSS would engage in education and outreach efforts to inform impacted families about the impact of the injunction.

53. In DSS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

54. If the injunction is narrowed as the federal government proposes, DSS anticipates it would have to expend funds and dedicate limited staff resources on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Connecticut.

**Chilling Effects**

55. DSS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, DSS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on Connecticut residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from the federal-state healthcare program altogether.

56. In DSS's experience, when parents fear that registering for public benefits carries a risk of immigration consequences for their children, such parents are less likely to enroll their children in public benefits. For example, studies have shown that when changes to the public charge rule were proposed by the first Trump Administration in 2019, many immigrant families avoided public benefits like SNAP, Medicaid and CHIP for which they might

otherwise qualify.[1] DSS's conversations with organizations in Connecticut that represent and serve immigrant families reflected a similar chilling effect in Connecticut during the 2019 public-charge debate.

57. DSS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, DSS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Connecticut, because of fear that doing so could subject their children to a heightened risk of deportation.

58. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in Connecticut, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some Connecticut residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

59. Further, should this come to pass, Connecticut will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

---

[1] Urban Institute, *One in Five Adults in Immigrant Families with Children Reported Chilling Effects on Public Benefit Receipt in 2019*, https://www.urban.org/research/publication/one-five-adults-immigrant-families-children-reported-chilling-effects-public-benefit-receipt-2019; Migration Policy Institute, *Anticipated Chilling Effects of the Public-Charge Rule are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real.

60. Enrollment in HUSKY has a positive impact on public health in the state. Individuals enrolled in HUSKY are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Connecticut residents with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

61. Having insurance coverage also makes it less likely that Connecticut residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

62. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

63. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left

uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

64. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

65. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

66. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all Connecticut residents who need healthcare services.

**Impacts on Healthcare System of Increased Uninsured Population**

67. DSS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, DSS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, including health insurance, because of fear that doing so could subject their children to a heightened risk of deportation.

68. DSS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. outside of the Plaintiff States' borders. If this occurs, DSS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Connecticut, because of fear that doing so could subject their children to a heightened risk of deportation.

69. As outlined in paragraph 58 of this supplemental declaration, the attempt to impose more restrictive public charge rules in 2019 demonstrated that immigrant families are less likely to pursue public benefits such as Medicaid when they fear that registering for these benefits carries a risk of immigration consequences.

70. To the extent a narrowed injunction of Executive Order 14160 would result in more uninsured children within Connecticut, the narrowed injunction would have negative consequences for the State's public health system.

71. Specifically, an increase in the uninsured child population would result in greater uncompensated care costs borne by Connecticut hospitals.

72. An increase in the uninsured child population would also result in greater State expenditures on services provided by Federally Qualified Health Centers to such children.

73. Public health will also suffer. Uninsured individuals are less likely to seek preventive care or attend routine health screenings and may delay necessary medical care due to prohibitive costs. Foregoing such services can result in negative health outcomes, such as emergency medical care with longer hospital stays, increased mortality rates, and higher costs.

**Impacts of Increased Population of Infants Who Lacked Access to Prenatal Care**

74. To the extent that children who were born out of State would now not be eligible for publicly funded prenatal care and thus never receive such care, such children would have an increased risk of preterm births, low birth weight, and congenital defects.

75. If such children then moved into Connecticut, regardless of whether they become insured, the State and its public health system would bear the costs of providing services to such infants—costs that are higher than if the infant had received appropriate prenatal care.

**Similar Difficulties in Other Programs**

76. While this supplemental declaration has been most focused on problems presented with respect to the administration of Medicaid, similar issues would arise in other Federal and joint State-Federal programs administered by DSS. For instance, because DSS is also required to verify citizenship and immigration status in SNAP, *see* 7 C.F.R. § 273.4, the drain on agency resources highlighted throughout this supplemental declaration would also be experienced by DSS when processing SNAP applications involving children impacted by Executive Order 14160. Any programs for which DSS must determine eligibility and consider citizenship will be similarly impacted and cause similar harms to the agency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Hartford, Connecticut.

*Peter Hadler*
_____
Peter Hadler, Deputy Commissioner
Connecticut Department of Social Services