# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.*

    Defendants.

Civil Action No.: 1:25-cv-10139

## DECLARATION OF STEVEN M. COSTANTINO

I, Steven M. Costantino, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Director of Health Care Reform and Associate Deputy Secretary at the Delaware Department of Health and Social Services (DHSS). I oversee the Delaware Medicaid program, Public Health, Health Care Quality, and all payment reform models across DHSS. I have previously served as Commissioner of the Department of Vermont Health Access and Medicaid Director, and as Secretary of the Executive Office of Health and Human Services in Rhode Island. I have a Master's degree in Health Care Delivery Science from Dartmouth College and a BA in Psychology from Providence College.

2. I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the alternative injunctive scopes proposed by the

1

federal government to understand the immediate impact of their implementation on Delaware.

3. I submit this declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Delaware's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

4. The DHSS mission is to improve the quality of life for Delaware's citizens by promoting health and well-being, fostering self-sufficiency, and protecting vulnerable populations. DHSS is a consolidated agency comprised of multiple divisions that provide services and funding to support low-income families and vulnerable populations. DHSS is responsible for administering a wide range of health and social service programs, including Medicaid, Delaware Healthy Children's Program (CHIP), Supplemental Nutrition Assistance Program (SNAP), and Temporary Assistance for Needy Families (TANF). DHSS also regulates healthcare facilities across the state and oversees the Office of Vital Statistics and Registry, which registers vital events such as births.

5. Delaware offers a variety of free or low-cost healthcare options, including Medicaid, CHIP, SNAP, TANF and other state programs designed to assist individuals, including children, with access to healthcare, food benefits and cash assistance. These programs are crucial to ensure wellness and quality of life at all levels.

6. When a family seeks health insurance for their child through DHSS, DHSS first screens for eligibility for Federal-State Medicaid and CHIP.

7. As a condition of eligibility for benefits under Medicaid, Delaware is required by federal statute to obtain the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

8. In addition to collecting SSNs, DHSS is required by federal law to have a Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

9. DHSS is also required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

10. Ordinarily, infants born in the U.S. receive an SSN at birth through the Enumeration at Birth (EAB) program, an SSA program that processes an application for an infant's SSN at birth.

11. Use of an infant's SSN that has been procured through EAB is an important tool for DHSS to maintain efficiency and accuracy in verifying eligibility for programs such as Medicaid, SNAP and TANF.

12. DHSS is required to use an applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have duplicate benefit accounts in other states. *See* 42 C.F.R. § 945 (d); 7 C.F.R. § 273.6(f). DHSS cannot conduct the search without an SSN.

13. DHHS is required to verify citizenship status through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows DHSS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

14. Based on DHSS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such

3

as when an infant did not receive an SSN at birth through EAB, then the HUB would not have information about the infant, and citizenship could not be verified through that method.

15. Federal regulations also permit verification through the Social Security Administration. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if the infant did not receive an SSN through EAB, the SSA would not have the infant's information.

16. Federal regulations govern how an infant can obtain an SSN if the infant does not receive an SSN through the EAB process. Satisfactory evidence must be submitted of age, citizenship, and identity and that process may require multiple documents. *See* 20 C.F.R. § 422.107(a). For example, a birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, along with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

17. There are alternative processes to verify citizenship without an SSN. DHSS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For DHSS to utilize this option for a child born outside of Delaware, coordination would be required with a relevant birth State's vital statistics agency on an individual basis. DHSS does not currently

verify place of birth for infants born out of State. Doing so would likely require arranging information sharing agreements with other States' vital statistics agencies. DHSS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

18. Once DHSS has a birth certificate, DHSS would also have to establish identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii). Coordination would therefore be required to obtain this information on an individual basis.

19. DHSS may also utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i).

20. DHSS does not have any such alternative method of verifying citizenship approved by the HHS Secretary and therefore, this is not a current method available for DHSS. Further, to develop such a method and submit it to the HSS Secretary requires expenditure of DHSS' time and resources.

21. Verifying eligibility for an infant who received an SSN at birth through EAB is straightforward and efficient, and accomplished through the Federal Data Services Hub. However, there is no established system to accommodate infants who may not receive SSNs at birth because they are born in a state that treats its citizenship differently as a result of the

Executive Order. Verifying eligibility for these infants and children will be complicated and require significant expenditures of DHSS' time and resources.

22. DHSS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

23. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, DHSS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

24. During this period, DHSS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

25. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, DHSS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

26. If Delaware pays for benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then Delaware may not, for example, receive federal matching funds for having provided those benefits. And to recover these funds, even assuming that a family would have the financial resources to repay, DHSS would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

27. DHSS understands that the federal government proposes an injunction of Executive Order 14160 that would treat a child differently for citizenship and/or eligibility for federally

funded benefits depending on whether that child was born in a Plaintiff state or a non-Plaintiff state. For example, a child born in a state that is not a Plaintiff in this litigation may not be considered a citizen or eligible for federally funded benefits in the child's birth State, but eligible for federally funded benefits within the borders of the Plaintiff States, including Delaware. Such an injunction would further hinder Delaware's ability to verify eligibility for federal and state benefits within Delaware should the child move to Delaware. DHSS has never experienced citizenship rules that vary by State.

28. Such an injunction would also cause DHSS to expend time and resources training staff and community partners on the meaning and implication of the injunction.

29. To the extent that the federal government intends to develop a new status for eligibility for federally funded benefits for individuals that is dependent on what US state the individual is born, DHSS would need to train its staff on this new status and how to verify it.

30. To the extent a narrowed injunction would result in more children within Delaware who were born out of State, but within the U.S., and did not receive an SSN at birth, DHSS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

31. DHSS expects that many impacted families it serves, especially those who may have moved into Delaware from non-Plaintiff states, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

32. If the injunction is narrowed to treat citizenship for children differently depending on the state that they are born, DHSS would engage in education and outreach efforts to inform impacted families.

33. In DHSS' experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

34. DHSS understands that the government's proposed narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet deportable. If this occurs, DHSS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits because fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on Delaware residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from a federal-state healthcare program altogether.

35. Delaware further understands that a narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet would be deportable outside of the Plaintiff States' borders. If this occurs, DHSS anticipates that there is likelihood that parents of such children would also be chilled from accessing federally funded benefits within Delaware, because of fear that doing so could subject their children to a heightened risk of deportation.

36. Delaware would experience negative consequences if parents are chilled from enrolling their children in federally funded benefits. It is substantially likely that some Delaware residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

37. Delaware will also incur greater costs in conducting outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

38. Enrollment in federal-state healthcare programs has a positive impact on public health in Delaware. Individuals enrolled in federal-state healthcare programs are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Delaware residents with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

39. Having insurance coverage also makes it less likely that Delaware residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

40. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

41. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health

impacts would further strain Delaware resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and Delaware.

42. Delaware can also anticipate a loss of compliance and lower engagement with health care systems which could have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for Delaware in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

43. Increased uncompensated care costs that hospitals and healthcare risks the closure of healthcare facilities. Such closures would impact all Delaware residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, New Castle County, DE.

Steven M. Costantino
Director, Health Care Reform
Associate Deputy Secretary
Delaware Department of Health and Social Services