# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*<br><br>Defendants. | Civil Action No.: 1:25-cv-10139 |

### DECLARATION OF RAFAEL LÓPEZ

I, Rafael López, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. Governor Wes Moore appointed me the Acting Secretary to the Maryland Department of Human Services ("MDHS") on January 18, 2023, and Secretary to MDHS on March 2, 2023. Prior to my appointment and confirmation by the Maryland Senate as Secretary, I served as a Senior Advisor to the Administration for Children and Families (ACF) in the United States Department of Health and Human Services from December 2021 through January 2023. I helped reunite more than 170,000 unaccompanied children with their families or other vetted sponsors at the height of the largest surge of unaccompanied children in U.S. history. I have held senior leadership roles at the city, county, state, and federal levels all primarily focused on serving children, youth, and families.

2. I compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency and other state agencies, and on the basis of documents that have been provided to and/or reviewed by me. I also familiarized myself with the alternative injunctive scopes proposed

by the federal government to understand the immediate impact of their implementation on Maryland.

3. I submit this declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Maryland's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

## Verifying Eligibility for State Social Services Programs

4. Maryland offers a suite of free or low-cost publicly funded healthcare insurance, including Medicaid and Maryland Children's Health Insurance Program ("CHIP"), which are collectively referred to as "Maryland Medical Assistance." These programs are administered by the Maryland Department of Health ("MDH").

5. Maryland Medical Assistance provides comprehensive healthcare coverage for a wide range of services, including primary care, hospitalization, laboratory tests, x-rays, prescriptions, mental health care, dental care, preventive screenings, and more.

6. MDHS and MDH determine eligibility for Maryland Medical Assistance through our joint operation of an information technology system, Maryland's Enrollment & Eligibility System, operated by the Maryland Department of Information Technology ("DoIT"). Eligibility for Maryland Medical Assistance health insurance programs, including eligibility for Medicaid and CHIP, depends in part on age, immigration status, and household income.

7. In general, children under the age of 18 (i) meet the income eligibility requirement for Medicaid in Maryland if their household's modified adjusted gross income ("MAGI") is less than 143% of the federal poverty level ("FPL"), and (ii) meet the income

eligibility requirement for CHIP in Maryland if their household's MAGI is less than 322% of the FPL.

8. To be eligible for Medicaid or CHIP, a child must also be a U.S. citizen or "lawfully residing," as that term is defined by federal law. "Lawfully residing" individuals are "lawfully present" and include qualified immigrants such as lawful permanent residents, asylees, refugees, and trafficking victims, as well as nonimmigrant visa holders and humanitarian status classes such as Temporary Protected Status and Special Immigrant Juvenile Status. Children who are not citizens or "lawfully residing" are commonly referred to as undocumented. The only exception to this eligibility requirement is for certain emergency services, which Medicaid covers for individuals who are neither citizens nor "lawfully residing."

9. Children enrolled in Maryland Medical Assistance are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that families are not left with medical bills that they are unable to pay. In addition, sick children with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

10. Having insurance coverage also makes it less likely that children will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

**Federal Funding**

11. As of June 30, 2025, Maryland Medical Assistance provides coverage to 1,508,710 individuals, representing 25% of the state's total population. This includes a significant proportion of the state's children, with 667,836 children aged 0-18 enrolled in Maryland Medicaid, accounting for almost half of all children statewide (out of approximately 1.5 million children).

12. In Calendar Year (CY) 2024, Maryland Medical Assistance spent approximately $3.4 billion on children ages 0 through 18. These costs include capitation payments to the Managed Care Organizations ("MCO") and additional costs paid on a fee-for-service (FFS) basis. The $3.4 billion spent on children is approximately 18.2% of the Program's total spending (approximately $18.6 billion in CY 2024).

13. The U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") allows the Maryland Department of Health to draw down federal funds at various different federal matching rates for children, subject to a quarterly report that Maryland provides to CMS as part of a reconciliation process.

**Heatlthcare Coverage for Newborns**

14. All children born in the United States and residing in Maryland whose family income is at or below 322% of the Federal Poverty Level are eligible for Maryland Medical Assistance.

15. Presently, all children born in Maryland are U.S. citizens.

16. Thus, at present, Maryland Medical Assistance coverage for newborns in Maryland is partially funded by the State and partially funded by the federal government, either through Medicaid or CHIP.

17. Most healthy newborns remain in the hospital for two or three days after delivery. During this time, they receive routine postnatal care, including a vitamin K injection, antibiotic eye drops, screening tests, and hepatitis B vaccination.

18. Additionally, it is recommended that newborns see a doctor or nurse for a "well-baby visit" six times before their first birthday, including at least once during their first three months and multiple times before six months.

19. Within the first year of life, babies may also need to visit a doctor when they appear ill and may require testing or prescription medication.

20. Children ages 1-18 typically have a range of health care needs that require services from various health care providers. For example, children in Maryland must receive certain immunizations prior to starting school.

