# EXHIBIT Q

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.* : | |
| Plaintiffs, : | |
| v. : | Civil Action No.: 1:25-cv-10139 |
| DONALD J. TRUMP, *et al.* : | |
| Defendants. : | |

**SUPPLEMENTAL DECLARATION OF MEGHAN GROEN**

I, MEGHAN GROEN, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Senior Chief Deputy Director for health services within the Michigan Department of Health and Human Services (MDHHS). Since May of 2023, I have been responsible for executive level oversight and administration of Medicaid and the HMP (Healthy Michigan Plan) (together commonly referred to as Medicaid), as well as CHIP (Children's Health Insurance Program), policy and the related eligibility and determination process. In this capacity, I also serve as the Michigan Medicaid Director.

2. I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with

1

the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Michigan.

3. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" (Executive Order 14160) will have on Michigan's Medicaid and CHIP programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

### Verifying Eligibility for State Social Services Programs

4. As explained in my initial declaration in support of a nationwide preliminary injunction, Michigan offers a suite of free or low-cost healthcare options, including Federal-State Medicaid, HMP, and MIChild, which is Michigan's primary CHIP program. These programs are collectively referred to as "Michigan Medicaid."

### Obtaining Social Security Numbers

5. As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

6. Federal regulations delineate limited exceptions to this requirement. Specifically, MDHHS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an

SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, MDHHS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id*. § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

7.  U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, MDHHS is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

8.  Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

9.  To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, as long with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

10. MDHHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for MDHHS to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of MDHHS's time and resources.

11. MDHHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

12. Michigan is at risk for losing federal matching funds if Michigan fails to obtain an SSN from a citizen applicant for programs like Medicaid—unless a valid federal exception applies. However, the exceptions are limited to cases involving citizenship verification errors, not general SSN collection failures. *See* 42 U.S.C. § 1320b-7(e) (prohibiting penalty for erroneously determining citizenship status if determination was made in certain delineated ways: based on info provided by DHS, or because required to provide a reasonable opportunity period to noncitizen applicant).

**Verification of Citizenship or Qualifying Immigration Status**

13. In addition to collecting SSNs, MDHHS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

14. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

15. In addition to this self-attestation, MDHHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

16. If the applicant attests that they are a U.S. citizen, MDHHS must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub (the Hub). *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows MDHHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

17. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship or immigration status of non-citizens.

18. In instances where citizenship cannot be verified through those automatic means, the applicant is contacted to provide supporting documentation,

including, but not limited to, a passport, Certificate of Naturalization, or Certificate of Citizenship, military record of service. See 42 C.F.R. § 435.945k. If verification of this manner cannot be provided, MDHHS will request third level evidence of U.S. citizenship.

    19.    Third level evidence is usually a non-government document established for a reason other than to establish U.S. citizenship and showing a U.S. place of birth. This includes an extract of a hospital record on hospital letterhead established at the time of birth that was created at least five years before the initial application date that indicated a U.S. place of birth; life, health or other insurance record showing a U.S. place of birth that was created at least five years before the initial application; religious record recorded in the U.S. within three months of birth showing the birth occurred in the U.S. and showing either the date of the birth or the individual's age at the time the record was made; or an early school records showing U.S. place of birth. If a third level of evidence cannot be supplied, MDHHS policy stipulates that fourth level evidence can be used only in the rarest of circumstances. When this is necessitated, a written affidavit completed by the applicant or recipient and at least two additional individuals of whom one is not related to the applicant/recipient and who have personal knowledge of the event(s) establishing the person's claim of citizenship can be considered. Individuals making the affidavit must be able to provide proof of their own citizenship and identity. The affidavit is signed under the penalty of perjury by the person making the

affidavit and must include information explaining why other documentary evidence establishing the applicant's claim of citizenship does not exist or cannot be obtained.

20. In sum, verifying citizenship via the Federal Data Services Hub is easy. But verifying citizenship for an applicant/recipient that never received an SSN at birth is more complicated and requires greater expenditures of MDHHS's time and resources.

**Qualifying Immigration Status Verification**

21. If the applicant attests that they have a qualifying immigration status, MDHHS must first attempt to verify that status Federal Data Services Hub or SAVE, administered by the United States Citizenship and Immigration Services. *See* 42 C.F.R. § 435.956(a)(2)(i).

22. Based on MDHHS's experience utilizing the SAVE, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Federal Data Services Hub or SAVE. Thus, that infant's qualifying status could not be verified via the Hub or SAVE.

23. As an alternative to verifying immigration status through the Hub or SAVE, MDHHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and

7

promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS).  42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).  In an instance where immigration status cannot be verified, MDHHS will contact the applicant to provide supporting documentation.  If no supporting documentation is provided, the applicant will be listed as undocumented.

