# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.*

    Defendants.

Civil Action No.: 1:25-cv-10139

**DECLARATION OF JOHN CONNOLLY**

I, John Connolly, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Deputy Commissioner and State Medicaid Director for the Minnesota Department of Human Services ("MDHS"). I previously served as assistant commissioner for the Health Care Administration within MDHS. Prior to joining the Department, I served as chief strategist for the Los Angeles County Department of Public Health, where I focused on advancement of Medicaid-funded services and programs, regulation of health facilities, homelessness, and emergency response.

2. I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Minnesota.

1

3. I submit this declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Minnesota's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

### Verifying Eligibility for State Social Services Programs

4. Minnesota offers a suite of free or low-cost healthcare options, including Federal-State Medicaid, CHIP, and MinnesotaCare, which is our Federal-State Basic Health Program but also includes a fully state-funded coverage option. These are collectively referred to as "Minnesota Health Care Programs."

5. When a family seeks health insurance for their child through MDHS, the MDHS first screens for eligibility for Federal-State Medicaid and CHIP. That is because a child is not eligible for the State's Basic Health Program or state-funded MinnesotaCare if the child is eligible for the partially federally funded Medicaid or CHIP program.

### Obtaining Social Security Numbers

6. With limited exceptions, federal regulations generally require the State to collect a social security number (SSN) from each applicant for benefits.

7. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

8. If a citizen-applicant cannot recall her SSN or has not been issued an SSN, MDHS must assist the applicant in completing an application for an SSN—including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the

applicant—and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

9. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then the MDHS must assist the parent in obtaining an SSN for the infant.

10. The MDHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for the MDHS to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of the MDHS's time and resources.

11. The MDHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

**Verification of Citizenship or Qualifying Immigration Status**

12. In addition to collecting SSNs, the MDHS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

13. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

14. In addition to this self-attestation, the MDHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

15. If the applicant attests that they are a U.S. citizen, the MDHS must first attempt to verify that information via trusted data sources. For families with children applying for MHCP, the

MDHS attempts through a federal electronic service known as the Federal Data Services Hub (the "Hub"). *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows the MDHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

16. Based on the MDHS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then neither the SSA nor the Department of Homeland Security would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

17. As an alternative to verifying citizenship through the Hub, the MDHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); *see* 42 C.F.R. § 435.956(a)(1)(i).

18. The MDHS does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of the MDHS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

19. If the MDHS is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then the MDHS has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

20. The MDHS may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

21. The MDHS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For the MDHS to utilize this option for a child born out of State, the MDHS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

22. Only if all other options are unavailable, the MDHS may verify citizenship by requesting that the individual or family submit a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

23. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. The MDHS may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of the MDHS's time and resources.

**Qualifying Immigration Status Verification**

24. If the applicant attests that they have a qualifying immigration status, the MDHS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

25. Based on the MDHS's experience utilizing the Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Federal Data Services Hub. Thus, that infant's qualifying status could not be verified via the Hub.

26. As an alternative to verifying immigration status through the Hub, the MDHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); *see* 42 C.F.R. § 435.956(a)(2)(i).

27. The MDHS does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

28. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, the MDHS would need to develop a method for accurately verifying place of birth. The MDHS does not currently verify place of birth for

6

infants born out of State. Doing so would likely require arranging information sharing agreements with other states' vital statistics agencies. The MDHS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

29. There are no alternatives to verify qualifying immigration status other than through the Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

30. In the MDHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

31. MDHS, for example, has received questions and requests for help from county workers with respect to immigrants who were paroled in the U.S. as "Cuban-Haitian Entrants." It is very difficult to verify these individuals' status through the federal services, even though they are eligible under federal law.

32. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as the MDHS is statutorily required to do, would require a significant expenditure of the MDHS's time and resources.

**Reasonable Opportunity Period**

33. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, the MDHS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

34. During this period, the MDHS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

35. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, the MDHS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

## Additional Impacts of Proposed Injunction

36. The MDHS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Minnesota)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

37. Narrowing the injunction in this way would cause the MDHS to expend time and resources training staff and community partners on the meaning and implication of the injunction. The MDHS has never experienced citizenship rules vary by State.

38. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., the MDHS would need to train its staff on this new status and how to verify it.

39. To the extent that the narrowed injunction would result in many more children within MDHS who were born out of State, but within the U.S., and did not receive an SSN at birth, the

MDHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Outreach and Education Expenses**

40. The MDHS expects that many impacted families it serves, especially those who may have moved into Minnesota from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

41. If the injunction is so narrowed, the MDHS would engage in education and outreach efforts to inform impacted families about the impact of the injunction.

42. In the MDHS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

43. For example, the MDHS engaged in a significant communications campaign and regular roundtable meetings with community organizations in connection with the expansion of state-funded MinnesotaCare eligibility to undocumented individuals.

44. If the injunction is narrowed as the federal government proposes, the MDHS anticipates it would have to engage in similar outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Minnesota.

**Chilling Effects**

45. The MDHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, the MDHS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing

federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on MDHS residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from the federal-state healthcare program, MDHS, altogether.

46. The MDHS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, the MDHS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Minnesota, because of fear that doing so could subject their children to a heightened risk of deportation.

47. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in Minnesota, to forgo such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some Minnesota residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

48. Further, should this come to pass, Minnesota will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

49. Enrollment in federal-state Medicaid, CHIP and the Basic Health Program has a positive impact on public health in the state. Individuals enrolled in Medicaid, CHIP or the Basic Health Program are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Minnesotans with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

50. Having insurance coverage also makes it less likely that Minnesotans will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

51. By contrast, when individuals forgo insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

52. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left

uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

53. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

54. The State also operates facilities specializing in behavioral health treatment, including the State's Forensic Mental Health Program, the Anoka Metro Regional Treatment Center, and Community Behavioral Health Hospitals. These facilities are responsible for treating individuals whose treatment is court-ordered, regardless of ability to pay. As a result, the State will likely be forced to bear the cost of treating individuals with behavioral health conditions who cannot afford to pay for services, decline to obtain care via the Medical Assistance or Emergency Medical Assistance programs, and ultimately require treatment in a state-operated facility. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

55. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all Minnesota residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Saint Paul, Minnesota.

John Connolly
Deputy Commissioner and State Medicaid Director
Minnesota Department of Human Services