# EXHIBIT S

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| : | |
| : | |
| : | |
| STATE OF NEW JERSEY, *et al.* | : |
| : | |
| Plaintiffs, | : |
| : | |
| v. | : Civil Action No.: 1:25-cv-10139 |
| : | |
| DONALD J. TRUMP, *et al.* | : |
| : | |
| Defendants. | : |
| : | |

**DECLARATION OF DR. SHANEEN MOORE**

I, Dr. Shaneen Moore, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.  I am the Assistant Commissioner of the Family Wellbeing Administration of the Minnesota Department of Children, Youth, and Families (DCYF). My educational background includes a Bachelor of Business degree, Master of Business Administration degree, and a Doctor of Philosophy in Public Service and Management. I have been employed as the Assistant Commissioner – Family Wellbeing since July 11, 2024. Prior to my role as Assistant Commissioner, I served as a Deputy Assistant Commissioner for the Children and Family Services Administration at the Minnesota Department of Human Services and as Director and Deputy Director of the Child Support Division. My professional experience in this and similar capacities spans almost 12 years working for state government.

2.  I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed

1

by me. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Minnesota.

3. I submit this declaration to explain the harmful impact that the January 20, 2025 executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Minnesota's federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

**<u>Verifying Eligibility for State Social Services Programs</u>**

4. Minnesota administers federal Temporary Assistance to Needy Families (TANF) and Supplemental Nutrition Assistance Program (SNAP), as well as state-funded elements of programs within Minnesota Family Investment Program (MFIP), Minnesota Food Assistance Program (MFAP), and other state programs.

5. When an individual or family applies for economic assistance, food assistance, or other public assistance through DCYF, DCYF first screens for eligibility to determine which among the various state- or federally-funded assistance programs the particular individual or family is eligible for based on their unique circumstances.

**Obtaining Social Security Numbers**

6. As a condition of eligibility for benefits under TANF, SNAP, MFIP, or MFAP, the State is required by federal statute to collect the individual's social security account number (SSN) from each applicant for benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 7 C.F.R. § 273.6.

7. Federal regulations allow limited exceptions to this SSN requirement. Specifically, DCYF is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who

lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, DCYF may issue benefits to such individuals, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

8. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, DCYF is required by federal law to collect an SSN from every person who applies for benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

9. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

10. If a citizen-applicant cannot recall their SSN or has not been issued an SSN, federal regulations require DCYF to assist the applicant in completing an application for an SSN; including providing applicant instruction on data elements needed for the SSN application, helping them complete the SSN application, instructing applicant to mail or take the SSA application to the SSA office and retain a copy of the application in the case file, and follow up to ensure the process was completed. See 7 C.F.R. § 273.6. This is the extent of the assistance provided. SSA requires proof of the age, the citizenship or alien status, and the identity of the applicant. Eligibility staff do not have the capacity to do more than what DCYF already instructs them to do to help applicants obtain an SSN. Any additional labor or process requirements add to the already complex and time-consuming requirements to establish eligibility for SNAP.

11. Similarly, if a parent seeks to apply for and receive public benefits on behalf of a U.S. citizen-infant but the infant does not already have an SSN, then DCYF must assist the parent in obtaining an SSN for the infant.

12. DCYF is required to use a SNAP or TANF applicant's SSN to conduct data matches to verify eligibility factors with the Social Security Administration (SSA), the Internal Revenue Service (IRS), the Department of Employment and Economic Development (DEED), which maintains unemployment data and wage data, the electronic Disqualified Recipient Subsystem (eDRS), Prisoner Verification System (PVS), Deceased Matching System, the National Directory of New Hires (NDNH), National Accuracy Clearinghouse (NAC), and the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. All of these data matches rely on SSNs for accurate verification of SNAP and TANF eligibility factors. If SSN status is in disarray, these program integrity efforts will be greatly diminished, leading to increased errors in benefit determination, which can result in increased error rates. *See* 7 C.F.R. § 273.6(f) and 45 CFR § 264.10. DCYF simply cannot conduct the data matches without an SSN.

13. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that DCYF assist the applicant in the process for applying for an SSN for the individual, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2)(i).

