# EXHIBIT V

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|                                 |   |                                 |
|---------------------------------|---|---------------------------------|
| STATE OF NEW JERSEY, *et al.*   | : |                                 |
| Plaintiffs,                     | : |                                 |
| v.                              | : | Civil Action No.: 1:25-cv-10139 |
| DONALD J. TRUMP, *et al.*       | : |                                 |
| Defendants.                     | : |                                 |

## SUPPLEMENTAL DECLARATION OF MELANIE BUSH

I, Melanie Bush, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and
correct:

1. I am the Assistant Secretary for NC Medicaid at the North Carolina Department of Health
   and Human Services, the designated Single State Agency responsible for administering North
   Carolina's Medicaid program (DHHS). My educational background includes a Master of
   Public Affairs from the University of Texas at Austin and a Bachelor of Science in Foreign
   Service from Georgetown University. I have been employed as Assistant Secretary of NC
   Medicaid since May 2025. Previous roles at NC Medicaid include Deputy Medicaid Director
   and Chief Operating Officer. Prior to employment with NC Medicaid, I worked as a
   nonpartisan Fiscal Analyst for Medicaid at the NC General Assembly and as a Senior Policy
   Analyst at Texas Medicaid.

2. I have compiled the information in the statements set forth below through personal
   knowledge, through agency personnel who have assisted me in gathering this information
   from our agency, and on the basis of documents that have been provided to and/or reviewed

1

by me]. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on North Carolina.

3. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on North Carolina's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

## Verifying Eligibility for State Social Services Programs

1. North Carolina offers Federal-State Medicaid and the Children's Health Insurance Program (CHIP) as a combined Federal-State Medicaid program called NC Medicaid through the Department of Health and Human Service's Division of Health Benefits. Certain administrative activities are delegated to the 100 counties within North Carolina and the Division of Health Benefits. For purposes of this document only, references to DHHS may include counties performing any delegated activities and/or the Division of Health Benefits.

## Obtaining Social Security Numbers

2. As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

3. Federal regulations delineate limited exceptions to this requirement. Specifically, the DHHS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in

2

accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, the DHHS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

4. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, the DHHS is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

5. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

6. If a citizen-applicant cannot recall her SSN or has not been issued an SSN, federal regulations require the DHHS to assist the applicant in completing an application for an SSN; including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

7. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then the DHHS must assist the parent in obtaining an SSN for the infant.

8. As with Federal-State Medicaid, the DHHS is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

9. The DHHS is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not

3

have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). The DHHS cannot conduct the search without an SSN.

10. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that the DHHS complete an application for an SSN for the individual, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2)(i).

11. To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, as long with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

12. The DHHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for the DHHS to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of the DHHS's time and resources.

13. The DHHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

4

## Verification of Citizenship or Qualifying Immigration Status

14. In addition to collecting SSNs, the DHHS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

15. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

16. In addition to this self-attestation, the DHHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

### Citizenship Verification

17. If the applicant attests that they are a U.S. citizen, the DHHS must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows the DHHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

18. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

19. Based on the DHHS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at

5

birth through EAB, and had not received any federally-funded public benefits, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

20. As an alternative to verifying citizenship through the Hub, the DHHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); see 42 C.F.R. § 435.956(a)(1)(i).

21. The DHHS does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of the DHHS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

22. If the DHHS is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then the DHHS has several additional verification options. See 42 C.F.R. § 435.956(a)(1)(ii).

23. The DHHS may verify citizenship through a data match with SSA. See 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

24. The DHHS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); see 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS.

6

*See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For the DHHS to utilize this option for a child born out of State, the DHHS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

25. Only if all other options are unavailable, the DHHS may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

26. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. The DHHS may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of the DHHS's time and resources.

**Qualifying Immigration Status Verification**

27. If the applicant attests that they have a qualifying immigration status, the DHHS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

28. Based on the DHHS's experience utilizing the Federal Data Services Hub ("the Hub"), if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the

7

Federal Data Services Hub. Thus, that infant's qualifying status could not be verified via the Hub.

