# EXHIBIT X

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.*

    Defendants.

Civil Action No.: 1:25-cv-10139

## SUPPLEMENTAL DECLARATION OF GABRIELLE ARMENIA

I, Gabrielle Armenia, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Director of the Division of Eligibility and Marketplace Integration in the Office of Health Insurance Programs of the New York Department of Health ("DOH"), a position I have held since 2024. I have also been New York State's Children's Health Insurance Program (CHIP) Director since 2019. As Director of Eligibility and Marketplace Integration, I am responsible for eligibility policy for the Medicaid and Child Health Plus Program, among other things. Prior to holding this position, I was the Director of the Bureau of Child Health Plus policy from April 2008 through October 2013, the Director of the Bureau of Child Health Plus and Marketplace Integration from October 2013 through October 2022, and the Director of the Child Health Plus and Marketplace Consumer Assistance Group from October 2022 through March 2024.

2. I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff. I have also

1

familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on New York State.

3. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on New York's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

**Verifying Eligibility for State Social Services Programs**

4. As explained in my initial declaration in support of a nationwide preliminary injunction, New York administers several programs through the NY State of Health Marketplace that enable qualifying New York residents to access free or low-cost healthcare coverage: Medicaid, Child Health Plus (New York's Children's Health Insurance Program ("CHIP"), which includes federal- and state-funded CHIP and New York's state extension), the Essential Plan ("EP") (New York's 1332 State Innovation Waiver), and Qualified Health Plans ("QHP"). Additional details about each of these programs are included in my initial declaration.

5. When a family seeks health insurance for their child through New York State of Health or through a local Department of Social Services, the child is first screened for Medicaid. If the child is ineligible for Medicaid, the child is screened for Child Health Plus eligibility. A child is not eligible for the Essential Plan, or a Qualified Health Plan due to their age. If a child is ineligible for Medicaid or Child Health Plus due to their immigration status, the child may be eligible for the state funded Child Health Plus program if otherwise eligible.

**Obtaining Social Security Numbers**

6. As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

7. Federal regulations delineate limited exceptions to this requirement. Specifically, NYDOH is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). NYDOH issues a Medicaid identification number (i.e. CIN number) to such individuals, as it does with all enrollees, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

8. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions, putting aside religious objectors. Thus, NYDOH is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

9. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

10. If a citizen-applicant cannot recall her SSN or has not been issued an SSN, federal regulations require NYDOH to assist the applicant in completing an application for an SSN; including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

11. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then NYDOH must assist the parent in obtaining an SSN for the infant. In practice, this is often accomplished through local departments of social services or application assistors around the state.

12. NYDOH has not been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the Enumeration at Birth (EAB) program. If NYDOH routinely encountered infants born in the U.S. but without an SSN, we would likely have to await further guidance and then adopt any necessary procedures, systems, training, and additional guidance to be able to complete the application process. Providing such assistance would require expenditure of NYDOH staff time and resources.

13. NYDOH is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

**Verification of Citizenship or Qualifying Immigration Status**

14. In addition to collecting SSNs, NYDOH is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

15. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

16. In addition to this self-attestation, NY State of Health must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

17. If the applicant attests that they are a U.S. citizen, NY State of Health must first attempt to verify that information through a federal electronic service known as the Federal Data

Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows NYDOH to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

18. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

19. Based on NY State of Health's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

20. As an alternative to verifying citizenship through the Hub, NYDOH may utilize mechanisms that will reduce administrative costs if approved by the U.S. Secretary of Health and Human Services (HHS).

21. NYDOH does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of NYDOH's staff time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

22. If NYDOH is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then NYDOH has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

23. NYDOH may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, then SSA would not have any information on the infant with which to provide a data match.

24. NYDOH may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "verification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For NYDOH to utilize this option for a child born out of State, NYDOH would have to contact the birth State's vital statistics agency, or instruct individuals to do so. That would require expenditure of staff time and resources. We would also need additional documents that could be used to ascertain identity.

