# EXHIBIT EE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW JERSEY, *et al.* | : |
| Plaintiffs, | : |
| v. | : Civil Action No.: 1:25-cv-10139 |
| DONALD J. TRUMP, *et al.* | : |
| Defendants. | : |

**DECLARATION OF KIMBERLY MEROLLA-BRITO, DIRECTOR
RHODE ISLAND DEPARTMENT OF HUMAN SERVICES**

I, Kimberly Merolla-Brito, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge and belief:

1. I am the Director of the Rhode Island Department of Human Services and have held this position since June 2022. My educational background includes a Master of Social Work and a Bachelor of Social Work, both from Rhode Island College. Prior to my current role, I served as the Deputy Director of Policy and Operations at DHS from 2017 to 2022, overseeing agency operations, policy initiatives, and staff development. From 2015 to 2017, I was the Associate Director of Policy and Operations, leading policy planning and quality control efforts. Between 2009 and 2015, I served as Administrator of Policy and Research, contributing to the development of the Unified Health Infrastructure Project (UHIP). I began my state service in 1998 as a social caseworker at the Department of Children, Youth & Families (DCYF), where I cultivated my clinical and public service expertise.

1

In addition to my professional experience, I am a Licensed Independent Clinical Social Worker (LICSW) and continue to be engaged in community service through board memberships and leadership development initiatives.

2. As the Director of the R.I. Department of Human Services, I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Rhode Island.

3. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, Executive Order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Rhode Island's federally funded benefits programs in the absence of a nationwide injunction, including if the injunction is narrowed along the lines suggested by the federal government in its recent filing.

4. "While many immigrants who are lawfully present in the United States are eligible for public benefits, there are restrictions based on citizenship and immigration status that limit their access to several federal means-tested programs. These include many of the programs intended to support work, economic stability, nutrition, and health for low-income children and families: Temporary Assistance for Needy Families (TANF), the Supplemental Nutrition Assistance Program (SNAP) the Child Care Assistance Program (CCAP) and Medicaid. Historically, unauthorized immigrants were ineligible for federally funded assistance, but welfare reform in 1996 also restricted access for lawfully present immigrants based on their immigration status, when they arrived in the United States, and length of U.S.

2

residence." United States Department of Health and Human Services publication, Office of the Assistant Secretary for Planning and Evaluation (ADA, March 26, 2021).

5. The Regulations provided below in Paragraph 6 depict DHS' detailed current practices in determining eligibility of non-citizens for (A) Medicaid, (B) Long-Term Support Services (LTSS), (C) Supplemental Nutrition Assistance Program (SNAP), (D) Temporary Assistance for Needy Families (TANF)-Rhode Island Works (RIW), and (E) Child Care Assistance Program (CCAP).

6. Verifying eligibility for State of Rhode Island social service programs listed in paragraph five (5) above is as follows:

    A. MEDICAID ELIGIBILITY

    Rhode Island's Medicaid eligibility determinations are primarily governed by a combination of State and federal laws and regulations. Federal Authority: Medicaid itself is a federal program established under Title XIX of the U.S. Social Security Act. Federal regulations further specify how states must implement eligibility rules.

    In accordance with Rhode Island General Laws, the single State Medicaid agency that oversees Medicaid is the Rhode Island Executive Office of Health and Human Services (EOHHS). However, it is the Rhode Island Department of Human Services (DHS), through an interagency agreement with EOHHS, that is explicitly authorized and responsible for Medicaid eligibility determinations.    The Medicaid eligibility determinations are conducted pursuant to the Rhode Island Code of Regulations (RICR). The Code of Regulations are promulgated in accordance with the Rhode Island Administrative Procedures Act (RIGL §42-35-1 *et seq.*).    The specific rules and regulations guiding Medicaid eligibility in Rhode Island are compiled within Title 210

3

of the RICR. These regulations detail the eligibility criteria, application process, and other requirements for different Medicaid coverage groups. Additional Medicaid eligibility functions are compiled with Title 218 of the RICR.

## B. RHODE ISLAND LONG-TERM SUPPORT SERVICES PROGRAM (LTSS)

In Rhode Island, Long-Term Support  Services (LTSS) are a range of applicable public services that support individuals with disabilities and/or chronic care needs. These services are designed to meet a person's health and care needs in settings in a setting that is ideal for the individual and their family, including an individual's home, community or institutional setting.

Eligibility Determination Factors – To gain access to LTSS, the information provided by applicants is evaluated across various eligibility factors. All persons seeking initial or continuing Medicaid LTSS must meet the general requirements for the program related to residency, citizenship and immigration status, and Social Security Numbers, and the like. The application form must be completed and signed along with the authorizations necessary to conduct electronic data matches to verify income and resources as well as necessary personal health information to assess and review clinical/functional level of need. General eligibility factors for Medicaid Affordable Care Coverage MAGI-based LTSS eligibility are located in 210-RICR-30-00-1.5(C) and for SSI-based LTSS eligibility in Part 5 of this Subchapter. Existing beneficiaries seeking LTSS must only update general eligibility information if there have been changes since the point of their last renewal. 210-RICR-50-00-1.8.3(a).

