# EXHIBIT FF

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.* | : |
| Plaintiffs, | : |
| v. | : Civil Action No.: 1:25-cv-10139 |
| DONALD J. TRUMP, *et al.* | : |
| Defendants. | : |

**SUPPLEMENTAL DECLARATION OF DEBRA STANDRIDGE**

I, Debra Standridge, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Deputy Secretary at Wisconsin Department of Health Services (DHS).

2. I have compiled the information in the statements set forth below through personal knowledge, through agency personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the alternative injunctive scopes proposed by the federal government in order to understand the immediate impact of their implementation on Wisconsin.

3. I submit this supplemental declaration to explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Wisconsin's health insurance and other federally funded benefits programs in the absence of a nationwide injunction, including if the

1

injunction is narrowed along the lines suggested by the federal government in its recent filing.

## Wisconsin Department of Health Services

4. Wisconsin Department of Health Service (DHS) has a mission to protect and promote the health and safety of the people of Wisconsin. To support that goal, DHS performs many functions, including regulating healthcare facilities across the State and overseeing the State Vital Records Office (SVRO), which registers vital events such as births.

5. The Office of Health Informatics (OHI) is a program within DHS, which oversees the SVRO and other public health data-related programs, systems, and infrastructure. OHI is responsible for compiling and releasing statistical information on the health of State residents. OHI publishes official reports on births, deaths, chronic illnesses, injuries, and behavioral risk factors, among other types of information. OHI manages and maintains a broad array of public health data systems, infrastructure, and data governance for public health data, and provides analytical support and data products, including datasets, data visualizations, and dashboards, to state and other governmental agencies to support population health initiatives.

6. DHS also administers Wisconsin's Medicaid programs and FoodShare program and provides access to health care, long-term care, and nutritional assistance to more than 1 million Wisconsin residents who are elderly, disabled, or have low income.

## Birth Records

7. SVRO registers vital events and maintains birth records, among other records of vital events that occur in Wisconsin. SVRO does not have a longitudinal data system; it only captures the birth event, and it only does so for births that occur in Wisconsin or for adoptees born in other jurisdictions but adopted in Wisconsin.

8. Under SVRO's current system, births are filed within three weeks of the completion of a certificate by the hospital where the birth occurred.

9. SVRO issues certified copies of birth certificates. Such certified copies issued by SVRO contain a raised seal. SVRO will issue a certified copy of a birth certificate only to the individual whose birth is recorded by the certificate or to an individual with a direct or tangible interest in it, as defined in Wis. Stat. 69.20(1). If a government agency requests a certified birth certificate for administrative use, it is furnished. For an individual with a direct or tangible interest, to obtain a certified copy of a birth certificate, they must request the vital record directly through SVRO or contact their local registrar office.

10. DHS' understanding is that each State has its own system of State and local registration of birth events and maintenance of such records.

11. SVRO shares information on vital events that occur in Wisconsin with the National Association of Public Health Statistics and Information Systems (NAPHSIS), which inputs that information into the State and Territorial Exchange of Vital Events system (STEVE).

12. STEVE handles births and deaths and is the system that feeds the Social Security Administration's birth and death master files.

13. All 50 states and the District of Columbia contribute vital events data to STEVE, but the degree of information that is shared varies greatly by jurisdiction. Federal law does not require that any jurisdiction share information with STEVE and the State is only able to receive data from states and jurisdictions that have signed an agreement to share such data.

14. Thus, SVRO could query STEVE for any records on vital events from other States pertaining to an individual. But if STEVE produced no responsive records, that would not prove the

non-existence of a registered out-of-State birth. It would only show that STEVE lacks the information.

15. Additionally, if STEVE did produce a responsive record, it would only provide information about an out-of-State birth event. STEVE cannot produce a certified copy of a birth record.

16. Based on the limited available information from STEVE, about 1700 children are born out of state to Wisconsin residents each year. Because the data from STEVE is limited, this number is likely an underestimate.

