# EXHIBIT GG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-10139 |

## SUPPLEMENTAL DECLARATION OF SHARON C. BOYLE

I, Sharon C. Boyle, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**I.   Background**

1.   I am the General Counsel of the Massachusetts Executive Office of Health and Human Services (EOHHS), a position I have held since 2016. EOHHS is a cabinet-level secretariat in Massachusetts that directly manages the MassHealth program and oversees eleven state agencies charged with promoting the health, resilience, and independence of the Commonwealth's residents. EOHHS's public-health programs serve nearly one in three Massachusetts residents, touching every city and town in the Commonwealth.

2.   Between 2003 and 2016, before assuming my current role, I held several titles within the EOHHS general counsel's unit, including First Deputy General Counsel and Chief MassHealth Counsel. From 1995 to 2003, I worked as an assistant general counsel in the Division of Medical Assistance.

3.   As EOHHS General Counsel, I have personal knowledge of the rules, regulations, and processes governing EOHHS and its agencies. I have personal knowledge, or knowledge based

on review in my capacity as General Counsel of information and records gathered by EOHHS and agency staff, of the matters set forth below.

4. I previously submitted a declaration in this case. See Doc. No. 5-6. I submit this supplemental declaration to further explain the harmful impact that the January 20, 2025, executive order titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order 14160") will have on Massachusetts's health insurance and other federally funded benefits programs in the absence of a nationwide injunction. I have also familiarized myself with the potential alternative, narrowed injunction proposed by the federal government in order to understand the immediate impact of its implementation on Massachusetts.

**II.    Verifying Eligibility for State Social Services Programs**

5. As explained in my initial declaration in support of a nationwide preliminary injunction, Massachusetts EOHHS administers several publicly funded federal-state programs that enable qualifying Massachusetts residents to access free or low-cost healthcare coverage, including Medicaid and Children's Health Insurance Program (CHIP), which are collectively known as "MassHealth." Jointly funded by state and federal dollars, MassHealth provides comprehensive coverage for a wide range of health services to children, the elderly, families, and individuals with disabilities. MassHealth benefits may vary depending on, among other things, a person's citizenship and immigration status and household income.

6. To provide more comprehensive coverage for children who are ineligible for the comprehensive MassHealth plans, Massachusetts allows individuals 18 and under to enroll in the state's Children's Medical Security Plan (CMSP). CMSP is funded primarily by the Commonwealth of Massachusetts; the federal government does not provide matching funds for

2

CMSP as it does for the comprehensive MassHealth programs.[1] Thus, Massachusetts children who meet the income eligibility requirements for federally funded Medicaid or CHIP programs, but who are not eligible for those programs because they are not U.S. citizens or qualified immigrants, are eligible for more comprehensive health coverage through CMSP at the state's expense.

7. When a family in Massachusetts seeks public health insurance for their child, EOHHS first screens for eligibility for MassHealth programs. A child is not eligible for CMSP if the child is eligible for the partially federally funded Medicaid or CHIP program.

A. **Obtaining Social Security Numbers for MassHealth and DTA Eligibility**

8. As a condition of eligibility for benefits under Medicaid, Massachusetts is required by federal statute to collect from each applicant's social security number (SSN). *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.956(d).

9. For certain individuals who lack SSNs, EOHHS may issue a Medicaid identification number, provided that it has established the individual is otherwise entitled to such federal benefits. *See* 42 C.F.R. § 435.910(a), (h); 20 C.F.R. § 422.104(a)(3)(i)

10. Because U.S. citizens are eligible for SSNs and otherwise do not fall into relevant regulatory exceptions, EOHHS is required by federal law to collect an SSN from every citizen who applies for MassHealth benefits. *See* 42 U.S.C. § 1320b-7(a)(1), (b)(2); 42 C.F.R. § 435.910(a).

11. Similarly, the Department of Transitional Assistance (DTA), a constituent agency within the Executive Office of Health and Human Services, is responsible for administering the Transitional Assistance for Needy Families (TANF) and Supplemental Nutrition Assistance

---

[1] The federal government provides limited funding for CMSP through the "Health Services Initiative," but that funding is subject to an annual cap which the program regularly exceeds, meaning that the state will shoulder the cost of any increased enrollment in the CMSP.

