UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil No. 25-10139-LTS |
| | ) |
| DONALD J. TRUMP et al., | ) |
| | ) |
| Defendants. | ) |

ORDER ON SCOPE OF PRELIMINARY INJUNCTION

July 25, 2025

SOROKIN, J.

I.    BACKGROUND

In this case, eighteen states and two municipalities sued President Donald Trump, four federal agencies, and the public officials leading those agencies, alleging that Executive Order 14160, entitled "Protecting the Meaning and Value of American Citizenship" ("the Executive Order"), violates the Fourteenth Amendment to the United States Constitution and a federal statute that incorporates the same language. Doc. No. 1.[1] On February 13, 2025, the Court issued a preliminary injunction barring the implementation and enforcement of the Executive Order during the pendency of this lawsuit. Doc. No. 145. The Court awarded this relief because its careful review of the uncontested factual record produced by the plaintiffs, viewed in light of binding legal precedent, caused it to render a series of conclusions supporting such an order in the specific circumstances presented by this particular case.

---

[1] Citations to "Doc. No. __ at __" reference document and page numbering as it appears in the header appended by the Court's electronic docketing system.

First, the Court found the plaintiff states and municipalities have standing to bring this lawsuit based (at least) on direct pocketbook injuries that they established would arise from implementation of the Executive Order.  See Doc. No. 144 at 8–11.  Second, the Court found the plaintiffs are "nearly certain to prevail" in their claims that the Executive Order contravenes both the Fourteenth Amendment and a related federal statute.  Id. at 14–24.  Third, the Court found the plaintiffs had established that, in the absence of injunctive relief, they would face irreparable harm in the form of "unpredictable, continuing losses" of federal funding and reimbursements, "coupled with serious administrative upheaval."  Id. at 24–26.  Fourth, the Court found that the traditional factors, including a balancing of harms and the public interest, "decisively . . . favor entry of injunctive relief."  Id. at 26–27.  And fifth, the Court found that, although a narrower order would provide "complete relief" to the individual and association plaintiffs in a companion case, "universal or nationwide relief is necessary" in this case because an injunction "limited to the State plaintiffs" would be "inadequate" protection against the harms the plaintiffs' uncontested declarations described.[2]  Id. at 27–30.

The defendants timely appealed the Court's decision, Doc. No. 154, and sought a stay pending appeal, Doc. No. 157.  Both this Court and the First Circuit declined to stay the preliminary injunction.  Doc. No. 165; New Jersey v. Trump, 131 F.4th 27, 33 (1st Cir. 2025).  A few aspects of the First Circuit's decision denying the defendants' stay request are pertinent here.

---

[2] Around the same time as this Court issued its preliminary injunction, federal courts in Washington, Maryland, and New Hampshire evaluated similar challenges to the Executive Order and issued decisions reaching the same conclusions as to the first four of the five findings described in this paragraph.  See N.H. Indonesian Cmty. Support v. Trump, 765 F. Supp. 3d 102 (D.N.H. 2025); Washington v. Trump, 765 F. Supp. 3d 1142 (W.D. Wash. 2025); CASA, Inc. v. Trump, 763 F. Supp. 3d 723 (D. Md. 2025).  In the Washington and Maryland cases—the former of which featured challenges advanced by a different collection of state plaintiffs—the district judges also found that universal relief was warranted.  Washington, 765 F. Supp. 3d at 1153–54; CASA, 763 F. Supp. 3d at 746.

For one thing, the First Circuit explained at length that the defendants had "failed to make a strong showing that the Plaintiff-States likely lack Article III standing" or that the defendants are "likely to prevail in [their] contention that the Plaintiff-States do not have standing to assert the federal constitutional and statutory rights to United States citizenship of the individuals who would not be recognized as having such citizenship under the" Executive Order.[3]  131 F.4th at 35–40 (citation modified).  In addition, the First Circuit "decline[d] to address [a] contention" proposed by the defendants for the first time on appeal regarding a narrower form of relief that they urged should replace the nationwide preliminary injunction this Court issued.  Id. at 43. Finally, noting the defendants' suggestion that they were prevented by this Court's decision from planning or developing guidance regarding implementation of the Executive Order, the First Circuit clarified that it did not "read the plain terms of the" injunction "to enjoin internal operations that are preparatory" and "cannot impose any harm on the Plaintiff-States."  Id. at 44 (citation modified).

Thereafter, the defendants filed emergency applications in the Supreme Court seeking partial stays of this Court's injunction and similar ones entered by federal courts in Washington and Maryland.  See Trump v. CASA, Inc., 606 U.S. ---, 145 S. Ct. 2540, 2548–49 (2025).  After hearing oral argument, the Supreme Court held that "universal injunctions"—those that "prohibit enforcement of a law or policy against anyone"—"likely exceed the equitable authority that Congress has granted to federal courts."  Id. at 2548 (emphasis in original).  Such authority

---

[3] Within its discussion of third-party standing, the First Circuit observed that the Executive Order contains language which "directly operates as to the Plaintiff-States, and not the individual excluded from citizenship."  131 F.4th at 39 (citation modified); see also id. at 38 n.8 (noting but leaving for later consideration possibility that states' sovereign interests in which persons become birthright United States and state citizens provides separate basis for finding states have Article III standing).