## Fiscal Impact of Revoking Birthright Citizenship

21. The following chart sets forth the approximate total monthly health care costs paid by Maryland Medical Assistance for children enrolled in Maryland Medical Assistance health insurance programs, along with the amount that is reimbursed by the federal government for children enrolled in federally-funded Medicaid or CHIP, broken down by age group:

**Table. Estimated Spending by Age for Calendar Year 2024**

| Age Group | CY 2024 Total Spending Capitation and FFS Costs | Estimated Federal Reimbursement | Total Cost to the State of Maryland | Member Months | Estimated Average Monthly Total Spending | Estimated Average Monthly Federal Reimbursement | Estimated Average Monthly Cost to the State of Maryland |
|---|---|---|---|---|---|---|---|
| <1 year | $343,917,200 | $187,022,173 | $156,895,027 | 448,561 | $766.71 | $416.94 | $349.77 |
| 1 to 5 years | $727,647,915 | $395,694,936 | $331,952,979 | 2,163,196 | $336.38 | $182.92 | $153.45 |
| 6 to 14 years | $1,532,529,626 | $833,389,611 | $699,140,015 | 4,040,562 | $379.29 | $206.26 | $173.03 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 15 to 18 years | $789,101,999 | $429,113,667 | $359,988,332 | 1,761,913 | $447.87 | $243.55 | $204.32 |
| **TOTAL** | **$3,393,196,740** | **$1,845,220,387** | **$1,547,976,352** | **8,414,232** | **$482.56** | **$262.42** | **$220.14** |

22. However, if a child were not eligible for federally-funded Medicaid or CHIP, Maryland would not receive that federal assistance and would cover the full cost of health insurance coverage for the newborn.

23. As a condition of eligibility for benefits under Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

24. Federal regulations delineate limited exceptions to this requirement. Specifically, MDHS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, MDHS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

25. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, MDHS and MDH are required by federal law to collect an SSN from every citizen who applies for Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

26. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

27. If a citizen-applicant cannot recall her SSN or has not been issued an SSN, federal regulations require MDHS to assist the applicant in completing an application for an SSN; including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

28. Thus, if a parent seeks to enroll a U.S. citizen-infant in Medicaid but the infant does not already have an SSN, then MDHS must assist the parent in obtaining an SSN for the infant.

29. As with Medicaid, MDHS is required to verify that an applicant has a SSN when they apply for benefits under the federally-funded Supplemental Nutrition Assistance Program ("SNAP") or Temporary Assistance for Needy Families program ("TANF"). *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

30. MDHS is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). MDHS cannot conduct the search without an SSN.

31. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that MDHS complete an application for an SSN for the individual, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2)(i).

32. To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-

(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, as well as a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

33. MDHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program.

34. MDHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

## Verification of Citizenship or Qualifying Immigration Status

35. In addition to collecting SSNs, MDHS is required by federal law to have a Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

36. As part of that system, Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

37. In addition to this self-attestation, MDHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

38. If the applicant attests that they are a U.S. citizen, MDHS must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows the MDHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

39. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

40. Based on MDHS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

41. As an alternative to verifying citizenship through the Hub, MDHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i).

42. MDHS does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of MDHS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

43.     If MDHS is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then MDHS has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

44.     MDHS may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

45.     MDHS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who has never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For MDHS to utilize this option for a child born out of State, MDHS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

46.     Only if all other options are unavailable, MDHS may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

47.     In sum, verifying citizenship for an infant who received an SSN at birth through EAB is low-cost, efficient, and not administratively burdensome. MDHS may conduct this

verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of MDHS's time and resources.

**Qualifying Immigration Status Verification**

48. If the applicant attests that they have a qualifying immigration status, MDHS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

49. Based on MDHS's experience utilizing the Federal Data Services Hub ("the Hub"), if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as would likely be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Federal Data Services Hub. Thus, that infant's qualifying status could not be verified via the Hub.

50. As an alternative to verifying immigration status through the Hub, MDHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

51. There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

52. In MDHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

53. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complications and uncertainty. Conducting such verification, as MDHS is statutorily required to do, would require a significant expenditure of MDHS's time and resources.

**Reasonable Opportunity Period**

54. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, MDHS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

55. During this period, MDHS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

56. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, MDHS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

57. If MDHS pays for benefits without having verified citizenship or immigration status, and ultimately, citizenship or immigration status cannot be verified, then Maryland will not receive federal matching funds for having provided those benefits.

58. And to recover these funds, Maryland would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

### Additional Impacts of Proposed Injunction

59. MDHS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Maryland)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

60. Narrowing the injunction in this way would cause MDHS to expend time and resources training staff and community partners on the meaning and implications of the injunction. MDHS has never experienced citizenship rules that vary by State.

61. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., MDHS would need to train its staff on this new status and how to verify it.

62. To the extent that the narrowed injunction would result in many more children within Maryland who were born out of State, but within the U.S., and did not receive an SSN at birth, MDHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Chilling Effects**

63.     MDHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, MDHS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on Maryland residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from the healthcare program altogether.

64.     MDHS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, MDHS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Maryland, because of fear that doing so could subject their children to a heightened risk of deportation.

65.     To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in Maryland, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some Maryland residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services,

threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

66. Further, should this come to pass, Maryland will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

67. Enrollment in Medicaid and Maryland's CHIP program has a positive impact on public health in the state. Individuals enrolled in Medicaid and Maryland's CHIP program are more likely to receive preventative care services, reducing the need for more intensive health care treatments, including emergency care, the financial burden on health care providers from providing care to uninsured individuals, and the strain on households left with medical bills that they are unable to pay. In addition, sick Maryland residents with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

68. Having insurance coverage also makes it less likely that Maryland residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

69. By contrast, when individuals forego insurance, this negatively impacts public health and results in an increased uncompensated care burden on hospitals.

70. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease, harms that could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and

baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services to address medical crises likely outweigh costs the state would incur for preventative care for those same individuals, further straining State resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

71. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

72. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

73. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all Maryland residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Baltimore, Maryland.

Rafael López
Secretary of Human Services