24. MDHHS does not have any other alternative method of verifying immigration status approved by the HHS Secretary or Homeland Security.  It would require expenditure of MDHHS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

25. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, MDHHS would need to develop a method for accurately verifying place of birth.  MDHHS does not currently verify place of birth for infants born out of State.  Doing so would likely require arranging information sharing agreements with other States' vital statistics agencies.  MDHHS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

26. There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary.  *See* 42 C.F.R. § 435.956(a)(2).

8

27. In MDHHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

28. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as MDHHS is statutorily required to do, would require a significant expenditure of MDHHS's time and resources.

**Reasonable Opportunity Period**

29. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, MDHHS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

30. During this period, MDHHS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

31. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, MDHHS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

32. If MDHHS pays for benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then MDHHS will not receive federal matching funds for having provided those benefits.

33. Additionally, MDHHS may be determined to have erroneously provided benefits, leading to increased error rate and heightened risk of penalty.

34. And to recover these funds, MDHHS would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

### Additional Impacts of Proposed Injunction

35. MDHHS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Michigan)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

36. Narrowing the injunction in this way would cause MDHHS to expend time and resources training staff and community partners on new citizenship rules

10

varying by state borders. MDHHS has never experienced such state-specific differential rules by State.

37. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., MDHHS would need to train its eligibility workers and update systems to verify such statuses.

38. To the extent that the narrowed injunction would result in many more children within Michigan who were born out of State, but within the U.S., and did not receive an SSN at birth, MDHHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train eligibility workers and update systems to verify such statuses.

**Chilling Effects**

39. MDHHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, MDHHS anticipates that there is a substantial likelihood that the parents and family members of such children would be chilled from accessing federally funded benefits. This chilling effect will result in individuals forgoing benefits for which they are eligible or seeking to disenroll themselves and their families from Michigan Medicaid. Some people will also avoid critical preventative care and necessary medical treatment, and in some cases may even avoid emergency medical services, possibly resulting in death or serious injury.

40. These adverse health impacts will further strain scarce resources and budget. For example, effective prenatal care lowers risks of preemie births and NICU stays—each more expensive per capita. Managing chronic conditions (e.g., diabetes, hypertension) early can prevent expensive hospitalizations. Without Medicaid coverage, these costs fall on state healthcare systems, community health centers, and local public health funds, undermining the cost-savings that Medicaid normally delivers. To the extent the treatment is left uncompensated, the cost of which will ultimately be shifted to the broader healthcare delivery system and the state.

41. These poor health outcomes will also harm the overall health of all residents, by both straining Michigan's healthcare delivery system as well as increasing the potential risks of the spread of infection and illness.

42. Community-wide health suffers when individuals avoid care. The healthcare system will be overloaded in emergency departments and public clinics. There will be a rising disease transmission risks, particularly for conditions detectable via routine screening as well as delays in addressing infectious outbreaks, due to underutilized testing and treatment services.

43. Additionally, several studies indicate that about 20% of adults in immigrant families avoided public benefits in 2019 due to public-charge fears. *See, e.g.*, Simon Marshall-Shah, Michigan League for Public Policy, *Covering More of Michigan's Children* (Oct. 2021), https://mlpp.org/wp-content/uploads/2021/11/5-year-waiting-period.pdf?utm_source=chatgpt.com. University of Michigan research

in Washtenaw County, Michigan, shows immigration raids increased anxiety, reduced healthcare use, and lowered self-rated health among Latino community members.  *See* Paul Flemming and William Lopez, University of Michigan School of Public Health, *Increased Immigration Enforcement and Anti-Immigrant Rhetoric has potential "Chilling Effect" on Health Care Access* (Feb. 1, 2018), available at sph.umich.edu.  This research suggests that Michigan's undocumented or mixed-status families may similarly withdraw from Medicaid out of fear.

44. Hospitals are legally obligated to treat patients regardless of their ability to pay for emergency medical care.  When individuals receive care at hospitals and cannot pay or refuse to enroll in Medicaid given the chilling effect of federal policies, the uncompensated care costs are pushed onto hospitals already operating on slim margins, potentially impacting service capacity and resulting in budget cuts, staffing reductions, and increased service costs for all individuals receiving care at the facility.

45. Overall, to MDHHS, a narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders.  There is a strong likelihood that the parents of such children would be chilled from accessing federally funded benefits within MDHHS because of fear that doing so could subject them and their children to a heightened risk of

13

deportation. As a result, there will be lower uptake, higher uncompensated care costs, and weaker public health outcomes.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Lansing, Michigan.

*Meghan E. Groen*
Meghan E. Groen
Senior Chief Deputy
Health Services
Michigan Department of Health and
Human Services