14. To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R.

§ 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). As a result, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity along with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

15. A parent may request an SSN for a newborn child on the birth certificate application. The state vital statistics office sends the birth registration data to the Social Security Administration. Social Security Administration issues an SSN and sends a Social Security card to the parents for the child. The parent would then provide the SSN to the eligibility worker to enter into the system, and the system would verify the SSN through an electronic interface with SSA to verify the number. Alternative approaches lack reliable program integrity markers. DCYF has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because of the process outlined above. It would be incredibly burdensome for DCYF to have to train staff on how to assist the parents with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of DCYF, county, and tribal agencies' time and resources and greatly slow the eligibility determination process. Eligibility workers already have multiple program rules to follow. Complicating the rules further will lead to backlogs and errors.

16. Further note that DCYF cannot simply opt forego these additional efforts. DCYF is prohibited by SNAP regulations from denying or delaying SNAP services to otherwise eligible individuals when good cause provisions are met for not providing an SSN. *See* 7 C.F.R. § 273.6(d).

## Verification of Citizenship or Qualifying Immigration Status

### Citizenship Verification

17.  If an applicant attests that they are a U.S. citizen, DCYF must first attempt to verify their citizenship through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SAVE can verify only naturalized/derived U.S. citizenship, but not U.S.-born citizenship.

18. Based on DCYF's experience using SAVE, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, which would likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SAVE would not have any information about the infant. As a result, that infant's citizenship could not be verified via SAVE.

19. In short, verifying citizenship for an infant who received an SSN at birth through EAB is easy. DCYF may conduct this verification simply via SAVE. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and would require substantial expenditures of DCYF's time and resources.

### Qualifying Immigration Status Verification

20. In DCYF's experience, verifying new qualifying immigration statuses can present significant administrative challenges even when federal databases are made available to do so.

21. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with

6

complication and uncertainty. Conducting such verification would require a significant expenditure of DCYF's time and resources.

**Reasonable Opportunity Period**

22. If either citizenship or immigration status cannot be fully verified through SAVE or documentary evidence at the time of application, DCYF must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4).

23. During this period, DCYF is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury.

24. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, DCYF must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

25. If DCYF pays for benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then DCYF will not receive federal matching funds for having provided those benefits.

26. Additionally, DCYF may be determined to have erroneously provided benefits, leading to increased error rate and heightened risk of penalty.

27. And to recover these funds, DCYF would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

**Additional Impacts of Proposed Injunction**

28. DCYF understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this

litigation, not be considered a citizen or eligible for federally funded benefits in the child's

birth State, but be considered eligible for federally funded benefits within the borders of the

Plaintiff States (including Minnesota)—and possibly also be considered a citizen for all

intents and purposes while within the Plaintiff States' borders. Narrowing the injunction in

this way results in significant hardship to Minnesota.

### Staff Training Expenses

29. Narrowing the injunction to Plaintiff-only states would cause DCYF to expend additional

    time and resources training staff and community partners on the meaning and implication of

    the injunction. DCYF has never experienced citizenship rules that vary by State.

30. To the extent that the federal government intends to develop a new status for federally

    funded benefits to eligible noncitizens born within the U.S., DCYF would need to train its

    staff on this new status and how to verify the status.

31. To the extent that the narrowed injunction would result in many more children within

    Minnesota who were born out of State, but within the U.S., and did not receive an SSN at

    birth, DCYF will have to develop methods for verifying these children's citizenship, as

    detailed above, and will have to train staff and develop appropriate technology to do so.

### Outreach and Education Expenses

32. DCYF reasonably anticipates that many impacted families it serves, especially those who

    may have moved into Minnesota from outside of the Plaintiff States, will be confused about

    the proposed injunction and its implications for their children's citizenship status and

    eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

33. If the injunction is so narrowed, DCYF would need to engage in education and outreach

    efforts to inform impacted families about the impact of the injunction.

34. In DCYF's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

35. If the injunction is narrowed as the federal government proposes, DCYF reasonably anticipates it would have to spend additional funds on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Minnesota.

### Chilling Effects

36. DCYF understands that the narrowed injunction could result in children within Minnesota who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, the DCYF anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on Minnesota residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking food support or cash assistance.

37. DCYF further understands that the narrowed injunction could, alternatively, result in children within Minnesota who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, DCYF still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Minnesota because of fear that doing so could subject their children to a heightened risk of deportation.

38. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits in Minnesota to forgo such enrollment, this chilling effect would have negative consequences for the State because of increased numbers of people eligible for and in need of food support and cash assistance are not receiving it.

39. Further, if the narrowed injunction is allowed to remain, Minnesota will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this __14th__ day of July 2025, in Saint Paul, Minnesota.


_____
Dr. Shaneen D. Moore
Assistant Commissioner
Minnesota Department of Children, Youth,
and Families/Family Well-being
Administration