29. As an alternative to verifying immigration status through the Hub, the DHHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); see 42 C.F.R. § 435.956(a)(2)(i).

30. The DHHS does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

31. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, the DHHS would need to develop a method for accurately verifying place of birth. The DHHS does not currently verify place of birth for infants born out of State. Doing so would likely require arranging information sharing agreements with other State's vital statistics agencies. The DHHS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

32. There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary. See 42 C.F.R. § 435.956(a)(2).

8

33. In the DHHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

34. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as the DHHS is statutorily required to do, would require a significant expenditure of the DHHS's time and resources.

**Reasonable Opportunity Period**

35. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, the DHHS must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

36. During this period, the DHHS is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

37. At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, the DHHS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5)(A).

38. If the DHHS pays for benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, then the DHHS will not receive federal matching funds for having provided those benefits.

39. To recover these funds, the DHHS would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

## Additional Impacts of Proposed Injunction

40. The DHHS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including North Carolina)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

### Staff Training Expenses

41. Narrowing the injunction in this way would cause the DHHS to expend time and resources training staff and community partners on the meaning and implication of the injunction. The DHHS has never experienced citizenship rules vary by State.

42. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., the DHHS would need to train its staff on this new status and how to verify it.

43. To the extent that the narrowed injunction would result in many more children within North Carolina who were born out of State, but within the U.S., and did not receive an SSN at birth, the DHHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

10

**Outreach and Education Expenses**

44. The DHHS expects that many impacted families it serves, especially those who may have moved into North Carolina from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

45. If the injunction is so narrowed, the DHHS would engage in education and outreach efforts to inform impacted families about the impact of the injunction.

46. In the DHHS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

47. If the injunction is narrowed as the federal government proposes, the DHHS anticipates it would have to spend administrative funds on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within North Carolina.

**Chilling Effects**

48. The DHHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, the DHHS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on North Carolina residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare. Under these conditions, individuals are

11

substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from the federal-state healthcare program, NC Medicaid, altogether.

49. The DHHS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, the DHHS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within North Carolina, because of fear that doing so could subject their children to a heightened risk of deportation.

50. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in North Carolina, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some North Carolina residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

51. Further, should this come to pass, North Carolina will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

52. Enrollment in NC Medicaid has a positive impact on public health in the state. Individuals enrolled in NC Medicaid are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to

12

uninsured individuals and ensures that households are not left with medical bills that they are
unable to pay. In addition, sick North Carolina residents with health insurance coverage are
more likely to see a health care provider and receive treatment, limiting the spread of
infectious illnesses across the state.

53. Having insurance coverage also makes it less likely that North Carolina residents will have to
visit an emergency room to treat preventable illnesses because it is more likely that they will
receive medical care before a treatable medical issue becomes an emergency. This reduces
the resource strain and uncompensated care burden on hospitals.

54. By contrast, when individuals forego insurance, this negatively impacts public health and
results in increased uncompensated care burden on hospitals.

55. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse
health effects during pregnancy and childbirth, overdose, and increased morbidity and
mortality for late-stage disease. Each of these harms could be prevented with early access to
screening and treatment. Research indicates that delayed or no prenatal care increases risks
for both mother and baby, including for preterm birth, low birth weight, and labor
complications. The costs of emergency services such as those described likely outweigh costs
the state would incur for preventative care for those same individuals. These adverse health
impacts would further strain State resources and budget. To the extent their treatment is left
uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare
delivery system and the State.

56. The State can also anticipate a loss of compliance and lower engagement with health care
systems which will have devastating impacts on public health including decreased use of
vaccines and other preventative medicine causing increased risks for immunocompromised

13

residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

57. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

58. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all North Carolina residents who need healthcare services.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 14th day of July 2025, in Raleigh, North Carolina.

Melanie Bush
Assistant Secretary, NC Medicaid
North Carolina Department of Health and
Human Services

14