25. Only if all other options are unavailable, NYDOH may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

26. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. NYDOH may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of staff time and resources.

**Qualifying Immigration Status Verification**

6

27. If the applicant attests that they have a qualifying immigration status, NYDOH must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

28. As explained, based on NYDOH's experience utilizing the Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, then it is unlikely that there would be any information about that infant in the Hub. Thus, that infant's qualifying status could not be verified via the Hub.

29. As an alternative to verifying immigration status through the Hub, the NYDOH may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

30. NYDOH does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

31. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, NYDOH would need to develop a method for accurately verifying place of birth. NYDOH does not currently verify place of birth for infants born out of State. Doing so might require arranging information sharing agreements with other State's vital statistics agencies. NYDOH does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

32.     There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

33.     In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as NYDOH is statutorily required to do, would require a significant expenditure of NYDOH's time and resources.

**Reasonable Opportunity Period**

34.     If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, NYDOH must allow the applicant a "reasonable opportunity period," which is usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R. § 435.956(b).

35.     During this period, NYDOH is required to furnish benefits provided that the applicant has completed a declaration of their status under penalty of perjury. 42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

36.     At the end of the reasonable opportunity period and any extensions, if the applicant's citizenship or immigration status has still not been verified, NYDOH must terminate eligibility.  *See* 42 U.S.C. § 1320b-7(d)(5)(A).

37.     If NYDOH pays for benefits without having verified citizenship or immigration status, and ultimately citizenship or immigration status cannot be verified, NYDOH will only receive federal matching funds for having provided those benefits during the reasonable opportunity period.

38. Additionally, NYDOH may be determined to have erroneously provided benefits, leading to increased error rate and heightened risk of penalty.

39. And to recover these funds, NYDOH would have to expend resources issuing overpayment notices to families, attempting collection, and conducting fair hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. § 1320b-7(d)(5)(B).

**Additional Impacts of Proposed Injunction**

40. NYDOH understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including New York)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

41. Narrowing the injunction in this way would cause NYDOH to expend time and resources training staff and community partners and the over 5500 application assistors on the meaning and implication of the injunction. NYDOH has never experienced citizenship rules that vary by State.

42. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., NYDOH would need to train its staff and contractor staff on this new status and how to verify it.

43. To the extent that the narrowed injunction would result in many more children within New York who were born out of State, but within the U.S., and did not receive an SSN at

birth, NYDOH will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Outreach and Education Expenses**

44. NYDOH expects that many impacted families it serves, especially those who may have moved into New York from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid.

45. If the injunction is so narrowed, NYDOH would engage first in its own analysis and evaluation process, and then in education and outreach efforts to inform impacted families about the impact of the injunction.

46. In NYDOH's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

47. If the injunction is narrowed as the federal government proposes, NYDOH anticipates it would have to spend funds on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within New York.

**Chilling Effects**

48. NYDOH understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens. If this occurs, NYDOH anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on New York residents will likely include but not be limited to

immigrants and their family members, who will be discouraged from seeking medically necessary healthcare and may forgo benefits for which they are eligible.

49. NYDOH further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet whom the federal government would not otherwise treat as citizens outside of the Plaintiff States' borders. If this occurs, NYDOH still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within New York, because of fear that doing so could subject their children to a heightened risk of deportation.

50. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in New York, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some New York residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

51. Further, should this come to pass, New York will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

52. Enrollment in health insurance has a positive impact on public health in the state. Individuals enrolled in health insurance are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are

unable to pay. In addition, sick New York residents with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

53. Having insurance coverage also makes it less likely that New York residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

54. By contrast, when individuals forego health insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

55. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would

incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

56. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

57. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all New York residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Niskayuna, New York.

Gabrielle Armenia
Director, Division of Eligibility and
Marketplace Integration
Office of Health Insurance Programs
New York Department of Health