4

Children up to Age Nineteen (19) – Children requiring LTSS are generally evaluated for MACC group eligibility and provided the services and supports they need under the authorities included in the Medicaid State Plan without requiring a separate determination of eligibility. Eligibility Criteria. All children seeking initial or continuing eligibility for Medicaid LTSS coverage shall meet the general requirements for eligibility, however, notwithstanding any language to the contrary contained in the Rhode Island Code of Regulations, children under the age of nineteen (19) are not required to meet citizenship and immigration status eligibility requirements or to have been assigned a SSN. 210-RICR-50-00-1.9.4 (C). Emphasis supplied). As indicated in 210-RICR-50-10-3.1through 3.6, there is also a separate eligibility pathway known as Katie Beckett (KB), which was established by Congress for children with serious illnesses and/or disabilities who are receiving care at home and, as a result, would otherwise be ineligible for Medicaid. These children would most likely be eligible if they were receiving care in an institution. The KB pathway, which is named after the young woman who inspired its creation by Congress, applies the SSI institutional Rules to provide Medicaid coverage available to these otherwise ineligible children by deeming their parents' income as unavailable to them. Accordingly, children eligible through the KB pathway receive the full scope of Medicaid State Plan and Section 1115 waiver services, including Early, Periodic, Screening, Detection and Treatment (EPSDT), provided to children with severe chronic diseases and/or disabling impairments who qualify in the MACC group pathway based on MAGI pursuant to 210-RICR-50-10-3.

5

## C. RHODE ISLAND SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP)

The Supplemental Nutrition Assistance Program is a federal program that provides food assistance to low-income individuals and families in the United States. Formerly known as "food stamps," SNAP benefits are distributed on an Electronic Benefits Transfer (EBT) card, which can be used like a debit card at authorized retailers to purchase food. The program aims to help eligible individuals and families afford a nutritionally adequate diet. The R.I. SNAP program regulations are found in the R.I. Code of Regulations 218-RICR-20-00-1 *et seq.* Among other non-financial eligibility requirements criteria are the residency and citizenship requirements. More specifically,

### 1.4.1 - Residency

A. A household must be living in the project area where it files an application for participation.

1. No individual may participate as a member of more than one (1) household or in more than one (1) project area in any month unless an individual is a resident of a shelter for battered persons and children as defined in § 1.4.8 of this Part and was a member of a household containing the person who had abused her or him.

Residents of shelters for battered persons and children are handled in accordance with § 1.4.8 of this Part.

2. Residency must not be interpreted to mean domicile which is sometimes defined as the legal place of residence or principal home.

3. No durational residency requirements must be imposed.

6

a. An otherwise eligible household must not be required to reside in a permanent dwelling or have a fixed mailing address as a condition of eligibility.

b. Residency must not mean an intent to permanently reside in the State. However, a person in the State solely for vacation must not be considered a resident.

### 1.4.2 - Citizenship and Eligible Non-Citizen Status

A. To receive SNAP benefits, an individual must be either:

1. A citizen of the United States as described in § 1.4.2(C) of this Part; or

2. An eligible non-citizen as described in § 1.4.2(D) of this Part.

B. A household with a member who is not a citizen of the United States or an eligible non-citizen must not be prevented from applying and, if eligible, receiving benefits for the remaining eligible members of the household.

C. For SNAP purposes, a citizen of the United States is defined as an individual born in one (1) of the fifty (50) States, the District of Columbia, Puerto Rico, Guam, or the Virgin Islands.

1. In addition, nationals from American Samoa and Swain's Island are considered United States citizens for SNAP purposes.

2. Naturalized citizens are also considered to be citizens since they have the same status as citizens.

D. Eligible Non-Citizens

1. Eligibility for participation in the Supplemental Nutrition Assistance Program depends on the non-citizen being an eligible non-citizen or a qualified non-citizen that meets certain conditions related to the qualified non-citizen status.

7

2. The following eligible non-citizens may be eligible to participate in the Supplemental Nutrition Assistance Program without having to meet any additional non-citizen requirements:

   a. Certain American Indians born abroad: American Indians born in Canada living in the U.S. under § 289 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1359, or non-citizen members of a Federally recognized Indian tribe under § 4(e) of the Indian Self-Determination and Education Assistance Act (Pub. Law 93-638); and

   b. Hmong or Highland Laotian tribal members: An individual lawfully residing in the U.S. who was a member of a Hmong or Highland Laotian tribe that rendered assistance to U.S. personnel by taking part in a military or rescue operation during the Vietnam era (August 5, 1964 – May 7, 1975).

   (1) This category includes the spouse (or un-remarried surviving spouse) or unmarried dependent children of these individuals.