### Verifying Eligibility for State Social Services Programs

17. Wisconsin offers a suite of free or low-cost healthcare options under Federal-State Medicaid and CHIP. These options are referred to as BadgerCare Plus or Medicaid, depending on the population served.

### Obtaining Social Security Numbers

18. As a condition of eligibility for benefits under Federal-State Medicaid, the State is required by federal statute to collect from each applicant for benefits the individual's social security account number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

19. Federal regulations delineate limited exceptions to this requirement. Specifically, Wisconsin DHS is not required to collect an SSN from an individual: who is not eligible to receive an SSN; who lacks an SSN and is only eligible to be issued an SSN for a valid non-work reason in accordance with 20 C.F.R. § 422.104; or who refuses to obtain an SSN because of well-established religious objections. *See* 42 C.F.R. § 435.910(a), (h)(1). Instead, Wisconsin DHS may issue a Medicaid identification number to such individuals, provided that the State has established the individual is otherwise entitled to such federal benefits. *See id.* § 435.910(h)(4); 20 C.F.R. § 422.104(a)(3)(i).

20. U.S. citizens are eligible for SSNs and otherwise do not fall into these regulatory exceptions. Thus, Wisconsin DHS is required by federal law to collect an SSN from every U.S. citizen who applies for Federal-State Medicaid benefits or to obtain proof that the individual has applied for one. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

21. Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program.

22. If a citizen-applicant cannot recall their SSN or has not been issued an SSN, federal regulations require Wisconsin DHS to assist the applicant in completing an application for an SSN, including, collecting evidence required to establish the age, the citizenship or alien status, and the identity of the applicant; and send the application to the Social Security Administration (SSA). *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

23. Thus, if a parent seeks to enroll a U.S. citizen-infant in Federal-State Medicaid but the infant does not already have an SSN, then Wisconsin DHS must assist the parent in obtaining an SSN for the infant.

24. As with Federal-State Medicaid, Wisconsin DHS is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

25. Wisconsin DHS is required to use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). In most data exchanges, Wisconsin DHS uses an applicant's SSN to verify income or other eligibility-related information, for example, in the Master Customer Index data exchange Wisconsin DHS uses an applicant's SSN to ensure that it does not duplicate members. Wisconsin DHS cannot conduct these searches without an SSN.

26. For individuals who do not have an SSN when they apply for SNAP or TANF benefits, regulations require that Wisconsin DHS assist them with completing an application for an SSN, including providing verification of identity, age, and citizenship. *See* 7 C.F.R. § 273.6(b)(2).

27. To Wisconsin DHS's best knowledge and belief, to obtain an SSN for an infant outside of the EAB process, certain evidentiary requirements must be met. *See* 20 C.F.R. § 422.107. Satisfactory evidence must be submitted of age, citizenship, and identity. *See* 20 C.F.R. § 422.107(a). A birth certificate suffices as evidence of age and citizenship for a U.S.-born applicant, but not of identity. *See* 20 C.F.R. § 422.107(b)-(d). For an infant, a medical record may establish identity. *See* 20 C.F.R. § 422.107(c). Thus, to complete an application for an SSN for a U.S.-born infant who did not receive an SSN at birth, the parents must provide medical records sufficient to prove the child's identity, along with a birth certificate showing a U.S. place of birth. These documents must be originals or certified copies. *See* 20 C.F.R. § 422.107(a).

28. Wisconsin DHS has not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for Wisconsin DHS to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of Wisconsin DHS's time and resources.

29. Wisconsin DHS is prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f).

**Verification of Citizenship or Qualifying Immigration Status**

30. In addition to collecting SSNs, Wisconsin DHS is required by federal law to have a Federal-State Medicaid eligibility verification system. *See* 42 U.S.C. § 1320b-7(a), (d).