Program (SNAP). *See* Mass. G.L. c. 18. As with MassHealth, DTA is required to verify that an applicant for SNAP and TANF has an SSN. *See* 42 U.S.C. § 1320b-7(b)(1), (4); 7 C.F.R. § 273.6(a).

12.     DTA must use a SNAP or TANF applicant's SSN to run a search through the Public Assistance Reporting Information System (PARIS) to ensure the applicant does not have any duplicate benefits accounts in other states. *See* 7 C.F.R. § 273.6(f). DTA cannot conduct the search without an SSN.

13.     Ordinarily, infants born in the U.S. would receive an SSN at birth through the Enumeration at Birth (EAB) program. See Doc. No. 5-6 ¶¶ 15-19.  To obtain SSNs for infants outside of the EAB process can be quite onerous, as it requires proof by various original or certified documents of age, citizenship, and identity, including typically birth certificates and medical records showing a U.S. place of birth. *See* 20 C.F.R. § 422.107.

14.     Citizen-applicants who have not been issued an SSN, or who cannot recall or obtain their SSN, may have to complete a new application for an SSN—which involves collecting evidence required to establish age, citizenship or alien status, and identity of the applicant—and submit the application to the Social Security Administration (SSA).  *See* 42 C.F.R. § 435.910(e); 42 C.F.R. § 435.956(b)(1)(i).

15.     EOHHS and DTA have not typically been in a position of assisting individuals with obtaining SSNs for U.S. citizen infants because, ordinarily, such children would have received an SSN at birth through the EAB program. It would be burdensome for both agencies to have to train staff on how to assist the parents of such children with compiling the documentation necessary to apply for an SSN and to complete the application process. Providing such assistance would require expenditure of state time and resources, including hiring and training additional staff or vendors,

implementing program oversight and management structures, and creating new public-facing informational materials regarding these state resources.

16. EOHHS and DTA are prohibited by federal law from denying or delaying services to otherwise eligible individuals pending issuance of an SSN. *See* 42 C.F.R. § 435.910(f);7 CFR 273.6(b)(4). If it becomes more difficult to clearly determine an individual's citizenship or eligibility for an SSN (as it would be in the absence of a consistent national approach to the issuance of national citizenship status), Massachusetts may incur risk from having to make determinations—based on its best application of new and unclear or complicated rules—that could be deemed erroneous or incorrect by the federal government later. *See* U.S. Department of Health and Human Services, "HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs," Press Release (July 10, 2025).

**B.     Verification of Citizenship or Qualifying Immigration Status for MassHealth**

17. In addition to collecting SSNs, EOHHS has a Medicaid eligibility verification system in which MassHealth applicants self-attest that they are citizens or have a qualifying immigration status. *See* 42 U.S.C. § 1320b-7(a), (d). In addition to this self-attestation, EOHHS must verify the applicant's citizenship or qualifying immigration status. *See* 42 C.F.R. § 435.956(a).

**Citizenship Verification**

18. If the applicant attests that they are a U.S. citizen, EOHHS must first attempt to verify that information through a federal electronic service known as the Federal Data Services Hub (the "Hub"). *See* 42 C.F.R. § 435.956(a)(1)(i). The Hub is a centralized platform that allows EOHHS to access data from various federal agencies, including SSA and the Department of Homeland Security. *See* 42 C.F.R. § 435.949.

19. The Hub can verify U.S. citizenship through SSA's electronic service known as the State Verification and Exchange System (SVES) and its real-time, online version, State On-Line Query (SOLQ), or through Homeland Security's electronic service, Systematic Alien Verification for Entitlements (SAVE), administered by the United States Citizenship and Immigration Services. SVES/SOLQ can verify either U.S.-born or naturalized/derived U.S. citizenship, but SAVE can only verify naturalized/derived U.S. citizenship.

20. Based on EOHHS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security, such as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits, then neither SVES/SOLQ nor SAVE would have any information about the infant. Thus, that infant's citizenship could not be verified via the Hub.

21. In cases where verifying citizenship through the Hub is impossible or impracticable due to lack of sufficient data, EOHHS must manually verify citizenship, using any means that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(1)(i).