generally empowers courts to "administer complete relief <u>between the parties</u>"; though a "party-specific" injunction "might have the <u>practical effect</u> of benefiting nonparties," it may "do so only incidentally." <u>Id.</u> at 2557 (emphases in original). As the majority opinion observed, "[t]he complete-relief inquiry is . . . complicated" where states are the plaintiffs. <u>Id.</u> at 2558. The majority further acknowledged that this Court had specifically "decided that a universal injunction was necessary to provide the States <u>themselves</u> with complete relief," not that such relief was warranted in order "to directly benefit nonparties." <u>Id.</u> (emphasis in original). After summarizing the competing arguments advanced by both sides, and noting the defendants had proposed two narrower alternatives for the Supreme Court to evaluate "in the first instance," the majority left it to "the lower courts" to "consider" the defendants' proposals along with "any related arguments" and "determine whether a narrower injunction is appropriate." <u>Id.</u> Ultimately, the Supreme Court granted the "applications to partially stay the preliminary injunctions . . . , but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." <u>Id.</u> at 2562–63.

In their emergency application, the defendants did not ask the Supreme Court to evaluate the legality of the Executive Order, and the <u>CASA</u> majority did not do so. Meanwhile, the defendants' appeal of this Court's preliminary injunction remains pending before the First Circuit, with oral argument scheduled for August 1, 2025. In the wake of the Supreme Court's <u>CASA</u> decision, the First Circuit declined a request by the defendants to permit supplemental briefing on <u>CASA</u>'s effect, remanding instead to this Court "for the limited purpose of" considering "the bearing, if any, of" the Supreme Court's "guidance in <u>CASA</u> on the scope of the preliminary injunction" in this case, "to address any argument that the parties may advance with respect to what grounds may now be asserted regarding the injunction's scope," and "to act

accordingly." Doc. No. 188 at 3. The Court turns now to explaining how it has conducted those tasks and what conclusion it has reached.

II.    DISCUSSION

    A.    Post-CASA Factual and Legal Submissions

Endeavoring to "move expeditiously to ensure that" the injunction issued in this case "comport[s] with" the "principles of equity" elucidated in CASA, 145 S. Ct. at 2563, the Court promptly set a schedule to govern submissions from the parties addressing the appropriate scope of the injunction in this case, Doc. No. 186. Because it was the defendants' partially successful application—and the narrower alternatives mentioned therein—that yielded the Supreme Court's direction to revisit this question, the Court permitted the defendants to have both the first and the last word as far as the written submissions were concerned. Id. After receiving those submissions, the Court heard oral argument on July 18, 2025.

As noted, this matter returns to the Court now for only a limited purpose: assessing "the bearing, if any," of "CASA on the scope of the preliminary injunction." Doc. No. 188 at 3. Given this specific task assigned by the First Circuit and the jurisdictional limits arising from the defendants' pending appeal,[4] the Court highlights two questions that are not presently before this Court. The first is standing. The defendants' post-CASA written submissions reiterate arguments about the plaintiffs' standing to challenge the Executive Order and seek injunctive relief. See Doc. No. 193 at 8–9; Doc. No. 197 at 3. However, this Court already found that the plaintiffs have standing, Doc. No. 144 at 8–11, and the First Circuit explained in detail why the defendants' arguments to the contrary—including as to third-party standing—were unlikely to

---

[4] This Court, pursuant to an "abecedarian principle," "is divested of authority to proceed with respect to any matter touching upon, or involved in," defendants' pending appeal of the preliminary injunction, aside from the specific issue remanded to it for further consideration. United States v. George, 841 F.3d 55, 71 (1st Cir. 2016).

succeed, 131 F.4th at 35–40. This Court is, of course, bound by the First Circuit's third-party-standing analysis in this case. Though the Supreme Court's majority declined to address the defendants' argument "that the States lack third-party standing," 145 S. Ct. at 2549 n.2, nowhere in CASA did the majority provide guidance that might alter the prior rulings regarding standing here, let alone invite this Court to revisit such rulings. The defendants' suggestion to the contrary is, at best, mistaken. See Doc. No. 193 at 4 (blurring CASA majority's discussion and directives regarding scope of injunction with its separate reference in the margin to defendants' standing challenge). In light of all this, and where the defendants have identified no new factual or legal development concerning standing now, the Court finds this threshold question is not properly reexamined by this Court now.

A second issue raised in the defendants' papers, despite being settled at the district-court level for present purposes by prior rulings in this case, is the plaintiffs' showing of irreparable harm. See id. at 10–11 (arguing "the States assert fundamentally monetary harms" but "have not established that those injuries are irreparable"). The Court already found that the plaintiffs "have established irreparable harm" via "numerous declarations," "which the defendants have not disputed or rebutted in any way," showing the "unpredictable, continuing losses coupled with serious administrative upheaval" they face if the Executive Order takes effect. Doc. No. 144 at 24–25. That finding is within the scope of the appeal now pending and is not one this Court has been empowered to revise—nor is the Court inclined to revise it, even if so empowered.[5]

Having dispensed with these threshold matters, the Court proceeds to the question that brings this case back before it now: Have the plaintiffs established that an order preliminarily

---

[5] This is so because the defendants have submitted no new factual evidence on standing, no new responses to the plaintiffs' evidence, and no additional legal reasons for rejecting the standing of the plaintiffs. Rather, they repeat arguments the Court previously considered and rejected.

enjoining implementation of the Executive Order nationwide is necessary to afford them complete relief, or will a narrower order suffice? As the Court will explain, the plaintiffs have met their burden.[6] The record does not support a finding that any narrower option would feasibly and adequately protect the plaintiffs from the injuries they have shown they are likely to suffer if the unlawful policy announced in the Executive Order takes effect during the pendency of this lawsuit.