3. The following qualified non-citizens may be eligible to participate in the Supplemental Nutrition Assistance Program without having to meet an additional condition:

   a. Asylees: Individuals granted asylum under § 208 of the INA;

   b. Refugees: Refugees admitted to the United States under § 207 of the INA;

8

c.   Deportation withheld: individuals whose deportation is being withheld under § 243(h) of the INA (as in effect before April 1, 1997), or removal is withheld under § 241(b)(3) of the INA;

d.   Cuban/Haitian Entrants: Cuban or Haitian entrants under § 501(e) of the Refugee Education Assistance Act of 1980 (Pub. Law 96-422); or

e.   Victims of Severe Trafficking: Victims under the Trafficking Victims Protection Act of 2000 (Pub. Law 106-386).

f.   Iraqi and Afghan Special Immigrants (SIV): Iraqi and Afghan special immigrants who have been granted special immigrant status under § 101(a)(27) of the INA who have worked on behalf of the U.S. government in Iraq or Afghanistan. The Department of Defense Appropriations Act of 2010 (DoDAA), Pub. Law 111-118 § 8120, enacted on December 19, 2009, provides that SIVs are eligible for all benefits to the same extent and the same period of time as refugees.

g.   Amerasian immigrants: as defined under § 584 of the Foreign Operations, Export Financing and Related Programs Appropriations Act of 1988 (Pub. Law 100-461);

h.   Elderly Non-citizens: elderly individuals born on or before August 22, 1931 and lawfully residing in the United States on August 22, 1996;

i.   Children under eighteen (18): Qualified non-citizen children under eighteen (18) years of age.

j.   Individuals receiving benefits or assistance for blindness or disability: Individuals who have been determined blind or disabled and are receiving

9

benefits or assistance for their condition as defined under § 3(r) of the
Food and Nutrition Act of 2008 (as amended though Pub. Law 118-5)
regardless of when they entered the United States;

k.  Military Connection: Individuals who are lawfully residing in a State and
are on active duty (other than for training) in the U.S. Army, Navy, Air
Force, Marine Corps, or Coast Guard (but not full-time National Guard)
or who are honorably discharged veterans who have not been discharged
due to non-citizen status. This category includes the spouse (or surviving
spouse who has not remarried) or unmarried dependent children of these
individuals. A discharge "Under Honorable Conditions" does not meet
this requirement.

l.  A Legal Permanent Resident (LPR) who prior to adjustment to LPR
status was:

(1)A refugee under § 207 of the INA, including a victim of severe forms
of trafficking;

(2)An asylee under § 208 of the INA;

(3)A non-citizen whose deportation was being withheld under § 243(h) of
the INA (as in effect before April 1, 1997), or removal is withheld under
§ 241(b)(3) of the INA;

(4)A Cuban/Haitian entrant as defined in § 501(e) of the Refugee
Education Assistance Act of 1980 (Pub. Law 96-422);

(5)An Amerasian immigrant as defined in § 584 of the Foreign

Operations, Export Financing and Related Programs Appropriations Act,

1988 (Pub. Law 100-461)or;

m.  Individuals lawfully residing in the U.S. in accordance with the Compacts

of Free Association (COFA) between the United States and the

Governments of the Federated States of Micronesia, the Republic of the

Marshall Islands, and the Republic of Palau pursuant to the Consolidated

Appropriations Act, 2024 (CAA) (Pub. Law 118-42).

4.  The following qualified non-citizens must meet one (1) additional condition in

order to be eligible to participate in the Supplemental Nutrition Assistance

Program:

a.  Legal Permanent Residents (LPRs): Individuals lawfully admitted for

permanent residence (LPR) in the United States (holders of green cards).

b.  Parolees: Individuals paroled into the United States under § 212(d)(5) of

the INA for at least one (1) year;

c.  Conditional Entrants: Individuals granted conditional entry under §

203(a)(7) of the INA as in effect before April 1, 1980;

d.  Battered Non-Citizens: Under certain circumstances, a battered non-

citizen spouse or child, non-citizen parent of a battered child or a non-

citizen child of a battered parent with a petition pending under §§

204(a)(1)(A) or (B) or 244(a)(3) of the INA.

11

5. In order to be eligible to receive SNAP benefits, LPRs, parolees, conditional entrants and battered non-citizens must meet one (1) of the following additional conditions:

   a. Five (5) years of residence: has lived in the U.S. as a qualified alien for five (5) years from the date of entry;

   b. Forty (40) qualifying work quarters (this condition can only be met by individuals who are LPRs):

      (1)An LPR who can be credited with forty (40) qualifying quarters of work under the Social Security system (credits may be earned individually, in combination with a spouse and in some circumstances a parent);

   c. Blind or disabled: Individuals who have been determined blind or disabled and are receiving benefits or assistance for their condition;

   d. Elderly Non-citizens: elderly individuals born on or before August 22, 1931 and lawfully residing in the United States on August 22, 1996;

   e. Military connection: an individual who is lawfully residing in a State and is on active duty in the military (excluding National Guard) or is an honorably discharged veteran whose discharge is not because of immigration status (includes spouse, surviving spouse if not married, and unmarried dependent children).