31. As part of that system, Federal-State Medicaid applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(d)(1)(A).

32. In addition to this self-attestation, Wisconsin DHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

### Citizenship Verification

33. If the applicant attests that they are a U.S. citizen, state agencies are required to attempt to verify that information through a federal electronic service known as the Federal Data Services Hub, or through another mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i). In accordance with this authority, Wisconsin DHS established a direct, real-time connection with SSA's SCHIP-I data exchange for citizenship verification and received permanent approval from HHS to use it as an alternative to the Federal Data Services Hub.

34. Based on Wisconsin DHS's experience utilizing SCHIP-I, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then SCHIP-I would not have any information about the infant, and the infant's citizenship could not be verified.

35. If Wisconsin DHS is unable to verify citizenship through SCHIP-I, then Wisconsin DHS has several additional verification options. *See* 42 C.F.R. § 435.956(a)(1)(ii).

36. If Wisconsin DHS is unable to verify citizenship through SCHIP-I, then it may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most documents that are considered sufficient documentary evidence are inapplicable to a young infant who never interacted with SSA or Department of Homeland Security. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For Wisconsin DHS to utilize this option for a child born out of State, Wisconsin DHS would have to contact the birth State's vital statistics agency. That would require expenditure of the Department's time and resources.

37. Only if all other options are unavailable, Wisconsin DHS may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

38. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy; Wisconsin DHS may conduct this verification simply via SCHIP-I. But verifying citizenship for an infant born out of State who never received an SSN at birth would be more complicated and require greater expenditure of Wisconsin DHS's time and resources.

**Qualifying Immigration Status Verification**

39. If an applicant attests that they have a qualifying immigration status, Wisconsin DHS must first attempt to verify that status through the Federal Data Services Hub ("the Hub"). *See* 42 C.F.R. § 435.956(a)(2)(i).

40. Based on Wisconsin DHS's experience utilizing the Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then it is unlikely that there would be any information about that infant in the Hub.

41. As an alternative to verifying immigration status through the Hub, Wisconsin DHS may utilize any mechanism that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of HHS. 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

42. While Wisconsin DHS could pursue immigration verification by manually checking an individual's status directly through SAVE, it would require expenditure of the Department's time and resources to develop such an alternative method, submit it to the HHS Secretary, and obtain approval. Because it uses the same source data as the Hub, it is likely that any alternative would be subject to the same limitations as current methods of immigration status verification.

43. To the extent that the federal government would deem non-citizen children eligible for Federal-State Medicaid based on place of birth, Wisconsin DHS would need to develop a method for accurately verifying place of birth. Wisconsin DHS does not currently verify

place of birth for infants born out of State. Doing so would likely require arranging information sharing agreements with other State's vital statistics agencies. Wisconsin DHS does not currently have such agreements and developing them would take time and resources, and it would depend on the cooperation of other States' agencies. These verification methods would also require investments in systems changes, staff time, and staff training.

44. In Wisconsin DHS's experience, verifying new qualifying immigration statuses can present administrative challenges, even when federal databases are made available to do so.

45. For example, for Cuban and Haitian immigrants who met the definition of a "Cuban-Haitian Entrant," Wisconsin DHS had difficulty obtaining accurate information to verify their qualified immigration status through the Federal Data Services Hub / SAVE, even though they were eligible under federal law. Managing this verification process was complex and error prone, and continues to require manual work by eligibility workers. Wisconsin DHS has also encountered challenges with getting timely, accurate and actionable information from SAVE for Ukrainian immigrants, and certain children seeking asylum and certain victims of violence or trafficking.

46. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for a noncitizen infant born out of State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Conducting such verification, as Wisconsin DHS is statutorily required to do, would require a significant expenditure of Wisconsin DHS's time and resources.

**Additional Impacts of Proposed Injunction**

47. Wisconsin DHS understands that the federal government proposes a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Wisconsin)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders.

**Staff Training Expenses**

48. Narrowing the injunction in this way would cause Wisconsin DHS to expend time and resources training staff and community partners on the meaning and implication of the injunction. Wisconsin DHS has never experienced citizenship rules that vary by State.