22. For instance, EOHHS may verify citizenship through a data match with SSA. *See* 42 C.F.R. § 435.956(a)(1)(ii)(A). However, if information about an infant has never been submitted to SSA, such as likely would be the case if an infant were born in the U.S., did not

receive an SSN at birth through EAB, and had not received any federally funded public benefits, then SSA would not have any information on the infant with which to provide a data match.

23. EOHHS also may verify citizenship through the collection of "sufficient documentary evidence of citizenship." 42 C.F.R. § 435.407(a); *see* 42 C.F.R. § 435.956(a)(1)(ii)(B). Most such documents are inapplicable to a young infant who never interacted with SSA or DHS. *See* 42 C.F.R. § 435.407(a). The most likely applicable option would be "[v]erification with a State vital statistics agency documenting a record of birth." *See* 42 C.F.R. § 435.407(a)(7). For EOHHS to utilize this option for a child born out of State, it would have to contact the birth State's vital statistics agency. That would require expenditure of EOHHS staff time and resources.

24. If all other options are unavailable, EOHHS may verify citizenship by submitting a birth certificate showing a U.S. place of birth along with proof of identity. *See* 42 C.F.R. § 435.407(b). For children under the age of 19, identity may be established by "a clinic, doctor, hospital, or school record, including preschool or day care records." *See* 42 C.F.R. § 435.407(c)(viii).

25. In sum, verifying citizenship for an infant who received an SSN at birth through EAB is easy. EOHHS may conduct this verification simply via the Federal Data Services Hub. But verifying citizenship for an infant born out of State who never received an SSN at birth would be much more complicated and would require greater expenditures of EOHHS time and resources, as well as necessary (but uncertain) inputs from infants' birth states, without which Massachusetts's ability to comply with its federal obligations would be at risk.

**Qualifying Immigration Status Verification**

26. Similarly, if the applicant attests that they have a qualifying immigration status, EOHHS must first attempt to verify that status through the Federal Data Services Hub. *See* 42 C.F.R. § 435.956(a)(2)(i).

27. Based on EOHHS's experience utilizing the Federal Data Services Hub, if information about an infant has never been submitted to SSA or to the Department of Homeland Security—as likely would be the case if an infant were born in the U.S., did not receive an SSN at birth through EAB, and had not received any federally-funded public benefits—then it is unlikely that there would be any information about that infant in the Federal Data Services Hub. Thus, that infant's qualifying status could not be verified via the Hub.

28. In cases where verifying immigration status through the Hub is impossible or impracticable, EOHHS must manually verify immigration status, using any means that will reduce administrative costs "while maximizing accuracy, minimizing delay, meeting applicable requirements relating to the confidentiality, disclosure, maintenance, or use of information, and promoting coordination with other insurance affordability programs" if approved by the U.S. Secretary of Health and Human Services (HHS). 42 C.F.R. § 435.945(k); s*ee* 42 C.F.R. § 435.956(a)(2)(i).

29. Before President Trump issued the Executive Order, infants born in the United States were presumed citizens. To the extent the federal government no longer accepts that premise and the court would now look to the infant's birth state to determiner citizenship, EOHHS would need to develop a method for accurately verifying place of birth within the United States. EOHHS does not currently verify place of birth for infants born in another State. Doing so would likely require EOHHS to arrange new information sharing agreements with other States' vital statistics agencies. EOHHS does not currently have such agreements and developing them would take time

and resources and depend on the cooperation, accuracy and timeliness of other States' agencies. In EOHHS's experience, verifying new qualifying immigration statuses can present substantial administrative challenges, even when federal databases are made available to do so.

30. In comparison to verifying citizenship for an infant who received an SSN at birth through EAB, verifying qualifying status for an infant born in another State who never received an SSN at birth and does not fall into any recognized immigration category is fraught with complication and uncertainty. Among the many challenges, every state in which birthright citizenship is not recognized would likely have their own tracking and identification system for such infants, or not track them at all, depending on that state's administrative process. Conducting such verification, as EOHHS is statutorily required to do, would require a significant expenditure of EOHHS's time and resources and could turn out to be an impossibility. To the extent these challenges would limit or hinder EOHHS's ability to comply with its federal statutory obligations, Massachusetts would be at risk of noncompliance with those obligations.