In making this determination, the Court has proceeded as it did originally. It has evaluated the record as a whole and considered only what relief is necessary to prevent irreparable harm to the plaintiffs themselves. Cf. CASA, 145 S. Ct. at 2558 (noting this Court's focus on party-specific relief); Doc. No. 144 at 28 (explaining that plaintiff-specific analysis did not favor "universal relief" in companion case brought by individual and two associations). This process has both legal and factual components. In addition to the equitable principles identified by the Supreme Court in CASA, two other legal precepts bear on the injunction's scope. Guided by the Federal Rules of Civil Procedure, the Court has considered whether narrower alternatives can be articulated "in reasonable detail" and with the specificity required by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 65(d)(1); see also Schmidt v. Lessard, 414 U.S. 473, (1974) (per curiam) (describing "specificity provisions of Rule 65(d)" as "no mere technical

---

[6] The Court does not understand CASA as calling into question its earlier determination that the plaintiffs have satisfied the test for preliminary-injunctive relief as a general matter. That determination and its subsidiary findings—that the plaintiffs are likely to succeed on the merits of their claims, that they face irreparable harm in the absence of relief, and that the public interest and balance of harms favor relief here—are now before the First Circuit for review. In addition, nothing in CASA alters the Court's determination that these plaintiffs, in this case, are entitled to "complete" relief for the injuries they have established. This is so because of the flagrancy with which the Executive Order contravenes both the Constitution and a federal statute, the complete absence of evidence (or argument) establishing countervailing considerations favoring the defendants, and for reasons the plaintiffs ably articulate in their papers. See Doc. No. 196 at 11–16.

requirements," but as conditions "designed to prevent uncertainty and confusion" by enjoined parties, to "avoid the possible founding of a contempt citation on a decree too vague to be understood," and to enable "an appellate tribunal to know precisely what it is reviewing"); Axia NetMedia Corp. v. Mass. Tech. Park Corp., 889 F.3d 1, 12–13 (1st Cir. 2018) (discussing specificity requirement and need for injunction to be "framed so that those enjoined will know what conduct the court has prohibited" (quotation marks omitted)).  And based on other Supreme Court precedent, the Court also has assessed whether any narrower alternative is feasible, or "workable."  New York v. Cathedral Acad., 434 U.S. 125, 129 (1977) (quoting Lemon v. Kurtzman, 411 U.S. 192, 200 (1973)); accord North Carolina v. Covington, 581 U.S. 486, 488 (2017) (per curiam); Ass'n of Am. Univs. v. Dep't of Def., No. 25-11740, 2025 WL 2022628, at *27 (D. Mass. July 18, 2025).[7]

On the facts, the Court confronts a one-sided record.  This is a result of the parties' divergent approaches to litigating this case.  In their original motion papers and their post-CASA submission concerning the injunction's scope, the plaintiffs supported their legal arguments with dozens of sworn declarations from subject-matter experts and public officials describing harms the Executive Order will visit upon the plaintiffs.  See Doc. Nos. 5-2 to -23, 196-2 to -37.  The defendants, on the other hand, submitted no evidence to support the positions advanced in their own memoranda.  They did not dispute (generally or specifically) the substance of the plaintiffs' factual submissions, nor did they offer their own declarations in rebuttal.[8]  Once again, then, "the

---

[7] To the extent the defendants urged during the most recent hearing that this Court need not concern itself with the details of whether and how any injunction it enters might be implemented, that position is wrong as a matter of law under both Rule 65(d) and the Supreme Court precedent cited in this paragraph.

[8] In their original motion papers, the defendants did not acknowledge the plaintiffs' declarations or urge the Court to reject them for any reason.  See generally Doc. No. 92.  Post-CASA, but before the plaintiffs' proffered any supplemental evidence, the defendants summarily suggested

Court accepts and credits" the plaintiffs' "declarations, which the defendants have not disputed

or rebutted in any way," and which the Court finds credible and reliable.  Doc. No. 144 at 25.