      (1)A discharge "Under Honorable Conditions", which is not the same as an honorable discharge, does not meet this requirement.

    f.   Child under eighteen (18): Qualified non-citizen children under eighteen (18) years of age.

6.  Battered Immigrants/Qualified Non-Citizen Criteria

    a.   Certain categories of immigrants who have been subjected to battery or extreme cruelty in the United States by a family member with whom they reside are provided qualified non-citizen status under § 431 of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (Pub. Law 104-193).

      (1)Qualified non-citizen status also extends to an immigrant whose child or an immigrant child whose parent has been abused. Additionally, this group of battered immigrants is exempt from deeming requirements as outlined in § 1.5.8 of this Part.

    b.   A non-citizen is a qualified non-citizen as a battered immigrant if the individual meets the following seven (7) requirements. In general, these Rules apply to abused immigrants who are (or were) married to LPRs or U.S. citizens, or whose parents are LPRs or citizens:

      (1)The battered immigrant must show that they have an approved or pending petition which makes a *prima facie* case for immigration status in one (1) of the following categories:

      (AA)A Form I-130 filed by their spouse or the child's parent;

      (BB)A Form I-130 petition as a widow(er) of a U.S. citizen;

(CC)An approved self-petition under Title VIII of the Violence Against Women Reauthorization Act of 2022(Pub. Law 117-103), (including those filed by a parent); or

(DD)An application for cancellation of removal or suspension of deportation filed as a victim of domestic violence.

(2)The immigrant, the immigrant's child or the immigrant child's parent has been abused in the United States under the following circumstances:

(AA)The immigrant has been battered or subjected to extreme cruelty in the U.S. by a spouse or parent of the immigrant, or by a member of the spouse's or parent's family residing in the same household if the spouse or parent consent to the battery or cruelty.

(BB)The immigrant's child has been battered or subjected to extreme cruelty in the U.S. by a spouse or parent of the immigrant, or by a member of the spouse's or parent's family residing in the same household if the spouse or parent consents to the battery or cruelty, and the immigrant did not actively participate in the battery or cruelty.

(CC)The parent of an immigrant child has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent, if the spouse consents to or acquiesces in such battery or cruelty.

(DD)There is a substantial connection between the battery or extreme cruelty and the need for SNAP benefits; and

14

(EE)The battered immigrant, child, or parent no longer resides in the same household as the abuser.

c.  The conditions discussed above only establish that the battered immigrant is a qualified non-citizen. In order for the immigrant to qualify for SNAP benefits based on her or his immigration status, such a qualified alien must meet the other conditions for eligibility such as the five (5) year residency requirement or an LPR with forty (40) qualifying quarters of work.

(1)The five (5) year residency period begins when the *prima facie* case determination is issued or when the abused immigrant's I-130 visa petition is approved.

(AA)In making its determination, the agency representative must remember that the relevant date for this immigrant's eligibility is the date that the individual obtained qualified alien status as an abused immigrant rather than the date of that individual's immigration status, such as that of an LPR.

(2)Examples to assist the agency representative determine whether a substantial connection exists between the battery or extreme cruelty and the applicant's need for public benefits include the following situations where benefits are needed:

(AA)To enable the applicant and the applicant's child or parent to become self-sufficient;

15

(BB)To escape the abuser or community in which the abuser lives or to ensure the safety of the applicant;

(CC)Because of a loss of financial support, dwelling, or source of income due to separation from the abuser; to alleviate nutritional risk; or

(DD)For medical attention, mental health counseling, or because of a disability that resulted from the abuse.

7. Undocumented Non-Citizens

a. When a household is unable, or unwilling, to provide documentation of non-citizen status for any household member, that member is classified as an ineligible non-citizen.

b. In such cases the agency representative does not continue efforts to obtain documentation and does not report him/her to the U.S. Citizenship and Immigration Services (USCIS) office. Only in those instances where the agency representative has seen the deportation notice can the immigrant be reported to the USCIS office.

8. Certification of Remaining Household Members

a. A non-citizen is ineligible for SNAP benefits until acceptable verification is provided unless:

(1)A copy of a document provided by the non-citizen has been submitted to USCIS for verification. Pending such verification, the agency cannot reduce, delay, deny or terminate the immigrant's benefits on the basis of the individual's immigration status; or

(2)A request has been submitted to the Social Security Administration (SSA) for information regarding the number of quarters of work that can be credited to the individual, SSA has responded that the individual has fewer than forty (40) quarters, and the individual provides documentation from SSA that SSA is conducting an investigation to determine if more quarters can be credited.