49. To the extent that the federal government intends to develop a new status for federally funded benefits eligible noncitizens born within the U.S., Wisconsin DHS would need to train its staff on this new status and how to verify it.

50. To the extent that the narrowed injunction will result in changes to citizenship rules that vary by state or if a new status is developed, Wisconsin DHS will need to modify impacted systems to accommodate these changes. Wisconsin DHS will need to expend time and resources to modify impacted systems, and to train staff and community partners on system modifications.

51. To the extent that the narrowed injunction would result in many more children within Wisconsin who were born out of State, but within the U.S., and did not receive an SSN at birth, Wisconsin DHS will have to develop methods for verifying these children's

citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

### Outreach and Education Expenses

52. Wisconsin DHS expects that many impacted families it serves, especially those who may have moved into Wisconsin from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

53. If the injunction is so narrowed, Wisconsin DHS would likely need to engage in education and outreach efforts to inform impacted families about the impact of the injunction.

54. In Wisconsin DHS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

55. If the injunction is narrowed as the federal government proposes, Wisconsin DHS anticipates it would have to spend significant resources on outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Wisconsin.

### Chilling Effects

56. Wisconsin DHS understands that the narrowed injunction could result in children within its borders who are eligible for federally funded benefits and yet deportable. If this occurs, Wisconsin DHS anticipates that there is a substantial likelihood that the parents of such children would be chilled from accessing federally funded benefits, because of fear that doing so could subject their children to a heightened risk of deportation and/or family separation. The chilling effect on Wisconsin residents will likely include but not be limited to immigrants and their family members, who will be discouraged from seeking medically

necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from our federal-state healthcare programs, BadgerCare Plus and/or Medicaid, altogether.

57. Wisconsin DHS further understands that the narrowed injunction could, alternatively, result in children within its borders who are eligible for federally funded benefits and yet would be deportable outside of the Plaintiff States' borders. If this occurs, Wisconsin DHS still anticipates that there is some likelihood that the parents of such children would be chilled from accessing federally funded benefits within Wisconsin, because of fear that doing so could subject their children to a heightened risk of deportation.

58. To the extent the narrowed injunction would cause parents who otherwise would enroll their children in federally funded benefits, including health insurance, in Wisconsin, to forego such enrollment, this chilling effect would have negative consequences for the State. It is substantially likely that at least some Wisconsin residents will forgo critical preventative care and necessary medical treatment, and in some cases may decline emergency medical services, threatening death or serious injury. Such a result would unwind years of investment in expanding health coverage and access.

59. Enrollment in BadgerCare Plus and Medicaid has a positive impact on public health in Wisconsin. Individuals enrolled in these programs are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Wisconsinites with health

insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

60. Having insurance coverage also makes it less likely that Wisconsinites will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

61. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

62. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Each of these harms could be prevented with early access to screening and treatment. Research indicates that delayed or no prenatal care increases risks for both mother and baby, including for preterm birth, low birth weight, and labor complications. The costs of emergency services such as those described likely outweigh costs the state would incur for preventative care for those same individuals. These adverse health impacts would further strain Wisconsin resources and budget. To the extent their treatment is left uncompensated, the cost of such treatment will ultimately be shifted to the broader healthcare delivery system and the State.

63. Wisconsin can also anticipate a loss of compliance and lower engagement with health care systems which will have devastating impacts on public health including decreased use of vaccines and other preventative medicine causing increased risks for immunocompromised residents and increased expenses for the state in outreach as well as reactive (as opposed to preventative) and emergency care for un- and underinsured residents.

64. Furthermore, the increase in uncompensated care that all hospitals and healthcare facilities may experience as a result of eligible individuals declining to enroll in Federal-State Medicaid and CHIP risks the closure of healthcare facilities altogether. Such closures would impact all Wisconsin residents who need healthcare services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __14__ day of July 2025, in New Berlin, WI.

*Debra Standridge*
_____
DEBRA STANDRIDGE
Deputy Secretary
Wisconsin Department of Health Services