**Reasonable Opportunity Period**

31. If either citizenship or immigration status cannot be fully verified through the Federal Data Services Hub or documentary evidence at the time of application, EOHHS must allow applicants a "reasonable opportunity period" to prove their status, during which EOHHS must provide benefits, so long as the applicants complete a sworn declaration of their status. After that period concludes, if applicants' citizenship or immigration status has still not been verified, EOHHS must terminate eligibility. *See* 42 U.S.C. § 1320b-7(d); 42 C.F.R. § 435.956.

32. This poses an additional risk to Massachusetts, if birthright citizenship depended on the State in which an infant is born. As described above, in that scenario, EOHHS would need to rely on *other* states to help it verify the citizenship or immigration status of infants born in other States who do not have an SSN or who have not yet interacted with the federal government. If

9

those states refuse to comply with EOHHS's requests, delay, or provide faulty information, Massachusetts may be found out of compliance with federal law obligating us to provide benefits for a "reasonable opportunity period." Any such finding could lead to financial penalties to Massachusetts.

### III.    Deemed Newborns and Conflicts with Federal law

33.    Under federal law, MassHealth "*must* provide Medicaid to children from birth until the child's first birthday *without application* if, for the date of the child's birth, the child's mother was eligible for and received covered services under [Medicaid or CHIP state plan]" including mothers who are undocumented and covered only for emergency Medicaid (emphasis added). *See* 42 C.F.R. § 435.117(b); *see also* 42 U.S.C. 1396a(e)(4). These babies are called "deemed newborns." *See* id.

34.    Under federal law, undocumented individuals are eligible for Medicaid only to treat emergency medical conditions, including labor and delivery. *See* 8 U.S.C. § 1611; 42 U.S.C. § 1396b(v). Babies born to individuals covered by emergency Medicaid are considered deemed newborns. *See* 42 U.S.C. 1396a(e)(4).

35.    Deemed newborns are enrolled in Medicaid either under the newborn's SSN, or under the mother's Medicaid ID or SSN. *See* 42 C.F.R. § 435.117(c). In the case of deemed newborns who are born to a mother who is undocumented, the state must immediately issue the deemed newborn its own SSN or Medicaid ID number. 42 U.S.C. 1396a(e)(4).

36.    Under birthright citizenship, deemed newborns are presumed to be citizens and, therefore, enrolled in MassHealth Standard, the most comprehensive healthcare coverage benefit offered by MassHealth, through their first birthday.

37.    At the same time the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 prohibits the use of federal funds to provide Medicaid to "an alien who is not a

10

qualified alien" except for the treatment of emergency medical conditions, including labor and delivery. *See* 8 U.S.C. § 1611; 42 U.S.C. § 1396b(v).

38. This means that, without birthright citizenship, a deemed newborn born to an undocumented person would be enrolled in a Medicaid benefit that only covered emergency services until citizenship could be established.

39. Under an injunction covering only plaintiff states, MassHealth would continue to enroll deemed newborns born in plaintiff states in MassHealth Standard because the deemed newborns would be citizens.

40. Without a nationwide injunction, deemed newborns moving from a non-birthright citizenship state to Massachusetts would create uncertainty as to whether Massachusetts should enroll those deemed newborns in MassHealth Standard, a comprehensive healthcare benefit, or if those deemed newborns should be treated as undocumented and enrolled in emergency Medicaid only. Under this scenario, if Massachusetts enrolls deemed newborns who move to Massachusetts from a non-birthright citizenship state in comprehensive MassHealth Standard (due to the absence of a national standard for birthright citizenship pending the outcome of this litigation), Massachusetts could be subject to audit findings and financial penalties from the federal government for providing a "non-citizen" with Medicaid other than for the treatment of emergency medical conditions. On the flip side, if Massachusetts does *not* enroll deemed newborns who move to Massachusetts from a non-birthright citizenship state in comprehensive MassHealth Standard, and enrolls them in Medicaid only for the treatment of emergency services, it could face significant risk of challenge from the individuals for failing to provide them a benefit to which they are entitled under the Medicaid rules that would apply within Massachusetts.

11

41. Additionally, without a nationwide injunction, there would be an incentive for individuals from other states to move to Massachusetts to give birth because their deemed newborns would both be citizens and guaranteed that the deemed newborn would have comprehensive MassHealth Standard through their first birthday, inflating participation in the MassHealth program and increasing costs to Massachusetts.