According to the uncontested declarations, several factors contribute to the financial and

administrative harms the plaintiffs likely face in the absence of nationwide relief.  First,

demographic data shows that there is substantial interstate movement among noncitizens parents

with their children in tow.[9]  The Court finds that a substantial number of children covered by the

Executive Order will move into the plaintiff states during the pendency of this action.  The Court

further finds that the administrative and financial impacts the plaintiffs are likely to experience

---

that the record "must be limited to . . . the declarations the States submitted with their motion for
a preliminary injunction."  Doc. No. 193 at 7.  The defendants cited no authority for this position.
The Court overrules this unsupported objection.  Once the plaintiffs filed their supplemental
exhibits—which explicitly address the adequacy and workability of narrower alternatives
proposed by the defendants for the first time on appeal—the defendants essentially ignored them.
Compare Doc. No. 197 at 5–6 (criticizing as "speculative" plaintiffs' argument in their brief that
financial burdens would arise because "fewer individuals would enroll in federal programs" but
not engaging with declarations upon which argument was based), with Doc. No. 196-2 ¶¶ 14–21
(citing research and survey support for chilling effect of fear in noncitizen communities,
including associated avoidance of necessary public services); see generally Doc. No. 197
(otherwise failing to mention declarations, dispute their substance, or further develop any
argument against their submission).  In these circumstances, the defendants have waived any
challenge to the plaintiffs' declarations and forfeited their opportunity to supply their own
evidence concerning the injunction's scope.  See United States v. Zannino, 895 F.2d 1, 17 (1st
Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived," because it is
"counsel's work" to "create the ossature for [their] argument, and put flesh on its bones").  In
sum, the defendants did not submit their own evidence, offered no legal or factual basis to
dispute the plaintiffs' evidence, never suggested the plaintiffs' evidence was not credible or
reliable, failed to request an evidentiary hearing, and advanced no reasoned argument for barring
the submission of evidence to a federal court considering the proper scope of an injunction.
[9] See, e.g., Doc. No. 196-3 ¶ 14 (attesting that nearly 27,000 noncitizen adults with at least one
child in their household moved from a non-plaintiff state to a plaintiff state in 2023); Doc. No.
196-8 ¶ 13 (estimating that an average of 6,000 children are born out-of-state to New Jersey
residents each year); cf. Tara Watson, Enforcement & Immigrant Location Choice (Nat'l Bureau
Econ. Rsch., Working Paper No. 19626, Nov. 2013) (examining effect of local immigration
enforcement and summarizing data suggesting certain practices incentivize movement within
United States from places with harsh enforcement practices to those with more lenient practices).

because of the Executive Order while this lawsuit proceeds, given the movement of children

within the Order's reach, are substantial and material, not de minimis or trivial.

Second, in the context of social services provided to young children, the plaintiffs rely on

Social Security numbers ("SSNs")[10]—and, in particular, on the enumeration at birth ("EAB")

program, through which most parents apply for a newborn's SSN as part of their hospital's birth-

registration process—to confirm citizenship and eligibility for such services.[11]  The Court finds

that citizenship requirements are included in numerous relevant federal statutes and, as a result,

are intrinsic components of electronic verification systems run by the United States that are

interconnected with state database and other processing systems.  Any change impacting these

systems—and especially a partial change that varies by location within the United States—will

likely trigger immediate confusion and burdens on state administrative processes.  Equity does

not support imposing on the plaintiffs substantial burdens to accommodate, even temporarily, an

unlawful Executive Order.

Third, a patchwork or bifurcated approach to citizenship would generate understandable

confusion among state and federal officials administering the various programs described by the

---

[10] Presently, children born in the United States are issued Social Security cards that reflect both
their SSN and their U.S. citizenship.  Two other categories of Social Security cards exist, but it is
not clear either would apply to a child born in the United States but lacking birthright citizenship
(per the policy set forth in the Executive Order).  See Soc. Sec. Admin., Types of Social Security
Cards, https://www.ssa.gov/ssnumber/cards.htm (describing alternative types of cards issued to
"people lawfully admitted to the United States on a temporary basis" with "authorization to
work," or "people from other countries" who require a SSN for one of two identified reasons).
[11] See, e.g., Doc. No. 196-7 ¶¶ 5–44 (describing use of SSN to verify citizenship and eligibility
for social services and associated federal reimbursements); see also Doc. No. 5-4 ¶¶ 9–16
(describing EAB process and anticipated effects of Executive Order on funding and
administrative systems related to that process); Doc. No. 196-5 ¶ 15(c)–(d) (discussing obstacles
and confusion that would arise if child was born in non-plaintiff state and not provided a SSN at
birth but then moved to plaintiff state and needed to acquire a SSN to enroll in public benefits
program like Medicaid).

plaintiffs, as well as similar confusion and fear among the parents of children within the scope of the Executive Order.  The Court finds that various statutes governing social-service programs through which states receive federal reimbursements or other funding require training, administrative approvals, and community outreach efforts by states participating in the programs. For example, states must identify and enroll all eligible children for social-service benefits such as the Children's Health Insurance Program.[12]  Significant confusion or changes impacting eligibility or administration of such programs will require states to examine and revise existing systems.  Shifting citizenship status, depending upon the location of a child or the purpose animating a citizenship determination, is a state of affairs without precedent in this country for at least 150 years.  Federal law and state systems are not designed to respond easily to such a regime.  The fear and confusion arising from implementation of the Executive Order would thwart states' ability to discharge these obligations under federal law, and likely also would chill enrollment in critical programs impacting children's health and wellbeing, leading to increased and unpredictable costs to the plaintiffs.[13]  Principles of equity do not favor requiring the plaintiffs to shoulder these burdens while this lawsuit proceeds.