(AA)If SSA indicates that the number of qualifying quarters that can be credited is under investigation, the agency must certify the individual pending the results of the investigation for up to six (6) months from the date of the original determination of insufficient quarters; or

(BB)The non-citizen applicant or the agency representative has submitted a request to a Federal Agency for verification of information which bears on the non-citizen's eligible non-citizen status. The agency representative must certify the individual pending the results of the investigation for up to six (6) months from the date of the original request for verification.

b.In all other situations, while awaiting acceptable verification, the non-citizen member(s) of the household whose status is questionable is not eligible. The non-citizen(s) with unverified status must be considered an ineligible member(s) and the eligibility of the remaining household members (if any) must be determined as defined in § 1.5.6 of this Part.

(1)The income and resources of the ineligible non-citizen must be treated in the same manner as an ineligible individual, and must be considered available in determining the eligibility of any remaining members.

17

(2)Cash payments from the ineligible non-citizen member(s) to the household are considered income under the normal income standards found in § 1.5.6 of this Part.

(3)If the agency representative determines from discussions with the household that the non-citizen either does not wish to contact USCIS, or does not give the agency representative permission to make the contact for him/her, the household is given the option of withdrawing its application or participating without the non-citizen member.

(AA)However, should the agency representative subsequently receive verification of eligible non-citizen status, the agency representative must act on the information as a reported change in household membership in accordance with the timeliness standards set in § 1.13.1 of this Part.

### D.  TEMPORARY ASSISTANCE FOR NEEDY FAMIIES (TANF) RI WORKS

The Temporary Assistance for Needy Families (TANF) program is designed to help families with children experiencing low-income achieve economic security and stability. States receive block grants to design and operate programs that accomplish one of the purposes of the TANF program. While TANF jurisdictions must meet certain work participation and cost sharing requirements, they have considerable flexibility with TANF funds to implement programs that best serve their distinct communities. Generally, non-citizens are not automatically eligible for TANF. Eligibility for TANF, which provides temporary cash assistance to needy families, is largely determined by immigration status,

with restrictions based on whether an individual is a qualified alien and how long they have been residing in the U.S.

Rhode Island's TANF program, known as Rhode Island Works (RIW), is governed by regulations established by the Rhode Island Department of Human Services (DHS). The RIW program regulations are found in the R.I. Code of Regulations 218-RICR-20-00-2 *et seq.* These regulations outline eligibility criteria, work requirements, and other aspects of the program. The program's goals are to help needy families with children by providing cash assistance and support services. More specifically, when determining financial eligibility for the RIW program, the following sections of 218-RICR-20-00-2 apply:

**2.17 – Income of Non-Citizen with Liable Sponsors**

A. When determining financial eligibility for cash assistance, it is necessary to consider the resources and income of a sponsor of a legally admitted non-citizen. Those resources and income of a sponsor which are deemed (taken for granted as available) as the resources and unearned income of a non-citizen are used in making the determination of eligibility for and amount of cash assistance.

B. Those non-citizens who meet the date of entry criteria and are not exempt as outlined in § 2.17.1 of this Part must cooperate in obtaining and documenting their sponsor's income and resources in order to determine their sponsor's liability. If such information and documentation are not provided, the Department representative is unable to determine eligibility for cash assistance.

C. The applicability of sponsorship deeming affects all applications for assistance made by the legal non-citizen.

**2.17.1 – Non-Citizens Exempted from Sponsor Liability**

A. The policy of sponsorship liability does not apply to non-citizens who are exempt because they are:

1.  Dependent children of the sponsor or of the sponsor's spouse;

2.  Admitted as a conditional entrant refugee to the United States as a result of the application, prior to 4/1/80, of the provisions of Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601;

3.  Admitted as refugees to the United States as a result of the application, after 3/31/81, of the provisions of 8 U.S.C. § 1157;

4.  Paroled into the United States as a refugee under 8 U.S.C. § 1182;

5.  Granted political asylum by the Attorney General under 8 U.S.C. § 1158;

6.  Cuban or Haitian entrants, as defined in Refugee Education Assistance Act of 1980, Pub. Law 100-200;

7.  Amerasians admitted to the United States under the provisions of the Amerasian Homecoming Act, Pub. Law 100-200.

8.  Considered qualified non-citizen under the Consolidated Appropriations Act of 2024, Pub. Law 118-42, in accordance with § 141 of the Compacts of Free Association

(COFA). These individuals may receive assistance once admitted to the U.S and are not subject to five (5) years of residency from date of entry.

## 2.17.2 - Sponsor Definition and Responsibility

A. A sponsor is, for the purpose of applying this policy, any person, agency, or organization that executed an affidavit of support or a similar agreement on behalf of a non-citizen as a condition of the non-citizen's entry into the United States.

B. The income and resources of a sponsor and the sponsor's spouse, which are deemed as unearned income and resources to the non-citizen, must be considered available to the non-citizen.