## IV.     Additional Impacts of Proposed Injunction

42. EOHHS understands that the federal government has proposed a narrowed injunction of Executive Order 14160 pursuant to which a child could be born outside of the Plaintiff States in this litigation, not be considered a citizen or eligible for federally funded benefits in the child's birth State, but be considered eligible for federally funded benefits within the borders of the Plaintiff States (including Massachusetts)—and possibly also be considered a citizen for all intents and purposes while within the Plaintiff States' borders. In addition to the impacts and risks that would flow to Massachusetts from such a proposal already discussed above, the federal government's proposed injunction would harm Massachusetts in the following ways.

**Staff Training Expenses**

43. Narrowing the injunction in this way would cause EOHHS to expend time and resources training staff and community partners on the meaning and implication of the injunction. This would be practically and conceptually challenging, as EOHHS has never experienced or contemplated national citizenship rules varying by State.

44. To the extent the federal government intends to develop a new status for federally funded benefits for eligible noncitizens born within the U.S.—with or without statutory or regulatory changes—EOHHS would need to train its staff on this new status and how to verify it.

45. To the extent that the narrowed injunction would result in many more children within Massachusetts who were born out of State, but within the U.S., who did not receive an SSN

12

at birth, EOHHS will have to develop methods for verifying these children's citizenship, as detailed above, and will have to train staff and develop appropriate technology to do so.

**Outreach and Education Expenses**

46. EOHHS expects that many impacted families it serves, especially those who may have moved into Massachusetts from outside of the Plaintiff States, will be confused about the proposed injunction and its implications for their children's citizenship status and eligibility for federally funded benefits like Medicaid, SNAP, and TANF.

47. If the injunction is so narrowed, EOHHS would likely need to engage in education and outreach efforts to inform impacted families about the impact of the injunction.

48. In the EOHHS's experience, such educational and outreach efforts can be particularly challenging when the intended audience consists of vulnerable communities who may be fearful of interacting with the government, such as certain immigrant communities.

49. If the injunction is narrowed as the federal government proposes, EOHHS anticipates it would have to issue guidance to providers and update materials for MassHealth Members and engage in outreach and educational efforts to inform impacted families of their eligibility for federally funded public benefits within Massachusetts. All of this additional guidance and outreach will have a cost to EOHHS. By way of example, during the recent Medicaid "unwind" post-COVID, MassHealth engaged in extensive education and outreach efforts in immigrant communities to make sure these communities understood how to retain their benefits. These efforts included $7.5 million dollars for a door knocking campaign, grants to community-based organizations, media outreach, and community assisters to make sure immigrant communities did not lose coverage they were entitled to

**Chilling Effects**

50. EOHHS further understands that the federal government's proposed narrowed injunction could result in children being recognized as citizens and thus eligible for federally funded benefits while they are in Massachusetts, but not while they live in non-plaintiff states (including ones they may be born in). EOHHS anticipates that this would lead to confusion and fear among parents in Massachusetts, who may decide not to access federally funded benefits for fear that doing so could subject their children to a heightened risk of deportation. This potential chilling effect on Massachusetts residents will likely include but not be limited to immigrants and their family members being discouraged from seeking medically necessary healthcare. Under these conditions, individuals are substantially likely to forgo benefits for which they are eligible or disenroll themselves and their families from MassHealth altogether.

51. Further, should its residents be chilled and discouraged from seeking medically necessary healthcare, Massachusetts would incur greater costs in conducting statutorily required outreach to enroll families and children in federally funded programs because it would be more difficult to encourage enrollment.

52. Enrollment in MassHealth has a positive impact on public health in the state. Individuals with health insurance, including MassHealth, are more likely to receive preventative care services. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that households are not left with medical bills that they are unable to pay. In addition, sick Massachusetts residents with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

53. Having insurance coverage also makes it less likely that Massachusetts residents will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency. This reduces the resource strain and uncompensated care burden on hospitals.

54. By contrast, when individuals forego insurance, this negatively impacts public health and results in increased uncompensated care burden on hospitals.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of July, 2025, in Boston, MA.

_____
Sharon C. Boyle
*General Counsel, Massachusetts Executive Office of Health and Human Services*