---

[12] See, e.g., Doc. No. 196-7 ¶¶ 47–56 (citing, e.g., statutory requirements governing Children's Health Insurance Program, in 42 U.S.C. § 1397bb(a)(2)–(3)).

[13] See, e.g., Doc. No. 196-2 ¶¶ 17–18, 121–23 (summarizing survey regarding noncitizen public engagement, including avoidance of public health services and other interactions by noncitizen families with children, and describing chilling effect and confusion that arise when immigration-related laws are not uniform nationwide); Doc. No. 196-4 ¶¶ 15–19 (expressing opinion that decrease in enrollment in public health programs will result in more uninsured patients and increased costs to state medical facilities); Doc. No. 196-27 ¶¶ 7–8 (describing increased cost of emergent and other medical care required when patients are deterred from accessing nutrition-assistance programs and other routine or preventive clinical care).  The defendants complain any increased costs are "speculative."  Doc. No. 197 at 5–6.  The Court finds they are proven at this stage, though, by the plaintiffs' reliable, thorough, and persuasive evidentiary submissions. Merely labeling the harms or evidence "speculative," without elaboration or support, does nothing to contest the detailed evidence the plaintiffs have submitted.  See note 8, supra.

This factual record is uncontested by the defendants.[14]  The evidence recounted in the preceding paragraphs, along with the corresponding findings by the Court, decisively supports the Court's original finding: The plaintiffs have established by a preponderance of evidence that the scope of Court's original preliminary injunction is necessary to provide them complete relief. Generally, in the Court's view, the parties' lopsided showing would be reason enough to justify this conclusion.  The Executive Order is unconstitutional and contrary to a federal statute.  A host of federal and state laws and corresponding administrative systems are built on the principle of birthright citizenship.  The defendants are entitled to pursue their interpretation of the Fourteenth Amendment, and no doubt the Supreme Court will ultimately settle the question.  But in the meantime, for purposes of this lawsuit at this juncture, the Executive Order is unconstitutional.[15]  The injuries flowing directly and promptly from the Executive Order are not neatly cabined by geography or program.  In these circumstances, equity does not require these aggrieved plaintiffs to bear the consequences they have shown will arise from this unlawful Executive Order while the parties litigate the dispute.

---

[14] The defendants have not challenged the data, surveys, or research upon which various declarants relied in reaching their conclusions or opinions.  They have not offered their own experts or other witnesses offering different opinions.  And they have not submitted evidence (or even argument) that the financial impacts and administrative upheaval the plaintiffs cite would not follow from the implementation of the Executive Order because, for example, children within its scope (though not citizens) would remain eligible for services by virtue of being granted a different qualifying immigration status in a manner that would not impact the plaintiffs' present enrollment, verification, and outreach processes.  Of course, the defendants at this point have had several opportunities to advance and support such arguments—including during the weeks that have elapsed since the Supreme Court in CASA expressly allowed their planning to begin.  Cf. Doc. No. 201 at 61, 67 (reflecting defense counsel at most recent hearing could not confirm having spoken with "anybody in any of these agencies" about feasibility of complying with narrower injunction and offered no specifics about how Executive Order would be implemented despite representing that agencies "are right now working on public guidance").
[15] The undersigned is hardly an outlier in reaching this conclusion.  As far as the Court is aware, "[e]very court to evaluate the Order has deemed it patently unconstitutional." CASA, 145 S. Ct. at 2573 (Sotomayor, J., dissenting).

B.    <u>Narrower Alternatives</u>

Sometimes, the adversary process reveals a narrower form of injunction sufficient to avoid, during the pendency of the lawsuit, the injuries supporting the claims of a plaintiff.  Not here.  This conclusion arises, at least in part, from the defendants' refusal to engage with the parameters or feasibility of even one narrower alternative.  <u>Cf.</u> <u>Rodriguez v. Mun. of San Juan</u>, 659 F.3d 168, 175 (1st Cir. 2011) ("Judges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority.  And they must give us the raw materials so that we can do our work, or they may lose as a consequence." (citation modified)).  Though the defendants "correctly state that they need not 'write' the injunction themselves," they "must state their objections to the injunction to the district court, so that the district court can consider them and correct the injunction if necessary."  <u>United States v. Zenon</u>, 711 F.2d 476, 478 (1st Cir. 1983) (Breyer, J.); <u>see</u> Doc. No. 193 at 7; <u>cf.</u> <u>Philip Morris, Inc. v. Harshbarger</u>, 159 F.3d 670, 680 (1st Cir. 1998) (admonishing that "a disappointed litigant cannot surface an objection to a preliminary injunction" including as to its breadth "for the first time in an appellate venue").

In response to the plaintiffs' original motion, the defendants opposed any form of relief, alternatively objected to an order with nationwide scope, but offered only a vague and somewhat circular alternative.  <u>See</u> Doc. No. 92 at 50 (urging the Court to "limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief").  When the defendants sought to stay the injunction it issued, they asked the Court to "limit any preliminary injunctive relief to the parties before it," without further explaining what such an order would look like.  Doc. No. 158 at 7; <u>cf.</u> 131 F.4th at 43 (reflecting First Circuit's understanding of this proposal as prohibiting enforcement of Executive Order with respect to children born in plaintiff states).  Before the First Circuit, the defendants offered a "different" suggestion, proposing an

injunction barring enforcement of the Executive Order against any plaintiff state when it administers a service to any child within the scope of that Order.  See 131 F.4th at 43 (describing proposal and contrasting it with position advanced in this Court).