C. The spouse's income and resources must be counted even if the sponsor and spouse have married since the signing of the agreement.

D. The income and resources of a sponsor who signed a support agreement for a non-citizen are still considered in the determination of the non-citizen's eligibility for assistance even if the sponsor claims to have given up sponsorship responsibility.

## 2.17.3 – Considerations Relating to Sponsoring Agency

A. The responsibilities of a sponsoring agency or organization are the same as those of an individual sponsor. It is the obligation of the sponsoring agency to support the non-citizen, if necessary to prevent the non-citizen from becoming a public charge.

B. The obligation to support is considered to have ceased if the agency:

    1. No longer exists, or

2. Has become unable to meet the non-citizen's needs.

C. If the non-citizen contends that either condition prevails, they must provide evidence to substantiate the claim. When the demise of the sponsoring agency or organization is common knowledge, documentation may not be required. But when such is not the case, the non-citizen must obtain verification from the Office of the Secretary of State or other appropriate government body in the State where the agency was chartered.

D. If the sponsoring agency or organization continues to exist but maintains it has become unable to meet the non-citizen's needs, the non-citizen must furnish an affidavit to this effect from the sponsoring agency to support the claim.

### 2.17.4 – Responsibility of Non-Citizen

A. A non-citizen must provide information and documentation of their sponsor and the sponsor's income and resources. Moreover, the non-citizen is responsible in obtaining the cooperation of the sponsor for the purpose of determining what income and resources can be deemed to the non-citizen.

B. Non-citizens who do not obtain this cooperation or supply this information are not eligible to receive cash assistance.

C. From the documents supplied, the Department determines if the non-citizen has a sponsor and if that sponsor signed an agreement to support.

D. If the non-citizen is unable to supply a copy of the Non-Citizen Sponsorship Affidavit, or further verification or information is needed from the United States Citizenship and

Immigration Services (USCIS), the Department representative may assist the applicant in obtaining such information. USCIS form G-639, Freedom of Information/Privacy Act Request, is used for this purpose.

E. The instructions for completing the form are on the reverse side of the G-639. In order to expedite the return of the form from USCIS, the name of the Department with an attention to the worker, and the office address and telephone number may be entered.

F. Calculation of Income Deemed to Non-citizen. The monthly income of the sponsor (and of the sponsor's spouse) deemed available to the non-citizen is computed in the following way (it should be noted that income from a sponsor receiving SSI, GPA, or cash assistance from the RI Works Program is not considered available to the non-citizen):

> 1. The sponsor's total monthly earned income is reduced by twenty percent (20%) (not to exceed one hundred seventy-five dollars ($175.00) monthly). Earned income is wages, salary, or gross earnings from self-employment minus the full amount of any costs incurred in producing self-employment income in the month.

> 2. The sponsor's total monthly unearned income is then added to the net amount of earned income calculated.

> 3. The remaining monthly amount is deemed as unearned income to the non-citizen who is applying for cash assistance.

G. Calculation of Resources Deemed to Non-citizen

1. The resources of the sponsor (and of the sponsor's spouse, if living together) deemed available to the non-citizen are determined as described below. It should be noted that resources of a sponsor receiving SSI, GPA, or cash assistance from the RI Works Program are not considered available to the non-citizen.

2. In determining the resources of a sponsor to be deemed to the non-citizen, the resource exclusions in § 2.14.2 of this Part shall be applied and the value in excess of one thousand five hundred dollars ($1,500.00) shall be considered available to the non-citizen.

H. Prorating Income and Resources of Sponsor

1. In a case where a person is the sponsor of two (2) or more non-citizen individuals, the deemed income and resources of the sponsor and of the sponsor's spouse are divided equally among the non-citizens.

2. In a case where a person is the sponsor of two (2) or more non-citizen families, the deemed income and resources of the sponsor (and of the sponsor's spouse, if living together) are divided equally among the non-citizens applying for or receiving assistance.

3. Income and resources deemed to a sponsored non-citizen are not considered in determining the needs of other unsponsored members of the non-citizen's household. An exception occurs when the deemed income and resources are actually available to members of the non-citizen's family such as the non-citizen's spouse and/or children.

I. Overpayments. When overpayments are made to a non-citizen because a sponsor failed to provide correct information, both the sponsor and non-citizen are held responsible. Refer to policy on overpayments in § 2.31 of this Part for procedures.