The defendants' position evolved again when the case reached the Supreme Court. There, the defendants floated (but did not develop in any detail) two alternatives: an injunction requiring the defendants to treat children covered by the Executive Order "as eligible for purposes of federally funded welfare benefits"; or an injunction forbidding the defendants from applying "the Executive Order within the respondent States, including to children born elsewhere but living in those States."  145 S. Ct. at 2558 (quoting defendants' emergency application). Notwithstanding the Supreme Court's reliance on the defendants' two narrower proposals and its instruction that the lower courts should "take [them] up . . . in the first instance" when evaluating on remand "whether a narrower injunction is appropriate," id., the defendants elected not to develop those proposals in this Court.  Indeed, they have retreated entirely from one of them. See Doc. No. 201 at 53–57 (agreeing second alternative quoted above and in CASA majority opinion is omitted from post-remand briefs because defendants "think it's still overbroad").

Instead, the defendants devoted more than half of their initial post-CASA memorandum to other matters.  See Doc. No. 193 at 4–11 (addressing scope of CASA stay, briefing order, assignment of burden, which party should propose alternatives, standing, and irreparable harm).[16]  In the few pages touching on the scope of an injunction, the defendants urged the Court to "at most require [them] to continue to reimburse Plaintiffs for services provided to persons

---

[16] The defendants claim the Court "improperly shift[ed]" the burden of proof to them in its briefing order.  Doc. No. 193 at 6.  Not so.  Plainly, the plaintiffs bear the burden to establish by a preponderance of evidence their entitlement to whatever injunction might issue.  Nothing in the briefing order said otherwise or even addressed the quantum or placement of that burden.

covered by the Executive Order as though they were citizens." Id. at 11; accord id. at 12

(suggesting such an order would also permit plaintiffs "to continue to treat individuals born in

the United States but covered by the Executive Order as citizens for purposes of" relevant federal

programs). In their reply, the defendants reiterated that position—an order "requiring that

covered individuals be treated as citizens for [purposes of eligibility for citizen-dependent

benefits programs]"—and suggested the Court should "build out" from there to create a bespoke

injunction that would "address any remaining injuries." Doc. No. 197 at 6; cf. id. at 4

(characterizing plaintiffs' harms as mostly tied to SSNs but urging that "an injunction requiring

the issuance of social security cards nationwide would still be broader than necessary"); id. at 5

(noting "narrower injunction could continue to allow plaintiff States to use existing methods of

verifying citizenship, such as birth certificates" (footnote omitted)).

        During the post-CASA hearing before this Court, the defendants expressed a general

belief that "the Court should consider a lot of alternatives that are narrower than the injunction

that it issued," Doc. No. 201 at 55, though they only identified the one alternative toward which

they gestured in their recent memoranda. At no point have the defendants fleshed out how any

narrower injunction would work. That is, they have never addressed what renders a proposal

feasible or workable, how the defendant agencies might implement it without imposing material

administrative or financial burdens on the plaintiffs, or how it squares with other relevant federal

statutes. In fact, they have characterized such questions as irrelevant to the task the Court is now

undertaking. The defendants' position in this regard defies both law and logic. To borrow from

an analogy employed by the Supreme Court in CASA, consider a nuisance case "in which one

neighbor sues another for blasting loud music at all hours of the night." 145 S. Ct. at 2557. The

plaintiff seeks an order requiring "the defendant to turn her music . . . off." Id. Under the law,

15

the defendant must do more than simply oppose such an order or vaguely say it is too broad, and the presiding judge must consider whether any alternatives proposed by the defendant are feasible.  If, for example, the defendant proposes the judge order her to build a soundproof wall or limit her music to "a volume that will not bother the plaintiff," the judge would rightly evaluate such alternatives.  The judge would consider, based on applicable law and the record the parties produced, whether the proposed wall is permissible given neighborhood zoning rules, and whether it is financially and temporally feasible to construct without generating additional burdens on the plaintiff.  The judge would consider whether an order limiting the music's volume would be specific enough to provide the plaintiff complete relief without risking repeated return trips to court for clarification or possible contempt.  If the defendant demurred when asked to engage with such questions, she would do so at her own peril.

Of course, the legal, administrative, and workability issues presented in this case are vastly more complicated than those arising when crafting a preliminary injunction to govern a noise-based nuisance claim.  Primarily due to the defendants' obduracy in refusing to explore specific alternatives and their workability, all of the possible alternatives before the Court suffer from shortcomings when it comes to the feasibility of implementing them without burdening the plaintiffs.  Nevertheless, in light of the Supreme Court's specific guidance in CASA, and because this Court takes seriously its obligation to ensure the relief in this (and any) case is sufficient without exceeding the injuries of the plaintiffs given the circumstances presented, the Court will now address each narrower alternative the defendants have offered throughout their various submissions here and on appeal.  It will also address another alternative that occurred to the Court in its independent consideration of this matter post-CASA, and that the defendants in their reply acknowledged but urged the Court to reject.  The Court will explain why its review of

16

the record and the harms to the eighteen states and two localities that are plaintiffs in this case

has led it to conclude that none of the narrower alternatives provide the complete relief to which

these plaintiffs are themselves entitled.