E. CHILD CARE ASSISTANCE PROGRAM

CCAP can refer to several different programs but as used here it stands for the Rhode Island Child Care Assistance Program (CCAP), which helps low-income families afford childcare so parents can work or attend school. CCAP is governed by regulations established by the Rhode Island Department of Human Services (DHS). The CCAP regulations are found in the R.I. Code of Regulations 218-RICR-20-00-4 *et seq.* These regulations outline eligibility criteria, work requirements, and other aspects of the program. The program's goals are to help needy families with children by providing cash assistance and support services. More specifically, when determining eligibility for the RIW program, the following general provisions and citizenship requirements within 218-RICR-20-00-2 apply:

**4.1.1 – Introduction**

A. The Rhode Island Department of Human Services (DHS) recognizes the importance of access to affordable child care for families making the transition from economic assistance to economic self-sufficiency as critical to promote safety, permanency and well-being for Rhode Island children. 1. The Starting RIght Child Care Assistance Program (CCAP), adopted in 1998, ensures access to affordable, developmentally appropriate, early childhood education and support services for young children and their families. CCAPs focus is on three crucial supports: a. providing low to moderate-income families with the

financial resources to find and afford quality child care for their children; b. promoting a stable, regulated, well-qualified provider community; and c. implementing quality initiatives to enhance the quality of child care in Rhode Island.

a. As defined in the DHS General Provisions, Part 10-00-1 of this Title, the applicant parent(s) and any applicant children in the financial unit shall be residents of the State of Rhode Island.

**4.3.1A4 Citizenship**

a. The applicant child shall be either a citizen of the United States or a qualified immigrant. There is no five (5) year waiting period for qualified immigrant children to be eligible for the CCAP. Qualified immigrants are:

(1)Lawful permanent residents (LPRs);

(2)Refugees, asylees, persons granted withholding of deportation/removal, conditional entry (in effect prior to April 1, 1980), or paroled into the U.S. for at least one (1) year;

(3)Cuban/Haitian entrants;

(4)Battered spouses and children, whose need for benefits has a substantial connection to the battery or cruelty (parent/child of such battered child/spouse are also "qualified"), with one (1) of the following:

(AA)A pending or approved self-petition for an immigrant visa;

(BB)An immigrant visa filed for a spouse or child by a U.S. citizen or LPR; or

(CC)An application for cancellation of removal/suspension of deportation.

(5)Victims of trafficking and their derivative beneficiaries who have obtained a T visa or whose application for a T visa sets forth a *prima facie* case.

b.The adult applying for the CCAP for an eligible child shall not be required to provide proof of citizenship or immigration status.

c.The Department utilizes the State Verification and Exchange System (SVES) to validate Social Security Numbers (SSNs) and verify an applicant/recipient's citizenship.

1.  Rhode Island offers a suite of free or low-cost healthcare options, including Federal-State Medicaid (eligibility managed by DHS), the Childrens Health Insurance Program (CHIP- managed by the Rhode Island Executive Office of Health and Human Services (EOHHS) and Healthsource RI (HSRI), the State's health insurance marketplace where individuals can enroll in other healthcare plans or be referred to DHS for Medicaid eligibility.

2.  When a family seeks health insurance for their child through HSRI, HSRI must first screen for eligibility for Federal-State Medicaid and CHIP. That is because a child is not eligible for the coverage through HSRI if the child is eligible for the partially federally funded Medicaid or CHIP program. The CHIP program is managed by the Rhode Island Executive Office of Health and Human services (EOHHS).

**Obtaining Social Security Numbers**

3.  As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

4.  Federal regulations delineate limited exceptions to this requirement. Specifically, DHS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, Medicaid Identification Numbers are automatically generated when an individual is created in RIBridges; RIBridges is the State's computer system that supports online applications and eligibility processing for Medicaid, SNAP, TANF, RI Works, Child Care Assistance Program (CCAP), HealthSource RI, Long-Term Supports and Services (LTSS), AT HOME cost-sharing, and General Public Assistance (GPA). DHS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise established entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

5.  U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, DHS is required by federal law to collect an SSN from every citizen who applies for Federal-State Medicaid benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

28

6. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

7. If a citizen-applicant cannot recall their SSN or has not been issued an SSN, federal regulations require the Department to assist the applicant in completing an application for an SSN; including collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

8. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then DHS must assist the parent in obtaining an SSN for the infant.

9. As with Federal-State Medicaid, DHS is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

10. DHS is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). DHS cannot conduct the search without an SSN.

11. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that DHS complete an application for an SSN for the individual, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2)(i).

12. To obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, as long with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

13. DHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for DHS to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of DHS's time and resources.

14. DHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

**Verification of Citizenship or Qualifying Immigration Status**

15. In addition to collecting SSNs, DHS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

16. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

17. In addition to this self-attestation, the DHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

18. If the applicant attests that they are a U.S. citizen, DHS may first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows DHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

19. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

20. If information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

21. As an alternative to verifying citizenship through the Hub, DHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); *see* 42 C.F.R. § 435.956(a)(1)(i).

22. DHS does not have any such alternative method of verifying citizenship approved by the HHS Secretary. It would require expenditure of the DHS's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

23. If DHS is unable to verify citizenship either through the Federal Data Services Hub and has no alternative method approved by the HHS Secretary, then DHS has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

24. DHS may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the

32

U.S., did not receive an SSN at birth through EAB, and had not received any federally funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

25. DHS may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For DHS to utilize this option for a child born out of State, DHS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

26. Only if all other options are unavailable, DHS may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

27. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. DHS may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth is more complicated and requires greater expenditures of the DHS' time and resources.