The first alternative discernible in the defendants' submissions in this case was an order

enjoining enforcement of the Executive Order within the plaintiff states to children born in a

plaintiff state. See Doc. No. 158 at 7; 131 F.4th at 43. The Court finds that this would not

provide the plaintiffs with anything close to complete relief and would impose additional

burdens on them. The plaintiffs have adduced uncontested evidence (not mere speculation)

establishing that pregnant women give birth to children outside their state of residence in annual

numbers that are not de minimis, and that families with children likely to need public services

move from non-plaintiff states to plaintiff states in annual numbers that also are not de minimis.

See note 9, supra. This evidence suffices to establish, and the Court finds for present purposes at

least, that substantial pocketbook and administrative injuries flowing from the unconstitutional

Executive Order would continue unabated under an order limited in scope to children born

within a plaintiff state's borders. Access to a SSN issued through the EAB program and other

federal benefits would be impeded or limited for a child born in a non-plaintiff state, generating

administrative and financial burdens for a plaintiff once the child returns or moves there.[17]

Perhaps anticipating this obvious problem, the next alternative articulated by the

defendants, and the one to which they have most often alluded in one form or another, is an order

requiring the defendants to reimburse the plaintiffs for services provided to children covered by

---

[17] The record establishes that these are direct, inevitable injuries within the proper scope of relief.
Certainly, one can conceive of means by which the defendants might attempt to mitigate these
harms. Before entering an order that does not account for these injuries, though, some
evidentiary showing is necessary. The defendants made none.

the Executive Order.  See 131 F.4th at 43; CASA, 145 S. Ct. at 2558; Doc. No. 193 at 11; Doc.

No. 197 at 6.[18]  A corollary of this alternative is that the plaintiffs would be permitted to treat

children covered by the Executive Order as citizens for purposes of eligibility for federal benefits

programs they administer.  See Doc. No. 197 at 5.  This proposal suffers from several fatal

shortcomings.  The defendants have altogether failed to show that this alternative is workable or

feasible and would avoid disrupting the processes presently used by the plaintiffs to administer

the relevant federal-benefits programs.  See notes 11–12, supra.  They have not explained how

they (or the plaintiff states) would identify and track, let alone verify eligibility using existing

processes and consistent with federal statutory requirements, the children within the scope of

such an order.  In contrast, the plaintiffs have supplied evidence addressing why this proposal is

unworkable and infeasible and would provide them incomplete relief.  For example, it fails to

account for the confusion and chilling effects, and the resulting administrative and financial

harms flowing therefrom, that are identified by the plaintiffs and supported by their declarations.

See notes 11–13, supra.

A broader alternative the defendants have disclaimed since mentioning it in their

emergency application to the Supreme Court is an order enjoining enforcement of the Executive

Order within the plaintiff states to children born or living in a plaintiff state.  See 145 S. Ct. at

2558.  This option has the benefit of sounding straightforward, but it suffers from the same flaws

as the alternative just discussed.  That is, it does nothing to avoid the confusion among officials

---

[18] The literal words of the defendants' proposal—that the Court could start by "requiring that
covered individuals be treated as citizens" for citizen-dependent benefits programs—could be
read as suggesting all such persons in the United States should receive such benefits.  In the
context of the defendants' general objections and positions in this case, the Court understands the
proposal as limited to covered persons seeking benefits from the plaintiff states.  Even with this
understanding, though, this alternative would indirectly but unavoidably supply a benefit to
nonparties (i.e., the children and families receiving the relevant benefits).

that would arise from a state-by-state approach to citizenship, or the financial and administrative harms flowing from the chilling effect such an approach would have on noncitizens—including, and most especially, noncitizen parents of covered children living in the plaintiff states who would be eligible for, but less likely to avail themselves of, public health and other social services.  See notes 11–13, supra.  Nor have the defendants, who now urge the Court to view this alternative as unnecessarily broad, explained how they could feasibly implement an order like this without burdening the plaintiffs administratively or otherwise.

The final alternative the Court has considered is one it devised based on its post-CASA review of the case: an order requiring the defendants to continue issuing SSNs to all children covered by the Executive Order throughout the United States, including by leaving the existing EAB program in place.  The defendants alluded to such an alternative in their reply but urged its rejection, Doc. No. 197 at 4, and the Court raised it with the parties during the most recent hearing in this matter.  Under such an order, the defendants would be obligated to reimburse the plaintiffs for services provided to children covered by the Executive Order, and the children's eligibility could be verified using existing administrative processes by virtue of their receipt of the same type of SSN that would have issued absent the Executive Order.  Evaluating this option alongside the plaintiffs' evidentiary submissions, however, reveals that it does not avoid the defects that the Court identified when addressing the last two alternatives.  A regime under which children covered by the Executive Order would be eligible at birth for the full array of social services in a plaintiff state but not a non-plaintiff state would leave intact the confusion and chilling effect already discussed.[19]  Moreover, the record establishes that SSNs issued

---

[19] For example, parents who live in Camden, New Jersey, but welcome a newborn in a hospital a few minutes away in Philadelphia, could apply for their child's SSN through the EAB program at the hospital, but likely (and accurately) would be told that their child is not eligible for Medicaid

through the EAB program are used by state agencies to verify citizenship and eligibility for

various state- and federal-benefits programs, using federal database(s) and state systems derived

from or depending on them.