**Qualifying Immigration Status Verification**

28. If the applicant attests that they have a qualifying immigration status, the DHS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

29. Based on the DHS's experience utilizing the Federal Data Services Hub ("the Hub"), if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Hub. Thus, that infant's qualifying status could not be verified via the Hub.

30. As an alternative to verifying immigration status through the Hub, DHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); *see* 42 C.F.R. § 435.956(a)(2)(i).

31. DHS does not have any such alternative method of verifying immigration status approved by the HHS Secretary. It would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval.

32. To the extent that the federal government would deem noncitizen children eligible for Federal-State Medicaid based on place of birth, DHS would need to

develop a method for accurately verifying place of birth. DHS does not currently verify place of birth for infants born out of State. Doing so would likely require arranging information sharing agreements with other State's vital statistics agencies. DHS does not currently have such agreements and developing them would take time and resources and depend on the cooperation of other States' agencies.

33. There are no alternatives to verify qualifying immigration status other than through the Federal Data Services Hub or an alternative method approved by the HHS Secretary. *See* 42 C.F.R. § 435.956(a)(2).

34. In DHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

35. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as DHS is statutorily required to do, would require a significant expenditure of the DHS's time and resources.

**Reasonable Opportunity Period**

36. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, DHS must allow the applicant a "reasonable opportunity period," which is

usually 90 days, to prove their status. *See* 42 U.S.C. § 1320b-7(d)(4); 42 C.F.R.

§ 435.956(b).

37. During this period, DHS is required to furnish benefits provided that the

applicant has completed a declaration of their status under penalty of perjury.

42 C.F.R. §§ 435.956(b); 435.406(a)(1), (2).

38. At the end of the reasonable opportunity period and any extensions, if the

applicant's citizenship or immigration status has still not been verified, DHS

must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d)(5).

39. If DHS pays for benefits without having verified citizenship or immigration

status, and ultimately citizenship or immigration status cannot be verified, then

DHS will not receive federal matching funds for having provided those benefits.

40. Additionally, DHS may be determined to have erroneously provided benefits,

leading to increased error rate and heightened risk of penalty.

41. And to recover these funds, DHS would have to expend resources issuing

overpayment notices to families, attempting collection, and conducting fair

hearings on the benefits termination and overpayment claims. *See* 42 U.S.C. §

1320b-7(d)(5)(B).

**Additional Impacts of Proposed Injunction**

42. DHS understands that the federal government proposes a narrowed injunction

of Executive Order 14160 pursuant to which a child could be born outside of

the Plaintiff States in this litigation, not be considered a citizen or eligible for

federally funded benefits in the child's birth State, but be considered eligible

for federally funded benefits within the borders of the Plaintiff States (including

Rhode Island)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

43. Narrowing the injunction in this way would cause DHS to expend time and resources training staff and community partners on the meaning and implication of the injunction. DHS has never experienced citizenship rules vary by State.

44. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., DHS would need to train its staff on this new status and how to verify it.

45. To the extent that the narrowed injunction would result in many more children within Rhode Island who were born out of State, but within the U.S., and did not receive an SSN at birth, DHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Outreach and Education Expenses**

46. DHS expects that many impacted families it serves, especially those who may have moved into Rhode Island from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

47. If the injunction is so narrowed, DHS would engage in education and outreach efforts to inform impacted families about the impact of the injunction.

48. In DHS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

49. If the injunction is narrowed as the federal government proposes, DHS anticipates it would have to spend additional funds on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Rhode Island.

**Chilling Effects**

50. DHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet deportable. If this occurs, DHS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation. The chilling effect on Rhode Island residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically necessary healthcare, LTSS, CCAP, SNAP, TANF-RI WORKS benefits. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from these programs altogether.

51. DHS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet would be deportable outside of the Plaintiff States' borders. If

38

this occurs, DHS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Rhode Island, because of fear that doing so could subject their children to a heightened risk of deportation.

52. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits in Rhode Island to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some Rhode Island residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

53. Further, should this come to pass, Rhode Island will incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it will be more difficult to encourage enrollment.

54. Enrollment has a positive impact on public health in the state. Individuals enrolled in federal-state healthcare program such as HealthSource Rhode Island are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Rhode Islanders

with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

55. Having insurance coverage also makes it less likely that Rhode Island residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

56. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

57. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health impacts would further strain State resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

58. The State can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing

increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

59. Like other hospitals, State-run hospitals must treat patients regardless of their ability to pay. State-run hospitals will be forced to cover the cost of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

60. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid risks the closure of healthcare facilities altogether. Such closures would impact all Rhode Island residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of July 2025, in Cranston, Rhode Island.

Kimberly Merolla-Brito
Director
RI Department of Human Services