      The Court has serious reservations about the workability, and the potential for

unanticipated consequences, of this final alternative in light of the uncertainty that would arise if

citizen-specific SSNs were issued to a swath of children whose citizenship is denied by the

Executive Order and might be subject to change or question depending on where a person is

located.  Although one can imagine the foregoing possibly working, imagination is not the stuff

of judicial decisions.  In contrast, the existing injunction is clear, simple and workable: The

defendants may not enforce the Executive Order while this lawsuit proceeds.  The plaintiffs have

demonstrated myriad defects with any proposal narrower than the injunction originally entered.

The defendants have offered nothing beyond the bland assurance they will comply with the

Court's order, whatever it may require, and the suggestion that any administrability questions

could be addressed later.  See Doc. No. 201 at 65 ("I can tell you we'll comply, but I can't tell

you exactly how we will do that.").  They submitted no evidence and provided no detail

concerning any narrower alternative for the Court to consider.  They did not say any proposal

was vetted with any persons responsible for its implementation.

      The defendants' approach fails to persuade.  The Court must craft an injunction which

complies with Rule 65(d) and long-established equitable principles.  On the record before the

Court, this final possible alternative does not adhere to those requirements.  The questions the

---

(because Pennsylvania is not a plaintiff here).  It would then fall to New Jersey to reach out to
the family, resolve the confusion, and take steps to enroll the child in a program outside of the
process that otherwise would have applied at the time of a birth in a New Jersey hospital.  See
note 11, supra.  The foregoing burdens are not "self-inflicted injuries," Doc. No. 197 at 6, but
obligations imposed on the plaintiffs by federal law, see note 12, supra.

defendants have not addressed in writing or explored with evidence, and could not answer at the hearing, do not concern minor ministerial issues. They bear on substantial, vague provisions that would govern complex government programs impacting real people's lives—including the real public servants working in innumerable agencies within the plaintiff states and municipalities to serve the needs of their residents. The defendants have done nothing to assure the Court that they fully grasp the potentially sweeping and disruptive effects of any misstep in implementation. With stakes this high, the Court simply cannot adopt the defendants' blasé approach to the details and workability of a more limited injunction.

In sum, the Court declines to adopt any of the narrower proposals discussed by the parties throughout the pendency of this case or identified by the Court in its own review. None of the alternatives would sufficiently protect the twenty plaintiffs before this Court against the harms they have established via uncontested and detailed factual submissions describing the imminent effects that would arise from implementation of the Executive Order. Cf. Washington v. Trump, --- F.4th ----, 2025 WL 2061447, *16–17 (9th Cir. July 23, 2025) (finding no abuse of discretion by district court determination that universal injunction was necessary to prevent irreparable pocketbook and administrative injuries to other states challenging same Executive Order).

III.    CONCLUSION

The Court finds again, as it did before, that the plaintiffs have met their burden of establishing entitlement to "complete" preliminary injunctive relief in a form that protects them against the irreparable financial and administrative burdens that they have shown the facially unlawful Executive Order would visit upon them. The plaintiffs have done so by advancing persuasive legal arguments backed by a formidable evidentiary showing. In other words, they have put in the hard work of marshaling the facts and the law to support the causes of action and requests for relief they articulate in this lawsuit. This is what parties—especially those

represented by experienced and capable counsel—are expected to do in litigation occurring in courts across this country each day.

The defendants opted for a different approach.  Initially and again now, they neither challenged nor rebutted the plaintiffs' evidentiary showing.  Rather than engaging seriously with the one question as to which they partially prevailed on appeal and which the Supreme Court expressly directed the lower courts to reckon with on remand, the defendants complained about the Court's briefing order, sought to reopen questions that are not properly before this Court now, and quibbled about whether they should be required to participate meaningfully in the process of devising and evaluating narrower alternatives to the Court's original order.  They need not "write their own injunction," but they must do something to help transform an idea into terms the Court can express in a feasible, specific injunction that is consistent with other federal laws.

Despite the defendants' chosen path, the Court—aided substantially by the plaintiffs' meticulous factual and legal submissions—undertook the review required of it by CASA and considered anew whether its original order swept too broadly.  After careful consideration of the law and the facts, the Court answers that question in the negative.

For the foregoing reasons, no workable, narrower alternative to the injunction issued originally would provide complete relief to the plaintiffs in this case. The Court therefore declines to modify that injunction.[20] The Clerk shall transmit a copy of this Order to the Clerk of the Court of Appeals for the First Circuit.

SO ORDERED.

           /s/ Leo T. Sorokin_____
          United States District Judge

---

[20] Though the defendants have interpreted the original injunction as prohibiting internal planning and preparation for the Executive Order's implementation, this Court did not intend such a restriction, the First Circuit did not read the injunction as containing such a restriction, and the Supreme Court in CASA made abundantly clear that no such restriction survives its decision to grant the defendants a partial stay.